Case No. 24-3101

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

STATES OF KANSAS, IOWA, MONTANA, ALABAMA, ALASKA, GEORGIA, IDAHO, INDIANA, KENTUCKY, MISSOURI, NEBRASKA, NEW HAMPSHIRE, NORTH DAKOTA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, VIRGINIA, WEST VIRGINIA, WYOMING, AND PHILLIP JOURNEY, ALLEN BLACK, DONALD MAXEY, AND CHISHOLM TRAIL GUN ASSOCIATION,
*Plaintiffs-Appellants*,

v.

MERRICK GARLAND, in his official capacity as Attorney General of the United States, STEVEN DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms, & Explosives of the United States Department of Justice, and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS, & EXPLOSIVES,
*Defendants-Appellees.*

## APPELLANTS' OPENING BRIEF

Appeal from the United States District Court for the District of Kansas
Honorable Toby Crouse, District Court Judge
District Court Case No. 6:24-cv-01086-TC-TJJ

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. v

GLOSSARY ............................................................................... xii

PRIOR AND RELATED APPEALS ..................................................... xiii

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF THE ISSUE .............................................................. 1

INTRODUCTION ............................................................................ 1

STATEMENT OF THE CASE ............................................................... 2

    A. Federal Firearms Act of 1938 and Gun Control Act of 1968 .......... 2

    B. The Firearms Owners' Protection Act ..................................... 4

    C. The Bipartisan Safer Communities Act .................................... 8

    D. The Rule ...................................................................... 9

    E. The Plaintiffs ................................................................ 12

    F. Procedural Posture ......................................................... 18

SUMMARY OF THE ARGUMENT ....................................................... 19

ARGUMENT .............................................................................. 23

    I.    Plaintiffs Have Standing. ............................................. 24

       A. Individual Plaintiffs have standing. ................................. 25

       B. Plaintiff Chisholm Trail has standing. .............................. 30

       C. Plaintiff States have standing. ...................................... 31

    II.    Plaintiffs Are Likely to Succeed on The Merits ..................... 39

A. The Rule is Not in Accordance with Federal Law. ............... 40

    i.    Lack of statutory authority. ............................. 41

    ii.    Conflict with federal law. ............................... 45

    a.  Personal collection safe harbor ...................... 46

    b.  Rewriting "engaged in the business" .................. 48

    c.  Redefinition of proof of profit ........................ 50

B. The Rule is Arbitrary and Capricious ...................... 51

    i.    Multi-factor test .......................................... 52

    ii.    Sharp departure from past practice ................ 55

C. The Rule is Unconstitutionally Vague ..................... 56

    i.    Personal protection weapons ......................... 58

    ii.    Number of firearms ..................................... 59

    iii.    Byzantine nature ........................................ 59

D. The Rule Violates the Second Amendment ............... 60

III.    Plaintiffs will be Irreparably Harmed. ................... 63

IV.    The Balance of Harms Favors Plaintiffs ................. 64

CONCLUSION ................................................................. 64

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........... 65

CERTIFICATE OF COMPLIANCE ................................... 73

CERTIFICATE OF DIGITIAL SUBMISSION ..................... 74

CERTIFICATE OF SERVICE ........................................... 75

Attachment: District Court Order Filed 7/22/24 ................ 76

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ................................................................. 46

*Automated Mktg. Sys. Inc. v. Martin,*
   467 F.2d 1181 (10th Cir. 1972) ........................................... 40

*Baptist Mem'l Hosp. – Golden Triangle, Inc. v. Azar,*
   956 F.3d 689 (5th Cir. 2020) ............................................... 51

*Bennett v. Spear,*
   520 U.S. 154 (1997) ............................................................... 35

*Berdiev v. Garland,*
   13 F.4th 1125 (10th Cir. 2021). ......................................... 40

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023) .......................................................... 25

*Biden v. Sierra Club,*
   142 S. Ct. 56 (2021) .............................................................. 33

*Bittner v. United States,*
   598 U.S. 85(2023) ........................................................... 44, 45

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ............................................... 38

*Chamber of Commerce of U.S. v. Federal Election Comm'n,*
   69 F.3d 600 (D.C. Cir. 1995) ............................................... 25

*City of Chicago v. Morales,*
   527 U.S. 41 (1999) ................................................................. 57

*City of Oakland v. Lynch,*

798 F.3d 1159 (9th Cir. 2015) ........................................ 33, 37

*City of Sausalito v. O'Neill,*
  386 F.3d 1186 (9th Cir. 2004) ............................................. 35

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce,*
  127 Harv. L. Rev. F. 230 (2014) .......................................... 62

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ...................................................... 35

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ...................................................... 55

*Derma Pen, LLC v. 4EverYoung Ltd.,*
  773 F.3d 1117 (10th Cir. 2014) ......................................... 24

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .......................................................... 47

*Does 1-11 v. Board of Regents of University of Colorado,*
  100 F.4th 1251 (10th Cir. 2024) .................................... 40, 64

*Ezell v. City of Chicago,*
  651 F.3d 684(7th Cir. 2011) .............................................. 61

*Firearms Regul. Accountability Coal., Inc., et al. v. Garland, et al.,*
  112 F.4th 507 (8th Cir. 2024) ........................................... 55

*Florida v. Becerra,*
  544 F. Supp. 3d 1241 (M.D. Fla. 2021) .......................... 33, 37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
  528 U.S 167 (2000) ........................................................... 31

*Gardner v. Toilet Goods Association,*
  387 U.S. 167 (1967) .......................................................... 26

*Harmon v. City of Norman*,
   981 F.3d 1141 (10th Cir. 2020) .................................................. 24, 39

*Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*,
   874 F.3d 1226 (10th Cir. 2017) .......................................................... 63

*Kearney Reg'l Med. Ctr., LLC v. Dep't of Health & Human Servs.*,
   934 F.3d 812 (8th Cir. 2019) ............................................................. 52

*La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*,
   476 U.S. 355 (1986) ........................................................................ 41

*LeMoyne-Owen Coll. v. NLRB*,
   357 F.3d 55 (D.C. Cir. 2004) ....................................................... 52, 53

*Loper Bright Enters. v. Raimondo*,
   144 S. Ct. 2244 (2024) .................................................................... 41

*Louisiana v. Biden*,
   No. 2:24-CV-00406, 2024 WL 3253103
   (W.D. La. July 1, 2024) .................................................. 32, 35, 36, 37

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................ 25

*Maryland Shall Issue, Inc. v. Moore*,
   86 F.4th 1038 (4th Cir. 2023) ......................................................... 61

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) ........................................................... 53

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022) ............................................................... 61, 62

*Nelson v. Priap*,
   139 S. Ct. 954 (2019) ...................................................................... 45

*New York v. Yellen,*
    15 F.4th 569 (2d Cir. 2021) ..................................................... 32, 33, 35

*Oklahoma v. Biden,*
    577 F. Supp. 3d 1245 (W.D. Okla. 2021) ............................................ 33

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C.Cir. 1976) ................................................................ 34

*Range v. Attorney General,*
    69 F.4th 96 (3d Cir. 2023), *vacated on other grounds*, No. 23-374,
    2024 WL 3259661 (U.S. July 2, 2024) ................................................ 61

*Record Head Corp. v. Sachen,*
    682 F.2d 672 (7th Cir. 1982) ................................................................ 53

*Ross v. Blake,*
    578 U.S. 632 (2016) ................................................................................ 43

*Sackett v. EPA,*
    566 U.S. 120(2012) ................................................................................. 30

*Sierra Club v. Trump,*
    977 F.3d 853 (9th Cir. 2020) ..................................................... 33, 34, 37

*Stone v. INS,*
    514 U.S. 386 (1995) ................................................................................ 43

*StreetMediaGroup, LLC v. Stockinger,*
    79 F.4th 1243 (10th Cir. 2023) ............................................................ 57

*Susan B. Anthony v. Driehus,*
    573 U.S. 149 (2014) ................................................................................ 30

*Texas v. ATF,*
    2024 WL 2967340 (2024) ...................................................................... 37

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) ............................................................ 38

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ..................................................... 35, 38

*Tyler v. Hennepin Cnty.*,
598 U.S. 631 (2023) ..................................................................... 32

*Washington v. Trump*,
441 F. Supp. 3d 1101 (W.D. Wash. 2020) ................................... 33

*Wyoming v. U.S. Dep't of Interior*,
674 F.3d 1220 (10th Cir. 2012) .................................................. 34

## Statutes

18 C.F.R. § 478.102 ........................................................................ 29

18 C.F.R. § 478.124 ........................................................................ 29

18 U.S.C. § 921 ....................................................................... *passim*

18 U.S.C. § 922 ........................................................... 10, 29, 50

18 U.S.C. § 923 ..................................................... 13, 29, 45, 49

18 U.S.C. § 926 ................................................... 21, 41, 42, 56

27 C.F.R. § 478.13 ..................................................................... 60

27 C.F.R. § 478.11 ...................................................................... 11

27 C.F.R. § 478 ...................................................................... 55, 56

28 U.S.C. § 1331 ............................................................................ 1

ix

28 U.S.C. § 1292 ............................................................................ 1

5 U.S.C. § 706 ....................................................................... 40, 52

borders. Tenn. Code Ann. § 39-17-1316 ........................................ 13, 14

Kan. Admin. Regs. § 92-19-22a ..................................................... 12, 34

Tenn. Code Ann. § 39-17-1316 ...................................................... 37

Tenn. Code Ann. § 67-4-710 ......................................................... 12

## Other Authorities

131 Cong. Rec. at S9125 .............................................................. 6

132 Cong. Rec. at H1652 ............................................................. 6

Bipartisan Safer Communities Act,
   Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022) ..................... 8, 9

Definition of 'Engaged in the Business' as a Dealer in Firearms,"
   89 FR 28,968 (April 10, 2024)................................................. *passim*

Federal Firearms Act of 1938 ("FFA"),
   Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938) ............................ 2, 3

Federal Firearms Owners Protection Act,
   S. Rep. No. 98-583, Sen. Jud. Com., 98th Cong., 2d Sess., at 3
   (1984)..................................................................................... 5, 6

Firearm Owners Protection Act ("FOPA"),
   Pub. L. 99-308, 100 Stat. 449 (May 19, 1986) ............................. 6, 7, 8

Gun Control Act of 1968 ("GCA"),
   Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968)............................. 3, 42

S. Rep. No. 98–583, at 6 (1984) .................................................... 6

The Right to Keep and Bear Arms, Report of the Subcommittee on the Constitution, Sen. Jud. Comm.,
  97th Cong., 2d Sess., at 20 (1982) .................................................. 4, 42

# GLOSSARY

**ATF:**       Bureau of Alcohol, Tobacco, Firearms and Explosives

**BSCA:**     Bipartisan Safer Communities Act, Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022)

**FFA:**       Federal Firearms Act of 1938, Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938)

**FFL:**       Federal Firearms License

**Rule:**      "Definition of 'Engaged in the Business' as a Dealer in Firearms," 89 Fed. Reg. 28,968 (April 10, 2024)

**FOPA:**    Firearm Owners Protection Act, Pub. L. 99-308, 100 Stat. 449 (May 19, 1986)

**GCA:**     Gun Control Act of 1968, Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968)

**TBI:**       Tennessee Bureau of Investigation

# PRIOR AND RELATED APPEALS

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331. The district court denied Plaintiffs' motion for a preliminary injunction on July 10, 2024, and Plaintiffs filed their notice of interlocutory appeal on July 19, 2024. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) since the district court denied injunctive relief.

## STATEMENT OF THE ISSUE

Did the district court abuse its discretion in denying a preliminary injunction against Defendants' unlawful "Definition of 'Engaged in the Business' as a Dealer in Firearms" Rule?

## INTRODUCTION

Defendants have instituted an unlawful Rule that requires virtually anyone who sells a firearm "predominantly for a profit" to obtain a federal license or face civil and even criminal penalties. The Rule is entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms." 89 FR 28,968 (April 10, 2024). As all federal firearms licensees are required to perform background checks before selling firearms, the Rule attempts to ensure near-universal background checks for firearm purchases. It also turns ordinary citizens into felons for engaging in otherwise lawful behavior. The Rule violates the

Constitution, unlawfully rewrites the statute it claims to interpret for its authority, and violates the Administrative Procedure Act ("APA").

The Rule has caused (and will continue to cause) irreparable harm to individual, organizational, and State Plaintiffs who sought injunctive relief. Because the district court applied the wrong legal standard, those parties were denied a preliminary injunction. This improper application of a legal standard was an abuse of discretion. The only avenue the Plaintiffs have for relief is this Court, and they request that it reverse the lower court's improper denial of a preliminary injunction.

## STATEMENT OF THE CASE

### A. Federal Firearms Act of 1938 and Gun Control Act of 1968

For the first 150 years of our nation's history, there was no significant regulation of firearms possession and transfers. The first licensing requirement for firearms dealers took place when Congress enacted the Federal Firearms Act of 1938 ("FFA"), Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938). It required "[a]ny . . . dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce" to apply for a license with "the Secretary of the Treasury, who shall prescribe by rules and regulations

the information to be contained in such application." *Id.* § 3, 52 Stat. at 1251. Once the applicant paid the prescribed fee, the Secretary was required to issue the license. *Id.* § 3, 52 Stat. at 1251. The FFA defined a "dealer" as "any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breach mechanisms to firearms." 52 Stat. at 1250.

Thirty years later, Congress passed the Gun Control Act of 1968 ("GCA"), Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968). The GCA sought to prevent "crime and violence" without "intending to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 82 Stat. at 1213–14. The GCA's definition of "dealer" largely tracked the FFA's definition: it defined "dealer" as "(A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a

pawnbroker." 82 Stat. at 1216 (codified at 18 U.S.C. § 921(a)(11)).

## B.     The Firearms Owners' Protection Act

In late 1979 and early 1980, Congress held hearings to investigate accusations that ATF was utilizing questionable techniques to generate arrests. The Right to Keep and Bear Arms, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 20 (1982). The report of the Senate Subcommittee on the Constitution among other things summarized the jarring evidence it received, concluding:

- The "enforcement tactics made possible by current federal firearms laws are constitutionally, legally and practically reprehensible." *Id.*

- "Although Congress adopted the Gun Control Act with the primary object of limiting access of felons and high-risk groups to firearms, the overbreadth of the law has led to neglect of precisely this area of enforcement." *Id.*

- ATF's statistics showed "that in recent years the percentage of its arrests devoted to felons in possession and persons knowingly selling to them have dropped from 14 percent down to 10 percent of their firearms cases." After the hearings, ATF said "that 55 percent of its gun law prosecutions overall involve persons with no record of a felony conviction, and a third involve citizens with no prior police contact at all." *Id.*

- The Subcommittee found that ATF had "primarily devoted its firearms enforcement efforts to the apprehension, upon

technical malum prohibitum charges, of individuals who lack all criminal intent and knowledge." *Id.*

• The Subcommittee also found that ATF "[a]gents anxious to generate an impressive arrest and gun confiscation quota [had] repeatedly enticed gun collectors into making a small number of sales—often as few as four—from their personal collections," even though each of the sales "was completely legal under state and federal law." *Id.* ATF still "charged the collector with having 'engaged in the business' of dealing in guns without the required license," which saddled "numerous collectors . . . [with] a felony record carrying a potential sentence of five years in federal prison" even though many had "no criminal knowledge or intent." *Id.*

• The Committee also received expert evidence "establishing that approximately 75 percent of [ATF] gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." *Id.* at 23.

Two years later, the Senate Judiciary Committee issued a report showing "the urgent need for changes [to federal firearms law] to prevent the recurrence of [ATF] abuses documented in detail in earlier Committee hearings and in hearings held by other Committees." Federal Firearms Owners Protection Act, S. Rep. No. 98-583, Sen. Jud. Com., 98th Cong., 2d Sess., at 3 (1984) (footnoted omitted). It explained that many hobbyists sold firearms from their personal collections; and many were charged and convicted for selling without a license, based on courts' broad reading of the GCA's reach. *Id.* at 8. And it declared that

the proposed bill would "narrow" the GCA's "broad parameters by requiring" that dealers "undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.* Both Senator Hatch and Representative Volker, sponsors of the bill in the Senate and House, highlighted ATF's improper focus on small-scale local sales that demonstrated Congress's concerns with ATF. *See* 131 Cong. Rec. at S9125; 132 Cong. Rec. at H1652.

Congress found that "additional legislation [was necessary] to correct existing firearms statutes and enforcement policies." 100 Stat. at 449 (detailing need to safeguard citizens' Second, Fourth, and Fifth Amendment rights and to prevent the "unconstitutional exercise of authority" under the Ninth and Tenth Amendments). Congress also found "additional legislation [was] needed to reaffirm [its] intent," as expressed in the GCA, that this title did not intend to impose "undue or unnecessary . . . burdens on law-abiding citizens" in the lawful "acquisition, possession or use of firearms" or to "discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.*

Congress responded to these abuses with the Firearm Owners

Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (May 19, 1986); *see also* S. Rep. No. 98–583, at 6 (1984). In doing so, Congress made several findings. First, "the rights of citizens . . . require additional legislation to correct existing firearms statutes and enforcement policies." 100 Stat. at 449 (codified at 18 U.S.C. § 921 Note). Second, "additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968." *Id.* Recognizing that need, the FOPA clarified that "it is not the purpose of this title to place undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, personal protection, or any other lawful activity." *Id.* And, importantly, the FOPA reiterated that it "is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.*

The FOPA narrowed the definition of "dealer" by defining "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive

purchase and resale of firearms." 100 Stat. at 450 (to be codified at 18 U.S.C. § 921(a)(21)). Importantly, the FOPA expressly excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* Critically here, Congress used the plural terms "sales, exchanges, [and] purchases." Also, the FOPA allowed private individuals from making a profit when "such occasional *sales*" occurred. *Id.* (emphasis added). It also narrowed the definition of "dealer" by defining "with the principal objective of livelihood and profit" as an intent that "the sale or disposition of firearms is predominantly [to] obtain livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* (to be codified at 18 U.S.C. § 921(a)(22)).

## C.   The Bipartisan Safer Communities Act

In 2022, Congress passed a narrow amendment to the GCA in the Bipartisan Safer Communities Act, Pub. L. Section 3 of 117–59, 136 Stat. 1313 (2022) ("BSCA"). The BSCA amended the definition of "dealer" in two ways. First, it replaced "with the principal objective of livelihood and profit" with "to predominantly earn a profit." *Id.* § 12002,

136 Stat. at 1324. Second, it defined "to predominantly earn a profit" as an "intent underlying the sale or disposition of firearms [that] is primarily one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* at 1325. The only difference between the FOPA's definition of intent— "primarily one of obtaining livelihood and pecuniary gain"—and the BSCA's definition—"primarily one of obtaining pecuniary gain"—was the BSCA's omission of "livelihood." *See id.*

## D.    The Rule

The Rule Plaintiffs challenge here, "Definition of 'Engaged in the Business' as a Dealer in Firearms," 89 FR 28,968 (April 10, 2024) ("the Rule"), took the statutory tweak in the BSCA and used it as a pretext for creating an entirely different definition of what it means to be "engaged in the business" as a firearms dealer. While the BSCA altered the requisite level of motive to constitute being "engaged in the business," it did not alter the requirement for a "regular course" of trade involving "repetitive" transactions of "firearms." By contrast, the Rule states "even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to

require a license." 89 FR 28,976; 29,091.

Importantly, the Rule also narrows the explicit safe harbor that Congress created in the FOPA. 18 U.S.C. § 921(a)(21)(C) excludes someone from being "engaged in the business" if that person "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." But the Rule purports to change this unqualified exception by redefining the term "personal collection" as:

> Personal firearms that a person accumulates for study, comparison, exhibition (e.g., collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (e.g., noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit . . . . In addition, *the term shall not include firearms accumulated primarily for personal protection*.

89 FR 29,090 (emphasis added) (to be codified at 27 C.F.R. § 478.11).

The Rule also states that if someone "restocks" their personal collection after selling a firearm, they may not be subject to the exemption for selling from a personal collection. *Id.* at 29,092.

In addition to redefining already-defined statutory terms, the Rule creates a series of five presumptions—three of which are multipart— any one of which ATF will use to presume someone is dealing in firearms. *See* 89 FR 29,091. Indeed, the Rule has exceptions to those presumptions that have their own exceptions. *See id.* This multi-tiered, multifactor test results in a nebulous standard that makes it impossible to identify who and what conduct is covered under the Rule.

For example, ATF will presume someone is "engaged in the business of dealing in firearms" when they "[r]esell[] or offer[] for resale firearms, *and also represent*[] to potential buyers or otherwise *demonstrate*[] *a willingness and ability* to purchase and resell additional firearms." *Id.* (emphases added). Therefore, just offering to sell one gun and then suggesting the possibility that a subsequent sale could occur fits this presumption. But the GCA does not criminalize such conduct. *See* 18 U.S.C. §§ 921(a)(11)(A) and (21)(C) (defining "dealer" and "engaged in the business"); 922 (unlawful acts). Although this presumption is—and the other four—are rebuttable, they are not exhaustive of the conduct that could require a person to obtain a license. 89 FR 29,092.

The Rule acknowledges that it will produce several effects on those who sell firearms without a license. The first is that a significant number of them will become federal firearms licensees and be compelled to abide by the new regulations. *Id.* at 29,898. A second anticipated effect is that there will be many individuals who stop selling firearms altogether. *Id.* at 29,054. The Rule places that number at 10%. *Id.* The Rule took effect May 20, 2024. *Id.* at 28,968.

## E.    The Plaintiffs

Plaintiffs are a collection of individuals, an organization, and states that are harmed in various ways by the Rule.

Plaintiff Phillip Journey is a firearms collector and hobbyist residing in Wichita, Kansas. Appx. Vol. I, at 86–87. He is a state court judge; and in his spare time, he is a shooting-sports coach and instructor. *Id.* at 86. He is an American citizen. *Id.* He attends 4-5 gun shows every year where he buys and sells firearms for and from his personal collection that includes firearms considered self-defense weapons. *Id.* at 87. Journey is not currently a federal firearms licensee. *Id.* Journey does not wish to give up selling firearms from his personal collection at gun shows, but the Rule makes him believe that he will

potentially be subject to civil, administrative, and possibly criminal penalties if he does so. *Id.* at 89–94. As discussed below, several of the Rule's definitions are written so broadly that they cover conduct that Congress left lawful under the statute or are written so narrowly that they eviscerate explicit statutory protections for personal collections such as Journey's—creating uncertainty for Journey as to the lawful nature of certain firearm sales without a federal firearm license. The requirements of becoming a federal firearms licensee would be burdensome on him as someone who buys, sells, and collects firearms as a hobby. *Id.*

Plaintiff Allen Black is a firearms hobbyist and enthusiast who maintains a personal collection of firearms including self-defense weapons, which he has accumulated over many years and which he actively seeks to expand by attending gun shows. *Id.* at 95–96. Black attends approximately 4-5 gun shows every year, where he buys and sells firearms from his personal collection. *Id.* at 96. Black is not a federal firearms licensee. *Id.*

Plaintiff Donald Maxey is also a firearms hobbyist and enthusiast who maintains antique firearms, some reproductions of antique

firearms, several modern sporting rifles and shotguns, and several revolvers which he depends on for self-defense. *Id.* at 101–02. Maxey attends approximately three gun shows every year. *Id.* at 102. At those gun shows, Maxey purchases firearms to add to his personal collection. *Id.* at 101. He also provides guidance to other gun show attendees on which firearms they should purchase. *Id.* at 102. He is not a federal firearms licensee. *Id.*

Plaintiff Chisholm Trail is a Kansas not-for-profit corporation founded in 1957 in Wichita, Kansas. *Id.* at 98. Chisholm Trail was organized to serve the interests of collectors and shooters of antique and antique-replica firearms and to help preserve the craftsmanship and the history of the arms of our forefathers for the enlightenment and enjoyment of future generations. *Id.* at 99. Chisholm Trail is not a federal firearms licensee, nor are most of its members, including Allen Black and Donald Maxey, who attend gun shows each year where they buy and sell firearms for and from their personal collections. *Id.*

Chisholm Trail sponsors and manages a biannual gun show each year and relies on the proceeds generated from these events to fund its annual club activities. *Id.* Approximately 70% of Chisholm Trail's

annual operating expenses are covered by revenue generated by these two shows. *Id.* Chisholm Trail also collects and pays sales tax to the State of Kansas for table rental fees charged during their gun shows. *Id.* at 100. During the most recent fiscal year, Chisholm Trail paid $4,005.72 in sales tax to the State of Kansas. *Id.*

Plaintiffs Alabama, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Missouri, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia, and Wyoming all have a sales tax that applies to the sale of firearms at gun shows and/or online platforms. Plaintiff Kansas also charges a tax on the sale of admission tickets to gun shows. *See* Kan. Admin. Regs. § 92-19-22a(a)(4), (b)(1). Plaintiff Tennessee charges a similar fee. Tenn. Code Ann. § 67-4-710.

Plaintiff Tennessee runs background checks and collects data on each licensed firearm transaction within its borders. Tenn. Code Ann. § 39-17-1316. Tennessee uses the same statutory language as federal law when defining a gun dealer for licensing purposes. *Id.* The relevant statute, Tennessee Code Ann. § 39-17-1316, incorporates 18 U.S.C. § 921's definition of a gun dealer, as well as any associated requirements imposed by federal regulation—including all applicable

licensing regimes under 18 U.S.C. § 923. *Id.* at § 39-17-1316(b)(2).

Each month, Tennessee evaluates tens of thousands of firearm transactions through a statewide law enforcement agency known as the Tennessee Bureau of Investigation ("TBI"). In 2023, TBI evaluated 570,184 firearm transactions.[1] Tennessee requires that such transactions and background checks be verified immediately so a dealer may be informed how to proceed with a transaction. Tenn. Code Ann. § 39-17-1316(d). A dealer is required to send purchaser identification, the purchaser's social security number, date of birth, name, and gender, firearm information, the business name of the gun dealer, the location of the transfer, and the dealer's FFL information, all directly to TBI for verification and background check purposes. *Id.* § 39-17-1316(c). Should the identity of a purchaser be in question, TBI may require thumbprints to be collected by the dealer and sent to a law enforcement agency for evaluation. *Id.* § 39-17-1316(g). Should a purchaser be denied, especially on grounds related to criminal history, he has a right to appeal such a

---

[1] TBI, TICS/Firearm Background Checks, https://www.tn.gov/tbi/divisions/cjis-division/firearm-background-checks.html (information may be found by clicking on "2023"); Appx. Vol. I, at 40.

determination. *Id.* § 39-17-1316(*o*).

If the purchaser and TBI are unable to locate final disposition information within 15 days, TBI will inform the dealer that they may conditionally proceed with a sale and the federal firearms licensees may transfer the firearm. *Id.* If it is later found that the firearm transaction was initially properly denied, TBI will take actions to implement the recovery of the wrongfully transferred firearm. *See id.* The Rule also notes that Plaintiff Tennessee is required to run a background check on every firearm sale within the State that involves a federal firearms licensee. 89 FR 29,065. The Rule expects an increase in background checks and notes that it is state law enforcement agencies in Tennessee that conduct these background checks. *Id.* at 29,088. This will likely result in an increase in administrative costs and reallocation of law enforcement resources for Plaintiff Tennessee.

Plaintiff New Hampshire is also a partial point of contact state for the federal government for the purposes of the National Instant Criminal Background Check System ("NICS"). *See* Appx. Vol. I, at 105. Its Permits and Licensing Unit of the Division of State fulfills that role. *Id.* Federal firearms licensees contact the state for purchases of

handguns, the frame or receiver of any firearm, firearm mufflers, and firearms silencers. *Id.* As noted above, the Rule expects an increase in background checks. 89 FR 29,088. This will increase administrative costs and reallocation of law enforcement resources for Plaintiff New Hampshire. Appx. Vol. I, at 105–06.

## F. Procedural Posture

On May 1, 2024, before the Rule went into effect, Plaintiffs filed suit in the Eastern District of Arkansas, challenging the Rule. *Id.* at 27–77. A few days later, Plaintiffs filed a motion asking the court to preliminarily enjoin Defendants from enforcing the Rule. *Id.* at 78–85. On May 17, the district court in the Eastern District of Arkansas held a hearing on the preliminary injunction. *See* Appx. Vol. II, at 74; Vol. III, at 117. Six days later (after the Rule had taken effect), that district court found Plaintiff Arkansas did not have standing and therefore venue was improper. Appx. Vol. II, at 74–78. So, it transferred the case to the District of Kansas. *Id.* at 80.

Plaintiffs immediately filed a motion for a hearing and a temporary restraining order in the District of Kansas. *Id.* at 81. That court denied the TRO and instead issued a scheduling order for briefing

on a preliminary injunction. Appx. Vol. I, at 19. Plaintiffs filed another motion for a preliminary injunction. Appx. Vol. II, at 99. They argued the district court should grant preliminary relief on the same grounds already argued in Arkansas. In support of the motion, Plaintiffs provided ten affidavits from people with knowledge of firearms dealing generally and gun shows specifically (including from Individual Plaintiffs themselves) as evidence of their irreparable injuries and of the Rule as the cause thereof. *See id.* at 134–41, 156–226.

The district court held a hearing on the renewed motion on July 1. On July 10, the court denied the preliminary injunction, and Plaintiffs now appeal.

## SUMMARY OF THE ARGUMENT

The district court denied Plaintiffs' motion for a preliminary injunction because it incorrectly found they were not substantially likely to succeed on the merits. The district court first expressed skepticism about whether Plaintiffs will be able to establish standing. But Plaintiffs have clearly established standing as individuals, an organization, and States.

The individual Plaintiffs attend multiple gun shows each year and buy or sell firearms. They are justifiably concerned that the Rule will require them to become federal firearms licensees, cease selling firearms, or risk civil and criminal penalties. This quandary constitutes a cognizable injury that provides them with standing.

Plaintiff Chisholm Trail also has standing. Not only does it have members whose purchase and sale of firearms relate to the purpose of the organization, but it also organizes biannual gun shows that cover a significant portion of its operating expenses. The Rule will lead to a decrease in firearms sales at guns shows, injuring Chisholm Trail.

In addition, the Plaintiff States have standing. They collect taxes from the sales of firearms and from table rentals at and admissions to gun shows. The Rule will cause them to lose tax revenue, which is sufficient to provide them with standing. Tennessee and New Hampshire also have standing due to administrative costs they will incur. The Rule will require them to run increased background checks, a financial injury, or change their laws, a sovereign injury.

Apart from its standing analysis, the district court also found the Plaintiffs had not shown they were substantially likely to succeed on

their substantive arguments, despite noting that Plaintiffs had identified "serious flaws" with the Rule and "instances where the Rule may have effectively attempted to rewrite the statute, which the agency may not do." Appx. Vol. III, at 11. Plaintiffs have identified four legal flaws with the Rule: (1) the Rule is contrary to federal law and exceeds Defendants' statutory authority, (2) it is arbitrary and capricious, (3) it is unconstitutionally vague, and (4) it violates the Second Amendment. The district court's failure to recognize that Plaintiffs are substantially likely to succeed on at least one of these claims was a legal error that amounts to an abuse of discretion.

First, the Rule both exceeds Defendants' statutory authority and conflicts with federal law. Congress has given Defendants no authority to adopt the Rule. Rather, 18 U.S.C. § 926(a) limits Defendants' authority to adopt "*only* such rules and regulations as are *necessary* to carry out the provisions of this chapter." (emphasis added). The legislative history and structure of the statute confirms this limitation. And the Rule is not "necessary" because Congress has already provided its own definition of "engaged in the business," the phrase the Rule seeks to redefine.

Even if Defendants could define an already statutorily defined term, they certainly cannot adopt a definition that conflicts with the statute. But that is exactly what they have done, in multiple ways. The Rule eviscerates the statutory safe harbor for those who sell from their personal collections, it rewrites the definition of "engaged in the business" to include those who sell or attempt to sell even a single firearm, and it redefines proof of profit.

Second, the Rule is arbitrary and capricious. The Rule creates a convoluted multi-factor test as to whether someone is a firearms dealer that Defendants intend to flesh out through case-by-case adjudication. Yet the Rule fails to provide predictability and intelligibility to regulated parties, which is particularly important given the severe criminal consequences of violating the Rule. The Rule also represents a sharp departure from past practice. Defendants have offered no reasonable explanation for this radical change; only an implausible pretext.

Third, the Rule is unconstitutionally vague. The elimination of the safe harbor for personal collections provides no guidance as to when a weapon is considered to be purchased primarily for personal protection,

the Rule creates confusion as to when a person might be covered based on selling or attempting to sell just one firearm, and the Byzantine structure of the Rule encourages arbitrary and discriminatory enforcement.

Finally, the Rule violates the Second Amendment. For the Rule to survive a Second Amendment challenge, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearms regulation, but Defendants have presented no evidence of this. In fact, the historical evidence points in the opposite direction.

While the district court denied a preliminary injunction because of its erroneous legal conclusion that Plaintiffs had failed to establish  a substantial likelihood of success on the merits, Plaintiffs have established the remaining factors as well. The district court's denial of Plaintiffs' motion for a preliminary injunction should be reversed.

## ARGUMENT

In order to obtain a preliminary injunction, Plaintiffs must show that (1) "they are substantially likely to succeed on the merits of their claims," (2) "they will suffer irreparable harm if the injunction is

denied," (3) "their threatened injury without the injunction outweighs any harm to the party opposing the injunction," and (4) "the injunction, if issued, is not adverse to the public interest." *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020).

The district court denied an injunction because it incorrectly found the Plaintiffs were not substantially likely to succeed on the merits. While this Court reviews the district court's denial of a preliminary injunction for an abuse of discretion, legal questions are reviewed de novo. *See Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119–20 (10th Cir. 2014) ("[H]ere, the district court relied largely on likelihood of success. Because this element involves interpretation of the distribution agreement, we conduct de novo review of the district court's conclusions on likelihood of success.").

## I. Plaintiffs Have Standing.

The district court incorrectly applied caselaw and concluded Plaintiffs' standing was "speculative" to some degree. Appx. Vol. III, at 8. This conclusion does not mean the district court found Plaintiffs had failed to establish standing at all, and therefore is not directly an issue on appeal. However, the district court's flawed conclusion regarding

Plaintiffs' standing was intertwined with its conclusion that Plaintiffs were unlikely to succeed on the merits.

Contrary to the district court's conclusion, Plaintiffs have clearly demonstrated standing as individuals, an organization, and states. This Court only needs to be convinced that at least one of them has standing in order for the claims to proceed. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023). However, all Plaintiffs have standing.

## A. Individual Plaintiffs have standing.

It is well established that "an agency rule, unlike a statute, is typically reviewable without waiting for enforcement." *Chamber of Com. of U.S. v. Fed. Election Comm'n*, 69 F.3d 600, 604 (D.C. Cir. 1995) (internal citation omitted). And when the plaintiff is the object of the government regulation, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. Therefore, in the APA context, pre-enforcement judicial review is the norm, especially when the plaintiff is the object of the regulatory action. This makes sense. The alternative is that anyone seeking to challenge an agency action would be required to demonstrate how their

conduct violated the new regulation or to wait for enforcement proceedings before seeking judicial review. But that is not what the law requires.

The choice of whether to comply with an unlawful agency rule (and incur costs associated with compliance) or face the consequences establishes standing in the APA context. In *Gardner v. Toilet Goods Association*, 387 U.S. 167, 172–173 (1967), the Supreme Court found standing where the party challenging an action was placed in a "quandary" where they could either test the regulations by waiting for enforcement actions or comply with the regulation and associated costs. Here, Individual Plaintiffs are in a "quandary" where they (1) could take a risk and see what happens by continuing in their otherwise lawful behavior, (2) get a license to sell firearms and incur the costs associated with it, or (3) stop selling firearms altogether. That alone suffices to confer standing. Because Individual Plaintiffs are regulated by the Rule and will undeniably face harm absent judicial intervention—and already have incurred harm by having to cease exercising their constitutional rights because of the Rule—they possess standing.

Plaintiff Journey attends four to five gun shows a year and buys or sells firearms at most of them. Appx. Vol. I, at 87. Journey owns firearms for personal protection, and he sells firearms for various reasons. *Id.* As he noted, the Rule could require him to obtain a federal firearm license ("FFL") if he engages in "even a single firearm transaction or offer to engage in a transaction." *Id.* at 90 (quoting 89 FR 29,091). So, if the Rule is allowed to remain in effect, Journey "believe[s] that [he] will have to give up selling firearms or register as [a licensee]." *Id.* at 89. This will have an immediate impact on him because he intends to attend gun shows (where he intends to buy and sell firearms) in the near future, and the license application process is burdensome and takes several months to complete. *Id.* at 90. He is harmed regardless of whether he is forced to unnecessarily apply for a license or he skips the shows. There is a realistic danger that he will be subject to penalties, and his injury is certainly impending.

Plaintiff Black likewise attends multiple gun shows a year where he buys and sells firearms. *Id.* at 96. He has reviewed the Rule and believes that it applies to him and his purchases and sales—a supposition he is better suited to make at this time than Defendants.

*Id.* If the Rule is allowed to remain in effect, he will either need to register as a licensee, which is a burdensome and time-consuming process, or stop buying and selling firearms altogether. *Id.* He is concerned that if he does not, an otherwise perfectly legal sale or offer to sell will put him at risk of "civil, administrative, and possibly criminal penalties." *Id.* at 97.

Plaintiff Maxey attends three gun shows a year and regularly purchases firearms. *Id.* at 102. He is aware that the Rule will decrease the number of people who sell firearms at gun shows. *Id.* This will impact his constitutional and statutory rights to acquire firearms.

Individual Plaintiffs do not want to become licensees. Becoming a licensee is a cumbersome process that takes months and costs $200. By the time a license is approved (if it is), Individual Plaintiffs will have had to decide whether to attend upcoming gun shows (and risk enforcement) or decline to exercise their Second Amendment rights. Once someone has a license, there are extensive obligations and burdens. *See, e.g.*, 18 U.S.C. §§ 923(g)(1)(A); 923(g)(1)(B)(ii)(I); 923(d)(1)(E); 922(t)(1)(A); 18 C.F.R. § 478.102(a); *see also id.* § 478.124(a)–(b). And a licensee is subject to warrantless record

inspections if he becomes involved in a criminal investigation. *See* 18 U.S.C. § 923(g)(1)(B)(i).

All three Individual Plaintiffs reasonably believe the Rule applies to conduct they regularly (and legally) engage in. Among other things, all three sell and/or buy firearms for personal protection, which are excluded from the definition of "personal collection" in the Rule. Two of them attend and sell firearms at multiple gun shows a year, which may or may not constitute "occasional" sales under the Rule, because it does not define the term and because it suggests even one sale (or contemplated sale) is sufficient to qualify someone as "engaged in the business." *See* 89 FR 29,091.

Individual Plaintiffs do not need to declare an intent to break the Rule in order to challenge it. Their simple desire to do something in the future that could result in prosecution is sufficient to establish a "cognizable injury" for the purposes of standing, especially when they have established a specific date in the future or plan to do the prohibited thing. *Susan B. Anthony v. Driehus*, 573 U.S. 149, 161 (2014). Individual Plaintiffs must simply establish "an intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Id.*; *see also Sackett v. EPA*, 566 U.S. 120, 127 (2012). Individual Plaintiffs have articulated in their declarations a desire and intent to do the very thing in the future that has been prohibited by the Rule (sell firearms multiple times a year without an FFL). This "cognizable threat" of potential prosecution based on the potential future conduct of Individual Plaintiffs is enough to refute the government's claim on this front. Individual Plaintiffs face a realistic, imminent threat of danger or else are chilled from exercising their Second Amendment rights. They have standing.

## B.      Plaintiff Chisholm Trail has standing.

Plaintiff Chisholm Trail also has standing. Both Plaintiffs Maxey and Black are members of Chisholm Trail, *see* Appx. Vol. I, at 99, and both have standing. Both Plaintiffs declared that they own, sell, or purchase firearms repeatedly throughout the year. The firearms that Black and Maxey sell and purchase can be used for personal protection, and thus fall within the ambit of the Rule.

Black and Maxey's activities relate to the purpose of the organization, and, therefore, it has standing. *Friends of the Earth, Inc.*

*v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S 167, 181 (2000). Chisholm Trail's injuries are concrete and particularized. In his declaration, Jim Fry outlined how approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by the biannual gun shows they organize. Appx. Vol. I, at 99. Since private party sales of firearms are what dominate these gun shows, the Rule will drive down attendance and revenue for the organization (because there will be fewer people willing to risk selling a firearm without becoming a licensee). In the weeks that the Rule has been in effect, there has been a drop of 30% in the number of unlicensed vendors at gun shows. Appx. Vol. II, at 136. Last fiscal year, Chisholm Trail paid sales tax to Kansas for table rental fees charged during their gun shows in the amount of $4,005.72. Appx. Vol. I, at 100. The loss of even a relatively small amount of the revenue generated by these gun shows would cause financial harm to both Chisholm Trail and Kansas in the form of tax revenue. Consequently, Chisholm Trail also has standing.

C. **Plaintiff States have standing.**

As with the Individual Plaintiffs and Plaintiff Chisholm Trail, the district court expressed doubts about the States' standing. Specifically,

the district court noted that the States' claim appeared to rely on a speculative chain of causality. But the Complaint and declarations submitted in support of a preliminary injunction clearly show the States have suffered an injury in fact in two distinct ways: loss of tax revenue and (for Tennessee and New Hampshire) financial and sovereign harms. Those injuries are traceable to Defendants' Rule and are redressable by the courts.

Starting with loss of tax revenue, Plaintiff States have already lost and will continue to lose tax revenue as a result of the Rule. Monetary loss is an injury-in-fact for the purposes of standing. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023); *accord Yellen*, 15 F.4th at 576. There is no argument that the States' specific monetary loss—loss of tax revenue—is a cognizable injury. As courts have repeatedly held, States have standing to challenge federal policies that cause them to lose specific tax revenues. *See, e.g., Louisiana v. Biden*, No. 2:24-CV-00406, 2024 WL 3253103, at *10 (W.D. La. July 1, 2024) ("Plaintiff States have sufficiently alleged that they have and will suffer an injury-in-fact that is actual and imminent based on their allegations of loss of specific tax revenues."); *Oklahoma v. Biden*, 577 F. Supp. 3d 1245, 1253

(W.D. Okla. 2021); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021); *Sierra Club v. Trump*, 977 F.3d 853, 870 (9th Cir. 2020) ("Economic loss and the loss of tax revenues can be sufficient to establish Article III injury in fact."), *cert. granted, judgment vacated on other grounds sub nom. Biden v. Sierra Club*, 142 S. Ct. 56 (2021); *Washington v. Trump*, 441 F. Supp. 3d 1101, 1114 (W.D. Wash. 2020) ("Washington's expected loss of tax revenue is sufficient to confer standing."); *City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (loss of tax revenue, "either directly through income taxes or indirectly through customer sales taxes," "constitutes injury under Article III."); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1254 (M.D. Fla. 2021) ("Florida ... suffers a concrete economic injury resulting from reduced revenue and increased unemployment spending.").

Plaintiff States collect revenue from the sales of firearms (whether at gun shows or online) and from table rentals at gun shows. *See* Appx. Vol. I, at 45–49 (collecting statutes). For example, Plaintiff Kansas collects a 6.5% sales tax on both admissions and sales of firearms during gun shows. Kan. Admin. Regs. § 92-19-22a(a)(4), (b)(1). The Fry declaration makes clear that Plaintiff Chisholm Trail pays these taxes

when its members and other members of the public attend the gun shows it puts on. Appx. Vol. I, at 100. The record is clear that Plaintiff States will lose and are losing tax revenue. So, they have suffered an injury-in-fact.

Next, the loss of tax revenue is fairly traceable to Defendants and the Rule. The States produced declarations that show "a 'fairly direct link between the state's status as a ... recipient of revenues and the legislative or administrative action being challenged.'" *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C.Cir. 1976)); *Sierra Club*, 977 F.3d at 872 ("The States have illustrated that the lost revenues stem from identifiable projects, directly linking the States' statuses as collectors and recipients of revenues to the challenged actions."); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019). The challenged action need not be the last link in the chain of causation. Even if there is a third person in the chain of causation, the Court may consider "basic economic logic," *New York v. Yellen*, 15 F.4th at 577 (brackets omitted), and whether the government action has a "determinative or coercive effect upon the action of someone else,"

*Bennett v. Spear*, 520 U.S. 154, 169 (1997). To establish causation, the States must simply allege that there is a "realistic" and "predictable" probability that people will be deterred from selling firearms and renting tables, leading to a loss in tax revenue, because of the Rule. *Louisiana v. Biden*, 2024 WL 3253103, at *8 ("loss of tax revenue was a cognizable injury where States showed a 'realistic' 'chain of economic events' tying the loss to the challenged statute" (quoting *New York*, 15 F.4th at 577)); *New York*, 15 F.4th at 577; *Texas v. United States*, 809 F.3d 134, 160 (5th Cir. 2015) (actions of third parties are not speculative if the third party has "strong incentives" to act or refrain from acting); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004) ("predictable consequences" of agency action are traceable to the agency). Regardless, in the case at bar, the third person *is* before the Court—the Individual Plaintiffs.

The Complaint and declarations clearly establish traceability. Plaintiffs alleged that the Rule will cause a decrease in the number of people who sell firearms at gun shows. This allegation is supported by reference to the Rule itself and to declarations. Next, Plaintiffs showed that this decrease will cause and is in fact causing a loss of the specific

tax revenue Plaintiffs collect from gun shows and sales of firearms. *See* Appx. Vol. I, at 100; Appx. Vol. II, at 135–38, 139–141.

The Rule imposes civil, and possibly criminal, sanctions on previously lawful behavior. The threat of criminal and civil sanctions inherently deters the behavior it is intended to deter. *Cf. Louisiana*, 2024 WL 3253103, at *12. Rather than expose themselves to the sanctions for selling firearms without a license, people will stop selling firearms without a license. *See* Appx. Vol. I, at 89, 96, 102; *see also* 89 FR 28,968 (the Rule will "deter [persons who are already engaged in the business of dealing in firearms] from engaging in the business of dealing in firearms without a license."). And because the process of obtaining a license is cumbersome, many will stop selling firearms altogether rather than obtain one. *See* Appx. Vol. I, at 89, 96, 102. The lost tax revenue is directly traceable to the Rule.

Finally, if the Rule is vacated (and the threat of civil and criminal sanctions lifted), some of the people who stopped selling firearms and renting tables are likely to do so again. The injury is therefore redressable. *Louisiana*, 2024 WL 3253103, at *11–12; *Sierra Club*, 977 F.3d at 872; *City of Oakland*, 798 F.3d at 1164; *Florida*, 544 F. Supp. 3d

at 1255 ("[E]ven if other 'variables' contribute to Florida's injury, Florida can establish standing by showing that the [challenged] order accounts for some of, or aggravates, Florida's injury.").

The States tax specific activities. Defendants crafted a Rule that imposes civil or criminal penalties on people who participate in those activities without undertaking the onerous process of obtaining a license. Defendants' rule, therefore, interferes with the States' ability to collect taxes and will result in lost tax revenue. Unsurprisingly, the Northern District of Texas found that states had standing on precisely those same grounds. *Texas v. ATF*, 2024 WL 2967340, at *3–4.

Tennessee and New Hampshire also have standing due to the administrative costs they will incur. As noted in the Rule itself, Tennessee is required by state law to run background checks on every firearm sale made by a federally licensed dealer. *See* Tenn. Code Ann. § 39-17-1316; Appx. Vol. I at 104–118. The Rule is expected to increase the number of federally licensed sellers, which in turn means Tennessee will have to conduct more background checks. *See* 89 FR at 29,088 (Tennessee is "affected by this rule to the extent [it] ha[s] to conduct increased background checks."). As in *Texas v. United States*, a federal

agency changed a policy, and that policy is forcing Tennessee to choose to either absorb the cost of more background checks, a financial injury to the State, or to change its law, a sovereign injury. 809 F.3d at 157 (State had standing when it "sued in response to a significant change in the [federal] policies" that forced the state to incur costs or change its pre-existing statute). Either way, Tennessee has suffered an injury-in-fact caused by the federal agency. *Texas v. Biden*, 10 F.4th 538, 548 (5th Cir. 2021) (noting the "States have incurred and will continue to incur costs associated with the border crisis, at least part of which the district court found is traceable to rescinding MPP. The causal chain is easy to see ... ."); *see also California v. Azar*, 911 F.3d 558, 573 (9th Cir. 2018) (states have standing to challenge federal healthcare policy when change would increase their own healthcare costs).

New Hampshire is a partial point of contact for federal background checks and conducts NCIC background checks for certain types of weapons sold in the State. Appx. Vol. I at 104–118. Like Tennessee, an increase in the number of federal licensees means New Hampshire will have to conduct more background checks, with all associated costs, or change its law, a sovereign injury. Either way, New

Hampshire has alleged it will be harmed by the Rule and, like Tennessee, it has standing.

## II. Plaintiffs Are Likely to Succeed on The Merits.

The district court correctly noted that Plaintiffs had identified "serious flaws" with the Rule and that there were "instances where the Rule may have effectively attempted to rewrite the statute, which the agency may not do." Appx. Vol. III at 11. Yet the district court nevertheless decided against issuing a preliminary injunction based on an incorrect understanding of the legal standard for injunctive relief, stating that Plaintiffs "have not established that the state of play is so one-sided as to warrant injunctive relief." *Id.*

That is incorrect. As *Harmon v. City of Norman* noted, "[i]n order to show a substantial likelihood of success on the merits, Plaintiffs had 'to make a *prima facie* case showing a reasonable probability that [they] will ultimately be entitled to the relief sought.'" 981 F.3d 1141, 1146 (10th Cir. 2020) (quoting *Automated Mktg. Sys. Inc. v. Martin*, 467 F.2d 1181, 1183 (10th Cir. 1972)). The district court's application of an incorrect standard is a legal error and inherently an abuse of discretion. *See Berdiev v. Garland*, 13 F.4th 1125, 1132 (10th Cir. 2021).

When viewed through the correct legal standard, Plaintiffs are likely to succeed on the merits for four reasons: (1) the Rule is contrary to federal law and exceeds Defendants' statutory authority, (2) it is arbitrary and capricious, (3) it is unconstitutionally vague, and (4) it violates the Second Amendment. Plaintiffs are likely to succeed on more than one of these arguments, which makes their argument for preliminary relief stronger. *See Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251, 1267 (10th Cir. 2024).

## A. The Rule is not in Accordance with Federal Law.

The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2). The Rule is not in accordance with law for at least two reasons: (1) Defendants do not have the statutory authority to implement the Rule and (2) the Rule conflicts with federal law because it attempts to rewrite the statute it claims as its authority.

### i. Lack of statutory authority

It is settled that "an agency literally has no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. Fed. Commc'ns Comm'n*, 476 U.S. 355, 357 (1986). In assessing the powers Congress provided an agency under a statute, courts use every tool at their disposal to determine the "best reading of the statute." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). Whether the agency's reading is a *permissible* reading of the statute is immaterial. "[I]n an agency case as in any other ... there is a best reading all the same," and courts search for the best, correct reading of the statute in all cases. *Id.*; *accord id.* at 2263.

Far from giving Defendants broad power, Congress intentionally *limited* their power in 18 U.S.C. § 926(a), which states in relevant part that the "Attorney General may prescribe *only* such rules and regulations as are *necessary* to carry out the provisions of this chapter." (emphases added.) Within this grant of authority is a significant restriction: the agency may only issue "necessary" rules and regulations. It is certainly not "necessary" to define the term "engaged in the business" when Congress *already provided its own definition*.

Therefore, the best reading of the statute is that Congress did not intend to give Defendants broad rulemaking authority.

Although the plain meaning of the statute is dispositive, the legislative history of this provision demonstrates this congressional limitation was intentional. Prior to the FOPA being passed, the GCA provided Defendants with authority to "prescribe such rules and regulations as he deems *reasonably necessary* to carry out the provisions of this chapter." 82 Stat. at 1226 (emphasis added) (to be codified at 18 U.S.C. § 926). But then Congress determined that in the years after it passed the GCA in 1968, ATF was "anxious to generate an impressive arrest and gun confiscation quota" and willing to cut corners to get arrests by "entic[ing] gun collectors into making a small number of sales ... from their personal collections." *The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 21 (1982). It was in that context the amendment to § 926 was made.

"When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'" *Ross v. Blake*, 578 U.S. 632, 641-42 (2016) (quoting *Stone v. INS*, 514 U.S. 386, 397

(1995)). Here, Congress made an intentional decision to add the word "only" after "prescribe" and replace "as he deems reasonably necessary" with "as are necessary." This Court must presume that change was done for a purpose and should afford it that purpose, which was to limit the authority of Defendants. Therefore, any authority Defendants have to prescribe rules is limited to what is truly "necessary." Nothing in the Rule would qualify as "necessary" because it seeks to redefine a term ("engaged in the business") that Congress already defined. They especially cannot do so through changing terms Congress has explicitly defined, as argued below.

In addition to § 926, two other contextual clues demonstrate that Congress did not delegate to Defendants the authority to define (or redefine) the statutory definitions in the Rule. First, 18 U.S.C. § 921(a) provides congressional definitions for a number of terms, yet only grants Defendants the authority to define a single term: "curios and relics," which is part of the statute's definition of a "licensed collector."[2]

---

[2] Even this limited grant of authority was later restricted in a spending prohibition. *See* Pub. L. 113-6, 127 Stat. 198, 248 (Mar. 26, 2013) ("[I]n the current fiscal year and any fiscal year thereafter, no funds appropriated under this Act shall be used to pay administrative expenses or the compensation of any officer or employee of the United

*See* 18 U.S.C. § 921(a)(13). No other part of § 921(a) authorizes the Director to promulgate any rules to define statutory terms. *See Bittner v. United States*, 598 U.S. 85, 94 (2023) (use of "particular language in one section of a statute" paired with "omi[ssion] from a neighbor[ing] provision]," "normally . . . convey[s] a difference in meaning (*expressio unius est exclusio alterius*)"). Consequently, the express grant of authority to define some terms strongly suggests Congress withheld that same authority for other terms.

Furthermore, if Defendants had broad authority to define terms, the express grant of authority to define "curios and relics" would violate the interpretative cannon against surplusage—"the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" *Nelson v. Priap*, 139 S. Ct. 954, 969 (2019) (quoting Scalia, *Reading Law* at 174).

Defendants were also granted specific rulemaking authority over the other provisions of the statute which includes licensing and

States to . . . change the definition of 'Curios or relics' in section 478.11 of title 27, [C.F.R.]")) (*codified at* 18 U.S.C. § 921 Note).

recordkeeping requirements for importers, manufacturers, dealers, and collectors. *See* 18 U.S.C. § 923(a), (b), (g)(1)(A), (g)(2). The fact that Congress provided a specific delegation of authority for rulemaking in these provisions should make the Court reluctant to infer a general delegation of authority for Defendants to define other statutory terms. *See Bittner*, 598 U.S. at 94.

Considered together, and along with § 926's limited delegation of rulemaking authority, the statutory structure establishes that Congress did not delegate authority to Defendants to redefine the term "engaged in the business" that Congress already defined. As such, the agency had "literally no power to act," and the Plaintiffs are likely to succeed on their claim that Defendants lacked statutory authority to implement the Rule.

### ii. Conflict with federal law

Defendants do not have authority to implement the Rule. But even if they did, they cannot exercise that authority in a manner that contradicts the law. "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). Defendants have usurped Congress's role and attempted to

become the "sorcerer" in three different ways: (1) the evisceration of the safe harbor provision of the statute for those who sell from their personal collections, (2) rewriting the definition of "engaged in the business" to include those who sell (or attempt to sell) one firearm, and (3) the redefinition of "proof of profit."

### a. Personal collection safe harbor

18 U.S.C. § 921(a)(21)(C) excludes from its definition of a dealer in firearms (and by extension the federal licensing requirements) "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." This is an unequivocal safe harbor that allows an individual to sell firearms that they personally own from being forced to get a federal license to sell them.

As noted above, Defendants have no authority to redefine the term "personal collection." And they certainly cannot redefine it in a manner that makes the safe harbor meaningless. But they did so anyway by limiting the definition of personal collection to "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting

curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)" and by excluding "firearms accumulated *primarily for personal protection.*" 89 FR 29,090 (emphasis added).

Nothing in the text of the statute supports the exclusion of firearms obtained for personal protection from the statutory term "personal collection." *Heller* expressly recognized that personal self-defense is "central to the Second Amendment right" and a primary reason that individuals acquire firearms for personal use. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). And, for many Americans, personal protection is the primary reason they acquired a personal collection of firearms in the first place. Additionally, this would likely apply to all handguns (44% of firearms in private possession[3]) and

---

[3] 145,027,290 out of a total of 325,974,664. John Berrigan, Deborah Azrael, and Matthew Miller, *The Number and Type of Private Firearms in the United States*, Sage Journals, Table 2, *available at* https://journals.sagepub.com/doi/full/10.1177/00027162231164855.

shotguns (20%[4]). Finally, if one includes rifles as firearms usable for personal protection—which virtually every rifle is—then every functioning firearm in the country is excluded from Defendants' arbitrary definition of "personal collection," which effectively eliminate the safe harbor. Defendants cannot point to any authority for doing this.

## b. Rewriting "engaged in the business"

Common sense tells us that someone does not become a "dealer" simply because they sold or attempted to sell a product one time. Congress enshrined that notion in 18 U.S.C. § 921(a)(21)(C) when it defined a dealer in firearms as "a person who devotes time, attention, and labor to dealing in *firearms* as a *regular course of trade or business* to predominantly earn a profit *through the repetitive purchase and resale of firearms*." (emphases added). The best reading of the terms "firearms," "regular course," and "repetitive purchase and resale" is that, at a minimum, a person has to sell *more than one* firearm before they can be deemed a firearms dealer. Furthermore, the statute excludes "a person who makes occasional *sales*, exchanges, or purchases of *firearms* for the enhancement of a personal collection or for a hobby,

---

[4] 65,384,747 out of a total of 325,974,664. *Id.*

or who *sells all or part* of his personal collection of firearms." *Id.*
(emphases added). Even the exceptions to the licensing requirements
allow for individuals to sell more than one firearm before they are
considered "dealers."

This is significant because being a licensed dealer comes with
extensive obligations to include: (1) maintaining records at their place
of business of all sales or other dispositions of firearms, (2) allowing
Defendants to inspect their records without a warrant during a criminal
investigation, and (3) maintaining a premise for where they conduct
business. *See generally* 18 U.S.C. § 923. It is not as simple as paying a
fee. It comes with serious obligations. The plain language of the statute
demonstrates it was not meant to require someone who sells a couple
firearms at a gun show to become a federal licensee. Yet the Rule claims
that there is *no* "minimum number of firearms to actually be sold to be
'engaged in the business.'" 89 FR 29,021. "[A] single firearm
transaction"—or even a mere offer to sell a firearm when combined with
other evidence—"may be sufficient to require a license." *Id.* at 28,976.
This flies in the face of Congress's explicit requirement that individuals

sell multiple firearms before they can be considered dealers and is an attempt to rewrite the statute. This is not something an agency can do.

### c. Redefinition of proof of profit

The Rule also attempts to rewrite the statute by stating, "a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms." 89 FR 29,091. This finds no support in the statute. 18 U.S.C. 922 § (a)(22), which defines the term "to predominantly earn a profit," describes it as "the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." But it goes on to say, "*Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

The fact that the statute says proof of profit is not required "for criminal purposes or terrorism" means it *is* required for other cases, or else it violates the statutory cannon of *expressio unius est exclusio alterius* that "expressing one item of [an] associated group or series

excludes another left unmentioned." *See Baptist Mem'l Hosp. – Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020). This is especially true when the statute as a whole never says intent is all that is required to meet the requirement that the sales of firearms are "to predominantly earn a profit." It simply means that if one did not intend to earn a profit, they are exempt from the statute. After all, a person can make a profit off a firearm when all they intended to do was liquidate their personal collection. And the statute provides a safe harbor to prevent that group from being wrapped into its reach. Yet Defendants attempt to rewrite this provision as well to sweep a larger group of individuals within their enforcement. Regardless of the wisdom of that rationale, it is Congress, not Defendants, that makes that decision.

### B.    The Rule is Arbitrary and Capricious.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Rule is arbitrary and capricious for two primary reasons: (1) it creates a multi-factor test through case-by-case adjudication without

providing regulated parties predictability or intelligibility and (2) it is a sharp departure from past practice without reasonable explanation.

### i. Multi-factor test

Defendants have created a convoluted Rule with numerous presumptions and exceptions to those presumptions, and they say that they'll adjudicate violations on a case-by-case basis without further guidance. 89 FR 28,978. In effect, they created a multi-factor test through case-by-case adjudication. When an agency intends to apply "a multi-factor test through case-by-case adjudication," some explanation is required to provide "predictability and intelligibility" to regulated parties. *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.); *see also Kearney Reg'l Med. Ctr., LLC v. Dep't of Health & Human Servs.*, 934 F.3d 812, 816 (8th Cir. 2019) (explaining agency action is arbitrary where one cannot "discern what legal standard the agency applied"). Otherwise, those seeking to conform their conduct to the regulation cannot know "which factors are significant and which less so, and why." *LeMoyne-Owen Coll.*, 357 F.3d at 61.

Those guardrails are particularly important here, where "[f]ailure to comply" with the Rule "carries the potential for ten years'

imprisonment," "fines," and "a lifetime ban on ownership of firearms." *Mock v. Garland*, 75 F.4th 563, 570–71 (5th Cir. 2023). Yet the Rule's "factors, which are both general and unweighted, invite inquiry into areas of doubtful relevance rather than make the [regulated] conduct any clearer." *Record Head Corp. v. Sachen*, 682 F.2d 672, 677 (7th Cir. 1982).

Defendants start from a premise that whether a person is a firearms dealer is a "fact specific" inquiry and that even a single sale (or attempted sale) of a firearm when combined with other evidence "may" require a license. 89 FR 29,091. The Rule then goes on to create a number of confusing rebuttable presumptions about who is considered a dealer that includes someone who "[r]esells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms." *Id.* Then it creates a list of conduct that does not support such presumptions and claims that the list can provide evidence to rebut those presumptions. For example, the Rule states if a person liquidates (without restocking) all or part of their personal collection (which does not include weapons purchased for personal protection), that could be

utilized to rebut a presumption that they are otherwise a dealer in firearms. *Id.* Then the Rule pulls back once again, stating neither the presumptions nor the conduct that rebuts them are "exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms." *Id.* In other words, leave it to Defendants to determine whether or not you violated the Rule.

There is no predictability or intelligibility provided to ordinary people to follow this Rule. This is especially a concern when the Rule rewrites a statute that has been in effect for decades. Defendants' rationale that they cannot establish bright-line rules that address every conceivable scenario is a strawman that has been rejected by courts. "The ATF informs us it 'reasonably chose to avoid brightline rules subject to easy circumvention' in favor of an undefined standard" but the Rule "does not explain how providing any amount of mathematical guidance, never mind bright-line mathematical rules, was likely to lead to circumvention of the law. Such guesswork fails to create an identifiable metric that members of the public can use to assess" whether their conduct is covered by the Rule. *Firearms Regul.*

*Accountability Coal., Inc., et al. v. Garland, et al.*, 112 F.4th 507, 520 (8th Cir. 2024). In short, Defendants can only utilize a multi-factor, weight-of-the-evidence test when the Rule defines and explains the criteria the agency is applying. *Id.* It has failed to do so here and makes it impossible for an ordinary person to determine when exactly they need a license. For that reason, it is arbitrary and capricious.

### ii. Sharp departure from past practice

The Rule is also arbitrary and capricious because it represents a sharp departure from past practice without a reasonable explanation. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Before now, Defendants adopted the congressional definitions of terms such as "engaged in the business" rather than attempting to redefine what Congress already defined. *See* 27 C.F.R. § 478. That makes sense. Federal law limits Defendants' authority to draft rules and regulations "as are necessary to carry out provisions of this chapter." 18 U.S.C. § 926(a). And Congress was explicit in what they allowed Defendants to define. *See* 18 U.S.C. § 921(a)(13). That is why the definitions Defendants adopted previously for 18 U.S.C. § 921(a)(21)(C) mirrored what Congress wrote. *See* 27 C.F.R. 478.

Now, Defendants attempt to redefine congressional terms utilizing the rulemaking process. In order to engage in such a sharp departure, they need to provide a reasonable explanation. What they actually provide is an implausible pretext. The Rule nods toward "new technologies, mediums of exchange, and forums in which firearms are bought and sold," but that's it. 89 FR 28,973. Nothing in the Rule limits its new requirements to those new forums. Rather, it mostly targets gun shows—which are not new. Emerging technologies only serve as a pretext for what Defendants wanted to do, which was establish near-universal background checks through the rulemaking process after they failed to pass Congress. An implausible pretext is not a reasonable explanation and is therefore arbitrary and capricious.

## C. The Rule is Unconstitutionally Vague.

A regulation is unconstitutionally vague if it does not give a person of reasonable intelligence fair notice that his conduct is unlawful or it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52, 60 (1999). The Rule is confusing and susceptible to multiple interpretations; as such, it

"encourages arbitrary and discriminatory enforcement."

*StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023). This Rule is unconstitutionally vague for three reasons: (1) the elimination of the safe harbor provision for "personal collection" does not provide any guidance as to what is a weapon purchased primarily for personal protection, (2) the Rule creates inherent confusion on when someone is covered based on selling or attempting to sell just one firearm, and (3) the Byzantine structure of the Rule encourages arbitrary and discriminatory enforcement.

### i. Personal protection weapons

The Rule eviscerates the personal collection safe harbor of the statute. For the reasons noted above this runs contrary to statute. But it is also problematic for another equally important reason. It provides no guidance as to what qualifies as a weapon purchased primarily for personal protection. It does not name any specific type of weapon that would qualify as personal protection and instead relies on the "nature and purpose" for which they were accumulated. 89 FR 29,039. In other words, it goes toward the subjective intent of the potential licensee. This is problematic for a whole host of reasons.

As a starting point, it would require Defendants to ascertain what the purpose of the original purchase of the firearm was, even if it was decades ago. But when a person purchases a firearm there is no form they fill out that states the purpose for which they are acquiring it (and such a form would present other legal concerns if it existed). Additionally, the intent for possessing a weapon can change with time. A weapon originally purchased for self-defense may no longer have that purpose when the buyer later relies on other firearms in her personal collection for self-defense. The Rule provides no guidance at all for determining when this exception applies. It leaves it open to arbitrary and discriminatory enforcement, which is exactly what the void for vagueness doctrine seeks to prohibit.

### ii. Number of firearms

The statute the Rule claims to interpret requires multiple sales of firearms to be considered a dealer in firearms. But the Rule covers individuals who sell or attempt to sell as little as one firearm when combined with other evidence. 89 FR 29,091. This is not only contrary to statute but unconstitutionally vague because it provides no guidance as to what qualifies as "other evidence." The closest it comes is

providing one example of "a person [who] represents to others a willingness and ability to purchase more firearms for resale." *Id.* But even that is nebulous because it leaves open a host of otherwise lawful behavior. For example, if someone attempts to sell a firearm at a gun show and tells a buyer that he can get another one if they do not like that one, does that make someone a firearms dealer under the Rule? It is unclear at best especially when the Rule includes a catch-all provision that states the presumptions (and exceptions) do not cover all behavior that may subject someone to the licensing requirement. This also subjects one to arbitrary and discriminatory enforcement, which is fleshed out in the evidence in the record. As one of the largest gun show organizers in the country stated, "If you talk to five different ATF agents about what the Rule covers, you will likely get five different answers." Appx. Vol. II, at 140.

### iii. Byzantine nature

The Rule contains multiple presumptions and multiple exceptions. And the multiple presumptions are accompanied by multiple opposing presumptions that serve as exceptions to the presumptions. *See*

*generally* 27 C.F.R. § 478.13.[5] It then contains a "catch all" provision that states none of the presumptions and exceptions are exhaustive of the behavior that subjects someone to the licensing requirements. *Id.* This was all within the context of a statute where Congress explicitly defined terms, and courts have interpreted those terms for years without issue. The Rule turns those otherwise clear terms into a mess where a person of ordinary intelligence cannot easily comprehend exactly what conduct is prohibited and is subject to arbitrary and discriminatory enforcement. The Rule is the very definition of unconstitutionally vague.

### D.   The Rule Violates the Second Amendment.

The Second Amendment provides that "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." "When the Second Amendment's plain text covers an individual's conduct, the Constitution

---

[5] For example, the Rule claims to uphold a statutory exemption by not presuming someone selling firearms from their personal collection is a dealer. Simultaneously, the Rule creates exceptions to the exception to that exemption: (1) a personal collection doesn't include firearms purchased for self-defense, (2) includes no firearm that was bought with intent to obtain profit, and (3) includes no one who buys other firearms after selling from their personal collection. 89 FR 29,068–69.

presumptively protects that conduct. To justify its regulation, . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). The ability to buy a firearm is encompassed in the right to keep a firearm. *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023), *vacated on other grounds*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024). While the Second Amendment expressly protects the right to "keep and bear arms," the only way to exercise this right "is to get one, either through sale, rental, or gift," *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023). The ability to sell a firearm to another is therefore also necessarily protected. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).[6]

In order to justify this regulation, "the government *must* demonstrate that the regulation is consistent with the Nation's

---

[6] Although there was dicta in *Heller* that stated "laws imposing conditions and qualifications on the commercial sale of firearms" may still be constitutional, the Supreme Court has yet to decide the contours of that potential caveat. *Heller*, 554 U.S. at 626-27. In addition, the Rule goes well beyond targeting "commercial sale of firearms" and targets private sales of firearms.

historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126

(emphasis added). Therefore, it is Defendants' burden to present

evidence that this Rule aligns with the historical traditional of firearm

regulation at the time the Second Amendment was ratified.

They cannot do this, as the Rule's attempt to regulate private,

non-commercial sale of firearms between individuals does not even have

a modern analogue, much less an historical one. In fact, the historical

record demonstrates the opposite. In 1774, when King George III

embargoed all imports of firearms and ammunition into the colonies,

the Americans saw the embargo on firearms commerce as an intent to

enslave Americans and *increased* their efforts to engage in firearms

commerce in response. David B. Kopel*, Does the Second Amendment*

*Protect Firearms Commerce*, 127 Harv. L. Rev. F. 230, 234 (2014). In

1777, when the British seemed on the verge of winning the American

Revolution, Colonial Undersecretary William Knox drafted a plan to

prevent any future rebellion that included a provision to prevent any

import or manufacturing of arms or gunpowder without a license. *Id.* at

235. In short, the Rule regulates firearms in a manner that is

inconsistent with our nation's history and tradition. Because of that, the Rule violates the Second Amendment.

## III.    Plaintiffs Will Be Irreparably Harmed.

Without preliminary injunctive relief, Plaintiffs will suffer irreparable harm. As discussed above, the States are harmed though loss of tax revenue and administrative costs. None of those damages are recoverable from the United States; "a party suing the government suffers irreparable harm where monetary relief might not be available because of the government's sovereign immunity." *Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226, 1251 (10th Cir. 2017) (cleaned up). The Rule has already decreased attendees, vendors, and sales revenue at gun shows in Plaintiff States. Appx. Vol. I, at 100, Appx. Vol. II at 134–41. Chisholm Trail will experience the same harm at its gun shows. As discussed above, the Rule will harm individual Plaintiffs through their inability to sell firearms from their personal collection at gun shows. This harm began the moment the Rule took effect and is ongoing. This harm cannot be remedied after the fact. Preliminary relief is necessary.

## IV. The Balance of Harms Favors Plaintiffs.

There is no harm to Defendants in pausing their attempted usurpation of Congress's role by maintaining the status quo with standards that have been in place for decades. Defendants claim that they aren't imposing near-universal background checks—and don't have the power to do so. 89 FR 28,987. Firearms sold by those truly "engaged in the business" of firearms sales already require a background check. *Id.* And the Rule risks turning everyday citizens into felons if they inadvertently sell guns according to longstanding law but contrary to the Rule. *Id.* at 28,995. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1279 (10th Cir. 2024). Maintaining the status quo while Plaintiffs challenge this Rule will ensure that otherwise law-abiding citizens aren't caught in the dragnet of this overly-broad and intrusive federal regulation.

## CONCLUSION

This Court should reverse the district court's denial of a preliminary injunction.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs request oral argument because of the significant legal issues at stake and because they believe that oral argument will materially assist the Court in resolving those important issues.

Respectfully submitted,

**KRIS W. KOBACH**
**Kansas Attorney General**

*/s/Abhishek S. Kambli*
Anthony J. Powell
Solicitor General
Abhishek S. Kambli
Deputy Attorney General
Erin B. Gaide
Assistant Attorney General

Office of the Kansas Attorney General

120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
anthony.powell@ag.ks.gov
abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
Eric H. Wessan
*Solicitor General*
Office of the Iowa Attorney
General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric.Wessan@ag.iowa.gov

*Counsel for Plaintiff State of Iowa*

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Christian B. Corrigan*
Christian B. Corrigan
*Solicitor General*
Peter M. Torstensen, Jr.
*Deputy Solicitor General*
Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for Plaintiff State of Montana*

STEVE MARSHALL
Alabama Attorney General

*/s/ Edmund G. LaCour, Jr.*
Edmund G. LaCour, Jr.
*Solicitor General*
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov

*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

*/s/ Aaron C. Peterson*
Aaron C. Peterson
*Senior Assistant Attorney General*
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Fax: (907) 276-3697
aaron.peterson@alaska.gov

*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

*/s/ Stephen Petrany*
Stephen Petrany
*Solicitor General*
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

*/s/ Joshua N. Turner*
Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
Alan M. Hurst
*Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov
Alan.hurst@ag.idaho.gov

*Counsel for Plaintiff State of Idaho*

TODO ROKITA
Indiana Attorney General

*/s/ James A. Barta*
James A. Barta
*Solicitor General*
Office of the Attorney General of
Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone: (317) 232-0709
James.Barta@atg.in.gov

*Counsel for Plaintiff State of
Indiana*


RUSSELL COLEMAN
Kentucky Attorney General

*/s/ Jack Heyburn*
Jack Heyburn
*Principal Deputy Solicitor
General*
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 892-1044
Jack.Heyburn@ky.gov

*Counsel for Plaintiff
Commonwealth of Kentucky*


ANDREW BAILEY
Missouri Attorney General

*/s/ Joshua Divine*
Joshua Divine
*Solicitor General*
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Joshua.Divine@ago.mo.gov

*Counsel for Plaintiff State of
Missouri*


MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Zachary A. Viglianco*
Zachary A. Viglianco
*Deputy Solicitor General*
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Counsel for Plaintiff State of
Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

*/s/ Brandon F. Chase*
Brandon F. Chase
*Assistant Attorney General*
New Hampshire Department of
Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Counsel for Plaintiff State of New
Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

*/s/ Philip Axt*
Philip Axt
North Dakota Office of the
Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for Plaintiff State of
North Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II
*Solicitor General*
Office of the Attorney General
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State of
Oklahoma*

ALAN WILSON
South Carolina Attorney General

*/s/ Joseph D. Spate*
Joseph D. Spate
*Assistant Deputy Solicitor
General*
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State of
South Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
Charles D. McGuigan
*Deputy Attorney General*
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Fax: (605) 773-4106
charles.mcguigan@state.sd.us

*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
Whitney D. Hermandorfer
*Director of Strategic Litigation Unit*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov

*Counsel for Plaintiff State of Tennessee*

JASON S. MIYARES
Attorney General of Virginia

/s/ *Kevin M. Gallagher*
Kevin M. Gallagher
*Principal Deputy Solicitor General*
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
kgallagher@oag.state.va.us

*Counsel for Plaintiff*
*Commonwealth of Virginia*

PATRICK MORRISEY
West Virginia Attorney General

*/s/ Michael R. Williams*
Michael R. Williams
*Solicitor General*
Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for Plaintiff State of*
*West Virginia*

BRIDGET HILL
Wyoming Attorney General

*/s/ Ryan Schelhaas*
Ryan Schelhaas
*Chief Deputy Attorney General*
Office of the Wyoming Attorney
General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State of
Wyoming*

*/s/ Anna St. John*
Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

*/s/ M. Frank Bednarz*
M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org

*Counsel for Plaintiff Phillip
Journey*

*/s/ Michael D. McCoy*
Michael D. McCoy
William E. Trachman
Mountain States
Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
Mmccoy@mslegal.org

*Counsel for Plaintiffs Allen
Black, Donald Maxey, and
Chisholm Trail Antique Gun
Association*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(b), as calculated by the word-counting function of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface—14-point Century Schoolbook—using Microsoft Word.

*s/ Abhishek S. Kambli*
Abhishek S. Kambli

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that a copy of the foregoing brief as submitted in digital form is an exact copy of the written document filed with the Clerk.

*s/ Abhishek S. Kambli*
Abhishek S. Kambli

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2024, the foregoing brief was electronically filed with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I also certify that within five business days of issuance of notice that the electronic filing is compliant, seven paper copies will be delivered by Federal Express to the Clerk's Office.

*s/ Abhishek S. Kambli*
Abhishek S. Kambli

### In the United States District Court
### for the District of Kansas

————————

Case No. 24-cv-01086-TC-TJJ

————————

STATE OF KANSAS, ET AL.,

*Plaintiffs*

v.

MERRICK GARLAND, ET AL.,

*Defendants*

————————

## ORDER

Plaintiffs sued Merrick B. Garland, United States Attorney General, Steven Dettelbach, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the United States Department of Justice. Doc. 1 at ¶¶ 1–10. They sought to enjoin a rule promulgated by DOJ and ATF. Doc. 1 at ¶ 13; Doc. 4; Doc. 81; Doc. 103. Their requests were denied because they did not show that they were substantially likely to succeed on the merits. Doc. 164. Other considerations, like the posture of the case, bolstered that conclusion. *Id.* at 12–14. Plaintiffs appealed, Doc. 165, and seek "relief from enforcement of the Final Rule while their appeal is pending." Doc. 167 at 5. A preliminary injunction is still not warranted because, among other things, Plaintiffs have not demonstrated a substantial likelihood of success on the merits. *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Plaintiffs' Emergency Motion for Injunction Pending Appeal, Doc. 167, is DENIED.

IT IS SO ORDERED.

Date: July 22, 2024

  s/ Toby Crouse
Toby Crouse
United States District Judge