# In the United States Court of Appeals
## FOR THE TENTH CIRCUIT

STATES OF KANSAS, IOWA, MONTANA, ALABAMA, ALASKA, GEORGIA, IDAHO, INDIANA, KENTUCKY, MISSOURI, NEBRASKA, NEW HAMPSHIRE, NORTH DAKOTA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, VIRGINIA, WEST VIRGINIA, WYOMING, AND PHILLIP JOURNEY, ALLEN BLACK, DONALD MAXEY AND CHISHOLM TRAIL GUN ASSOCIATION,

*PLAINTIFFS-APPELLANTS*,

v.

MERRICK GARLAND, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES, STEVEN DETTELBACH, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, & EXPLOSIVES OF THE UNITED STATES DEPARTMENT OF JUSTICE, AND THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES,

*DEFENDANTS-APPELLEES*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS, HONORABLE TOBY CROUSE, DISTRICT COURT JUDGE, CASE NO. 6:24-CV-01086-TC-TJJ

## *AMICUS CURIAE* BRIEF OF THE NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., IN SUPPORT OF PLAINTIFFS-APPELLANTS

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

Cory Brewer
330 East Kilbourn Avenue
Suite 725
Milwaukee, WI 53202

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

CORPORATE DISCLOSURE STATEMENT ......................................... 1

INTEREST OF *AMICUS CURIAE* ........................................................ 1

ARGUMENT ............................................................................................ 2

   I.  At least one plaintiff-appellee has standing. .................................. 2

     A. The individual plaintiffs-appellants have standing because they are credibly threatened with enforcement. ......................... 4

     B. The membership-based organization has standing to protect its members and its own interests. ................................ 7

     C. The states have standing to protect their tax revenue streams. ........................................................................................ 8

     D. The District Court's standing analysis is conclusory and non-sensical .................................................................................. 8

  II. A preliminary injunction here would maintain the status quo .... 10

  III.  The rule violates the Second Amendment ................................. 13

     A. The conduct regulated by the rule is protected by the Second Amendment. ................................................................... 14

     B. The rule is inconsistent with the historical tradition of firearms regulation in the United States. ................................. 15

CONCLUSION ...................................................................................... 18

CERTIFICATE OF COMPLIANCE ...................................................... 19

CERTIFICATE OF SERVICE ............................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Am. Humanist Ass'n, v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243 (10th Cir. 2017) ............................................................. 10

*Baker v. USD 229 Blue Valley*, 979 F.3d 866 (10th Cir. 2020) ........... 8, 9

*Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) ................. 6

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................... 14

*Kansas v. Garland*, No. 24-CV-01086-TC-TJJ, slip op., 2024 WL 3360533 (D. Kan. July 10, 2024) ............................. 3, 7, 8, 9, 10, 12

*Luis v. United States*, 578 U.S. 5 (2016) (Thomas, J., concurring in judgment) .................................................................................. 14, 15

*Mock v. Garland*, 697 F. Supp. 3d 564 (N.D. Tex. 2023) ......................... 4

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) 13, 14, 16

*O Centro Espirita Benficiente Uniao Do Vegtal v. Ashcroft*, 342 F.3d 1170 (10th Cir. 2003) ...................................................... 11

*Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) ........................ 8

*Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460 (7th Cir. 2001) ................................................................. 11

*Rumsfeld v. Forum for Acad. & Instit. Rts., Inc.*, 547 U.S. 47 (2006) ............................................................................................... 4

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023). ......................................................... 7

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) ................. 15

*Tex. Gun Rights, Inc. v. ATF*, 697 F. Supp. 3d 593 (N.D. Tex. 2023) ...... 2

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. 2016) ........................... 6

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ........................ 13, 14, 15

*United States v. Stevens*, 559 U.S. 460 (2010) ....................................... 5

*United States v. Students Challenging Reg. Agency Procedures*, 412 U.S. 669 (1973) ........................................................................ 10

*VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022) ............. 4

*Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1120 (10th Cir. 2012) ......... 8

**Statutes**

Bipartisan Safer Communities Act, Pub. L. 117-159, 136 Stat. 1313 (2022) ...................................................................... 17

Federal Firearms Act of 1938, Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938) ..................................................................... 16

**Other Authorities**

*DOJ Publishes New Rule to Update Definition of "Engaged in the Business" as a Firearms Dealer*, DOJ (Apr. 11, 2024), https://www.justice.gov/opa/video/doj-publishes-new-rule-update-definition-engaged-business-firearms-dealer .................... 4

Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, Law & Contemp. Probs., 55 (2017) ................................................................................ 17

**Treatises**

Thomas M. Cooley, *General Principles of Constitutional Law* (1880) .................................................................................. 15

**Regulations**

*Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28968-01 (Apr. 19, 2024) ............................. 3

Wis. Admin. Code (ATCP) § 85.03(1)(a) .................................... 6

**Constitutional Provisions**

U.S. Const. amend. II ............................................................... 17

## CORPORATE DISCLOSURE STATEMENT

Amicus makes the following disclosure under Tenth Circuit Rule 26.1: The National Association for Gun Rights, Inc., is a non-profit, tax-exempt organization incorporated in the State of Virginia. Amicus has no parent corporation, and no publicly held company has 10% or greater ownership in amicus.

## INTEREST OF *AMICUS CURIAE*[1]

The National Association for Gun Rights, Inc. ("NAGR") is a membership-based and donor supported nonprofit whose sole purpose is to protect and defend every American's right to keep and bear arms. With hundreds of thousands of members across the United States, NAGR regularly litigates and files amicus briefs to defend Second Amendment rights. Among other things, NAGR has successfully challenged unconstitutional rules promulgated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. *See, e.g.*, *Tex. Gun Rights, Inc. v. ATF*, 697 F. Supp. 3d 593 (N.D. Tex. 2023).

---

[1] Undersigned counsel for *amicus curiae* certifies that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amicus* and their counsel have contributed money for this brief.

The new rule at issue in this action will drastically change how firearms are acquired, affecting NAGR and its members. As such, NAGR is interested in ensuring that this Court reaches a correct outcome in a well-reasoned opinion.

## ARGUMENT

Briefing on this appeal will inevitably be lengthy and complex, so NAGR advances only three points: (1) at least one of the twenty-four plaintiffs-appellants must have standing; (2) a preliminary injunction will preserve the status quo; and (3) the rule violates the Second Amendment.

## I. At least one plaintiff-appellee has standing.

This action involves twenty-four plaintiffs-appellants, each with an interest in gun shows. According to the complaint, three are individuals who "attend multiple gun shows every year." Compl., ¶¶3–5. Each either buys or sells firearms for his "personal collection at gun shows," and some of these firearms "include[] . . . self-defense weapons." *Id.* None are licensed. *Id.* Another plaintiff-appellant is a membership-based organization that sponsors and manages a "biannual gun show." *Id.*, ¶6.

Two members of that organization are individual plaintiffs-appellants. *Id.* Additionally, about 70 percent of the organization's operating expenses are paid for with the revenue from gun shows. *Kansas v. Garland*, No. 24-CV-01086-TC-TJJ, slip. op, 2024 WL 3360533, at *5 (D. Kan. July 10, 2024). The other twenty plaintiffs-appellants are states. Compl., ¶¶65–91. Many of them tax gun sales. *Id.*

The new rule will totally change gun shows—and shut down many. For context, the phrase "gun show" or "gun shows" appears 129 times in the preamble to the rule. *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28968-01 (Apr. 19, 2024). Multiple commentators referenced a so-called "gun show loophole." *Id.* at 28988–89. The Bureau responded that "as a result of th[e] rule, . . . more individuals who engage in the business of dealing firearms at gun shows . . . will become licensed . . . . As th[e] rule clarifies, all persons who engage in the business of dealing in firearms must be licensed . . . ." *Id.* at 28989. Notably, the Attorney General told reporters that the rule would "close the gun show loophole," as documented in a video posted on the Department of Justice website. *DOJ Publishes New Rule to Update Definition of "Engaged in the Business" as a Firearms Dealer*, DOJ (Apr.

11, 2024), https://www.justice.gov/opa/video/doj-publishes-new-rule-update-definition-engaged-business-firearms-dealer. He further said that the rule is a "historic step" in the "fight against gun violence" and exclaimed that the Department "will not rest" until it ends the "devastation of gun violence." *Id.*

Against this backdrop, at least one plaintiff in this action must have standing—and only one needs standing under well-established precedent. *Rumsfeld v. Forum for Acad. & Instit. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient . . . ."). Standing can sometimes be tricky, but it is not supposed to be Kafkaesque.

## A. The individual plaintiffs-appellants have standing because they are credibly threatened with enforcement.

The individual plaintiffs-appellants have standing because they are credibly threatened with enforcement. *See Mock v. Garland*, 697 F. Supp. 3d 564, 585 (N.D. Tex. 2023) (quoting *VanDerStok v. Garland*, 633 F. Supp. 3d 847, 856 (N.D. Tex. 2022)) ("If the FPC members proceed in taking all compliance steps necessary to entirely avoid prosecution, they will be left deprived of their presumptively protected Second

Amendment conduct . . . . If the FPC members proceed in their presumptively protected Second Amendment conduct, they will be left to face criminal prosecution for noncompliance . . . . Absent injunctive relief, enforcement of the . . . [r]ule evidently threatens the loss of . . . constitutional rights to possess . . . and operate commonly used . . . pistols for lawful self-defense purposes. This 'unquestionably constitutes irreparable injury.' ").

To think that the rule is not going to be enforced is, well, absurd. The Attorney General's own statements show he intends to enforce the rule. He was unequivocal: he believes the rule is needed to close the "gun show loophole," which he thinks causes "gun violence," and has said the Department of Justice "will not rest" until it singlehandedly solves gun violence. *See generally United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promises to use it responsibly."). Notably, the Attorney General and his staff are working awfully hard to ensure that they can enforce it, should they choose—i.e., if this challenge fails.

Indeed, a rule, particularly a recently promulgated rule like the one at issue, is itself evidence of a threat in a way that a statute is not because: (1) a rule can be more easily repealed; (2) the branch in charge of enforcement is also in charge of the repeal process; and (3) that branch just promulgated the rule. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. 2016) (quoting *Chamber of Commerce v. FEC*, 69 F.3d 600, 604 (D.C. Cir. 1995) ("[A]n agency rule, unlike a statute, is typically reviewable without waiting for enforcement.")).

The credible threat of enforcement standard is meant to prevent plaintiffs from manufacturing controversies and then running to court, but no one can say that the plaintiffs-appellants did any such thing. They are not asking this Court to set aside some old regulation that has not been enforced in decades. *See, e.g.*, Wis. Admin. Code (ATCP) § 85.03(1)(a) (requiring butter produced in Wisconsin to "possess a fine and highly pleasing butter flavor").

Accordingly, the individual plaintiffs-appellants have standing.

**B.** **The membership-based organization has standing to protect its members and its own interests.**

The membership-based organization also has standing for at least two reasons. First, it has members who have standing, so it has associational standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199 (2023).

Second, even if the membership-based organization lacks members with standing (it does not), it also relies on gun shows to stay afloat. The Bureau all but concedes in the preamble to the rule that gun show revenue will decrease. After all, more burdensome licensing means (inevitably) fewer sellers, which means decreased public interest in attending gun shows. *Kansas*, 2024 WL 3360533, at *5 . If more is required, two of the individual plaintiffs-appellants are members of the organization, both said that they attend gun shows where they sell guns, and neither is licensed. Compl., ¶¶5–7.

**C.** **The states have standing to protect their tax revenue streams.**

For much the same reason, the various states also have standing—their injury is a loss in tax revenue. *See Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1120, 1234 (10th Cir. 2012) (quoting *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)).

**D.** **The District Court's standing analysis is conclusory and non-sensical.**

The District Court erroneously concluded that not one of the twenty-four plaintiffs was likely to establish standing. *Kansas,* 2024 WL 3360533, at *7. Its reasoning, though, makes little sense.

First, the District Court questioned the individual plaintiffs-appellants' standing, saying they may not face a credible threat of enforcement. *Id.* at *5. The Court, however, did not explain its reasoning in any detail.

The District Court cited a precedent that is not on point, *Baker v. USD 229 Blue Valley*, 979 F.3d 866 (10th Cir. 2020). In that action, a parent of a school-aged child received a "religious exemption" so that the child could attend school without being vaccinated. *Id.* at 868–69. She then sued, and her theory was that the school district might "revoke" the

exemption. *Id.* at 869. This Court rejected her theory, essentially treating the exemption as a concession that the vaccination requirement would not be enforced (especially because the parent did not adequately explain why she thought that the district might revoke it). *Id.* at 873–74.

*Baker* is dissimilar at best. If the government wants to grant all of the plaintiffs-appellants an exemption, perhaps it can rely on *Baker*, but NAGR is unaware of any such offer. No other precedent on the credible threat issue was cited by the District Court.

Next, the District Court said that the membership-based organization had not established that it would lose revenue, while fully acknowledging that most of the organization's money comes from gun shows. *Kansas*, 2024 WL 3360533, at *5.

This reasoning is conclusory and hard to follow. The Bureau and Attorney General have been quite clear: They do not like gun shows, and the rule will create a more burdensome licensing scheme, thereby closing what the Attorney General says is a "gun show loophole."

Lastly, the District Court held that the states had not shown that they would lose tax revenue. *Id.* at *5–6.

Again, though, the Court's reasoning is conclusory and hard to follow. The Court acknowledged that the plaintiffs-appellants pointed to a "series of cancelled gun shows." *Id.* at *5. The Court seemed to agree that fewer gun shows means fewer sales, which means less tax revenue; however, it then blamed the gun shows for closing, noting they could still operate if they wanted. *Id.*

By analogy, imagine a bar that closes after the enactment of a law that stops it from selling liquor. Would any reasonable person contend that because the bar could have changed its business model and sold coffee, a state did not lose tax revenue? Of course not.

This Court should correct the District Court's erroneous standing analysis. Standing requires no more than an "identifiable trifle," and all the plaintiffs-appellants have much more than a trifle with the rule. *See Am. Humanist Ass'n, v. Douglas Cnty. Sch. Dist. RE-1*, 859 F.3d 1243, 1248 (10th Cir. 2017) (quoting *United States v. Students Challenging Reg. Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)).

## II. A preliminary injunction here would maintain the status quo.

The status quo—fairly conceptualized—supports a preliminary injunction. This Court has said that "the definition of the 'status quo'" is

often fact dependent; however, it is normally the "last uncontested status between the parties," which is sometimes (if not oftentimes) is the status that existed "*immediately* preced[ing] the litigation." *O Centro Espirita Benficiente Uniao Do Vegtal v. Ashcroft*, 342 F.3d 1170, 1177–79 (10th Cir. 2003); *see also Praefke Auto Elec. & Battery Co. v. Tecumseh Prods. Co.*, 255 F.3d 460, 464 (7th Cir. 2001) (explaining "preliminary injunctions are often issued to enjoin the enforcement of a statute or contract and thus interfere with existing practices").

For example, when a religious community sued the Attorney General to prevent him from prohibiting the sacramental use of *hoasca* (a controlled substance) in religious ceremonies, this Court held that the status quo was the ability of the community to practice its beliefs free from a government-imposed burden. *O Centro*, 342 F.3d at 1177–79.

A chronological overview of this action's procedural history demonstrates that it is analogous:

**April 14**: The rule is published in the *Federal Register* but does not take effect

**May 1**: The plaintiffs-appellants sue

**May 6**: The plaintiffs-appellants move for a preliminary injunction

**May 20**:    The rule takes effect

**July 10**:    The District Court denies the motion

The plaintiffs-appellants did not sit on their rights—they moved at breakneck speed to get to court. This action was not even ripe until April 14, and about two weeks later, this action was commenced. A week after that, the plaintiffs-appellants moved for a preliminary injunction. They filed the motion two full weeks before the rule was to take effect.

Accordingly, the status quo must be the non-existence of the rule. Otherwise, how anyone could ever get a preliminary injunction to stop the enforcement of a rule is unclear.

While the District Court did not hold that a preliminary injunction would change the status quo, it referenced the status quo issue multiple times and expressed confusion as to how to define the status quo. *Kansas*, 2024 WL 3360533, at *8 n.5. It indicated that perhaps the plaintiffs-appellants had to meet an especially high burden if they were trying to alter the status quo, while ultimately not ruling against them on this issue. *Id.* at *8.

This appeal presents a straightforward opportunity for this Court to provide the guidance that district courts seem to need: At least when

a rule is challenged before it has even taken effect, the status quo is the non-existence of the rule.

## III.   The rule violates the Second Amendment.

Finally, the District Court erred in concluding that the plaintiffs-appellants were not likely to succeed on the merits of their claims. NAGR will address one such claim: that the rule violates the Second Amendment.

The Second Amendment protects the right to keep and bear arms. When "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022). To adopt a regulation restricting that right, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right . . . ." *Id.*

This two-step analysis for firearms regulation was subsequently affirmed by the United States Supreme Court just this summer in *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). As the Court said, "[a]s we explained in *Bruen*, the appropriate analysis involves considering

whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.*

The private sale of firearms by individuals is conduct protected by the Second Amendment. There is no historical tradition of regulating this conduct, and so the rule is unconstitutional.

## A. The conduct regulated by the rule is protected by the Second Amendment.

Just like the sale of a book implicates the First Amendment, the sale of a gun implicates the Second. *Luis v. United States*, 578 U.S. 5, 27 (2016) (Thomas, J., concurring in judgment); *see also Bruen*, 597 U.S. at 24–25 (analogizing to the First Amendment in deciding a Second Amendment claim).

The plain text of the Second Amendment covers "the right of the people to keep and bear Arms," U.S. Const. amend. II, which necessarily implies the right to obtain them. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (recognizing such ancillary rights are safeguarded under Second Amendment, noting "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective"); *see also*

Thomas M. Cooley, *General Principles of Constitutional Law* 271 (1880) ("[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use [of] them in a way that makes those who keep them remedy for their efficient use . . . .").

Indeed, "the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 577 (9th Cir. 2017) (en banc) (internal quotation and citation omitted). In the words of Justice Clarence Thomas, "[w]ithout protection for these closely related rights, the Second Amendment would be toothless." *Luis*, 578 U.S. at 27.

Here, the Rule plainly regulates conduct which itself is covered by the Second Amendment's guarantee. As such, the first step of the *Bruen* two-step analysis is met.

### B. The rule is inconsistent with the historical tradition of firearms regulation in the United States.

When government action regulates arms-bearing conduct, as here, "it bears the burden to justify its regulation." *Rahimi*, 133 S.Ct. at 1897 (quotation and citation omitted). To meet that burden, the "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to

keep and bear arms." *Bruen*, 597 U.S. at 19. The government cannot do that here: the historical tradition of regulation simply does not support the overreaching authority which the agency has taken for itself in the rule.

As the plaintiffs-appellants explained in their opening brief, "the rule's attempt to regulate private, non-commercial sale of firearms between individuals does not even have a modern analogue, much less a historical one." App. Br. at 62.

Indeed, the historical record shows that the private, non-commercial sale of firearms between individuals has been explicitly *excluded* from the nation's history and tradition of firearms regulation.

At the federal level, the first licensing requirements on the sale of firearms came in 1938 (a century and a half after the Second Amendment was ratified). The definition only applied to "any person engaged in the businesses of" firearms dealing, not private sales. Federal Firearms Act of 1938, Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938). Plaintiffs-appellants have already explained how subsequent amendments to that law and others continued to exclude the private sale of firearms. *See* App. Br. at 2–9.

The same is true at the state level. As even proponents of gun control have argued, such regulations were not enacted until the twentieth century and were largely limited to commercial sales. *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, Law & Contemp. Probs., 55, 75 (2017) (surveying various state level firearm sale regulations with the earliest being enacted by Georgia in 1902).

The government here is purporting to upend all of this history and tradition, it says, in order to implement part of the Bipartisan Safer Communities Act, Pub. L. 117-159, 136 Stat. 1313 (2022). But even if that enactment did allow this type of regulation (it does not, as plaintiffs-appellants have already explained), then that statute too must be declared unconstitutional as a violation of the Second Amendment.

**CONCLUSION**

For the foregoing reasons, NAGR respectfully requests this Court

reverse the District Court's denial of a preliminary injunction.

Dated: September 26, 2024.

Respectfully Submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*/s/ Cory Brewer*

Cory Brewer
330 East Kilbourn Avenue, Suite
725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
CBrewer@will-law.org

# CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume for an *amicus* brief supporting an appellant and contains 4,067 words. *See* Fed. R. App. P. 32(a)(7)(B)(i), 29(a)(5).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: September 26, 2024

*/s/ Cory Brewer*
CORY BREWER

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2024, I filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: September 26, 2024

*/s/ Cory Brewer*
CORY BREWER