## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

STATE OF KANSAS, et al.,

Plaintiffs-Appellants,

v.

MERRICK B. GARLAND, in his official capacity as the United States Attorney General, et al.,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Kansas
District Court Case No. 6:24-CV-0186-TC-TJJ (Judge Crouse)

## BRIEF FOR APPELLEES

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

KATE E. BRUBACHER
  *United States Attorney*

MICHAEL S. RAAB
BRAD HINSHELWOOD
KEVIN KENNEDY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-7823*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED APPEALS

GLOSSARY

TABLE OF AUTHORITIES ................................................................................................iii

STATEMENT OF JURISDICTION ...................................................................................1

STATEMENT OF THE ISSUE ..........................................................................................1

PERTINENT STATUTES AND REGULATIONS ...........................................................2

STATEMENT OF THE CASE ...........................................................................................2

      A.    Statutory and Regulatory Background ..........................................................2

      B.    Prior Proceedings ..........................................................................................7

SUMMARY OF ARGUMENT ...........................................................................................9

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT ..................................................................................................................... 12

I.    Plaintiffs Lack Article III Standing ...................................................................... 12

      A.    The Individual Plaintiffs Have Not Alleged an Intent to Engage in
           Conduct Addressed by the Rule ................................................................13

      B.    Chisholm Trail's Speculative and Attenuated Claims of Lost
           Revenue Do Not Establish Standing...........................................................18

      C.    The States Cannot Establish Standing Based On Injuries That Are
           Speculative, Attenuated, or Self-Inflicted...................................................20

           1.    The States' Claims of Lost Tax Revenue Are Attenuated
                And Speculative .....................................................................20

       2.      Tennessee and New Hampshire's Asserted Administrative-Cost Injury is Self-Imposed ...............................................26

II.    Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits ...... 27

    A.    ATF has Authority To Promulgate the Rule ...............................................28

    B.    Federal Law Does Not Set A Numerical Threshold for Firearms Transactions That Require a License ...........................................................33

    C.    Persons Dealing in Firearms Require a License Even If They Fail to Turn a Profit ................................................................................................36

    D.    The Rule's Understanding of "Personal Collection" Tracks the Statute .............................................................................................................39

    E.    Plaintiffs' Arbitrary-and-Capricious and Constitutional Challenges Fail.....................................................................................................................42

III.   The Other Factors Weigh Against an Injunction ................................................. 48

CONCLUSION ................................................................................................................ 51

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987) ........................................................................ 50

*American Petroleum Inst. v. U.S. Dep't of the Interior*,
  823 F. App'x 583 (10th Cir. 2020) ........................................... 15, 17

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022) ......................................................... 22

*Citizens for Constitutional Integrity v. United States*,
  47 F.4th 750 (10th Cir. 2023) .................................................. 19-20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................... 13, 16, 17, 19, 20, 27

*Colorado Outfitters Ass'n v. Hickenlooper*,
  823 F.3d 537 (10th Cir. 2016) ...................................................... 18

*Colorado v. U.S. EPA*,
  989 F.3d 874 (10th Cir. 2021) ................................................. 10, 27

*Department of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ........................................................................... 43

*Diné Citizens Against Ruining Our Env't v. Jewell*,
  839 F.3d 1276 (10th Cir. 2016) ..................................................... 12

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................... 11, 45, 46, 48

*El Paso County v. Trump*,
  982 F.3d 332 (5th Cir. 2020) ........................................................ 22

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ........................................................ 48

*Florida v. Mellon*,
  273 U.S. 12 (1927) ........................................................................ 21

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ................................... 9, 18, 19, 20, 21

*Garrison v. Baker Hughes Oilfield Operations, Inc.*,
 287 F.3d 955 (10th Cir. 2002) ........................................................ 50

*Gill v. Whitford*,
 585 U.S. 48 (2018) ........................................................................ 50

*Harmon v. City of Norman*,
 981 F.3d 1141 (10th Cir. 2020) ...................................................... 28

*Heideman v. South Salt Lake City*,
 348 F.3d 1182 (10th Cir. 2003) ...................................................... 49

*Huddleston v. United States*,
 415 U.S. 814 (1974) ................................................................. 2, 42

*Iowa ex rel. Miller v. Block*,
 771 F.2d 347 (8th Cir. 1985) .......................................................... 22

*Jake's Fireworks Inc. v. Acosta*,
 893 F.3d 1248 (10th Cir. 2018) ...................................................... 45

*Johnson v. United States*,
 576 U.S. 591 (2015) ....................................................................... 45

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) ....................................................................... 13

*Madsen v. Women's Health Ctr., Inc.*,
 512 U.S. 753 (1994) ....................................................................... 50

*McRorey v. Garland*,
 99 F.4th 831 (5th Cir. 2024) .......................................................... 46

*MD/DC/DE Broads. Ass'n v. FCC*,
 236 F.3d 13 (D.C. Cir. 2001) ......................................................... 50

*Murthy v. Missouri*,
 603 U.S. 43 (2024) ................................................................... 13, 18

*New Mexico v. Dep't of the Interior*,
 854 F.3d 1207 (10th Cir. 2017) ...................................................... 50

*New York State Rifle & Pistol Ass'n v. Bruen*,
 597 U.S. 1 (2022) ..................................................................... 46, 47

*Nken v. Holder,*
 556 U.S. 418 (2009) ................................................................. 49

*Nova Health Sys. v. Gandy,*
 416 F.3d 1149 (10th Cir. 2005) ............................................ 24

*NRA v. Brady,*
 914 F.2d 475 (4th Cir. 1990) ........................... 28-29, 29, 31

*Parker v. Levy,*
 417 U.S. 733 (1974) ................................................................. 45

*Pennsylvania ex rel. Shapp v. Kleppe,*
 533 F.2d 668 (D.C. Cir. 1976) .................................. 22, 25

*Printz v. United States,*
 521 U.S. 898 (1997) ................................................................. 27

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ................................... 13, 15, 16, 17

*Teixeira v. County of Alameda,*
 873 F.3d 670 (9th Cir. 2017) ........................ 46-47, 47, 48

*United States v. Biswell,*
 406 U.S. 311 (1972) ...................................................... 12, 49

*United States v. Brenner,*
 481 F. App'x 124 (5th Cir. 2012) ................................ 34-35

*United States v. Carter,*
 801 F.2d 78 (2d Cir. 1986) .................................................. 34

*United States v. Duncan,*
 No. 7:20-cr-00167-M-3, 2023 WL 7346042 (E.D.N.C. Nov. 7, 2023) ...... 47

*United States v. Flores,*
 652 F. Supp. 3d 796 (S.D. Tex. 2023) ............................. 47

*United States v. Idarecis,*
 164 F.3d 620, 1998 WL 716568 (2d Cir. 1998) .............. 41

*United States v. King,*
 646 F. Supp. 3d 603 (E.D. Pa. 2022) .............................. 47

*United States v. King,*
    735 F.3d 1098 (9th Cir. 2013) ......................................................... 35

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ............................................................... 48

*United States v. McNulty,*
    684 F. Supp. 3d 14 (D. Mass. 2023) ............................................... 47

*United States v. Nadirashvili,*
    655 F.3d 114 (2d Cir. 2011) ............................................................ 35

*United States v. Shipley,*
    546 F. App'x 450 (5th Cir. 2013) ..................................................... 37

*United States v. Swinton,*
    521 F.2d 1255 (10th Cir. 1975) ................................................. 10, 35

*United States v. Texas,*
    599 U.S. 670 (2023) .......................................................................... 21

*United States v. Tilotta,*
    No. 3:19-cr-04768-GPC, 2022 WL 3924282 (S.D. Cal. Aug. 30, 2022) ...................47

*United States v. Tyson,*
    653 F.3d 192 (3d Cir. 2011) .................................................. 11, 34, 37, 40

*United States v. Valdes,*
    681 F. App'x 874 (11th Cir. 2017) ................................................... 37

*Village of Hoffman v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) .......................................................................... 45

*Washington v. U.S. Food & Drug Admin.,*
    108 F.4th 1163 (9th Cir. 2024) ........................................................ 22

*WildEarth Guardians v. U.S. EPA,*
    770 F.3d 919 (10th Cir. 2014) ......................................................... 43

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .............................................................................. 12

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) .................................................................... 25, 26

*Wyoming v. U.S. Dep't of Interior*,
674 F.3d 1220 (10th Cir. 2012) ............................................... 9, 22, 23, 25, 26

*Ysleta Del Sur Pueblo v. Texas*,
596 U.S. 685 (2022) ...................................................................... 42

**Statutes:**

Act of May 22, 1794,
Ch. 33, § 1, 1 Stat. 369, 369 ......................................................... 47

Act of July 8, 1986,
Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 ........................... 38

Bipartisan Safer Communities Act,
Pub. L. No. 117-159, 136 Stat. 1313 (2022) ................................ 2

Firearms Owners' Protection Act,
Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986) ................. 3

Gun Control Act of 1968 (GCA),
18 U.S.C. § 921 *et seq.* .................................................................. 2
    18 U.S.C. § 921(a)(13) ........................................ 11, 32, 39, 40
    18 U.S.C. § 921(a)(21)(C) ............... 3, 6, 10, 14, 15, 17, 18, 33, 34, 36, 39
    18 U.S.C. § 921(a)(22) .......................... 3, 6, 10, 33, 36, 37, 38
    18 U.S.C. § 922(a)(1)(A) ............................................... 1, 2
    18 U.S.C. § 922(b)(5) .......................................................... 2
    18 U.S.C. § 922(t)(1) ........................................................... 2
    18 U.S.C. § 923(a) .............................................................. 32
    18 U.S.C. § 923(a)(1) ......................................................... 33
    18 U.S.C. § 923(b) .............................................................. 32
    18 U.S.C. § 923(g)(1)(A) .............................................. 2, 32
    18 U.S.C. § 923(g)(2) .......................................................... 32
    18 U.S.C. § 926(a) ................................................... 4, 28, 30

Pub. L. No. 90-618, tit. I, sec. 102, 82 Stat. 1213, 1226 (1968) ...................... 30

28 U.S.C. § 1292(a)(1) ..................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

## Regulations:

27 C.F.R. § 478.11 ................................................................ 7, 11, 14, 39, 40

27 C.F.R. § 478.13(a) .......................................................... 14, 15, 17, 18

27 C.F.R. § 478.13(b) ................................................................................ 35

27 C.F.R. § 478.13(c) ................................................................................. 5

27 C.F.R. § 478.13(c)(2)(ii)(A) .................................................................. 4

27 C.F.R. § 478.13(d)(2) ............................................................................ 5

27 C.F.R. § 478.13(d)(2)(ii) ....................................................................... 5

27 C.F.R. § 478.13(e) ................................................................................. 5

27 C.F.R. § 478.13(g) ................................................................................ 5

27 C.F.R. §§ 478.121-478.134 ................................................................... 2

28 C.F.R. § 25.2 ....................................................................................... 26

28 C.F.R. § 25.6(a) .................................................................................. 26

## Rule:

Fed. R. App. P. 4(a)(1)(B) ........................................................................ 1

## Legislative Material:

Report of the Subcomm. on the Constitution, Sen. Jud. Comm.,
 97th Cong., *The Right to Keep and Bear Arms* (Comm. Print 1982) ............................... 31

S. Rep. No. 98-583 (1984) ....................................................................... 31

## Other Authorities:

ATF, *Do I Need A License to Buy and Sell Firearms?*,
 https://perma.cc/RX5R-7K47 (last updated May 2024) ............................................ 15

*Collection*, Merriam-Webster Online Dictionary,
    https://perma.cc/KXX7-ASLQ .....................................................................39

*Definition of "Engaged in the Business" as a Dealer in Firearms*,
    89 Fed. Reg. 28,968 (Apr. 19, 2024) ............................ 1, 3, 3-4, 4, 5, 6, 7, 10, 11, 14,
                                 15, 17, 18, 23, 29, 33, 35, 36, 37,
                                 39, 40, 41, 42, 43, 46, 47, 49, 50,

## STATEMENT OF RELATED APPEALS
## PURSUANT TO CIRCUIT RULE 28.2(C)(1)

Counsel for appellees is not aware of any prior or related appeals.

## GLOSSARY

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| BSCA | Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022) |
| FFL | Federal firearms licensee |
| GCA | Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* |
| NICS | National Instant Criminal Background Check System |
| Rule | *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) |

## STATEMENT OF JURISDICTION

The district court denied plaintiffs' motion for a preliminary injunction on July 10, 2024. App. Vol. 2 at 15. Plaintiffs appealed on July 19, 2024. *Id.* at 16; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). The district court had jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

For decades, persons "engage[d] in the business" of dealing in firearms have been required to obtain a license from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). 18 U.S.C. § 922(a)(1)(A). In 2022, Congress expanded the definition of "engaged in the business" to cover additional persons. ATF subsequently promulgated the rule at issue here, which both implements the statutory change and addresses longstanding noncompliance issues by clarifying when a person is "engaged in the business" of dealing in firearms and setting forth examples of conduct that presumptively does, or does not, rise to the level of engaging in the business of dealing. *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) (Rule). Plaintiffs sought a preliminary injunction, which the district court denied given "serious issues" with plaintiffs' "standing and merits arguments" and the "procedural stage" of the case. App. Vol. 3 at 14.

The question presented is:

Whether the district court abused its discretion in denying a preliminary injunction against the Rule.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

1.  To restrict the access of criminals and other dangerous individuals to firearms, federal law has long imposed requirements on dealers of firearms, most notably through the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* (GCA).  *See Huddleston v. United States*, 415 U.S. 814, 825 (1974).  Federal firearms licensees (FFLs) must comply with various obligations when transferring firearms to non-licensees, including submitting information about the transferee to the Federal Bureau of Investigation's National Instant Criminal Background Check System (NICS), which then conducts a background check on the transferee and prevents transactions where the transferee is prohibited from receiving or possessing the firearm.  18 U.S.C. § 922(t)(1).  FFLs also maintain records of firearms transfers, enabling tracing of firearms recovered from crime scenes.  *Id.* §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-478.134.

Since the GCA's enactment, Congress has required anyone "engage[d] in the business" of dealing in firearms to become an FFL.  18 U.S.C. § 922(a)(1)(A).  As most recently amended by the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022) (BSCA), someone "engaged in the business" is "a person who devotes time, attention, and labor to dealing in firearms as a regular course of

trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," while excluding anyone "who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). The GCA defines "to predominantly earn a profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* § 921(a)(22). There is no requirement to prove that intent for persons who "engage[] in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

Congress added the definition of "to predominantly earn a profit" to the statute to broaden the category of individuals covered by the licensing requirement. Previously, the GCA required persons to be licensed if they had "the principal objective of livelihood and profit." *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 101, 100 Stat. 449, 450 (1986). There is thus no longer a requirement that "livelihood" be part of the intent in selling firearms; a predominant intent to "obtain[] pecuniary gain" is sufficient. 18 U.S.C. § 921(a)(22).

2. Even before the BSCA amendments, ATF observed significant noncompliance with the licensing requirements of the GCA. 89 Fed. Reg. at 29,086. ATF issued guidance about compliance with the licensing requirements in 2016, but that guidance produced only a limited and short-term improvement. *Id.* at 29,022,

3

29,067.  After the BSCA amendments, ATF conducted the rulemaking at issue here to "implement" the BSCA's "statutory change" to the definition of engaged in the business and to "provide clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms.  *Id.* at 28,968.  ATF conducted that rulemaking under the GCA's general grant of rulemaking authority, which provides that "[t]he Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter."  18 U.S.C. § 926(a).

The Rule does not require anyone to become an FFL of its own force.  Instead, relying on "conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business'" and ATF's enforcement experience, 89 Fed. Reg. at 28,977, the Rule identifies circumstances in which individuals are presumptively "engaged in the business" or likely have the requisite intent "to predominantly earn a profit," *id.* at 29,091; *see id.* at 28,977 nn.72-73, 28,978 nn.74-77, 79-80, 28,979 nn.81-83, 28,981-82, 28,981 nn.97-99, 28,982 nn.100-104 (collecting case law and examples of federal prosecutions), as well as circumstances in which individuals presumptively do not meet the statutory definition, *id.* at 29,092.

For example, a person is presumptively engaged in the business if he repetitively purchases stolen firearms for the purpose of resale, or resells or offers for resale stolen firearms.  89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(2)(ii)(A)).  Similarly, a person presumptively has the requisite intent to earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms

4

offered for resale.  *Id.* (27 C.F.R. § 478.13(d)(2)(ii)).  By contrast, a person "shall not

be presumed" to be engaged in the business if they only resell or transfer firearms

"[o]ccasionally to a licensee or to a family member for lawful purposes."  *Id.* at 29,092

(27 C.F.R. § 478.13(e)).  The Rule explains that the ultimate assessment will depend

upon the totality of the circumstances: "neither the courts nor the Department [of

Justice] have recognized a set minimum number of firearms purchased or resold that

triggers the licensing requirement."  *Id.* at 28,976.

The Rule provides that the identified circumstances give rise to rebuttable

presumptions in civil or administrative (but not criminal) proceedings.  89 Fed. Reg. at

29,091 (27 C.F.R. § 478.13(c), (d)(2)).  Within civil and administrative proceedings, the

rebuttable presumptions "apply only to shift the burden of production, not the

burden of persuasion."  *Id.* at 29,007.  Thus, "the rebuttable presumptions are merely

evidentiary tools to assist the trier of fact in determining whether the Government has

met its burden of production in a given proceeding."  *Id.*  Therefore, "[i]f evidence

sufficient to support a presumption is produced in a civil or administrative

proceeding, the responding person has the opportunity to produce reliable rebuttal

evidence to refute that presumption."  *Id.* at 29,026.  And the Rule is clear that the

activities set forth in the presumptions, and the examples of rebuttal evidence set out

in the Rule, "are not exhaustive of the conduct or evidence that may be considered."

*Id.* at 29,092 (27 C.F.R. § 478.13(g)).

To illustrate the point in concrete terms, if the government produces reliable evidence in an administrative proceeding that a person repetitively purchases stolen firearms for the purpose of resale, that evidence would give rise to a presumption in that proceeding that the person is required to be licensed. The person would then bear the burden to produce reliable evidence showing that their conduct nevertheless does not require a license.

Two specific aspects of the Rule are particularly relevant here. First, the GCA's definition of "to predominantly earn a profit" turns on "the intent underlying the sale," namely that the seller "predominantly" intend to "obtain[] pecuniary gain." 18 U.S.C. § 921(a)(22). Consistent with that definition, the Rule explains that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit through the repetitive purchase and resale of firearms that is required." 89 Fed. Reg. at 29,045. Thus, under the statute, it follows that "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." *Id.*

Second, the statutory definition of "engaged in the business" excludes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" or sales of "all or part of [a] personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Drawing on dictionary definitions and case law, the Rule defines the term "personal collection" to include "[p]ersonal firearms that a

person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)." 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11). The Rule further explains that firearms purchased "for the purpose of resale with the predominant intent to earn a profit" or "accumulated primarily for personal protection" are not part of a "personal collection," though the Rule provides that nothing in it "shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use." *Id.*

## B.    Prior Proceedings

1. A group of 25 plaintiffs—21 States, three individuals, and one association—filed suit in the Eastern District of Arkansas and sought a temporary restraining order and a preliminary injunction. The district court there concluded that Arkansas lacked standing because its alleged harm from the Rule—supposed loss of tax revenue—was "vague and speculative." App. Vol. II at 76. Because Arkansas was the only plaintiff with venue in Arkansas, the court transferred the case to the District of Kansas without ruling on other issues. *Id.* at 74.

After plaintiffs renewed their request for preliminary relief, the Kansas court denied the motion for a preliminary injunction as to the remaining plaintiffs. App. Vol. 3 at 1-15. The court held that plaintiffs had not adequately demonstrated

standing.  The court began with the three individual plaintiffs, all of whom "allege speculative injuries."  *Id.* at 8.  Phillip Journey and Allen Black asserted only that they "attend gun shows to sell firearms," remained "uncertain whether they will become licensed," and thus faced no imminent enforcement.  *Id.*  Donald Maxey did not claim to sell firearms, instead asserting only that the Rule "will limit the number of guns in circulation and 'reduce public interest in gun shows,'" a purported injury "even more speculative than that of his peers."  *Id.*  As for the organizational plaintiff, Chisholm Trail Antique Gun Association, it could not establish standing based on a member and lacked standing in its own right: although it sponsors a biannual gun show, "its theory of injury depends on a layered prediction" about how third parties would react to the Rule, asserting a purported reduced interest in gun shows.  *Id.*

The district court observed that the remaining State plaintiffs faced an "even more difficult" task in establishing standing.  App. Vol. 3 at 8.  Two States pled no facts supporting standing, while others rested on a "speculative sales-tax theory" claiming that the "Rule makes individuals less likely to sell guns, which makes gun show promoters less likely to host shows, which makes putative buyers less likely to purchase guns, which ultimately reduces a state's sales tax receipts," or alternatively that "taxes imposed on gun show tickets and tables rented at gun shows" will decline. *Id.*  The district court concluded that these theories "depend on a speculative chain with many uncertain links" that could not establish standing.  *Id.* at 9.

8

The district court thus held that preliminary relief was inappropriate given the combination of plaintiffs' "questionable injuries-in-fact" and their failure to show that "even [their] best arguments … suggest any of the Plaintiffs are 'substantially likely to succeed on the merits'" at this stage. App. Vol. 3 at 12. In addition, because the Rule has already gone into effect, the district court observed that an injunction would "upend the current legal landscape." *Id.*

2. Plaintiffs appealed the district court's denial of the preliminary injunction, App. Vol. 3 at 16, and moved for an injunction pending appeal. This Court denied the motion. Order (Oct. 28, 2024), Dkt. No. 151.

## SUMMARY OF ARGUMENT

I. The district court correctly recognized that plaintiffs failed to establish standing. The individual plaintiffs—Journey, Black, and Maxey—do not allege an intent to engage in any conduct that would require a license. The remaining plaintiffs—Chisholm Trail and the States—are not regulated by the Rule at all, and instead allege only that the Rule might decrease revenue at Chisholm Trail's gun shows or might reduce tax revenue related to firearms sales or gun shows. These theories are "too speculative" and "too attenuated" to confer standing, *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024), particularly where "the impairment of state tax revenues" does not generally "support state standing," *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012). And allegations that two States will suffer increased administrative costs from conducting background

checks cannot suffice: those States voluntarily choose to perform background checks that the federal government would otherwise perform at no cost, rendering any injury "self-inflicted" and thus "not legally cognizable." *Colorado v. U.S. EPA*, 989 F.3d 874, 888 (10th Cir. 2021).

II.  Plaintiffs are also unlikely to succeed on the merits.  Plaintiffs erroneously contend that the Rule exceeded ATF's authority or otherwise contradicts the statute. The Rule, which ATF explained was appropriate to implement the BSCA amendments and to address ongoing noncompliance with the statutory requirements, falls squarely within ATF's rulemaking authority.  The Rule's substance, moreover, tracks the statute and applicable case law.  The Rule tracks the statute and courts' interpretation of it in explaining that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" and that "[e]ven a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license."  89 Fed. Reg. at 28,976, 29,021; *e.g.*, *United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975).  Similarly, the Rule correctly states that "actual profit is not a requirement of the statute."  89 Fed. Reg. at 29,045. The statute defines the phrase "to predominantly earn a profit" to refer to "the intent underlying" a person's actions, regardless of whether the person has completed a sale or succeeded in turning a profit.  18 U.S.C. § 921(a)(22).  The Rule also properly recognizes that the term "personal collection" in the statute's exception to the licensing requirement under 18 U.S.C. § 921(a)(21)(C) is limited to firearms

10

"accumulated for study, comparison, exhibition … , or for a hobby." 89 Fed. Reg. at 29,090. That follows from the ordinary meaning of "collection" and is confirmed by other portions of the statute, which define a "collector" as someone who "acquires, holds, or disposes of" certain firearms, 18 U.S.C. § 921(a)(13), that are "of special interest to collectors" for some reason other than their capacity "as offensive or defensive weapons," 27 C.F.R. § 478.11; *see, e.g.*, *United States v. Tyson*, 653 F.3d 192, 202 (3d Cir. 2011).

Plaintiffs' remaining arguments largely repeat their misreading of the statutory framework. The Rule addresses longstanding noncompliance issues by gathering in one place and summarizing principles courts and ATF have long applied—the same principles that would govern even in the absence of the Rule—and likewise implements Congress's amendments. The Rule is thus neither an unexplained departure from past practice nor vague or uncertain in its application. Finally, plaintiffs' Second Amendment challenge runs headlong into the Supreme Court's recognition that "longstanding … laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 627 n.26 (2008), not to mention the history and tradition of placing minimal restrictions on the commercial sale of firearms of the sort at issue here.

III. The equities likewise do not favor a preliminary injunction. Plaintiffs' claims of irreparable harm overlap substantially with their claims to standing, and fail

for the same reasons. On the other hand, regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime," *United States v. Biswell*, 406 U.S. 311, 315 (1972), and any injunction would undermine those efforts. And at a minimum, any injunction should apply only to those parts of the Rule at issue and only to those plaintiffs who have established standing.

## STANDARD OF REVIEW

This Court "review[s] the district court denial of a preliminary injunction for an abuse of discretion." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016). "An abuse of discretion occurs only when the trial court bases its decision on an erroneous conclusion of law or where there is no rational basis in the evidence for the ruling." *Id.*

## ARGUMENT

A party seeking a preliminary injunction must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiffs have failed to carry their burden on any of these factors.

## I.     Plaintiffs Lack Article III Standing

To establish standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) that

the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable [judicial] decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). The district court correctly recognized that no plaintiff has made the requisite "clear showing" that they are "likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); App. Vol. 3 at 7.

### A. The Individual Plaintiffs Have Not Alleged an Intent to Engage in Conduct Addressed by the Rule

1. Only two plaintiffs—Journey and Black—suggest that the Rule may someday apply to them. To establish standing to challenge the potential future enforcement of a statute or regulation, a plaintiff must show "an intention to engage in a course of conduct" that is "arguably proscribed" by that statute or regulation, and that "the threat of future enforcement … is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-164 (2014). Mere "subjective fear," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013), or "wholly speculative" possibilities of future application, *Susan B. Anthony List*, 573 U.S. at 160, do not suffice.

Neither plaintiff has stated an intent to engage in conduct that would require obtaining a license to sell firearms. Journey and Black say they are "firearms hobbyist[s] and enthusiast[s]" who each maintain a large "personal collection of firearms," attend four or five gun shows per year, and buy and sell firearms at those

13

shows to "enhance" or "expand" their collections. App. Vol. 1 at 87, 95-96. Journey explains that he "appreciate[s] the craftmanship, design and history of individual firearms," and thus accumulates his firearms for different purposes: some for "self-defense" but others "as relics of special interest, for noncommercial recreation, [or] for personal enjoyment." *Id.* at 88.

That conduct does not require Journey or Black to obtain a license under the GCA or the Rule. As the statute makes clear, "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" does not need a license. 18 U.S.C. § 921(a)(21)(C). The Rule repeats the statutory language verbatim on this point, *see* 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)), and further explains that the personal collection exception applies where firearms are "accumulate[d] for study, comparison, exhibition … , or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)," *id.* at 29,090 (27 C.F.R. § 478.11). Thus, Journey and Black's intentions to sell firearms to enhance their collection as "hobbyist[s]," App. Vol. 1 at 7, 95-96, impose no obligation to obtain a license and create no prospect of enforcement.

The same is true for Journey and Black's plans to purchase or sell firearms predominantly for the purpose of self-defense. The occasional sales that Journey and Black describe do not constitute being "engaged in the business" because neither

plaintiff indicates that he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business," as required under the statute and repeated in the Rule. 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)). And neither Journey nor Black contends that he makes such sales with the predominant intent to "earn a profit"—again, a necessary threshold requirement for needing a license under the statute that is parroted by the Rule. 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)).[1] Indeed, Journey expressly disclaims profit as his "predominant purpose in collecting" firearms. App. Vol. 1 at 88.

Journey and Black have thus not alleged they "intend to engage in a course of conduct that would result in [their] noncompliance" with the Rule as necessary to establish standing. *American Petroleum Inst. v. U.S. Dep't of the Interior*, 823 F. App'x 583, 587 (10th Cir. 2020). Neither the statute nor the Rule requires Journey or Black to obtain a license to engage in the activity they describe, and it is telling that plaintiffs have not identified any presumption under the Rule that they believe their conduct could plausibly fall within. Any fear of future application is thus entirely "speculative." *Susan B. Anthony List*, 573 U.S. at 160, 165.

---

[1] Moreover, ATF has published guidance to help members of the public understand whether they are engaged in the business of dealing in firearms under federal law. *See* ATF, *Do I Need A License to Buy and Sell Firearms?*, https://perma.cc/RX5R-7K47 (last updated May 2024). ATF's guidance explains that "nothing" in the Rule "precludes a person from lawfully acquiring firearms for self-protection or other lawful personal use, *or making isolated sales of such firearms* without devoting time, attention, and labor to dealing in firearms as a regular course of trade or business." *Id.* at 32 (emphasis added).

For much the same reason, Journey and Black's declarations also fail to show that the "threat of future enforcement" of the Rule against them "is substantial." *Susan B. Anthony List*, 573 U.S. at 164. Journey and Black instead assert that the Rule makes their conduct "seem suspect and potentially actionable," App. Vol. 1 at 89, or state their "concern[]" that they will "be subject to" enforcement actions, *id.* at 97. But plaintiffs "cannot manufacture standing" through a "subjective fear" of "hypothetical future harm" that is far from "certainly impending." *Clapper*, 568 U.S. at 416, 418.

2. The remaining named plaintiff, Maxey, fares no better. As the district court recognized, his theory of injury—based on a purported decline in interest in gun shows and thus a decline in the number of guns in circulation available for purchase—"is even more speculative" than Journey and Black's. App. Vol. 1 at 8. Indeed, it is hard to discern what injury Maxey anticipates will befall him. Maxey states that he intends to continue purchasing firearms to augment his collection of "antique firearms, some reproductions of antique firearms, several modern sporting rifles and shotguns, and several revolvers which [he] depends on for self-defense." App. Vol. 1 at 102. But the Rule applies to sellers, not to buyers. Maxey does not sell and does not allege an injury based on increased prices of firearms, which would in any event be speculative. Nor does Maxey explain why any marginal decrease in the total supply of firearms under the Rule would affect the availability of the firearms he wants to purchase. He has thus failed to establish standing.

16

3.  Plaintiffs primarily respond by asserting that they need not "demonstrate how their conduct violated the new regulation … before seeking judicial review." Br. 25-26; *accord* Br. 29.  But that runs headlong into the Supreme Court's admonition that a party must demonstrate "an intention to engage in a course of conduct" that is "arguably proscribed" by the Rule before obtaining pre-enforcement review.  *Susan B. Anthony List*, 573 U.S. at 161; *see American Petroleum Inst.*, 823 F. App'x at 586. Similarly, plaintiffs' repeated assertions that their "suppositions" or what they "believe" about the Rule are sufficient (Br. 27, 29) cannot be squared with the Supreme Court's rejection of "subjective fear" of "hypothetical future harm" as a basis for standing.  *Clapper*, 568 U.S. at 416, 418.

Plaintiffs' limited attempt to demonstrate an objectively reasonable basis to believe their conduct implicates the Rule depends on a manifest misstatement of the Rule.  They claim an intent "to do the very thing in the future that has been prohibited by the Rule (sell firearms multiple times a year without an FFL)."  Br. 30. As explained above, a person may in many circumstances sell multiple firearms a year without being "engaged in the business" of dealing in firearms.  Journey and Black thus cannot establish standing by simply asserting an intent to sell firearms, particularly where their own description of that conduct indicates that much of it is for a "personal collection" and otherwise does not show that either plaintiff "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business," 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)),

and does so with the predominant intent to "earn a profit," 18 U.S.C. § 921(a)(21)(C); 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)).

## B. Chisholm Trail's Speculative and Attenuated Claims of Lost Revenue Do Not Establish Standing

The remaining plaintiffs—Chisholm Trail and the States—do not allege that they will ever, or could ever, be subject to a civil or administrative proceeding where the Rule might apply. Chisholm Trail briefly claims (Br. 30) associational standing based on the membership of Maxey and Black, but that attempt fails because Maxey and Black themselves lack standing. *Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 550 (10th Cir. 2016).

Alternatively, Chisholm Trail asserts a speculative economic theory of injury. Chisholm Trail asserts that the Rule will reduce the revenue the organization derives from its biannual gun shows "by decreasing the number of attendees that sell firearms at these shows as those who are not [FFLs] will not be able to sell their firearms," leading to "a decrease in overall attendance at these gun shows, as fewer firearms for sale will decrease the options available and reduce public interest in these events." App. Vol. 2 at 203; *see also* Br. 31.

Such a theory of economic injury depends entirely on the actions of third parties. Reliance on third-party actions makes standing "substantially more difficult to establish." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *accord Murthy*, 603 U.S. at 57. Plaintiffs cannot "rely on speculation about 'the

18

unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 414 n.5. Moreover, their showing of causation "must not be too speculative or too attenuated," an inquiry examining both whether the reactions of third parties are "sufficiently predictable" and whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Alliance for Hippocratic Med.*, 602 U.S. at 383. And changes in behavior attributable to the BSCA's broadening of the statutory definition, or from the belated licensing of individuals who were previously not in compliance with the statute, are traceable to the statute rather than the Rule.

The district court correctly applied those premises in holding that Chisholm Trail lacks standing. Chisholm Trail's standing depends on guesses about how prospective gun show attendees will choose to spend their time and money, as well as whether and to what extent those decisions are influenced by the Rule as opposed to other factors. That is precisely the sort of "layered prediction" that cannot suffice for standing. App. Vol. 3 at 8. Chisholm Trail's predictions regarding third-party conduct are particularly questionable because they start from the erroneous premise that the Rule forbids sales by unlicensed individuals at gun shows. App. Vol. 2 at 203-04. Nothing precludes such sales if the seller is not "engaged in the business" of dealing in firearms. Thus, Chisholm Trail's asserted injury depends in large measure on the assumption that third parties will misunderstand the Rule, but that speculation does not show that "third part[ies] will *likely* react in predictable ways." *Citizens for*

*Constitutional Integrity v. United States*, 47 F.4th 750, 761 (10th Cir. 2023). And even assuming that some third parties might not attend a gun show based on inaccurate subjective concerns about the Rule (like Journey and Black), those "third parties' subjective fear" cannot confer standing. *Clapper*, 568 U.S. at 417 n.7.

## C. The States Cannot Establish Standing Based On Injuries That Are Speculative, Attenuated, or Self-Inflicted

The States assert injuries stemming from third-party conduct leading to decreased tax revenue and increased administrative costs. Both theories fail.

### 1. The States' Claims of Lost Tax Revenue Are Attenuated And Speculative

a. Plaintiffs' brief addresses the States' tax-revenue claims collectively, but two States—West Virginia and Montana—pleaded no harms at all. App. Vol. 3 at 8. The other States allege injury in the form of reduced tax revenue from the Rule's anticipated follow-on effects on economic activity. This theory takes two forms. First, the States claim that the Rule will make individuals less likely to sell guns, leading to fewer overall firearms sales, and thus reducing the sales tax collected on private sales of firearms. Second, the States add a step to Chisholm Trail's theory of injury, contending that the Rule will make individuals less likely to attend gun shows, thus leading to a decrease in tax revenue on tables rented at such shows. As the district court properly recognized, *id.* at 8-9, each of those alleged injuries is both "too attenuated" and "too speculative" to confer standing, *Alliance for Hippocratic Med.*, 602 U.S. at 383.

The Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "direct," rather than indirect or attenuated, injury from federal action. *Florida v. Mellon*, 273 U.S. 12, 18 (1927). In *Mellon*, Florida challenged the constitutionality of a federal inheritance tax, arguing that the tax would cause the State financial harm by "inducing potential taxpayers to withdraw property" and diminishing its tax base. *Id.* at 17-18. The Court rejected that theory of standing, explaining that any harm caused by the tax was "purely speculative, and, at most, only remote and indirect." *Id.* at 18. The Court reiterated this principle just last year when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," when a State "asserts … that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

The States' contrary view has no limit: because virtually everything the federal government does (or does not do) may have some downstream effect on state tax revenue, States would have standing to sue over virtually every federal policy. Nor would such theories be cabined to States: hotels or restaurants near a gun show would have the same downstream claim to standing. *See Alliance for Hippocratic Med.*, 602 U.S. at 391-92 (rejecting similar theories). Recognizing as much, this Court has noted that "the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest … that impairment of state tax revenues should not, in general, be recognized

as sufficient injury-in-fact to support state standing." *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (citation omitted). Indeed, this Court explained that "holding otherwise might spark a wave of unwarranted litigation against the federal government." *Id.*

Other courts of appeals have likewise rejected claims of state standing premised on the indirect effects of federal policy on state tax revenue or state expenditures. *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1175-76 (9th Cir. 2024); *El Paso County v. Trump*, 982 F.3d 332, 340-41 (5th Cir. 2020); *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 352-54 (8th Cir. 1985); *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672-73 (D.C. Cir. 1976). Those circuits have recognized that that "the States' boundless theory of standing … would make a mockery … of the constitutional requirement of case or controversy." *Arizona*, 40 F.4th at 386; *accord El Paso County*, 982 F.3d at 341 (noting that courts would become "general complaint bureaus").

In addition to being attenuated, the States' theories of injury are also highly speculative. Plaintiffs contend, for example, that the "Rule will cause a decrease in the number of people who sell firearms at gun shows" and thus a loss of tax revenue from firearm sales or table rentals. Br. 35. But the crucial link in that theory—that some marginal number of fewer sellers means fewer sales—is not supported by record evidence or common sense. The Rule predicts that a small proportion of currently "unlicensed persons who would be considered 'engaged in the business'

22

under th[e R]ule" will be "unwilling or unable" to obtain a federal firearms license and "will instead choose to cease their dealing in firearms altogether." 89 Fed. Reg. at 29,072. But even supposing that the Rule slightly reduces the number of firearms sellers, that does not mean that the number of taxable firearms sales will decline: prospective buyers are just as likely to simply go to another source—including an FFL—to obtain a firearm, which would result in the same number of taxable sales. *See id.* at 29,066 ("[T]he overall number of firearm transactions [is] unlikely to be significantly affected [by the Rule]."). Plaintiffs' declarations from state officials, which simply assert predicted declines in firearm sales, provide at most "speculative evidence consisting of conclusory statements." *Wyoming*, 674 F.3d at 1236. As the district court recognized, plaintiffs' "speculative chain with many uncertain links" cannot support their claims to standing. App. Vol. 3 at 9.

Indeed, plaintiffs avoid the specifics of this lengthy chain of events, and do not engage with the substantial differences among States described in the complaint: some tax all firearms sales; some tax only sales or other activities at gun shows; others tax many sales but exempt "occasional sales." App. Vol. I at 45-49. Consider Virginia, which "taxes the sale of firearms at gun shows" but only "by persons or businesses that regularly engage in the business of selling firearms." App. Vol. I at 122. Thus, even if some unlicensed sellers exit the market, that would have no apparent effect on Virginia's tax revenue from gun show sales, and could in fact increase it to the extent purchasers instead buy from dealers who are taxed. Whether or not any change in

Virginia's (or other States') revenue occurs, the salient point is that such speculative and attenuated chains do not confer standing.

Plaintiffs also point to declarations from Chisholm Trail and two individual gun-show promoters, Br. 35-36, but those limited efforts similarly highlight the speculative nature of the claims at issue and their reliance on independent decisions by third parties. One promoter reports that he cancelled a gun show, but attributes that cancellation in part to "concerns with the facility." App. Vol. 2 at 139-41. The other promoter generally asserts a decrease in vendors at gun shows and cancellation of one gun show, *id.* at 135-38, while Chisholm Trail only speculates that a reduction in interest may occur, App. Vol 1 at 99-100. Even assuming those consequences occur and could be attributed to concern about regulation rather than economic or other factors, it is also unclear whether any such change would be attributable to the Rule rather than to the BSCA's expansion of the *statutory* definition to include individuals who do not intend to earn a livelihood from dealing in firearms. Furthermore, any resulting revenue loss is not fairly traceable to the Rule but rather to "independent" decisions made by "some third party not before the court." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005). And even if some gun-show-related tax revenues might decline, there is good reason to think that people who decide not to attend a gun show will instead spend their discretionary income on other taxable goods and services. Any overall loss of tax revenues thus remains speculative, further underscoring why courts have generally rejected standing based on the incidental

revenue effects of a federal policy.

b.  Plaintiffs provide no limiting principle for their theory of standing based on lost tax revenue.  They instead simply assert that loss of tax revenue is a "monetary loss" that apparently always confers standing, largely citing district court or out-of-circuit cases.  Br. 32-33.  To the extent they engage with the cases of this Court and others rejecting standing on that basis, it is to note that this Court has declined to entirely "foreclose the argument that reduced tax revenues can provide a state with Article III standing" where "a 'fairly direct link between the state's status as a … recipient of revenues and the legislative or administrative action being challenged'" can be shown.  *Wyoming*, 674 F.3d at 1234 (quoting *Kleppe*, 533 F.2d at 672); Br. 34.  But the case this Court discussed in that context—the Supreme Court's decision in *Wyoming v. Oklahoma*, 502 U.S. 437 (1992)—underscores the attenuated nature of plaintiffs' claims.  There, Oklahoma power plants purchased virtually all their coal from Wyoming mines, and the Supreme Court held that Wyoming had standing to challenge the validity of an Oklahoma law requiring power plants to use "at least 10% Oklahoma-mined coal."  *Id.* at 440, 443-44.  There was thus no question that third parties—Oklahoma power plants—would respond to the law by reducing their purchases of Wyoming coal, and it was undisputed that Oklahoma adopted the law with the avowed purpose of reducing purchases of coal from Wyoming and thus Wyoming's collection of tax on that coal.  *Id.* at 443.  And the special master

specifically found that "the loss of any market" for Wyoming coal in Oklahoma "cannot be made up by sales elsewhere." *Id.* at 446.

This Court thus explained that *Wyoming* involved unusual circumstances where a State alleged a "direct link" to "the loss of *specific* tax revenues." *Wyoming*, 674 F.3d at 1234. Wyoming lost tax revenue based on a targeted law that solely addressed an activity not subject to substitution and for which the reaction of third parties was not speculative. And as the Supreme Court reiterated in reaching that holding, that is different from cases "den[ying] standing to States where the claim was that actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues." *Wyoming*, 502 U.S. at 448. The Rule here, by contrast, is a general, non-targeted action that could, at most, cause a reduction in some forms of state tax revenue, which may well be made up through substitute actions.

### 2. Tennessee and New Hampshire's Asserted Administrative-Cost Injury is Self-Imposed

Tennessee and New Hampshire also claim injury based on increased administrative costs related to conducting background checks. Br. 37-38. Specifically, while FFLs generally contact the federal government directly to process background checks, states may voluntarily serve as the "Point of Contact" for those checks, 28 C.F.R. § 25.2; *see id.* § 25.6(a) (process for initiating background checks), as New Hampshire and Tennessee have. Both assert that because more individuals will

26

become FFLs required to conduct background checks for each sale, they will have to expend more resources processing background checks. Br. 37-38.

Any costs Tennessee or New Hampshire face are "self-inflicted" and thus cannot confer standing. *Clapper*, 568 U.S. at 418. States may volunteer—but are not required—to conduct federal background checks through NICS themselves. Indeed, during a period when federal law mandated that state and local officials conduct background checks, the Supreme Court held that such requirements were impermissible. *See Printz v. United States*, 521 U.S. 898, 933 (1997). A State's voluntary choice to conduct background checks the federal government would otherwise perform at no cost to those States is precisely the sort of "legislative decision" that creates a "self-inflicted" injury that is "not legally cognizable." *Colorado v. U.S. EPA*, 989 F.3d 874, 888 (10th Cir. 2021).

Moreover, any expected increase in the number of private sellers obtaining a federal firearms license is a direct consequence of the BSCA's broadening of the definition of being "engaged in the business," *see supra* p. 3, meaning that any corresponding increase in mandatory background checks for firearms purchases is largely traceable to that statute rather than the Rule.

## II. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

The Rule serves the important purpose of providing clarity about when persons are required to obtain a federal firearms license by describing conduct that courts and

ATF have historically and regularly found to constitute being "engaged in the business" of dealing in firearms, even before the 2022 amendments to the BSCA broadened the relevant definition. Its primary effect is to provide for evidentiary presumptions in civil and administrative—not criminal—proceedings, such that conduct understood to constitute engaging in the business of dealing in firearms in past cases will be understood as likely to constitute engaging in the business in future proceedings.

The district court held that plaintiffs were not "'substantially likely' to succeed on the merits" on any of their "substantive arguments." App. Vol. 3 at 10. The district court's assessment was correct.[2]

## A. ATF has Authority To Promulgate the Rule

1. Plaintiffs first contend that ATF lacked authority to promulgate the Rule. Br. 41. The GCA, however, includes an express grant of rulemaking authority: 18 U.S.C. § 926(a) provides for the promulgation of "only such rules and regulations as are necessary to carry out the provisions" of the GCA. As the Fourth Circuit has recognized, that provision "almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *NRA v. Brady*, 914 F.2d 475, 479

---

[2] Plaintiffs briefly argue that the district court erred in applying the wrong standard. Br. 39. But the district court quoted, and applied, this Court's preliminary-injunction standard. *See* App. Vol. 3 at 1-2 (quoting *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir. 2020)).

(4th Cir. 1990). And there, the Fourth Circuit upheld ATF regulations defining terms in the GCA. *See id.* at 480-81.

As ATF explained, issuance of the Rule here served several important purposes. First, promulgating the Rule was appropriate for implementing the BSCA's amendments to the GCA to ensure that the regulations "accurately reflect the statutory text." 89 Fed. Reg. at 29,086. Second, "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," and that noncompliance continued to be an issue even after ATF in 2016 issued guidance containing many of the same points as the Rule. *Id.* at 29,085-86; *accord id.* at 29,022, 29,067. Because the Rule was issued through notice and comment and is contained in the Federal Register and Code of Federal Regulations, it would be more visible to the public and put more people on notice of the statutory licensing requirements. *Id.* at 29,086. That increased awareness, in turn, improves public safety by ensuring that individuals who Congress has determined require a license actually obtain one, keeping firearms out of hands of dangerous individuals and aiding the tracing of firearms involved in crime. *Id.* ATF reasonably exercised its delegated statutory authority to issue the Rule in furtherance of those valid regulatory purposes.

2. Plaintiffs at times seem to say that the Rule exceeds this authority because it "redefine[s]" or "chang[es]" the statutory definitions in some way that departs from them. *E.g.*, Br. 43, 45. But that question simply goes to whether the Rule accurately

reflects the statutory requirements and is redundant with plaintiffs' mistaken arguments on that score. *See infra* pp. 33-42.

Plaintiffs also advance the broader premise that a rule discussing a statutory definition can never be "necessary" where "Congress already provided its own definition" of a term. Br. 41 (emphasis omitted). Plaintiffs cite no case for that premise, and in any event ignore the reasons the Rule was promulgated. As discussed, ATF observed noncompliance with the statutory requirements Congress enacted notwithstanding a variety of court decisions and prosecutions applying those requirements, as well as efforts to educate the public through guidance. Congress also amended the GCA to broaden the category of individuals required to obtain a license. It should be beyond dispute that promoting understanding of, and compliance with, the requirements Congress established is a permissible purpose for the exercise of rulemaking authority granted "to carry out the provisions" Congress enacted. 18 U.S.C. § 926(a). The fact that the Rule addresses compliance with definitions established by Congress does not alter that basic point.

Plaintiffs' other arguments about the GCA's authorization of rulemaking authority are likewise erroneous. Plaintiffs emphasize that before being amended by FOPA, the GCA originally provided ATF with authority to promulgate regulations the Attorney General "deem[ed] reasonably necessary to carry out" the statute's terms. Pub. L. No. 90-618, tit. I, sec. 102, 82 Stat. 1213, 1226 (1968); Br. 42. From this they infer that the present rulemaking authority is narrower, and repeat that the

Rule cannot be "'necessary' because it seeks to redefine a term … that Congress already defined." Br. 43.

The relevance of this argument is unclear; plaintiffs do not explain why the Rule here would be permissible if the prior "reasonably necessary" language applied but is somehow no longer permissible under the "are necessary" language prevailing today. As discussed, under the authority conferred in present § 926(a), the Rule is an appropriate response to the BSCA amendments and the observed need to promote compliance with the statute Congress enacted. But plaintiffs are in any event mistaken about the import of the FOPA amendment to § 926(a). It is unclear what regulation would qualify as both "necessary" and unreasonable, and that is presumably why the legislative history from the introduction of the amendment explains that the amendment merely eliminated redundancy: providing for the promulgation of "only such regulations as are necessary (as opposed to the redundant 'reasonably necessary') to carry out the provisions of the Gun Control Act." S. Rep. No. 98-583, at 27 (1984); *see Brady*, 914 F.2d at 479. And the legislative history plaintiffs quote is not even discussing the scope of the agency's rulemaking authority. Br. 42 (quoting Report of the Subcomm. on the Constitution, Sen. Jud. Comm., 97th Cong., *The Right to Keep and Bear Arms*, at 21 (Comm. Print 1982)).

Plaintiffs also err in observing that § 921(a) "grants [ATF] the authority to define a single term: 'curios and relics,'" and inferring that ATF must therefore lack authority to provide other definitions. Br. 43-44. Section § 921(a)(13) states that ATF

31

"shall"—in other words, must—define "curios or relics." 18 U.S.C. § 921(a)(13).

That ATF is required to define one term does not eliminate ATF's authority to issue

rules under § 926, or suggest that Congress's express command to define "curious and

relics" is "surplusage." Br. 44.

Plaintiffs similarly misunderstand the import of §§ 922 and 923 of the GCA,

which they argue confer an express authority to engage in rulemaking to the exclusion

of all others. Br. 44-45. Those provisions address particular types of regulations

issued by ATF; they do not purport to withdraw the general grant of rulemaking

authority explicitly granted by Congress in § 926. Additionally, like § 921(a)(13),

§ 923(a) and (b) both direct ATF to use its existing authority to promulgate

regulations. 18 U.S.C. § 923(a) (providing that Attorney General "shall by regulation

prescribe" certain matters related to licensing of importers, manufacturers, and

dealers); *id.* § 923(b) (similar for collectors). Plaintiffs point to two subsections of

§ 923 which state the Attorney General may—as opposed to must—promulgate

specific regulations. But those provisions authorize the Attorney General to impose

specific requirements not contained in the GCA itself, *see id.* § 923(g)(1)(A) (regarding

recordkeeping obligations that the Attorney General may by regulations prescribe); *id.*

§ 923(g)(2) (regarding the nature of a bound volume of records that the Attorney

General may by regulations prescribe).

### B. Federal Law Does Not Set A Numerical Threshold for Firearms Transactions That Require a License

Plaintiffs contend (Br. 48-50) that the Rule departs from the statute in stating that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" and that "[e]ven a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 Fed. Reg. at 28,976, 29,021. But the Rule is consistent with plain text of the statute and decades of uniform case law.

1. Federal law does not set a numerical threshold for the number of firearms a person must sell before they are required to obtain a federal firearms license. Instead, the point of the statutory scheme is that dealers must be licensed before they begin selling to the public. *See* 18 U.S.C. § 923(a)(1) (providing that "[n]o person shall engage in the business of … dealing in firearms … until he has … received a license to do so"). Congress thus wrote the definition to focus on a person's efforts and intent rather than a threshold number of sales or transactions: a person is engaged in the business of dealing in firearms if they "devote[] time, attention, and labor" to dealing in firearms "as a regular course of trade or business" to "predominantly earn a profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), and "'to predominantly earn a profit' means that the *intent underlying* the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," *id.* § 921(a)(22) (emphasis added). The relevant question is thus whether a person

33

devotes effort as a regular course of trade or business to firearms transactions with the predominant purpose of profiting from repeated sales, not whether they have actually completed some number of sales.

For example, a person who incorporates a gun store, purchases inventory for resale, rents a storefront to display the inventory, advertises the availability of guns at the store, and contracts with a payments processor to enable credit card payments is required to obtain a license before making a sale. In those circumstances, the individual undoubtedly has "devote[d] time, attention, and labor" to firearms dealing "as a regular course of trade or business" with the intent to "earn a profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(a)(21)(C). And the corollary is that some individuals are not required to obtain a license even though they will engage, or have engaged, in multiple firearms transactions: as illustrated by *Journey* and *Black*, multiple sales that are not part of a regular course of trade or business and lack the relevant predominant intent to earn a profit do not require a license. *See supra* pp. 13-16.

Courts have recognized this principle for decades in a variety of cases, explaining that there is no "'magic number' of sales" that trigger the licensing requirement. *United States v. Carter*, 801 F.2d 78, 82 (2d Cir. 1986). Instead, identifying individuals engaged in unlicensed dealing focuses on "the intent of the actor and all circumstances surrounding the acts." *United States v. Tyson*, 653 F.3d 192, 201 (3d Cir. 2011) (quotation omitted); *accord United States v. Brenner*, 481 F. App'x 124, 127 (5th

34

Cir. 2012) (per curiam).  For example, an individual who ordered 19 firearms, unsuccessfully attempted to sell one of them, and repeatedly told others he could procure guns for sale was engaged in the business, as the licensing requirement "does not require an actual sale of firearms."  *United States v. King*, 735 F.3d 1098, 1106-07, 1107 n.8 (9th Cir. 2013); *accord United States v. Nadirashvili*, 655 F.3d 114, 120-21 (2d Cir. 2011); *see United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975) (holding before enactment of statutory definition that a single firearm sale "standing alone, without more" does not show need for a license, but may together with "other facts and circumstances").

The Rule straightforwardly implements this understanding of the statutory framework.  The Rule explains that a "single isolated firearm transaction" may demonstrate a need for a license only when "combined with other evidence (*e.g.*, where a person represents to others a willingness and ability to purchase more firearms for resale)."  89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)).  And the Rule's preamble—relying on many of the cases cited above—explains that "a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license," while "an isolated firearm transaction would not require a license when other factors were not present."  *Id.* at 28,976.

2.  Plaintiffs do not acknowledge, much less address, the case law, and cite no cases endorsing their view.  Nor do they identify a particular numerical threshold they believe applies.  They instead simply note that § 921(a)(21)(C) uses various plural

35

terms ("firearms") and terms contemplating an ongoing course of conduct ("repetitive"; "regular course"; "purchase and resale"), and from that conclude that "at a minimum, a person has to sell more than one firearm before they can be deemed a firearms dealer." Br. 48 (emphasis omitted). That ignores the intent component of the statute and the structure of the definition. A person (like the defendant in *King*) may have devoted energy to dealing in "firearms," and may have the requisite intent to profit from "the repetitive purchase and resale of firearms," even if they have completed only a single sale, or none at all. The Rule, like the case law, instead properly understands that the "through the repetitive purchase and resale of firearms" describes how a person intends "to predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C); *see also id.* § 921(a)(22) (defining "to predominantly earn a profit" in terms of "intent"); 89 Fed. Reg. at 28,977. Any businessperson can attest that putting effort into a business hoping to turn a profit through "the repetitive purchase and resale" of products is quite different from actually successfully engaging in such sales.

## C. Persons Dealing in Firearms Require a License Even If They Fail to Turn a Profit

Plaintiffs further contend that the Rule departed from the statute in recognizing that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit through the repetitive purchase and resale of firearms that is required," and thus "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly

36

reselling the firearms purchased, but never actually find a buyer." 89 Fed. Reg. at 29,045. Once again, the Rule is consistent with the text and the relevant case law.

As noted, the requirement to obtain a dealer's license may attaches even before a sale has been consummated (and thus before any profit has been realized); the defendant in *King*, for example, could not avoid a conviction because he had not yet profited from the sale of a firearm. That is because the statute defines the phrase "to predominantly earn a profit" to refer to intent, not actual profit: "[t]he term 'to predominantly earn a profit' means that *the intent* underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to *other intents*, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22) (emphases added). Consistent with that definition, the statute eliminates the intent requirement for particular bad actors, noting that the "proof of profit" normally required—*i.e.*, proof of intent to profit—"shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism." *Id.*

Even where sales have occurred, courts have consistently emphasized that the test is whether the individual intended to earn a profit and rejected arguments that an actual profit must be shown. *See United States v. Valdes*, 681 F. App'x 874, 877 (11th Cir. 2017) (per curiam); *United States v. Shipley*, 546 F. App'x 450, 454 (5th Cir. 2013) (per curiam); *Tyson*, 653 F.3d at 200. Indeed, were it otherwise, someone who is

simply a bad businessman could sell unlimited firearms without any requirement to obtain a license.

Here, too, plaintiffs do not reckon with any of the cases rejecting their claim that actual profit is required under the statute. They instead argue that the exception's provision that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism" implies that actual profit must be required for other sales not "for criminal purposes or terrorism." Br. 50 (quoting 18 U.S.C. § 921(a)(22)). The quoted exception has been part of federal law since 1986, *see* Act of July 8, 1986, Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766, and no court of appeals has suggested that it means that actual profit is required for other sales. That is because the sentence immediately preceding this exception makes clear that "intent" to profit determines whether a person engages in conduct "to predominantly earn a profit." 18 U.S.C. § 921(a)(22). The exception thus provides that someone who buys and distributes firearms to arm a gang or terrorist organization is required to obtain a license—and can be prosecuted for unlicensed dealing—even if their predominant intent is to support terrorism or criminal activity rather than to profit. It does not add requirements to the definition of "to predominantly earn a profit," which exclusively addresses "the intent underlying the sale or disposition of firearms." *Id.*

### D. The Rule's Understanding of "Personal Collection" Tracks the Statute

The GCA excludes from the licensing requirement "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Plaintiffs contend that the Rule departed from the statute in recognizing that not every firearm is part of a "personal collection" under the statute and explaining that the term does not include firearms "accumulated primarily for personal protection." 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11). Plaintiffs are again mistaken.

1. Not everyone who owns firearms has a "personal collection" of firearms, just as not everyone who owns cars has a "personal collection" of automobiles. Instead, the ordinary meaning of the term "collection" is "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby." 89 Fed. Reg. at 29,038 (quoting *Collection*, Merriam-Webster Online Dictionary, https://perma.cc/KXX7-ASLQ); *see id.* at 29,038 n.216. The Rule directly adopts this definition of "[p]ersonal collection": "Personal firearms that a person accumulates for study, comparison, exhibition … or for a hobby." *Id.* at 29,090 (27 C.F.R. § 478.11).

The ordinary meaning of the term is reinforced by comparison to other portions of the GCA. Under the statute, a "collector" is a "person who acquires, holds, or disposes of firearms as curios or relics." 18 U.S.C. § 921(a)(13). As noted,

Congress required the Attorney General to define "curios or relics," *id.*, and the relevant regulations have long defined the term as including "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended … as offensive or defensive weapons," such as firearms manufactured more than 50 years ago or that "derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event," 27 C.F.R. § 478.11.  As the Rule explains, a "'personal collection' … does not include firearms that have no special interest to the collector or hobbyist other than as weapons for self-defense or defense of others."  89 Fed. Reg. at 29,038.

Here, too, courts have consistently rejected arguments that all firearms a person owns are part of a "personal collection."  In *United States v. Tyson*, for example, the Third Circuit addressed a defendant who told others he was selling "'antique' guns" and described himself as a "firearms 'collector.'"  653 F.3d at 202.  The Third Circuit rejected those arguments, emphasizing that "none of the firearms purchased by [the defendant] were antiques."  *Id.*  Similarly, in *United States v. Idarecis*, the Second Circuit rejected arguments "that the definition of a gun 'collection' in § 921(a)(21)(c) should be read more broadly than the definition of a gun 'collector,'" emphasizing the absence of "case authority to suggest that there is a distinction between the definition

of a collector and of a collection in the statute." 164 F.3d 620, 1998 WL 716568, at *3-4 (2d Cir. 1998) (unpublished table decision).[3]

2. Plaintiffs fail to grapple with these basic premises. Aside from a passing assertion that "[n]othing in the text" supports the Rule's approach, Br. 47, they offer no textual argument at all.

They instead offer only a policy argument—that the personal-collection exclusion cannot mean what the plain text and structure require because that would mean "many Americans" would fall outside that exclusion and thus be subject to licensing requirements. Br. 47-48. That concern is based on mistaken premises. The "personal collection" exception provides that some conduct that would otherwise require a license—such as selling all or part of a personal collection of firearms, which could be a significant number—may nevertheless occur without a license. While firearms acquired primarily for personal protection do not fall within the personal collection *exclusion* from the definition of engaged in the business, that does not mean that sales of such firearms automatically require a license. Private sales of such firearms are permissible without a license so long as the seller's conduct does not rise to the level of being "engaged in the business." *See* 89 Fed. Reg. at 29,039 (noting that the definition does not mean that "individuals or companies cannot buy or sell

---

[3] As the Rule notes, courts routinely draw the same distinction between firearms acquired as part of a "collection" and firearms acquired primarily for self-defense under the Sentencing Guidelines. 89 Fed. Reg. at 29,039 & n.219-221 (collecting cases).

firearms that are primarily for self-defense or protection of others," just that such "firearms are not necessarily part of a 'personal collection'"). And more generally, it is unsurprising that Congress did not write the statute to exclude those who intend to regularly sell firearms for profit from the requirement to obtain a license if they engage in the business of dealing in firearms; the requirement to obtain a license is a central feature of Congress's regulation in this area. *See Huddleston v. United States*, 415 U.S. 814, 825 (1974) (explaining that the "the focus of the federal scheme is the federally licensed firearms dealer" to ensure that "weapons could not be obtained by individuals whose possession of them would be contrary to the public interest"); 89 Fed. Reg. at 29,038-39. Plaintiffs' apparent disagreement with that choice is not a reason to ignore the statute Congress enacted. *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 706 (2022).

### E. Plaintiffs' Arbitrary-and-Capricious and Constitutional Challenges Fail

1. Plaintiffs' other claims fare no better. They characterize (Br. 55-56) the Rule as an unexplained departure from past practice. Plaintiffs do not suggest that the Rule reflects a change in ATF's understanding of the statutory requirements. Instead, they contend that the "departure" from past practice is simply the decision to promulgate a rule where none existed before. Br. 55. Plaintiffs cite no case demanding special justification in those circumstances; the case they cite addressed an agency attempting to rescind a prior agency action without addressing reliance interests engendered by

that prior action. *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). In any event, ATF explained that promulgating the Rule was appropriate to implement the BSCA amendments and to address issues with noncompliance with the statutory requirements, *see supra* p. 29, and acknowledged that in 1980 it had declined to promulgate a regulation addressing the definition of "engaged in the business," 89 Fed. Reg. 28,969-70. Nothing more could be demanded here. *See, e.g.*, *WildEarth Guardians v. U.S. EPA*, 770 F.3d 919, 941 (10th Cir. 2014) (explaining "reversal of policy" is permissible if "adequately explain[ed]").

Plaintiffs' suggestion that the Rule is arbitrary and capricious because it establishes a "multi-factor" test that makes it "impossible for an ordinary person to determine when exactly they need a license," Br. 55, largely appears to repeat plaintiffs' erroneous statutory arguments. They criticize the absence of "bright-line rules," Br. 54, but they do not dispute that the inquiry into whether someone is "engaged in the business" is inherently fact-specific under the statute, and identify no such bright-line rules themselves. They likewise do not take issue with many of the specific factual scenarios giving rise to presumptions under the Rule. Nor do they suggest that the circumstances identified in past cases and the Rule as demonstrating a need to obtain a license are exclusive, or that a factfinder should ignore other relevant facts and circumstances.

Plaintiffs' theory is apparently that ATF has somehow introduced uncertainty by identifying from judicial precedent and long experience circumstances that

presumptively satisfy, or do not satisfy, the statute's criteria. That is difficult to fathom: the Rule gathers in one place and summarizes principles courts and ATF have long applied, and those same principles would govern the inquiry even in the absence of the Rule. The Rule thus provides for the consistent application of those principles in civil and administrative proceedings by establishing evidentiary presumptions to guide the determination.

The same principles demonstrate the error in plaintiffs' claim that the Rule is unconstitutionally vague. They do not contend that the statute itself is unconstitutionally vague, and acknowledge that "courts have interpreted" the statutory language "for years without issue." Br. 60. Insofar as the specific conduct identified in the Rule is nothing more than a distillation of precedent and practice applying the statute, the Rule promotes public understanding, and plaintiffs' vagueness argument appears to have no independent force. Moreover, as discussed, the Rule itself does not impose any requirement to obtain a license not already required by the statute. And the Rule itself is quite clear about the proceedings in which it applies, the specific conduct that gives rise to an evidentiary presumption in a civil or administrative proceeding, the effects of those presumptions, and how those presumptions may be overcome.

Even if more inquiry were needed, plaintiffs underscore the point with the three aspects of the Rule they contend are vague in at least some applications. Br. 57. Plaintiffs make no effort to square these limited challenges with the general rule that a

facial attack on a regulation requires showing that it is "impermissibly vague in all of its applications." *Village of Hoffman v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982); *see Jake's Fireworks Inc. v. Acosta*, 893 F.3d 1248, 1257-58, 1258 n.9 (10th Cir. 2018). But in any event, these arguments largely repeat plaintiffs' statutory assertions. Plaintiffs assert, for example, that the term "primarily for personal protection" is vague, Br. 57, but do not engage with the plain text or the structural indications demonstrating the meaning of that term, much less the cases applying the interpretation the Rule adopts. *See supra* pp. 39-42. And their assertions that the term is vague because it includes consideration of "the subjective intent of the potential licensee," Br. 57, or that the Rule is more generally vague because it is not "exhaustive," Br. 60, and recognizes that "other evidence" may be relevant, Br. 58, are baffling; plaintiffs do not contend that the statutory language provides an exhaustive list of conduct that meets the statutory definition, and many provisions call for inquiry into subjective intent or "the application of a qualitative standard … to real-world conduct" without thereby becoming vague. *Johnson v. United States*, 576 U.S. 591, 604 (2015). And in any event, even if plaintiffs could identify some marginal cases, it is well-settled that that alone would not suffice to demonstrate vagueness. *E.g.*, *Parker v. Levy*, 417 U.S. 733, 757 (1974).

2. The Rule comports with the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court made clear that "longstanding … laws imposing conditions and qualifications on the commercial sale of arms" are

"presumptively lawful regulatory measures," *id.* at 626-27 & 627 n.26, and the

Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1

(2022), "did nothing to disturb that part of *Heller*," *McRorey v. Garland*, 99 F.4th 831,

836 (5th Cir. 2024).

In *Bruen*, both the majority opinion and Justice Kavanaugh's concurrence

affirmed the constitutionality of "'shall-issue' licensing regimes," in which the right to

carry weapons is conditioned on passing a "background check" and obtaining a

license. *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring). And

the Fifth Circuit recently held that the background check requirements of the BSCA

are constitutional, even though those background checks may delay an individual's

ability to purchase a firearm. *McRorey*, 99 F.4th at 839. If it is permissible to require a

license to *bear* arms, a right listed in the Second Amendment, there is no reason that it

would violate the Second Amendment to require a license to *deal* in firearms, an

activity not mentioned in the amendment's text. *See id.* at 835-37; *see also* 89 Fed. Reg.

at 29,002 (citing cases). It is no surprise that courts both before and after *Bruen* have

rejected arguments that the Second Amendment precludes regulation of those

engaged in the business of dealing in firearms. *See, e.g., Teixeira v. County of Alameda*,

873 F.3d 670 (9th Cir. 2017) (en banc); *United States v. Flores*, 652 F. Supp. 3d 796 (S.D. Tex. 2023).[4]

The GCA's modest requirements for commercial sales are, moreover, "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As ATF explained in the Rule's preamble, "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." 89 Fed. Reg. at 29,002. For example, in 1794, Congress enacted a law temporarily making it unlawful "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados, gunpowder, sulphur, or saltpetre," Act of May 22, 1794, ch. 33, § 1, 1 Stat. 369, 369, making clear that the Founding generation believed that it was constitutionally permissible to regulate arms sales. And in concluding that "[t]he historical record confirms that the right to sell firearms was not within the 'historical understanding of the scope of the [Second Amendment] right,'" *Teixeira*, 873 F.3d at 683, the Ninth Circuit cited additional historical materials showing that many colonies enacted restrictions on commercial sales of firearms to Indians, and Connecticut and Virginia "controlled more generally where colonial settlers could transport or sell guns," *id.* at 685.

---

[4] *United States v. Duncan*, No. 7:20-cr-00167-M-3, 2023 WL 7346042, at *3 (E.D.N.C. Nov. 7, 2023); *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022); *United States v. McNulty*, 684 F. Supp. 3d 14, 17-21 (D. Mass. 2023); *United States v. Tilotta*, No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022).

Plaintiffs note that some courts have held that the Second Amendment's right to keep a weapon implies a right to purchase a weapon. *See, e.g., Teixeira*, 873 F.3d at 677. But that hardly suggests an unfettered right to engage in the business of dealing in firearms without regulations such as licensing. Indeed, such "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," *Heller*, 554 U.S. at 626-27, 627 n.26.

The cases cited by Plaintiffs are not to the contrary. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), held that the Second Amendment protected a right to practice shooting at a firing range, not to engage in the business of dealing in firearms without a license. In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), the court noted in dicta that there may be a "constitutional defect in prohibiting the commercial sale of firearms," but the court did not suggest that mere regulations on commercial sales would violate the Second Amendment. *Id.* at 92 n.8.

Plaintiffs' briefly sketched history is no more persuasive. Plaintiffs ignore the examples provided by the Rule and those identified by the Court in *Teixeira*. And the fact that American colonists were opposed to a complete embargo on gun imports by King George hardly demonstrates that there is no tradition of modest licensing requirements on commercial firearm sales.

## III. The Other Factors Weigh Against an Injunction

A. The other injunctive factors likewise do not support the extraordinary relief of a preliminary injunction.

Plaintiffs' claims of irreparable harm largely overlap with their claims to standing, and fail for the same reasons. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.") (quotation marks omitted). The individual plaintiffs have not demonstrated irreparable harm because they have not alleged any intention to engage in conduct proscribed by the Rule. Chisholm Trail and the States have not demonstrated irreparable harm because the financial injuries they allege are too speculative and too attenuated to be properly attributed to the Rule.

As to the final two factors, the balance of the equities and public interest merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As noted, plaintiffs face no cognizable injury at all from the Rule, and many would face injury only in the event they were involved in some unspecified future administrative or civil proceeding. The government, on the other hand, has a strong interest in continuing to enforce the Rule. Regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime." *United States v. Biswell*, 406 U.S. 311, 315 (1972). ATF nonetheless documented significant noncompliance with the licensing requirements of the GCA, even before the BSCA amendments. 89 Fed. Reg. at 29,086. The Rule promotes compliance with those licensing requirements. Any preliminary injunction would undercut these efforts to reduce noncompliance.

B. If the Court were to conclude that a preliminary injunction is warranted, that relief should be no broader than necessary to remedy any demonstrated harms of

the plaintiffs in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *accord Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002).

This Court should limit relief to the provisions or aspects held likely unlawful. The Rule contains a "[s]everability" section expressing ATF's intent that the Rule's provisions be severable to the maximum extent possible, such that if any aspect of the Rule is held unlawful, the remainder "shall not be affected and shall be construed so as to give them the maximum effect permitted by law." 89 Fed. Reg. at 29,070. Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency *and* [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *see New Mexico v. Dep't of the Interior,* 854 F.3d 1207, 1233 (10th Cir. 2017). The Rule's severability section makes clear ATF's intentions. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

KATE E. BRUBACHER
*United States Attorney*

MICHAEL S. RAAB

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
KEVIN KENNEDY
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

November 2024

## REQUEST FOR ORAL ARGUMENT

Appellees belief that oral argument would be of assistance to this Court, and respectfully request oral argument.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,908 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 921 (excerpts) ........................................................................A1

18 U.S.C. § 922 (excerpts) ........................................................................A4

27 C.F.R. § 478.11 (excerpts) ...................................................................A5

27 C.F.R. § 478.13 ....................................................................................A7

**18 U.S.C. § 921 (excerpts)**

**§ 921. Definitions**

**(a)** As used in this chapter—

…

  **(11)** The term "dealer" means (A) any person engaged in the business of selling firearms at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker. The term "licensed dealer" means any dealer who is licensed under the provisions of this chapter.

…

  **(13)** The term "collector" means any person who acquires, holds, or disposes of firearms as curios or relics, as the Attorney General shall by regulation define, and the term "licensed collector" means any such person licensed under the provisions of this chapter.

…

  **(21)** The term "engaged in the business" means—

  **(A)** as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured;

  **(B)** as applied to a manufacturer of ammunition, a person who devotes time, attention, and labor to manufacturing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition manufactured;

  **(C)** as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms;

  **(D)** as applied to a dealer in firearms, as defined in section 921(a)(11)(B), a person who devotes time, attention, and labor to engaging in such activity as a regular course of trade or business with the principal objective of livelihood and profit, but such term shall not include a person who makes occasional

repairs of firearms, or who occasionally fits special barrels, stocks, or trigger mechanisms to firearms;

**(E)** as applied to an importer of firearms, a person who devotes time, attention, and labor to importing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms imported; and

**(F)** as applied to an importer of ammunition, a person who devotes time, attention, and labor to importing ammunition as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the ammunition imported.

**(22)** The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended—

  **(i)** to intimidate or coerce a civilian population;

  **(ii)** to influence the policy of a government by intimidation or coercion; or

  **(iii)** to affect the conduct of a government by assassination or kidnapping.

**(23)** The term "with the principal objective of livelihood and profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this paragraph, the term "terrorism" means activity, directed against United States persons, which—

**(A)** is committed by an individual who is not a national or permanent resident alien of the United States;

**(B)** involves violent acts or acts dangerous to human life which would be a criminal violation if committed within the jurisdiction of the United States; and

**(C)** is intended—

  **(i)** to intimidate or coerce a civilian population;

  **(ii)** to influence the policy of a government by intimidation or coercion; or

  **(iii)** to affect the conduct of a government by assassination or kidnapping.

**18 U.S.C. § 922 (excerpts)**

**§ 922. Unlawful acts**

**(a)** It shall be unlawful—

    **(1)** for any person—

        **(A)** except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce; or

        **(B)** except a licensed importer or licensed manufacturer, to engage in the business of importing or manufacturing ammunition, or in the course of such business, to ship, transport, or receive any ammunition in interstate or foreign commerce;

        …

**27 C.F.R. § 478.11 (excerpts)**

**§ 478.11. Meaning of terms.**

…

*Collector.* Any person who acquires, holds, or disposes of firearms as curios or relics.

…

*Curios or relics.* Firearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons. To be recognized as curios or relics, firearms must fall within one of the following categories:

**(a)** Firearms which were manufactured at least 50 years prior to the current date, but not including replicas thereof;

**(b)** Firearms which are certified by the curator of a municipal, State, or Federal museum which exhibits firearms to be curios or relics of museum interest; and

**(c)** Any other firearms which derive a substantial part of their monetary value from the fact that they are novel, rare, bizarre, or because of their association with some historical figure, period, or event. Proof of qualification of a particular firearm under this category may be established by evidence of present value and evidence that like firearms are not available except as collector's items, or that the value of like firearms available in ordinary commercial channels is substantially less.

…

*Personal collection (or personal collection of firearms, or personal firearms collection)*—(1) *General definition.* Personal firearms that a person accumulates for study, comparison, exhibition (e.g., collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (e.g., noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit (e.g., primarily for a commercial purpose or financial gain, as distinguished from personal firearms a person accumulates for study, comparison, exhibition, or for a hobby, but which the person may also intend to increase in value). In addition, the term shall not include firearms accumulated primarily for personal protection: Provided, that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.

…

*Principal objective of livelihood and profit.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents such as improving or liquidating a personal firearms collection: Provided, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

## § 478.13. Definition of "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker."

**(a) *Definition.*** A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms. The term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms. In addition, the term shall not include an auctioneer who provides only auction services on commission to assist in liquidating firearms at an estate-type auction; provided, that the auctioneer does not purchase the firearms, or take possession of the firearms for sale on consignment.

**(b) *Fact-specific inquiry.*** Whether a person is engaged in the business as a dealer under paragraph (a) of this section is a fact-specific inquiry. Selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity. However, there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (e.g., where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license; whereas, a single isolated firearm transaction without such evidence would not require a license. At all times, the determination of whether a person is engaged in the business of dealing in firearms is based on the totality of the circumstances.

**(c) *Presumptions that a person is engaged in the business as a dealer.*** In civil and administrative proceedings, a person shall be presumed to be engaged in the business of dealing in firearms as defined in paragraph (a) of this section, absent reliable evidence to the contrary, when it is shown that the person—

**(1)** Resells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (i.e., to be a source of additional firearms for resale);

**(2)** Repetitively purchases for the purpose of resale, or repetitively resells or offers for resale, firearms—

**(i)** Through straw or sham businesses, or individual straw purchasers or sellers; or

**(ii)** That cannot lawfully be purchased, received, or possessed under Federal, State, local, or Tribal law, including:

**(A)** Stolen firearms (e.g., 18 U.S.C. 922(j));

**(B)** Firearms with the licensee's serial number removed, obliterated, or altered, or not identified as required by law (e.g., 18 U.S.C. 922(k) or 26 U.S.C. 5861(i));

**(C)** Firearms imported in violation of law (e.g., 18 U.S.C. 922(l), 22 U.S.C. 2778, or 26 U.S.C. 5844, 5861(k)); or

**(D)** Machineguns or other weapons defined as firearms under 26 U.S.C. 5845(b) that cannot lawfully be possessed (e.g., 18 U.S.C. 922(o); 26 U.S.C. 5861(d));

**(3)** Repetitively resells or offers for resale firearms—

**(i)** Within 30 days after the person purchased the firearms; or

**(ii)** Within one year after the person purchased the firearms if they are—

**(A)** New, or like new in their original packaging; or

**(B)** The same make and model, or variants thereof;

**(4)** As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale to a person (other than a licensee in accordance with § 478.57 or § 478.78) firearms that were in the business inventory of the former licensee at the time the license was terminated (i.e., license revocation, denial of license renewal, license expiration, or surrender of license), whether or not such firearms were transferred to a responsible person of the former licensee after the license was terminated in accordance with § 478.57(b)(2) or § 478.78(b)(2); or

**(5)** As a former licensee (or responsible person acting on behalf of the former licensee), resells or offers for resale firearms that were transferred to the licensee's personal collection or otherwise as personal firearms in accordance with 18 U.S.C. 923(c) and 27 CFR 478.125a(a) prior to the time the license was terminated, unless:

**(i)** The firearms were received and transferred without any intent to willfully evade the restrictions placed on licensees by 18 U.S.C. chapter 44; and

**(ii)** One year has passed from the date of transfer to the licensee's personal collection or otherwise as personal firearms.

**(d)** ***Predominantly earn a profit***—(1) *Definition.* The intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: Provided, that proof of profit, including the intent to profit, shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism. For purposes of this section, a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms.

**(2)** ***Presumptions that a person has intent to predominantly earn a profit.*** In civil and administrative proceedings, a person shall be presumed to have the intent to predominantly earn a profit through the repetitive purchase and resale of firearms as defined in paragraph (d)(1) of this section, absent reliable evidence to the contrary, when it is shown that the person—

**(i)** Repetitively or continuously advertises, markets, or otherwise promotes a firearms business (e.g., advertises or posts firearms for resale, including through the internet or other digital means, establishes a website to offer their firearms for resale, makes available business cards, or tags firearms with sales prices), regardless of whether the person incurs expenses or only promotes the business informally;

**(ii)** Repetitively or continuously purchases, rents, or otherwise exchanges (directly or indirectly) something of value to secure permanent or temporary physical space to display firearms they offer for resale, including part or all of a business premises, a table or space at a gun show, or a display case;

**(iii)** Makes and maintains records to document, track, or calculate profits and losses from firearms repetitively purchased for resale;

**(iv)** Purchases or otherwise secures merchant services as a business (e.g., credit card transaction services, digital wallet for business) through which the person intends to repetitively accept payments for firearms transactions;

**(v)** Formally or informally purchases, hires, or otherwise secures business security services (e.g., a central station-monitored security system registered to a business, or guards for security) to protect firearms assets and repetitive firearms transactions;

**(vi)** Formally or informally establishes a business entity, trade name, or online business account, including an account using a business name on a social media or other website, through which the person makes, or offers to make, repetitive firearms transactions; or

A9

**(vii)** Secures or applies for a State or local business license to purchase for resale or to resell merchandise that includes firearms.

**(e)** *Conduct that does not support a presumption.* A person shall not be presumed to be engaged in the business of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms—

**(1)** As bona fide gifts;

**(2)** Occasionally to obtain more valuable, desirable, or useful firearms for the person's personal collection;

**(3)** Occasionally to a licensee or to a family member for lawful purposes;

**(4)** To liquidate (without restocking) all or part of the person's personal collection; or

**(5)** To liquidate firearms—

**(i)** That are inherited; or

**(ii)** Pursuant to a court order; or

**(6)** To assist in liquidating firearms as an auctioneer when providing auction services on commission at an estate-type auction.

**(f)** *Rebuttal evidence.* Reliable evidence of the conduct set forth in paragraph (e) of this section may be used to rebut any presumption in paragraph (c) or (d)(2) of this section that a person is engaged in the business of dealing in firearms, or intends to predominantly earn a profit through the repetitive purchase and resale of firearms.

**(g)** *Presumptions, conduct, and rebuttal evidence not exhaustive.* The activities set forth in the rebuttable presumptions in paragraphs (c) and (d)(2) of this section, and the activities and rebuttal evidence set forth in paragraphs (e) and (f) of this section, are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms.

**(h)** *Criminal proceedings.* The rebuttable presumptions in paragraphs (c) and (d)(2) of this section shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences.