No. 24-3101

———————————————

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————————

STATES OF KANSAS, IOWA, MONTANA, ALABAMA, ALASKA, GEORGIA,
IDAHO, INDIANA, KENTUCKY, MISSOURI, NEBRASKA, NEW
HAMPSHIRE, NORTH CAROLINA, OKLAHOMA, SOUTH CAROLINA,
SOUTH DAKOTA, TENNESSEE, VIRGINIA, WEST VIRGINIA, WYOMING,
AND PHILLIP JOURNEY, ALLEN BLACK, DONALD MAXEY, AND
CHISHOLM TRAIL GUN ASSOCIATION,
Plaintiffs-Appellants.
v.
MERRICK GARLAND, in his official capacity as Attorney General of the United
States, STEVEN DETTELBACH, in his official capacity as the Director of the
Bureau of Alcohol, Tobacco, Firearms, & Explosives of the United States
Department of Justice, and the BUREAU OF BUREAU OF ALCOHOL,
TOBACCO, FIREARMS, & EXPLOSIVES,
Defendant-Appellees.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
Case No. 6:24-cv-01086-TC-TJJ

———————————————

**MOTION FOR AN INJUNCTION PENDING APPEAL**

———————————————

**KRIS W. KOBACH**
**ATTORNEY GENERAL OF KANSAS**
Abhishek S. Kambli
Deputy Attorney General
120 SW 10th Avenue
Topeka, KS 66612-1597
(785) 296-7109
Abhishek.Kambli@ag.ks.gov
Counsel for Appellant State of Kansas
*Counsel for the Plaintiff-Appellant States*

Dated: July 24, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................... ii

JURISDICTION .........................................................................................................1

INTRODUCTION .......................................................................................................1

BACKGROUND .........................................................................................................2

LEGAL STANDARD ..................................................................................................5

ARGUMENT ..............................................................................................................5

    A.    Plaintiffs Have Standing ...................................................................6

        1.    Individual Plaintiffs have standing ..........................................6
        2.    Plaintiff Chisholm Trail has standing ......................................8
        3.    Plaintiff States have standing ................................................10

    B.    The States Are Likely to Prevail on Their Challenges to The
        Rule's Legality ............................................................................... 12

        1.    The Rule is Contrary to Federal Law.......................................12
            a.    ATF lacks statutory authority to issue the Rule .........................12
            b.    The Rule Rewrites the Statute it Claims to Interpret ...............14

    C.    The Rule is Arbitrary and Capricious ............................................. 16

    D.    The Rule is Unconstitutionally Vague ............................................. 17

    E.    The Rule Violates the Second Amendment..................................... 18

II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN
    INJUNCTION ................................................................................... 19

III.    DEFENDANTS FACE NO COGNIZABLE HARM IN AN INJUNCTION
    PENDING APPEAL AND IT IS IN THE PUBLIC INTEREST............ 20

CONCLUSION.........................................................................................................21

CERTIFICATE OF COMPLIANCE ........................................................................22

CERTIFICATE OF SERVICE.................................................................................23

# TABLE OF AUTHORITIES

CASES

*Automated Marketing. Systems, Inc. v. Martin*, 467 F.2d 1181 (10th Cir. 1972)........... 6

*Berdiev v. Garland*, 13 F.4th 1125 (10th Cir. 2021) ...................................................... 6

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................................... 6

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013) ....................................... 10

*Colorado Union of Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581 (10th Cir. Aug. 23, 2023)................................................................................................................ 7

*Department of Commerce v. New York*, 139 S. Ct. 2551 (2019)................................... 10

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S 167 (2000) 9

*Harman v. City of Norman*, 981 F.3d 1141 (10th Cir. 2020)...................................... 6, 12

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................... 6

*New York v. Yellen*, 15 F.4th 569 (2nd Cir. 2021) ..................................................... 9, 10

*Nken v. Holder*, 556 U.S. 418 (2009)............................................................................. 5

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) .......... 9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)............................................... 7

*Texas v. ATF*, No. 2:24-CV-089-Z, 2024 WL 2967340 (N.D. Tex. June 11, 2024).. 3, 7, 10

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015), *affirmed by an equally divided Court* 579 U.S. 547 (2016) ...................................................................................................... 7, 11

*Tyler v. Hennepin County*, 598 U.S. 631 (2023)............................................................ 10

REGULATIONS

Kan. Admin. Regs. § 92-19-22a(4) ............................................................... 11

ACTS OF CONGRESS

Bipartisan Safer Communities Act, Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022)
............................................................................................................................... 3

## JURISDICTION

The district court has federal question jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction over an interlocutory appeal under 28 U.S.C. § 1292(a) as Plaintiffs were denied injunctive relief.

## INTRODUCTION

Defendants have instituted an unlawful Rule that requires virtually anyone who sells a firearm "predominantly for a profit" to obtain a federal license or face civil and even criminal penalties. The Rule entitled "Definition of 'Engaged in the Business' as a Dealer in Firearms." 89 Fed. Reg. 28,968 (April 10, 2024). It attempts to rewrite the statute it claims as authority to regulate private sales of firearms. As licensees are required to preform background checks before selling firearms, the Rule attempts to ensure near-universal background checks for firearm purchases. But the Rule is unlawful because it violates the constitution, violates the Administrative Procedure Act ("APA"), and even tries to rewrite the statute it claims for its authority.

The Rule has caused (and will continue to cause) irreparable harm to individual, organizational, and State Plaintiffs who sought injunctive relief. Yet, because the district court applied the wrong legal standard, those parties were denied a preliminary injunction. Plaintiffs therefore ask this Court for an injunction pending appeal, to avoid further irreparable harm.

# BACKGROUND

Since the Federal Firearms Act of 1938 ("FFA"), Congress has required firearm "dealers" to obtain federal licenses. Pub. L. No. 75-785, 52 Stat. 1250, 1251. Although precisely who qualifies as a "dealer" has changed since then, the FFA's core definition—"any person engaged in the business of selling firearms," 52 Stat. at 1250—still prevails to this day. 18 U.S.C. § 921(a)(11).

However, in the mid-1980s, Congress became concerned that the Bureau of Alcohol, Tobacco, and Firearms ("ATF")[1] was abusing its authority and targeting lawful behavior. *See* Pub. L. No. 99-308 § 1, 100 Stat. 449, 449. Congress therefore passed the Firearms Owners' Protection Act ("FOPA"). The FOPA narrowed the definition of "dealer" by defining "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 100 Stat. at 450. But the FOPA excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* It also narrowed the licensing requirement by defining "with the principal objective of livelihood and profit" as intending "the sale or

---

[1] In 2002, the ATF was transferred from the Department of the Treasury to the Department of Justice and renamed the Bureau of Alcohol, Tobacco, Firearms and Explosives. Pub. L. No. 107-296 § 1111, 116 Stat. 2135, 2274–75.

disposition of firearms . . . predominantly [to] obtain livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.*

In 2022, Congress passed the Bipartisan Safer Communities Act ("BSCA"), Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022). The BSCA made one minor change to the FOPA: it removed "livelihood" from the definition of "dealer in firearms," making it clear that firearm dealing did not have to be a person's sole job for that person to qualify as a "dealer." 136 Stat. at 1324–25. ATF interpreted this minor change as a sweeping mandate to announce new regulatory restrictions on individuals. On April 10, 2024, ATF published the Rule that Plaintiffs challenged below. The Rule purported to "clarify" the meaning of "engaged in the business" following the passage of the BSCA. But in reality, the agency re-defined terms Congress had already defined. The Rule's published effective date was May 20.

On May 1, before the Rule went into effect, Plaintiffs (21 states, individual Plaintiffs Phillip Journey, Allen Black, and Donald Maxey (collectively "Individual Plaintiffs"), and organizational Plaintiff Chisholm Trail Gun Association) filed suit in the Eastern District of Arkansas, challenging the Rule.[2] A.1. A few days later,

---

[2] Another lawsuit was filed at the same time in the Northern District of Texas. Reviewing what is essentially the same record here, the Northern District of Texas appropriately granted a preliminary injunction, *see Texas v. ATF*, No. 2:24-CV-089-Z, 2024 WL 2967340 (N.D. Tex. June 11, 2024).

Plaintiffs filed a motion asking the court to preliminary enjoin Defendants from enforcing the Rule. Dkt. 4. On May 17, the Eastern District of Arkansas held a hearing on the preliminary injunction. *See* Dkt. 65. Six days later (after the Rule had taken effect), that district court found Plaintiff Arkansas did not have standing, and therefore venue was improper. So, it transferred the case to the District of Kansas. Dkt. 75; A.52.

Plaintiffs immediately filed a motion for a hearing and a temporary restraining order in the District of Kansas. Dkt. 78, 81; A.59, A.62. That court (hereinafter the district court) denied the TRO and instead issued a scheduling order for briefing on a preliminary injunction. *See* Dkt. 100. Plaintiffs filed another motion for a preliminary injunction. Dkt.103; A.65. They argued the district court should grant preliminary relief on the same grounds already argued in Arkansas. A.85–90, A.99. In support of the motion, Plaintiffs provided ten affidavits from people with knowledge of firearm dealing generally and gun shows specifically (including from Individual Plaintiffs themselves) as evidence of their irreparable injuries and the Rule was the cause of thereof. *See* A.81, A.108–115, A.130–200.

The district court held a hearing on the renewed motion on July 1. On July 10, the district court denied the preliminary injunction and Plaintiffs filed a notice of appeal. Plaintiffs filed a motion for an injunction pending appeal in the district court a few days later, which the district court denied. Plaintiffs therefore seek an injunction pending appeal from this Court.

## LEGAL STANDARD

In evaluating a motion for injunction pending appeal, a court considers "four factors: '(1) whether the [] applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent [an injunction]; (3) whether issuance of the [injunction] will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).[3]

## ARGUMENT

Plaintiffs are likely to succeed on appeal because they have standing and the Rule is unlawful.

In denying Plaintiffs' motion for a preliminary injunction, the district court applied the wrong legal standard for "substantial likelihood of success on the merits." *Kansas v. Garland*, No. 24-CV-01086-TC-TJJ, 2024 WL 3360533, at *1 (D. Kan. July 10, 2024). According to the district court, the burden for likelihood of success on the merits is "much higher when a party seeks a preliminary injunction" than even final judgement. *Id.* at *6. This is wrong, and the authority the district court itself cited shows that.

The district court cited *Harmon v. City of Norman*, 981 F.3d 1141, 1146 (10th Cir.

---

[3] *Nken* technically speaks of applications for a stay, but the same standard applies to injunction requests, *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001).

2020) for its supposed heightened standard. But *Harmon* stated, "[i]n order to show a substantial likelihood of success on the merits, Plaintiffs had 'to make a prima facie case showing a reasonable probability that [they] will ultimately be entitled to the relief sought.'" *Id.* (quoting *Automated Mktg. Sys. Inc. v. Martin*, 467 F.2d 1181, 1183 (10th Cir. 1972)). The district court applied its flawed heightened standard to both whether Plaintiffs had standing and on the merits of their claims. That is a legal error and inherently an abuse of discretion. *See Berdiev v. Garland*, 13 F.4th 1125, 1132 (10th Cir. 2021). Therefore, Plaintiffs are likely to succeed on appeal.

### A.    Plaintiffs Have Standing

Plaintiffs have standing as individuals, an organization and States. This Court only needs to be convinced that at least one of them has standing in order for the claims to proceed. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023). However, all of Plaintiffs have standing.

### 1.    Individual Plaintiffs have standing

Individual Plaintiffs have standing. "The nature and extent of facts that . . . establish standing depends considerably upon whether the plaintiff is himself an object of the action" and "[i]f he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgement preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992). Individual Plaintiffs all submitted detailed declarations describing their long-running practices of buying and selling firearms at gun shows oftentimes for what can be

deemed "predominantly for a profit" (thus subjecting themselves to the Rule's licensing requirement). A.130–38; A.139–41; A.145–47.

The Rule directly regulates this behavior. "The definition of 'to predominantly earn a profit' now focuses only on whether the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain." 89 Fed. Reg. 28,968. Basically, the Rule effectively gives Individual Plaintiffs two choices: (1) get a license to sell firearms or (2) risk civil, administrative, and criminal penalties by selling firearms at gun shows without one. Indeed, *the Rule itself* admits it would "result in more persons . . . becoming licensed and deter others from engaging in the business of dealing in firearms without a license." *Id.*

Because "[a] plaintiff suffers an injury even if it can avoid that injury by incurring other costs," Individual Plaintiffs have standing here. *Texas v. United States*, 787 F.3d 733, 749 (2015). More specifically, Individual Plaintiffs have shown that they have an intention to engage in a course of conduct that is arguably proscribed by the Rule, and that the threat of enforcement is substantial. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014); *Colo. Union of Taxpayers, Inc. v. Griswold*, No. 22-1122, 2023 WL 5426581, at *6–7 (10th Cir. Aug. 23, 2023) (unpublished); *Texas v. ATF*, 2024 WL 2967340, at *4–5.

The district court conducted almost no analysis and concluded these injuries were "speculative." *Kansas*, No. 24-CV-01086-TC-TJ, at *5. This is incorrect. The declarations provided by Individual Plaintiffs point to exactly the harm they face as a

result of the Rule. Journey states, he will "either give up selling firearms or register as a federal firearms license." A.133. Furthermore, Journey stated, "parts of the Rule are so convoluted, vague, and ambiguous that I (even as a lawyer myself) cannot determine what is prohibited versus what is allowed." *Id.* at 134. This is especially important since Individual Plaintiffs raise a void for vagueness challenge to the Rule. Black and Maxey, who are members of Chisholm Trail, made averred similar facts. A.139–41; A.145–47.

The district court refused to engage with the evidence provided in Individual Plaintiffs' declarations and provided little analysis in its conclusion that they have not demonstrated standing. Its conclusion that such injuries were "speculative," *Kansas*, No. 24-CV-01086-TC-TJ, at *5, was incorrect because "where threatened action by *government* is concerned, [federal courts] *do not require a plaintiff to expose himself to liability* before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (emphases added); *see also Davis v. FEC*, 554 U.S. 724, 734 (2008). A "plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction." *Id.* at 129. Thus, Individual Plaintiffs have standing.

## 2.    Plaintiff Chisholm Trail has standing

The inquiry into standing can end with Individual Plaintiffs as only one plaintiff need establish standing in order for the case to proceed. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). In this case, there is more than

one Plaintiff with standing. Maxey and Black are members of Chisholm Trail. Both have standing; and their activities relate to the purpose of the organization. A.139–41; A.145–47. As a result, Chisholm Trail itself has standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.,* 528 U.S 167, 181 (2000).

But Chisholm Trail also has standing as an organization. As noted in its declaration, 70% of Chisholm Trail's operating revenues comes from the two gun shows it organizes every year. A.143. They expect a decrease in these revenues because the Rule can reasonably be expected to cause both (1) a decrease in total vendors selling firearms at gun shows and (2) decreased attendance.

But the district court wrote off this theory saying it was a "layered prediction." *Kansas*, No. 24-CV-01086-TC-TJ, at *5. It did so without further analysis and by ignoring (1) the other declarations in the record and (2) basic economic logic. The combination of these two is sufficient to establish standing for Chisholm Trial. *See New York v. Yellen*, 15 F.4th 569, 577 (2nd Cir. 2021). Private sales of firearms are what dominate these gun shows, and Plaintiffs presented evidence that the Rule will drive down attendance and revenue at such shows (with a 30% drop in the number of unlicensed vendors just in the first weeks the rule has been in effect). A.110; A.114. A drop in Chisolm Trail's revenues is the natural and unavoidable consequence. This is bolstered by Journey's declaration, which described a "panic" among 100 collectors and dealers at the last gun show he attended prior to the Rule taking effect. A.134–35. Even the Rule *itself* acknowledges there will be a decrease in unlicensed vendors in

the marketplace. 89 Fed. Reg. 29,054. It is therefore not some "layered prediction" that Chisolm Trail will face a loss of revenue, but a known phenomenon. Accordingly, Chisholm Trail also has standing to challenge the Rule.

**3.     Plaintiff States have standing**

Plaintiff States have standing through two independent harms: (1) loss of tax revenue and (2) administrative costs. Starting with loss of tax revenue, Plaintiff States have lost and will continue to lose tax revenue as a result of the Rule. And such monetary loss confers standing. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023); *accord Yellen*, 15 F.4th at 576. Loss of revenue caused by a federal agency is an injury to the States that is traceable to Defendants. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Unsurprisingly, the Northern District of Texas found that states had standing on precisely those same grounds. *Texas v. ATF*, 2024 WL 2967340, at *3–4.

The district court here said this harm was based on a speculative chain of causality but that holding was incorrect. "[A] demonstration of omniscience is not required for Article III standing;" "[r]ather, courts 'have found standing based on a "substantial risk" that the harm will occur . . . .'" *Id.* at 7 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

Plaintiff States presented concrete evidence of lost revenue flowing form the Rule. Many Plaintiff States tax tables at gun shows, sales of firearms, or income made from selling firearms. For example, Plaintiff Kansas collects a 6.5% sales tax on both

admissions and sales of firearms during gun shows.  Kan. Admin. Regs. § 92-19-22a(4); *see also* A.19–23.  The loss of tax revenue at gun shows is not speculative; it has already occurred and continues to occur.  A115; A.144.

Similarly, it is undisputed that the Rule will impose additional administrative costs due to an increase in the number of federal firearm licensees predicted by the Rule.  89 Fed. Reg. 28,998.  Tennessee and New Hampshire tie their state background-check requirements to federal law.  As the number of federal firearm licensees increases as a result of the Rule, these states will bear additional administrative expenses of processing these licenses and associated background checks.

These administrative costs are sufficient for standing.  Yet the district court wrote them off in a footnote saying they were "voluntary" without further analysis.  *Kansas*, No. 24-CV-01086-TC-TJ, at *5 n.3.  Again, this was incorrect.  States are also harmed if they are forced to change their laws to *avoid* irreparable injury.  *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015), *aff'ed* 579 U.S. 547 (2016).  The mere fact that the injury occurs by operation of a state law that could be amended is immaterial.  The Rule puts Tennessee and New Hampshire in a position where they either give up the benefits of tying their background checks (required by licensed sellers) to the federal system or (face the undisputed increase in administrative costs).  Either way, both states have standing to challenge the Rule.

**B.** **The States Are Likely to Prevail on Their Challenges to The Rule's Legality**

Even the district court noted that Plaintiffs had identified "serious flaws" with the Rule and that there "instances where the Rule may have effectively attempted to rewrite the statute, which the agency may not do." *Kansas*, No. 24-CV-01086-TC-TJ, at *7. Yet the district court held that Plaintiffs "have not established that the state of play is so one-sided as to warrant injunctive relief." *Id.* This requirement of one-sidedness has no basis in the law. As noted, the district court incorrectly applied a heightened standard for injunctive relief. The correct standard requires merely a *prima facie* showing of a reasonable probability that Plaintiffs will ultimately be entitled to relief. *Harmon*, 981 F.3d at 1146. Plaintiffs more than meet this standard because the Rule (1) is in excess of and contrary to federal law, (2) is arbitrary and capricious, (3) is unconstitutionally vague, and (4) violates the Second Amendment.

**1.** **The Rule is Contrary to Federal Law**

The Rule takes a wrecking ball through the statute it claims as authority. Defendants don't have statutory authority to issue the Rule to begin with. And even if they did, the Rule rewrites the underlying statute in multiple ways. In either scenario, it is unlawful.

**a.** **ATF lacks statutory authority to issue the Rule**

In assessing agency authority under a statute, courts use every tool at their disposal to determine the best reading of the statute." *Loper Bright Enters. v. Raimondo*,

144 S. Ct. 2244, 2266 (2024).  Whether the agency's reading is a *permissible* reading of the statute is immaterial.  "[I]n an agency case as in any other . . . there is a best reading all the same," and courts search for the best, correct reading of the statute in all cases.  *Id.*; *accord id.* at 2263.

Here, the ATF's statutory authority is in 18 U.S.C. § 926(a), which explains that it "may prescribe *only* such rules and regulations *as are necessary* to carry out the [law's] provisions."  *Id.*  (emphases added).  Within this grant of authority is a significant restriction: the agency may only issue "necessary" rules and regulations.  And it is hardly "necessary" to define the term "engaged in the business" when Congress *already provided its own definition.*[4]

And there is other textual evidence that Congress did not delegate such authority.  Section 921(a) specifically grants ATF rulemaking authority to define the term "curios and relics."  *See* 18 U.S.C. § 921(a)(13).  No other part of § 921(a) authorizes it to promulgate any other definitions.  The use of "particular language in one section of a statute" paired with "omi[ssion] from a neighbor[ing provision]" "normally . . . convey[s] a difference in meaning (*expressio unius est exclusio alterius*)."  *Bittner v. United States*, 598 U.S. 85, 94 (2023).  Consequently, the express grant of authority to define some terms strongly suggests Congress withheld that same

---

[4]  This is especially so when the added definition conflicts with Congress'.  *Infra* Part II.A.2.

authority for other terms.

The best reading of the statute, then, is that ATF lacks authority to issue this Rule.

**b.     The Rule Rewrites the Statute it Claims to Interpret**

The Rule violates federal law in at least two ways: (1) it eviscerates the statute's safe harbor provision by removing an exemption for selling from one's personal collection if those firearms were "primarily for personal protection," 89 Fed. Reg. at 29,090, and (2) it violates the statutory requirement that there be repetitive sales of multiple firearms.

First, 18 U.S.C. § 921(a)(21)(C) has a safe harbor: one "who sells all or part of his personal collection of firearms" needn't be licensed. This is an unequivocal exemption for selling from a personal collection. But Defendants manufacture a hitherto-unknown exception by excluding from one's personal collection "firearms accumulated primarily for personal protection." 89 Fed. Reg. 29,090. Nothing in the statute's text warrants excluding firearms obtained for personal protection from the statutory term "personal collection." Personal protection is "central to the Second Amendment right" and a primary reason that individuals acquire firearms for personal use. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). The practical results of the Rules manufactured exception would be absurd; just about any firearm can be deemed "primarily for personal protection," which would destroy the safe harbor provision of the statute.

Second, § 921(a)(21)(C) requires that someone required to be a licensee has to be "dealing in firearms as a *regular course of trade or business*" by "the *repetitive purchase* and *resale* of firearms." *Id.* (emphases added). Yet the Rule claims that there is no "minimum number of firearms to actually be sold to be 'engaged in the business.'" 89 Fed. Reg. 29,021. According to the Rule, "a single firearm transaction"—or even a mere offer to sell a firearm when combined with other evidence—"may be sufficient to require a license." *Id.* at 28,976. This flatly contradicts the statutory text. The contradiction is even more obvious when viewed in light of the statute's exclusion of people "who make[] occasional sales, exchanges, or purchases . . . for the enhancement of a personal collection or for a hobby," § 921(a)(21)(C). The statute uses the plural form for each of "sales, exchanges," and "purchases"—i.e., even people who sell *multiple* firearm can be exempt from the statute. Yet the Rule regulates those who attempt to sell even one firearm.

The Court should also understand that, because of the link between licensing and background checks, the Rule is an attempt to smuggle universal background checks through the backdoor, settling a long-raging debate over an issue of vast political significance through administrative diktat. 89 Fed Reg. 28,986–987. To do so, the agency needs to point to clear authorization in the statutory language. *West Virginia v. EPA*, 597 U.S. 697, 721–22, 733 (2022). A "colorable" or "plausible" textual basis won't do. *Id.* at 722, 723. Defendants have nothing close to a clear authorization for the Rule.

## C.     The Rule is Arbitrary and Capricious

The Rule is also arbitrary and capricious.  An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation, fails to address alternatives to its action, or ignores affected communities' reliance on the prior rule.  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).  The Rule departs sharply from past practice by defining terms that Congress already defined without reasonable explanation.  The Rule nods toward "new technologies, mediums of exchange, and forums in which firearms are bought and sold," but that's it. 89 Fed. Reg. 28,973. And nothing in the Rule limits its new requirements to those new forums.  Rather, it mostly targets gun shows—which are not new.  Emerging technologies only serve as a pretext for what Defendants wanted to do, which was establish near-universal background checks through the rulemaking process after they failed to pass Congress.

The Rule is also arbitrary and capricious because Defendants have created a convoluted Rule with numerous presumptions and exceptions to those presumptions, and they say that they'll adjudicate violations on a case by case basis without further guidance.  89 Fed. Reg. 28,978.  When an agency intends to apply "a multi-factor test through case-by-case adjudication," some explanation is required to provide "predictability and intelligibility" to regulated parties.  *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.); *see also Kearney Reg'l Med. Ctr., LLC v. Dep't of Health & Human Servs.*, 934 F.3d 812, 816 (8th Cir. 2019) (explaining agency

action is arbitrary where one cannot "discern what legal standard the agency applied"). Otherwise, those seeking to conform their conduct to the regulation cannot know "which factors are significant and which less so, and why." *LeMoyne-Owen Coll.*, 357 F.3d at 61.

Those guardrails are particularly important here, where "[f]ailure to comply" with the Rule "carries the potential for ten years' imprisonment," "fines," and "a lifetime ban on ownership of firearms." *Mock v. Garland*, 75 F.4th 563, 570–71 (5th Cir. 2023). Yet the Rule's "factors, which are both general and unweighted, invite inquiry into areas of doubtful relevance rather than make the [regulated] conduct any clearer," *Record Head Corp. v. Sachen*, 682 F.2d 672, 677 (7th Cir. 1982).

The Fifth Circuit recognized this deficiency clearly with respect to Defendants' stabilizing pistol brace rule. As that court explained, "the six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace." *Mock*, 75 F.4th at 585. The Court should not condone ATF's "vague, indeterminate, multi-factor balancing test," which will use "uncertainty" as "a Sword of Damocles hanging over the heads of American gun owners." *VanDerStok v. Garland*, 86 F.4th 179, 197 (5th Cir. 2023) (Oldham, J., concurring), *cert granted* 144 S. Ct. 1390 (2024). That's unreasoned decisionmaking and an invitation for regulatory abuse.

### D.    The Rule is Unconstitutionally Vague

The Rule's unconstitutionally vague because it does not give a person of reasonable intelligence fair notice that his conduct is unlawful or it "fails to establish

17

standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chi. v. Morales*, 527 U.S. 41, 52, 60 (1999). It also "encourages arbitrary and discriminatory enforcement." *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023). This is for multiple reasons that will be fully briefed at the merits stage but, most notably, the term "primarily for personal protection" as utilized in the Rule is unconstitutionally vague.

As noted above, the Rule eviscerates the statutory safe harbor for selling from one's personal collection by excluding from a collection weapons used "primarily for personal protection." Yet it does so without providing guidance as to what qualifies as such a weapon. This is especially dubious as virtually every firearm can be deemed primarily for personal protection. The Rule provides no guidance on how to make that determination. A person of reasonable intelligence would have no idea how to comply with this provision of the Rule, which means it violates the Constitution's due-process requirement.

### E. The Rule Violates the Second Amendment

Finally, the Rule unconstitutionally burdens a citizen's Second Amendment right to possess a firearm. The ability to buy a firearm is encompassed in the right to keep a firearm. *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023), *vacated on other grounds*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024). The ability to sell a firearm to another is therefore also necessarily protected. *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011). A person can't possess a firearm if he can't acquire one.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). "[T]he government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation" to justify it. *Id.* Although the Court did not address this issue at all in its order, there's little doubt that Defendants failed to make such a showing here.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION

The States have lost tax revenue under the Rule and will continue to lose revenue if the Rule remains in effect during an appeal that will take months to resolve. And the States' increased administrative costs will increase while the Rule remains in effect. Once these taxes are lost and costs are incurred, the states can't get them back. *Kansas ex rel. Kan. Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226, 1251 (10th Cir. 2017) ("[A] party suing the government suffers irreparable harm where monetary relief might not be available because of the government's sovereign immunity." (internal quotes omitted)). The precise magnitude of this loss is far less relevant than the fact of irreparability. *See Rest. Law Ctr. v. Dep't of Labor*, 66 F. 4th 593, 597 (5th Cir. 2023). And the States are also harmed if they're forced to change their laws to *avoid* irreparable injury. *Texas v. United States*, 787 F.3d at 748.

Meanwhile, Individual Plaintiffs face the loss of a constitutional right (and longstanding hobby) to own, buy, and sell their firearms. They face potential civil and

criminal enforcement actions for selling even a single firearm from their personal collections. Even if they were willing to undertake the burdens of obtaining a license, the process takes months and requires them to incur significant costs that they could not later recover. This harm, too, is irreparable.

## III. DEFENDANTS FACE NO COGNIZABLE HARM IN AN INJUNCTION PENDING APPEAL AND IT IS IN THE PUBLIC INTEREST

The Final Rule went into effect about two months ago, but is not fully in effect because the Northern District of Texas enjoined the Final Rule as to the plaintiffs in that case, which include four states, an individual, and organizations. Defendants accordingly have only patchwork enforcement authority now, and will suffer no injury from not having enforcement power as to additional states, individuals, and an organization. In any event, the government has no interest in enforcing an unlawful rule. *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

An injunction pending appeal is also in the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1279 (10th Cir. 2024). Allowing the Rule to remain in place and abridge the constitutional rights of Individual Plaintiffs is contrary to the public interest. This pause will prevent law-abiding citizens from getting caught in the overly broad Rule, which prohibits activities that were lawful until a few weeks ago.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court issue an injunction pending appeal. Plaintiffs request a decision by July 30, 2024.


July 31, 2024                                    Respectfully submitted,


                                                 s/ Abhishek S. Kambli
                                                 Abhishek S. Kambli

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,195 words. It also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface. I further certify that this motion complies with the requirements of Tenth Circuit Rule 27.1 because counsel for plaintiffs-appellees were advised in advance of its filing. Plaintiffs-appellees state that they oppose this motion. I further certify that this motion complies with the requirements of Tenth Circuit Rule 8.1.

s/ Abhishek S. Kambli
Abhishek S. Kambli

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2024, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

s/ Abhishek S. Kambli
Abhishek S. Kambli

**APPENDIX**

## TABLE OF CONTENTS

*Complaint*
.............................................................................................................................................**001**

*Transfer Order of the Eastern District of Arkansas*
.............................................................................................................................................**052**

*Transfer Letter*
.............................................................................................................................................**057**

*Plaintiffs' Motion for a Hearing in the District of Kansas*
.............................................................................................................................................**059**

*Plaintiffs' Motion for a Temporary Restraining Order*
.............................................................................................................................................**062**

*Plaintiffs' Motion for a Temporary Restraining Order or Preliminary Injunction*
.............................................................................................................................................**065**

*Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order or Preliminary Injunction with Exhibits*
.............................................................................................................................................**073**

*Defendants' Response in Opposition to Plaintiffs' Motion for a Temporary Restraining Order or Preliminary Injunction*
.............................................................................................................................................**201**

*Plaintiffs' Reply in Support of Plaintiffs' Motion for a Temporary Restraining Order or Preliminary Injunction*
.............................................................................................................................................**230**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

State of KANSAS,
State of ARKANSAS,
State of IOWA,
State of MONTANA,
State of ALABAMA,
State of ALASKA,
State of GEORGIA,
State of IDAHO,
State of INDIANA,
State of KENTUCKY,
State of MISSOURI,
State of NEBRASKA,
State of NEW HAMPSHIRE,
State of NORTH DAKOTA,
State of OKLAHOMA,
State of SOUTH CAROLINA,
State of SOUTH DAKOTA,
State of TENNESSEE,
State of VIRGINIA,
State of WEST VIRGINIA,
State of WYOMING,
PHILLIP JOURNEY,
ALLEN BLACK,
DONALD MAXEY, and
CHISHOLM TRAIL ANTIQUE GUN
ASSOCIATION,

Plaintiffs,

v.

MERRICK B. GARLAND, in his official
capacity, as Attorney General of the United
States,
STEVEN DETTELBACH, in his official
capacity, as the Director of the Bureau of
Alcohol, Tobacco, Firearms, and Explosives,
UNITED STATES DEPARTMENT OF
JUSTICE, and
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

Defendants.

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 0 1 2024

TAMMY H. DOWNS, CLERK
By:_____
                    DEP CLERK

Civil Action No. *2:24CV88-JM*

This case assigned to District Judge *Moody*
and to Magistrate Judge *Moore*

001

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

The right to keep and bear arms is central to our country's history and traditions, so Congress must be careful when addressing that right through federal legislation. For that reason, current law is tailored to regulate and reach only interstate, commercial firearm sales—not small-scale sales and certainly not private sales between individual citizens. And Congress has affirmed that aim time and again through clear statutory text and express statements of purpose. Yet Defendants, Attorney General Merrick Garland and Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF" or "Director") Steven Dettelbach, claim that Congress gave them authority to regulate far more broadly. Under a new rule, *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Final Rule"), ATF claims the power to reach and regulate (via an extensive licensing scheme) a citizen who makes a local sale of even one firearm to another individual.

For more than 40 years, the relevant federal statute has already defined who is required to become a federal firearms licensee. Yet Defendants seized on a recent, minor change in that statute and effectively rewrote the entire definition. Until now, only those who *repetitively* purchased and sold firearms as a *regular course* of business had to become a licensee. But through the Final Rule, Defendants will now presume that anyone who sells or resells even one firearm with the intent to profit (no matter how little), combined with other (nebulously defined) evidence, is a firearms dealer who must become a licensee. This would put innocent firearms sales between law-abiding friends and family members within the reach of federal regulation. Such innocent sales between

2

friends and family would constitute a felony if the seller did not in fact obtain a federal firearms license and perform a background check.

Defendants' claim of authority to implement this scheme dramatically upends both our constitutional traditions and the federal firearms licensing regime Congress designed. Not only does the Final Rule go beyond the Defendants' statutory authority, but it also contradicts the applicable statutory language. The Final Rule is therefore unlawful and this Court should set it aside.

## THE PARTIES

1.      Plaintiffs Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia, West Virginia, Wyoming ("Plaintiff States") are all sovereign states of the United States of America, and they sue to vindicate their sovereign, quasi-sovereign, and proprietary interests.

2.      Plaintiff States bring this suit through their Attorneys General, who are each the chief legal officer of their state and have the authority to represent their state in federal court. *See* Ala. Code § 36-15-1(2); AS 44.23.020; Ark. Code Ann. 25-16-703; GA Code § 45-13-3-6; Idaho Code § 67-1401; Ind. Code § 4-6-1-6; Iowa Code § 13.2; Kan. Stat. Ann. 75-702(a), Ky. Rev. Stat. § 15.020; Mo. Rev. Stat. 27.060; Mont. Code. Ann. § 2-15-501; Neb. Rev. Stat. § 84-203; N.H. Rev. Stat. § 21-M:2; N.D.C.C. § 54-12-01; Okla. Stat. tit. 74, § 18b(A)(2); SDCL ch. 1-11, Tenn. Code Ann. § 8-6-109(b)(1); Va. Code §§ 2.2-507, 2.2-513; W. Va. Code § 5-3-2; Wyo. Stat. Ann. § 9-1-603; *State ex rel. Condon v. Hodges*, 349 S.C. 232, 239–40, 562 S.E.2d 623, 627 (2002) (the South Carolina attorney general "'may institute, conduct and maintain all such suits and *proceedings* as *he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the

*protection of public rights.*'" (emphasis in original) (quoting *State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd* 282 U.S. 187 (1930)).

3. Plaintiff Phillip Journey ("Journey") is a firearms collector and hobbyist residing in Wichita, Kansas. He is also a shooting sports coach and instructor. He is an American citizen who is not engaged in the firearms business. Indeed, he is a state court judge in Kansas in Division 1, 18th judicial district. He attends 4-5 gun shows every year where he buys and sells firearms for and from his personal collection that includes firearms considered self-defense weapons. Journey is not currently a federal firearms licensee.

4. Plaintiff Allen Black ("Black") is a firearms collector and hobbyist residing in Wichita, Kansas. He is an American citizen who is not engaged in the firearms business. He attends multiple gun shows every year in Kansas. In addition, he sells firearms from his personal collection at gun shows. Black is not currently a federal firearms licensee.

5. Plaintiff Donald Maxey ("Maxey") is a firearms collector and hobbyist residing in Valley Center, Kansas. He is an American citizen who is not engaged in the firearms business. He helps to organize and attends multiple gun shows every year in Kansas. In addition, he purchases firearms for his personal collection at gun shows. Maxey is not currently a federal firearms licensee.

6. Plaintiff Chisholm Trail Antiques Gun Association ("Chisholm Trail") is a Kansas not-for-profit corporation founded in 1957 in Wichita, Kansas. Chisholm Trail was organized for the purposes of serving the interests of collectors and shooters of antique and antique-replica firearms and to help preserve the craftsmanship and the history of the arms of our forefathers for the enlightenment and enjoyment of future

4

generations. Chisholm Trail is not a federal firearms licensee, nor are most of its members, including Allen Black and Donald Maxey, who attend gun shows each year where they buy and sell firearms for and from their personal collections. Chisholm Trail sponsors and manages a biannual gun show and relies on the proceeds to fund its activities.

**B.    Defendants**

7.    Defendant Merrick B. Garland is Attorney General of the United States and is sued in his official capacity.

8.    As Attorney General, Defendant Garland is the head of the U.S. Department of Justice ("DOJ") and is responsible for its actions under federal firearms statutes.

9.    Defendant Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and is sued in his official capacity.

10.    Defendant DOJ is an executive agency of the United States.

11.    ATF is a sub-agency or component of the DOJ and is responsible for, among other things, enforcing, conducting investigations, and executing arrests and seizures in connection with federal firearms statutes.

12.    As ATF Director, Defendant Dettelbach is the head of ATF and is responsible for its actions under federal firearms statutes.

13.    DOJ and ATF issued the Final Rule.

## JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1331. The federal government has waived its immunity for this suit. *See* 5 U.S.C. § 702.

15.    The Final Rule constitutes "agency action" under 5 U.S.C. § 551(13) for

purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff State of Arkansas is in this judicial district, and (2) there is no real property involved in this action.

17.     Activities affected by the Final Rule routinely take place in this judicial district. For example, the Arkansas Gun and Cartridge Collectors Club (AGCCC) Little Rock Gun & Knife Show is scheduled for April 27-28, 2024, in Little Rock; the Northeast Arkansas Gun & Knife Show is scheduled for May 3-4, 2024 in Jonesboro; and the AGCCC Little Rock Gun & Knife Show is scheduled for September 7-8, 2024, in Little Rock. ATF also maintains a field office in Little Rock, Arkansas, that on information and belief conducts activities to carry out and enforce the Final Rule.

## BACKGROUND

18.     Schoolchildren are taught of Paul Revere's ride, Lexington, and Concord, and the shot heard 'round the world. But the lesson often omits why those events occurred: British General Thomas Gage sought to seize or destroy the guns and powder the colonists had stockpiled at Concord.

19.     The Founding Fathers were staunch advocates of the people's right to keep and bear privately-owned arms, both for personal protection and to protect their liberty. Alongside the events at Concord, Thomas Paine recognized that "[a]rms discourage and keep the invader and the plunderer in awe, and preserve order in the world as well as property." Likewise, Thomas Jefferson recognized that laws forbidding the carrying of arms "disarm only those who are neither inclined nor determined to commit crimes" and only "make things worse for the assaulted and better for the assailants." Thomas Jefferson, *The Commonplace Book of Thomas Jefferson: A Repertory of His Ideas on*

6

*Government* 314 (Gilbert Chinard ed., 1926) (quoting 18th century Italian criminologist Cesare Beccaria). With respect to commerce, Jefferson noted that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed., 1853).

20. Ever observant of human nature, George Mason looked back after the Revolution and explained that "[w]hen the resolution of enslaving America was informed in Great Britain, the British Parliament was advised by an artful man, who was governor of Pennsylvania, to disarm the people; that it was the best and most effectual way to enslave them; but that they should not do it openly, but weaken them, and let them sink gradually ...." *Journal Notes of the Virginia Ratification Convention Proceedings* (June 13, 1788).

21. The Founding Fathers thus enshrined the right to keep and bear arms in the Constitution: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

22. As noted attorney David Kopel explained: "In terms of the original meaning of the Second Amendment, the right to engage in firearms commerce is clear." David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230 (Apr. 11, 2014) (reviewing Founding Era sources). "It is one of the most important reasons why America's political dispute with Great Britain turned into an armed revolution." *Id.*

007

## FEDERAL FIREARMS ACT OF 1938 AND GUN CONTROL ACT OF 1968 LICENSING OF DEALERS "ENGAGED IN THE BUSINESS"

23. With that background, it's unsurprising that federal involvement in firearms possession and transfer was insignificant during the first 150 or so years of our nation's history.

24. Congress didn't attempt to regulate the interstate firearms industry until 1934, when it enacted the National Firearms Act ("NFA"). Pub. L. 73-474, 48 Stat. 1236 (June 26, 1934). The NFA required dealers of short-barreled rifles, short-barreled shotguns, and machineguns to register and pay a tax. *See id.* § 1(a)-(b), § 2(a); 48 Stat. at 1236-37.

25. Four years later, Congress imposed the first general licensing requirement for firearms dealers. Federal Firearms Act of 1938 ("FFA"), Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938). It required "[a]ny ... dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce" to apply for a license with "the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application." *Id.* § 3, 52 Stat. at 1251. Once the applicant paid the prescribed fee, the Secretary was required to issue the license which "entitle[d] the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce." *Id.* § 3, 52 Stat. at 1251.

26. The FFA defined a "dealer" as "any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or barrels, stocks, trigger mechanisms, or breach mechanisms to firearms[.]" 52 Stat. at 1250.

8

27.     In 1968, Congress revised the dealer licensing scheme in the Gun Control Act of 1968 ("GCA"), Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968), "the most comprehensive gun control law ever signed in this Nation's history." President Lyndon B. Johnson, Remarks Upon Signing the Gun Control Act of 1968, 2 Pub. Papers 1059, 1059 (Oct. 22, 1968). The Gun Control Act sought to prevent "crime and violence" without "intending to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 82 Stat. at 1213-14.

28.     The GCA's definition of "dealer" largely tracked the FFA's definition. It defined "dealer" as "(A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker." 82 Stat. at 1216 (codified at 18 U.S.C. § 921(a)(11)).

**FIREARM OWNERS PROTECTION ACT OF 1986**

29.     As moonshining faded away, ATF shifted its efforts to enforcing firearms laws. But complaints about the techniques ATF used to generate firearm cases led to congressional hearings in late 1979 and early 1980. *The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 20 (1982). The Senate Subcommittee on the Constitution's report summarized the jarring evidence it received and its conclusions:

- The "enforcement tactics made possible by current federal firearms laws are constitutionally, legally and practically reprehensible." *Id.*

- "Although Congress adopted the Gun Control Act with the primary object of limiting access of felons and high-risk groups to firearms, the overbreadth of the law has led to neglect of precisely this area of enforcement." *Id.*

9

- ATF's statistics showed "that in recent years the percentage of its arrests a devoted to felons in possession and persons knowingly selling to them have dropped from 14 percent down to 10 percent of their firearms cases." After the hearings, ATF said "that 55 percent of its gun law prosecutions overall involve persons with no record of a felony conviction, and a third involve citizens with no prior police contact at all." *Id.*

- The Committee found that ATF had "primarily devoted its firearms enforcement efforts to the apprehension, upon technical malum prohibitum charges, of individuals who lack all criminal intent and knowledge." *Id.*

- The Committee also found that ATF "[a]gents anxious to generate an impressive arrest and gun confiscation quota [had] repeatedly enticed gun collectors into making a small number of sales—often as the few as four—from their personal collections," even though each of the sales "was completely legal under state and federal law." ATF still "charged the collector with having 'engaged in the business' of dealing in guns without the required license," which saddled "numerous collectors ... [with] a felony record carrying a potential sentence of five years in federal prison" even though many had "no criminal knowledge or intent." *Id.*

- The Committee also received expert evidence "establishing that approximately 75 percent of [ATF] gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." *Id.* at 22.

30.    Based on this evidence, the Committee concluded that the "reform of federal firearm laws is necessary to protect the most vital rights of American citizens." *Id.*

31.    Two years later, the Senate Judiciary Committee issued a report showing "the urgent need for changes [to federal firearms law] to prevent the recurrence of [ATF] abuses documented in detail." *Federal Firearms Owners Protection Act*, Sen. Rep. 98-583, Sen. Jud. Com., 98th Cong., 2d Sess., at 3 (1984). It explained that firearm hobbyists often sold from their personal collections and many were charged and convicted for selling without a license based on courts' broad reading of the GCA's reach. *Id.* at 8. And it claimed that the proposed bill would narrow the GCA's "broad parameters" by requiring

010

that dealers "undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.*

32.    During a Senate debate in 1985, Senator Hatch, the bill's floor manager, observed that many collectors had been "convicted for just a few sales which were made during the regular and normal course of their collecting or hobby activities." 131 Cong. Rec. S9111, S9125 (1985).

33.    Similar concerns were raised during a House debate the next year. Representative Volkmer, the chief sponsor of the bill, recounted the experience of Patrick Mulcahey, a person who was arrested for dealing without a license "after he sold three firearms from his personal collection over the period of 1 year." 132 Cong. Rec. H1651, H1652 (1986).

34.    Congress responded to those abuses with the Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (May 19, 1986); *see also* S. Rep. No. 98–583, at 6 (1984) ("[T]he general purpose of the legislation [is] to limit Federal regulation to those involved in more than isolated activities.").

35.    Congress found that "(1) the rights of citizens … require additional legislation to correct existing firearms statutes and enforcement policies; and (2) additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that 'it is not the purpose of this title to place undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, *personal protection*, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use

11

of firearms by law-abiding citizens for lawful purposes.'" 100 Stat. at 449 (emphasis added) (codified at 18 U.S.C. § 921 Note).

36.     The FOPA narrowed the definition of "dealer" by defining "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 100 Stat. at 450 (to be codified at 18 U.S.C. § 921(a)(21)).   But the FOPA expressly excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* It also narrowed the definition of "dealer" by defining "with the principal objective of livelihood and profit" as an intent that "the sale or disposition of firearms is predominantly [to] obtain livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* (to be codified at 18 U.S.C. § 921(a)(22)).

37.     When the FOPA was passed, private firearm sales at gun shows were a well-known phenomenon. *See Sales of Firearms and Ammunition by Licensees at Gun Shows*, 49 Fed. Reg. 46889 (Nov. 29, 1984) (noting commenters "felt that it was inherently unfair to restrict sales by licensees to their licensed premises, while non-licensees who are not engaged in a firearms business may sell at such gun shows"). Far from seeking to restrict those private sales, Congress amended the GCA to specifically authorize licensed dealers to make sales at gun shows, too.

38.     Congress amended the FOPA's definition of "with the principal objective of livelihood and profit" a few months later, clarifying that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and

12

disposition of firearms for criminal purposes or terrorism." Pub. L. 99-360, 100 Stat. 766, 766 (July 8, 1986) (to be codified at 18 U.S.C. § 921(a)(22)).

## THE BIDEN ADMINISTRATION CIRCUMVENTS CONGRESS

39. As the ranking member on the Senate Judiciary Committee, then-Senator Biden helped pass the FOPA. Senator Biden said that the FOPA struck "a fair balance between unnecessary restrictions and regulations on lawful ownership of rifles and handguns and the legitimate interests of law enforcement in carrying out their responsibilities." 131 Cong. Rec. S18229 (July 9, 1985). Senator Biden elaborated:

> I believe the compromises that are now a part of this bill have resulted in a balanced piece of legislation that protects the rights of private gun owners while not infringing on law enforcement's ability to deal with those who misuse guns or violate laws.
>
> During my 12 years as a Member of this body, *I have never believed that additional gun control or Federal registration of guns would reduce crime. I am convinced that a criminal who wants a firearm can get one through illegal, nontraceable, unregistered sources, with or without gun control.*

*Id.* (emphasis added).

40. Despite his original support for the FOPA, Senator Biden eventually yielded to the increasingly extreme demands of his gun restrictionist electoral base and ran for President advocating for far-reaching gun control measures.

41. Four months after taking office, in April 2021, President Biden held a Rose Garden event to push gun control initiatives, stating that "no amendment to the Constitution is absolute." Joseph R. Biden, President, *Remarks by President Biden on Gun Violence Prevention*, WHITEHOUSE.GOV (Apr. 8, 2021), https://perma.cc/QNN5-YCTR. President Biden said he asked the Justice Department to "identify immediate, concrete actions" he could take "without having to go through ... Congress." He also announced his nomination of David Chipman—a senior policy adviser for the gun control

13

advocacy group Giffords—to be the Director of ATF. *Id.* That nomination was ultimately withdrawn in the face of stiff Congressional and popular opposition, with one Senator explaining that "[m]any see putting a committed gun control proponent like David Chipman in charge of ATF is like putting a tobacco executive in charge of the Department of Health and Human Services, or antifa in charge of the Portland Police Department." The Newsroom, Republican Leader, *Anti-Gun Zealot David Chipman is the Wrong Choice to Lead ATF*, REPUBLICANLEADER.SENATE.GOV (July 29, 2021), https://perma.cc/FF4M-PWAN. Yet nominating Chipman revealed much about the Biden Administration's approach to gun control.

42. Keeping with that approach, President Biden nominated another gun control advocate—Stephen Dettelbach—as director of ATF. Learning from the failed Chipman nomination, Dettelbach was more subtle with the public and Congress. But after he was confirmed, Dettelbach showed his colors and called for universal background checks and a ban on many of the most popular types of firearms. *See* S. Mac Healy & Michael A. Maines, *ATF Director Calls for Universal Background Checks, Assault Weapons Ban at Harvard IOP Forum*, THE HARVARD CRIMSON (Nov. 1, 2023), https://perma.cc/7FDQ-GKNW. After confirmation, and without any need to mask his disdain for the Second Amendment, Dettelbach characterized many pro-Second Amendment individuals as selfish and un-American. *Id.* ("People who have the view that their rights, their individual rights, are the only thing that should be taken into account — it is just not who we are as Americans.")

43. Meanwhile Congress repeatedly rejected many bills that the Biden Administration was advocating, including additional regulations on private sales of

firearms to close the so-called "gun show loophole." *See* 89 Fed. Reg. at 28986. For example, the House passed, but the Senate rejected, the Bipartisan Background Checks Act. *See* H.R. 8.

44.     Rather than do anything to restrict private sales of firearms as requested by the Biden Administration, two years ago, Congress passed a narrow amendment to the GCA in the Bipartisan Safer Communities Act ("BSCA"), Pub. L. 117-159, 136 Stat. 1313 (June 25, 2022) ("BSCA"). BSCA amended the definition of "dealer" in two ways.

45.     *First,* it replaced "with the principal objective of livelihood and profit" with "to predominantly earn a profit." 136 Stat. at 1324.

46.     *Second*, it defined "to predominantly earn a profit" as an "intent underlying the sale or disposition of firearms [that] is primarily one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 136 Stat. at 1325. But the only difference between the FOPA's definition of intent— "primarily one of obtaining *livelihood and* pecuniary gain"—and the BSCA's definition— "primarily one of obtaining pecuniary gain"—was the BSCA's omission of "livelihood," *see id.*—hardly a sweeping substantive change that warrants the expansive Final Rule.

47.     From that tiny seed, the Biden Administration and Defendant Dettelbach sought to smuggle in the backdoor what Congress had long-refused to allow in the front door: near-universal background checks, with the criminal edges so fuzzy that few individuals would risk private sales of firearms.

## REDEFINING "ENGAGED IN THE BUSINESS"

48.     On March 14, 2023, President Biden issued an Executive Order directing the Attorney General to "develop and implement a plan to: (i) clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal

15

firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law[.]" Exec. Order 14092, 88 Fed. Reg. 16527, 16527-28 (Mar. 17, 2023).

49.     On September 8, 2023, ATF proposed a rule "to implement the 'engaged in the business' provisions of the BSCA and the [DOJ's] plan in response to Executive Order 14092 by making conforming changes to the new or amended definitions, by clarifying the updated BSCA definition of 'engaged in the business,' and by preventing former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." *Definition of "Engaged in the Business" as a Dealer in Firearms*, 88 Fed. Reg. 61993, 61996 (Sept. 8, 2023) ("NPRM" or "proposed rule").

50.     ATF conceded that its "proposed rule would impact unlicensed persons who would now have to become licensed dealers to lawfully operate as a small business," including the additional costs of acquiring a firearms license and satisfying record retention requirements. 88 Fed. Reg. at 62017.

51.     All of the Plaintiff States in this case along with five other states ("Objecting States")—submitted a comment letter opposing the proposed rule. The Objecting States explained that the proposed rule departed from the plain meaning and purpose of the federal firearms law and ignored the Second Amendment, which the proposed rule also violated.

52.     Undeterred, ATF nonetheless issued the Final Rule without any significant alterations. *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024).

16

53. A contemporaneous DOJ press release shows that the Final Rule goes well beyond implementing the BSCA: "[I]in addition to implementing the revised statutory definition [of 'engaged in the business'], the Final Rule clarifies the circumstances in which a license is—or is not—required by, among other things, adding a definition of 'personal firearms collection' to ensure that genuine hobbyists and collectors may enhance or liquidate their collections without fear of violating the law. The Final Rule also provides clarity as to what licensees must do with their inventory when they go out of business." Press Release, U.S. Dep't of Just., *Justice Department Publishes New Rule to Update Definition of "Engaged in the Business" as a Firearms Dealer* (Apr. 10, 2024), https://perma.cc/U3GB-7FSJ.

54. The Final Rule has the practical effect of requiring background checks for a large number of firearm sales that would not have been required under the prior definition of "engaged in the business." *See* 18 U.S.C. § 922(t)(1)(A). That effect registered with the public: "Many commenters indicated a belief that the ... rule created a universal background check requirement." 89 Fed. Reg. at 28987. Indeed, Mark Collins of the anti-gun Brady Campaign called the proposed rule "a big step closer to" universal background checks. Media coverage of the Final Rule describes it as closing the so-called gun show loophole and resulting in the largest expansion of background checks since 1993. Peter Weber, *ATF Finalizes Rule to Close 'Gun Show Loophole,'* THE WEEK (April 11, 2024), https://perma.cc/FL7Y-3C85. All of this would occur without any action by Congress.

55. While the White House was careful with its public statements, it still made it clear that it believes the Final Rule will have a sweeping impact. Indeed, the White House specifically boasted that it was now going to require background checks for all sales

at gun shows. It explained that just as those doing business from a brick-and-mortar store must "become a licensed dealer and run background checks," those "dealing firearms *at a gun show*, online, in [their] home, in the trunk of a car, at a flea market, or anywhere else ... must obtain a license and run background checks." *FACT SHEET: Biden-Harris Administration Announces New Action to Implement Bipartisan Safer Communities Ace, Expanding Firearm Background Checks to Fight Gun Crime,* WHITEHOUSE.GOV (Apr. 11, 2024), https://perma.cc/L8YB-J4AS (emphasis added). And it added that "[e]*vidence that a person placed ads online or reserved a table at a gun show shows that the person is intending to profit from the sale.*" *Id.* (emphasis added).

56. ATF explained that the Final Rule "will result in more persons who are already engaged in the business of dealing in firearms [as ATF defines it] becoming licensed and deter others from engaging in the business of dealing in firearms without a license." 89 Fed. Reg. at 28968. And "[a]s more persons become licensed under this rule, those licensees will conduct more background checks." *Id.*

57. The federal dealer licensing scheme drives the injuries that are caused by the Final Rule. Becoming a dealer is costly; the fee to obtain a license is $200. In addition to the monetary costs, dealers are subject to significant regulatory burdens. For example, licensed dealers must maintain records at their places of business of all sales or other dispositions of firearms. 18 U.S.C. § 923(g)(1)(A). Dealers also face yearly compliance inspections of their sales and dispositions records. *Id.* § 923(g)(1)(B)(ii)(I). The Attorney General may also inspect a dealer's records without a warrant during criminal investigations. *Id.* § 923(g)(1)(B)(i), (iii). On top of the recordkeeping requirements, dealers must maintain premises in a state "from which he conducts business subject to license." *Id.* § 923(d)(1)(E). And dealers must certify that "secure gun storage or safety

018

devices will be available at any place in which firearms are sold under the license." *Id.* § 923(d)(1)(G).

58.     Engaging in the unlicensed dealing of firearms exposes individuals to criminal sanctions. Federal law makes it unlawful for anyone other than a licensed dealer to engage in the business of dealing in firearms. 18 U.S.C. § 922(a)(1)(A). Persons who willfully engage in the business of dealing in firearms without a license are subject to a term of imprisonment of up to five years, a fine of up to $250,000, or both. 18 U.S.C. § 922(a)(1)(A); § 924(a)(1)(D); § 3571(b)(3).

59.     The Final Rule asserts that it will increase the number of licensed dealers, but it acknowledges that some people will instead stop selling firearms altogether (and it estimates that number as 10% of current sellers). *See* 89 Fed. Reg. at 29054.

**HARM TO PLAINTIFFS**

60.     The Final Rule harms the Plaintiff States in at least two ways.

61.     First, the Final Rule is expected to reduce the number of individuals who sell firearms, period. The Final Rule estimates that reduction at 10%. The actual percentage will likely be much greater.

62.     The expected decrease in individuals selling firearms will, in turn, decrease the number of vendors at gun shows, as that is a target of the Final Rule. A significant number of small-scale firearm sales occur between individuals at gun shows.

63.     Although many vendors at gun shows are licensed dealers, a significant portion are private individual sellers who are not currently required to be licensed dealers.

64.     A decrease in vendors would reduce the number of tables that are rented at gun shows.

19

65.     States that collect taxes or fees related to gun shows will lose revenue if the Final Rule goes into effect.

66.     In addition, the Final Rule also targets firearms sales in online websites such as Armslist.com.  The decrease in firearms sellers would also be applicable to those websites.

67.     Many websites that allow individuals to sell firearms do not require someone to be an FFL to sell on those websites.

68.     This Final Rule would reduce the number of individuals who sell on these websites.

69.     Plaintiff Alabama collects a sales tax both for admissions and sales of firearms at gun shows. *See* Ala. Code § 40-12-143; Ala. Admin. Code 810-6-1-.125(3)(b)(4).

70.     Plaintiff Arkansas charges a 1% short-term-rental tax on the cost of any table rentals that are at gun shows.  Plaintiff Arkansas also has a sales tax that applies to sale of firearms at gun shows and online.

71.     Plaintiff Georgia collects a 4% sales tax that generally applies to sale of firearms during gun shows.

72.     Plaintiff Idaho collects a 6% sales tax that generally applies to the sale of firearms.

73.     Plaintiff Indiana collects a 7% sales tax for sale of firearms during gun shows. Non-FFL sellers have rented tables and sold firearms at gun shows in Indiana.

74.     Plaintiff Iowa imposes a six percent sales tax on the sale of all tangible personal property sold at retail in the state to consumers, including firearms sold online. *See* Iowa Code §§ 423.2; 423.15. Plaintiff Iowa also collects sales tax on tickets for

020

admission to gun shows. *See* Iowa Admin. Code r. 701-205.5(423).

75. Plaintiff Kansas collects a 6.5% sales tax both for admissions and sale of firearms during gun shows.

76. Plaintiff Kentucky applies its 6% sales tax to "admissions," Ky. Rev. Stat. § 139.200(2)(c), which would include admissions to gun shows. The 6% sales tax would also apply to retail sales of firearms. Ky. Rev. Stat. § 139.200(1)(a). However, note that Plaintiff Kentucky's sales tax does not apply to "occasional sales," Ky. Rev. Stat. § 139.470(3); *see* Ky. Rev. Stat. § 139.010(27), which likely includes sales by small-scale hobbyists at a gun show who are not in the business of selling firearms.

77. Plaintiff Missouri collects 4.225% sales that applies to admissions and sales of firearms at gun shows.

78. Plaintiff Nebraska's tax regulations require that sales tax be collected when a firearm is sold at a gun show. See 316 Neb. Admin. Code Ch. 1, 033.01, 03, 03A. The sales tax due can be collected by the promoter of the gun show rather than the individual seller in the event the seller is not engaged in regular sales and therefore does not have a sales tax permit. *Id.*

79. Plaintiff North Dakota collects sales tax for both the admission tickets and sale of firearms during gun shows. N.D.C.C. § 57-39.2-10.1 North Dakota also charges sales taxes on online sales, including for firearms. N.D.C.C. § 57-39.2-12.1.

80. Plaintiff Oklahoma collects sales tax from gun shows. *See* OKLA. STAT. tit. 68, § 1364.2 – gun shows qualify as a "special event" in Oklahoma, § 1364.2(J)(2), gun show vendors "shall collect sales tax from purchasers of tangible property" at such events, § 1364.2(D), and organizers or promoters of gun shows must remit those taxes to the Oklahoma Tax Commission. § 1364.2(E).

81.     Plaintiff South Carolina taxes retail gun sales, including sales of guns at gun shows. S.C. Code Ann. § 12-36-910(A) ("A sales tax, equal to five percent of the gross proceeds of sales, is imposed upon every person engaged or continuing within this State in the business of selling tangible personal property at retail.").

82.     Plaintiff South Carolina taxes online gun sales through a use tax. S.C. Code Ann. § 12-36-1310(A) ("A use tax is imposed on the storage, use, or other consumption in this State of tangible personal property purchased at retail for storage, use, or other consumption in this State, at the rate of five percent of the sales price of the property, regardless of whether the retailer is or is not engaged in business in this State.").

83.     Plaintiff South Dakota also taxes sales of firearms and attendance fees at gun shows.

84.     Plaintiff Tennessee generally charges a flat fee to each vendor that has a booth at gun shows. *See* T.C.A. § 67-4-710.

85.     The Final Rule further conflicts with Tennessee policy governing nonprofits' participation in gun shows.

86.     Plaintiff Tennessee generally provides more favorable treatment to nonprofit gun collectors who engage in the firearms trade, including by exempting them from paying any sales taxes on proceeds at gun shows. T.C.A. § 67-6-310.

87.     In addition, Tennessee law generally does not require nonprofit gun collectors to have a license to minimally partake in the sale and showing of firearms; instead, they have fallen into a safe harbor under Tennessee law, as they have not historically qualified as firearms dealers. *Id.* § 39-17-1316.

88.     Such policies aim to avoid onerous fees levied upon organizations that pursue purposes other than purely maximizing profit. *See* Tenn. Op. Atty. Gen. No. 85-

22

280 (Tenn.A.G.), 1985 WL 193831, at *4 (1985) (referencing Tennessee's statutes and Constitution favoring nonprofits and exempting such entities from various expenses).

89.    By requiring nonprofit gun collectors providing limited wares at gun shows to acquire federal licenses, ATF's promulgated rule runs afoul of Tennessee's legal treatment of nonprofit gun collectors and the State's policy of exempting nonprofits from burdensome regulations.

90.    Plaintiff Virginia taxes retail gun sales, including sales of guns online and at gun shows. See Va. Code §§ 58.1-603; 58.1-604.

91.    Plaintiff Wyoming imposes an excise tax upon the sales price of tangible personal property within the State. Most retail sales of firearms in Wyoming are subject to the imposition of the excise tax.  There is an underlying State mandated 4% excise tax rate that applies to the sale of firearms during gun shows including firearms sold online. In addition, each county and local jurisdiction may increase the tax rate above the State mandated 4% excise tax rate.

92.    Plaintiff Alaska's state government does not levy any tax related to gun shows, but local governments do charge for vendor tables.  A reduction in vendors would likely result in loss of revenue for Plaintiff Alaska.

93.    Second, the Final Rule anticipates a significant increase in the number of individuals becoming federal firearms licensees once the Final Rule takes effect.

94.    Some states require additional information or perform their own background analyses prior to executing a sale or transfer of firearms.

95.    Plaintiff Tennessee runs background checks and collects data on each licensed firearm transaction within its borders.  Tenn. Code Ann. § 39-17-1316.

96.    Plaintiff Tennessee uses the same statutory language as federal law when

defining a gun dealer for licensing purposes. *Id.* The relevant statute, § 39-17-1316, incorporates 18 U.S.C § 921's definition of a gun dealer, as well as any associated requirements imposed by federal regulation—including all applicable licensing regimes under 18 U.S.C. § 923.

97. Each month, Tennessee evaluates tens of thousands of firearm transactions through a statewide law enforcement agency known as the Tennessee Bureau of Investigation (TBI). In 2023, TBI evaluated well over 500,000 firearm transactions.

98. Tennessee requires that such transactions and background checks be verified immediately so a dealer may be informed how to proceed with a transaction. Tennessee Code Annotated § 39-17-1316.

99. A dealer is required to send purchaser identification, including social security number, firearm information, and FFL information directly to TBI. *Id.*

100. Should the identity of a purchaser be in question, TBI may require thumbprints to be collected by the dealer and sent to a law enforcement agency for evaluation. *Id.*

101. Should a purchaser be denied, especially on grounds related to criminal history information, he has a right to appeal such a determination. *Id.*

102. If the purchaser and TBI are unable to locate final disposition information within fifteen (15) days, TBI will inform the dealer that they may conditionally proceed with a sale and the federal firearms licensees may transfer the firearm. *Id.*

103. If it is later found that the firearm transaction was initially properly denied, TBI will take actions to implement the recovery of the wrongfully transferred firearm.

104. Tennessee currently has 25 dedicated employees to providing background check services timely and in accordance with Tennessee Code Annotated § 39-17-1316.

105.  There are currently 3,103 federal firearms licensees in Tennessee.  As stated above, Tennessee law requires all applicable transactions that FFLs partake in to be evaluated by TBI.

106.  The Final Rule also notes that Plaintiff Tennessee is required to run a background check on every firearm that occurs within the state that involves a federal firearms licensee.  89 Fed. Reg. 29065.

107.  The Final Rule expects an increase in background checks and notes that it is state law enforcement agencies in Tennessee that conduct these background checks.  89 Fed. Reg. 29088.

108.  This will result in an increase in administrative costs and reallocation of law enforcement resources for Plaintiff Tennessee.

109.  Plaintiff New Hampshire law permits the New Hampshire Department of Safety ("NHDOS") to become a point of contact for the federal government for the purposes of the National Instant Criminal Background Check System (NICS). N.H. Rev. Stat. Ann. § 159-D:1.

110.  Since approximately 1999, NHDOS has served as a partial point of contact in that a federal firearms licensee contacts the state for purchases of handgun, the frame or receiver of any firearm, firearm mufflers, and firearm silencers, and contacts the FBI for long guns, rifles and shotgun purchases.

111.  The Permits and Licensing Unit of the Division of State Police fulfills the point of contact ("POC") role.  It must access the NICS as part of the background check process and search the New Hampshire Criminal History Record database established under RSA 106-B:14.

112.  In addition, it must conduct a review of a list of individuals produced by the

25

New Hampshire Judiciary who currently have a domestic violence protection orders issued against him or her. This review is conducted because state law prohibits firearm sales to individuals who are under an ex parte domestic violence protective order; federal law contains a different standard. Compare N.H. Rev. Stat. Ann. § 173-B:4, II with 18 U.S.C. § 922(g)(8).

113. Thus, maintaining the NHDOS's current practice as a POC not only benefits public safety in New Hampshire, but ensures the continued enforcement of RSA 173-B:4, II.

114. The Final Rule expects an increase in background checks. This increase will likely result in an increase in administrative costs and resources for Plaintiff New Hampshire.

115. The Final Rule harms Plaintiff Journey because it arguably would require him to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms, and would reduce trade among collectors such that prices will increase while purchasing options decrease for him.

116. The Final Rule harms Plaintiff Black because it arguably would require him to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms, and would reduce trade among collectors such that prices will increase while purchasing options decrease for him.

117. The Final Rule harms Plaintiff Maxey because as a collector of firearms and a purchaser of firearms at gun shows, the Final Rule would reduce trade among collectors such that prices will increase while purchasing options decrease for him.

118. The Final Rule harms Plaintiff Chisholm Trail because it would reduce its revenues from the gun shows that it sponsors and manages because it would result in

fewer vendors and attendees and would increase its costs and administrative and other burdens at its shows. In addition, the Final Rule will harm Chisholm Trail's members, many of whom, including Plaintiff Black and Plaintiff Maxey, are not federal firearm licensees and buy and sell firearms for their personal collections at gun shows, because it arguably would require them to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)
### FINAL RULE IS NOT "NECESSARY"

119. The foregoing allegations are repeated and realleged as if fully set forth herein.

120. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

121. The GCA authorized regulations as follows:

The Secretary may prescribe such rules and regulations as he deems *reasonably necessary* to carry out the provisions of this chapter, including—

(1) regulations providing that a person licensed under this chapter, when dealing with another person so licensed, shall provide such other licensed person a certified copy of this license; and

(2) regulations providing for the issuance, at a reasonable cost, to a person licensed under this chapter, of certified copies of his license for use as provided under regulations issued under paragraph (1) of this subsection.

The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.

27

82 Stat. at 1226 (emphasis added) (to be codified at 18 U.S.C. 926).

122.   The FOPA amended that regulatory authority as follows:

(a) The Secretary may prescribe **only** such rules and regulations ~~as he deems reasonably~~ **as are** necessary to carry out the provisions of this chapter, including—

(1) regulations providing that a person licensed under this chapter, when dealing with another person so licensed, shall provide such other licensed person a certified copy of this license; and

(2) regulations providing for the issuance, at a reasonable cost, to a person licensed under this chapter, of certified copies of his license for use as provided under regulations issued under paragraph (1) of this subsection.

~~The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.~~

No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation.

(b) The Secretary shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations.

(c) The Secretary shall not prescribe rules or regulations that require purchasers of black powder under the exemption provided in 18 use 845. section 845(a)(5) of this title to complete affidavits or forms attesting to that exemption.

100 Stat. 459-60 (strike-through reflects deletions; underlines reflect additions).

123.   "When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'" *Ross v. Blake*, 578 U.S. 632, (2016) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)).

124.   Congress's amendment of Section 926 in the FOPA removed any affirmative grant of discretion to Defendants, and instead requires the regulations be truly

028

"necessary" to carry out the provisions of Chapter 44 of Title 18. That is confirmed by the statutory purpose provisions enacted as part of the FOPA: reinforcing that "it is not the purpose of this title to place *undue or unnecessary* Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.'" 100 Stat. at 449 (codified at 18 U.S.C. 921 Note) (emphasis added). It's further confirmed by the problem the FOPA was intended to address: BATF's "reprehensible" abuses of the overbroad definition of "engaged in the business" in the GCA. *See* Senate Subcommittee on the Constitution, *The Right to Keep and Bear Arms* 20-21 (Comm. Print Feb. 1982).

125. Even assuming that agencies are entitled to deference under any circumstances, *see Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (granting certiorari on "[w]hether the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency"), deference has "no role to play" in construing statutes with criminal penalties, *Guedes v. BATFE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of certiorari). Indeed, the Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference." *Id.* (quoting *Apel v. United States*, 571 U.S. 359 (2016)).

126. The Final Rule is not "necessary" beyond purely technical conforming amendments that track the change in statutory language in the BSCA.

127.    The Final Rule is thus contrary to federal statutory law and in excess of Defendants' statutory authority.

## SECOND CAUSE OF ACTION
## VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)
## NO AUTHORITY TO DEFINE STATUTORY TERMS

128.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

129.    The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … (A) … not in accordance with law; … [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

130.    By statute, Defendants "may prescribe *only* such rules and regulations as are *necessary* to carry out the provisions of" Chapter 44 of Title 18.   18 U.S.C. § 926(a) (emphasis added).

131.    In § 921(a)(13), Congress provided that "[t]he term 'collector' means any person who acquires, holds, or disposes of firearms as curios or relics, *as the Attorney General shall by regulation define* …." The affirmative grant authority to define "curios or relics" by regulation necessarily implies the absence of authority to define other statutory terms by regulation. *See, e.g., Bittner v. United States*, 143 S. Ct. 713, 720 (2023) (applying the *expressio unius est exclusion alterius* canon).

132.    But Congress restricted even that limited authority via a spending prohibition. Pub. L. 113-6, 127 Stat. 248 (Mar. 26, 2013).

133.    Congress delegated express authority in both § 922 (unlawful acts) and § 923 (licensing) to promulgate rules and regulations to implement multiple statutory provisions. *See* § 922(p)(2)(C)(ii), (3) (previously prohibited firearms detectable as

30

Security Exemplars); *id.* § 923(a) (firearms license applications); *id.* § 923(b) (licenses for firearms collectors); *id.* § 923(g)(1)(A) (recordkeeping requirements for licensed importers, manufacturers, and dealers); *id.* § 923(g)(2) (recordkeeping requirements for licensed collectors); *id.* § 923(i) (serialization requirements for imported or manufactured firearms); *id.* § 923(j) (temporarily conducting business at locations other than location specified on license); *id.* § 923(k) (distribution requirements for packages containing armor piercing ammunition).

134. But given these specific delegations—which includes licensing and recordkeeping requirements for importers, manufacturers, dealers, and collectors, *see* § 923(a), (b), (g)(1)(A), (g)(2)—courts should be reluctant to infer from congressional silence a delegation of authority to ATF to define (or redefine) statutory definitions. *See Bittner*, 598 U.S. at 94.

135. And none of these express statutory grants of rulemaking authority permit Defendants to enforce their new statutory definitions or redefinitions via presumptions.

136. Accordingly, (a) all definitions in the Final Rule that consist of anything other than repeating statutory language and (b) all presumptions in the Final Rule are contrary to law, in excess of Defendants' statutory authority, and must be set aside.

### THIRD CAUSE OF ACTION
### VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)
### DEFINITION OF "ENGAGED IN THE BUSINESS"

137. The foregoing allegations are repeated and realleged as if fully set forth herein.

138. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... not in accordance with law; ... [or] (C) in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

139.    The GCA defined a "dealer" as "(A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker." 82 Stat. at 1216.

140.    Courts applying the GCA's definition construed the phrase "engaged in the business" as "strongly imply[ing] more than one isolated sale or transaction," and "dealing" as "connot[ing] a regular course of conduct carried on over a period of time or, at least, on more than one or two unrelated occasions." *United States v. Tarr*, 589 F.2d 55 (1st Cir. 1978). Thus, for example, in *United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975), the court held that a single sale, without more, would not have been sufficient to establish a violation of 18 U.S.C § 922(a)(1).

141.    The FOPA narrowed the definition of "engaged in the business" (as applied to a dealer in firearms) to mean "a person who devotes time, attention, and labor to dealing in firearm*s* as a *regular course* of trade or business with the principal objective of livelihood and profit through the *repetitive* purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 100 Stat. at 450 (emphases added).

142.    The reference to the plural "firearms" and the addition of the words "regular course" and "repetitive" eliminate any doubt that a single purchase or sale is not enough to establish a person is engaged in the business, regardless of whether that purchase or sale has a profit motive.

143. "Regular" means "recurring at fixed times" or "periodic." *Regular,* DICTIONARY.COM, https://www.dictionary.com/browse/regular. "Course" means "a customary manner of procedure." *Course,* DICTIONARY.COM, https://www.dictionary.com/browse/course defined as "an accustomed procedure or normal action." The term "repetitive" is commonly used to refer to something that happens more than once. *See Repetition,* DICTIONARY.COM, https://www.dictionary.com/browse/repetition ("repetition" refers to "the act of repeating ... or doing something again"—that is, "repeated action"). These terms clearly imply plurality.

144. Although the BSCA ostensibly changed the intent requirements to constitute being "engaged in the business," it did not alter the requirement for a "regular course" of trade involving "repetitive" firearms transactions.

145. Even so, the Final Rule states "even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 Fed. Reg. at 28976, 29091. It also identifies profit motive, but that is a distinct element.

146. But even if a single purchase or sale can be enough to constitute being "engaged in the business" when combined with nebulous "more" evidence, that "more" cannot consist of acts commonly incidental to a single sale or liquidating all or part of a personal collection, like renting a table at a gun show or running advertisements.

147. And if a single purchase or sale can be enough to constitute being "engaged in the business" when combined with nebulous "more" evidence, that "more" cannot consist of profit motive, which is a distinct element of being "engaged in the business."

148. While the Final Rule retains the requirements for a "regular course of trade

33

or business" and the "repetitive purchase and resale of firearms," it conditions that by noting that whether a person is "engaged in the business" is a "fact-specific inquiry" and there "is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (quoting 27 C.F.R. § 478.13(a), (b)). But these nebulous requirements fail to retain the statutory requirement of a "regular course of business" or "repetitive" transactions.

149. The Final Rule definition of "engaged in the business" and all related definitions are contrary to law in excess of Defendants authority, and must be set aside.

## FOURTH CAUSE OF ACTION
### VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)
### DEFINING AWAY STATUTORY EXEMPTIONS

150. The foregoing allegations are repeated and realleged as if fully set forth herein.

151. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

152. Federal law excludes someone from being "engaged in the business" if that person "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C).

153. Defendants concede that the BSCA's amending the definition of "engaged in the business" "did not alter the longstanding FOPA exclusions for 'a person who makes occasional sales, exchanges or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.'"

34

89 Fed. Reg. at 28971 (quoting 18 U.S.C. § 921(a)(21)(C)).

154.  Nevertheless, the Final Rule redefines this unqualified "personal collection" exception by limiting it to "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)" and by excluding "*any firearm purchased for the purpose of resale with the predominant intent to earn a profit*" and "firearms accumulated *primarily for personal protection.*" 89 Fed. Reg. at 29090 (emphases added) (to be codified at 27 C.F.R. § 478.11).

155.  Nothing in the text of the statute warrants excluding firearms obtained for personal protection from the statutory term "personal collection." Indeed, *Heller* expressly recognized that personal self-defense is "central to the Second Amendment right" and a primary reason that individuals acquire firearms for personal use. *See District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).

156.  By removing "any firearm" purchased with a predominant intent to earn a profit from the "personal collection" exemption, the Final Rule also—when combined with its new regulatory presumptions—threatens to force a person who sells a single firearm to comply with federal firearms licensing requirements, even though the statute demands "repetitive" transactions as a part of a "regular course" of business. It's yet another example of Defendants blurring the distinct statutory requirements for "repetitive" transactions and profit motive.

157.  The Final Rule also contradicts the statutory allowance of "occasional sales" (plural) from "a personal collection or for a lobby."

35

158. The Final Rule creates a new distinction between firearms for personal protection and other firearms, and that is found nowhere in relevant federal law. This distinction is contrary to law.

159. The Final Rule is thus not in accordance with federal law, is in excess of Defendants' statutory authority, and must be set aside.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF APA 5 U.S.C. § 706(2)(A)**
**ARBITRARY AND CAPRICIOUS CHANGE IN USE OF DEFINITIONS /**

**PRETEXT**

160. The foregoing allegations are repeated and realleged as if fully set forth herein.

161. Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A).

162. An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or disregards either alternatives to its action or the affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

163. The past practice of the Defendants for at least the past 36 years was to stick to the definitions Congress provided for terms such as "engaged in the business." *See* 27 C.F.R. § 478.

164. The Final Rule departs sharply from that past practice of not redefining congressional terms without providing a reasonable explanation for why that is necessary.

165. For the past 36 years, these statutory definitions have been utilized by

36

Defendants, individuals, and courts in determining who is considered a dealer without the need for "clarification." In fact, Defendants cite many cases where courts have applied the existing definitions in support of the Final Rule.

166. Defendants do not provide a reasonable explanation as to why such a sharp deviation from past practice is warranted.

167. Defendants claim the Final Rule "implements the provisions of the Bipartisan Safer Communities Act, Public Law 117–159, sec. 12002, 136 Stat. 1313, 1324 (2022) ('BSCA'), that amended the definition of 'engaged in the business' in the [GCA] at 18 U.S.C. 921(a)(21)(C), as well as the Department's plan in response to Executive Order 14092 of March 14, 2023 (Reducing Gun Violence and Making Our Communities Safer), 88 FR 16527 (Mar. 17, 2023)." 89 Fed. Reg. at 28968.

168. But many of the changes in the Final Rule are unrelated to, and not necessitated by, the BSCA, leaving only the politically motivated Executive Order as justification.

169. The Final Rule nods toward "new technologies, mediums of exchange, and forums in which firearms are bought and sold." 89 Fed. Reg. at 28973. But the Final Rule doesn't limit itself to (or even focus on) those new forums. Rather, the Final Rule makes it difficult or impossible for ordinary citizens to get a table at an old fashioned, regular, low-tech gun show without risking a felony. And if new technological forms are the problem, existing regulations already cover them.

170. Stripping away the pretext, Defendants' primary reason for this abrupt change was a raw, political desire to close the so-called "gun show loophole" after their political party failed to achieve the same through legitimate legislative processes.

171. In addition, the Defendants did not consider the reliance interests of the

States that operate off these congressional definitions for things such as the collection of tax revenue, reciprocal licenses and expanded background checks.

172.   The Final Rule claims that it exists to "clarify" definitions Congress already provided by statute.  But the content of the Final Rule does the opposite of clarifying definitions, it modifies and confuses them.

173.   The Final Rule redefines already-defined statutory terms and expresses those new definitions through a series of presumptions.  Then it creates exceptions to the presumptions that have their own exceptions within them.  This results in a nebulous and convoluted standard that makes it impossible to identify who and what conduct is covered under the Final Rule.

174.   For example, the Final Rule claims to uphold a statutory exemption by not presuming someone selling firearms from their personal collection is a dealer.  But it invents the following exceptions to the exception to the presumption, a personal collection (1) does not include firearms purchased for self-defense, (2) does not include any firearm that was brought with any intent to obtain profit, and (3) does not include anyone who purchases any additional firearms after selling from their personal collection.

175.   No reasonable person would conclude that these nebulous and convoluted definitions clarify anything.  Instead, they provide a moving target for the Defendants to maximize the scope of who they claim is covered under the Final Rule.

176.   The idea that this "clarifies" anything is so implausible that it cannot be ascribed to difference in view or being the product of agency expertise and end the so-called "gun show loophole."

177.   The Final Rule is not the product of a well-reasoned decision. Rather it betrays a series of post-hoc justifications that serve as a pretext for doing what the

Defendants truly want to do, which is create near-universal background checks.

178.  The Final Rule is thus arbitrary and capricious and must be set aside.

## SIXTH CAUSE OF ACTION
## VOID FOR VAGUENESS

179.  The foregoing allegations are repeated and realleged as if fully set forth herein.

180.  A regulation is unconstitutionally vague if it does not give a person of reasonable intelligence fair notice that his or her conduct is unlawful or it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chi. v. Morales,* 527 U.S. 41, 52, 60 (1999); *see also United States v. Berger,* 553 F.3d 1107, 1110 (8th Cir. 2009) ("To defeat a vagueness challenge, a penal statute must pass a two-part test: The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement.").

181.  An average person reading the Final Rule would not be able to determine whether his or her conduct is lawful. The Final Rule ostensibly permits some behavior (or, rather, does not extend to some behavior), while at the same time, Defendants give themselves ample room to apply the Final Rule to the same behavior if they so choose.

182.  As an example, the Final Rule states that if someone "restocks" his personal collection after selling a firearm he may not be subject to the exemption for selling from a personal collection. *Cf. Stahl v. City of St. Louis,* 687 F.3d 1038, 1041 (8th Cir. 2012) ("Though there are certainly times when a speaker knows or should know that certain speech or activities likely will cause a traffic problem, in many situations such an effect is

difficult or impossible to predict.").[1]  It is common for gun owners to sell a firearm with the intent to replace that firearm with a superior or preferred firearm.

183.  "The lack of clarity also makes the Final Rule susceptible to arbitrary enforcement." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023).

184.  Providing cover for arbitrary enforcement by the Defendants appears to be an intended goal (and not an ancillary effect) of the Final Rule because it is difficult, if not impossible, to imagine a situation where the Defendants would not be able to point to some provision in the Final Rule that justifies an arrest, investigation, or prosecution.

185.  The Defendants are clearly "able to decide arbitrarily which members of the public [the agency] will [enforce it against]." *Morales*, 527 U.S. at 58.  This lack of "established safeguards" is the definition of arbitrary enforcement.

186.  Defendants' actions violate private Plaintiffs' civil rights and, accordingly, fall within the scope of 42 U.S.C. 1983.

187.  Because the Final Rule is unconstitutionally vague, it must be set aside.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE SECOND AMENDMENT**

188.  The foregoing allegations are repeated and realleged as if fully set forth herein.

189.  The Second Amendment provides that "A well-regulated Militia, being

---

[1] *Stahl* found the statute in question violated the due process clause of the Fourteenth Amendment, rather being facially void for vagueness.  687 F.3d at 1041 (statute violated the Due Process Clause because it failed to "provide people with fair notice of when their actions are likely to become unlawful").  This characterization does not make the Final Rule any less unconstitutional, because under either theory it fails to provide adequate notices of what is or is not permitted.

necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

190. "In terms of the original meaning of the Second Amendment, the right to engage in firearms commerce is clear." David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230 (Apr. 11, 2014) (reviewing Founding Era sources). Even if that weren't true, the right to "keep and bear arms" can be exercised only by "get[ting] one, either through sale, rental, or gift." *Md. Shall Issue, Inc. v. Moore*, 2023 WL 8043827, *4 (4th Cir. 2023).

191. Thus, if one's ability to obtain and dispose of firearms is restricted, one's right to keep and bear arms is hindered and burdened.

192. Courts have held that the ability to buy a firearm is encompassed in the right to keep a firearm. *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023).

193. Accordingly, the ability to sell a firearm to another is also protected. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds as recognized by Range*, 69 F.4th 96.

194. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, ... the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

195. The Defendants cannot demonstrate that the Final Rule is consistent with the "Nation's historical tradition of firearm regulation," because no analogous regulation of non-commercial sales of firearms existed at the time the Second Amendment was

ratified.

196.   Indeed, when Congress enacted the FOPA, it found that "additional legislation [was necessary] to correct existing firearms statutes and enforcement policies." 100 Stat. at 449.   In particular, it found legislation was necessary to safeguard citizens' right "to keep and bear arms under the [S]econd [A]mendment." *Id.* Congress also found "additional legislation [was] needed to reaffirm [its] intent," as expressed in the GCA, that this title did not intend to impose "undue or unnecessary ... burdens on law-abiding citizens" in the lawful "acquisition, possession or use of firearms" or to "discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.* That is nothing like what the Final Rule does.

197.   Because the Final Rule violates the Second Amendment, it should be set aside.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF SEPARATION OF POWERS – NON-DELEGATION DOCTRINE

198.   The foregoing allegations are repeated and realleged as if fully set forth herein.

199.   Criminal statutes are for the courts, not for the Executive, to construe. Separation of powers prohibits Congress from "handing off to [the Attorney General and his subordinates] the power to write [their] own criminal code." *Gundy v. United States*, 139 S. Ct. 2116 (2019) (Gorsuch, J., joined by Roberts and Thomas, JJ.); *see also id.* (Alito, J., concurring, calling for reconsideration of non-delegation jurisprudence); *Whitman v. United States*, 135 S. Ct. 352 (2014) (statement of Scalia, J., joined by Thomas, J.). Article I of the U.S. Constitution reserves the legislative power exclusively to Congress.

200.   Alternatively, particularly if the BSCA is construed as broadly as Defendants

42

contend in the Final Rule, the BSCA lacks any intelligible principle to guide Defendants' rulemaking.

201. Thus, at least in this instance, the Final Rule would be an unconstitutional delegation of lawmaking and must be set aside.

## NINTH CAUSE OF ACTION
## SEPARATION OF POWERS – PRETEXT / MAJOR QUESTIONS DOCTRINE

202. The foregoing allegations are repeated and realleged as if fully set forth herein.

203. Over the past several years, the Supreme Court has applied a new "label" to a doctrine that has developed over decades—the major questions doctrine. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023). The doctrine requires "clear congressional authorization" for agency action in certain "extraordinary cases" where an agency invokes broad authority over matters of great economic and political significance. *See West Virginia v. EPA*, 597 U.S. 697, 721-22 (2022). Otherwise, the major question is reserved for Congress-not the agency-to answer.

204. A variety of circumstances may trigger the application of the doctrine, including the economic or political impact of the agency action. *See Nebraska*, 143 S. Ct. at 2375; *West Virginia*, 597 U.S. at 724.

205. Whether the federal government should conduct universal background checks on firearms purchases is an issue of major political significance.

206. The Final Rule effectively makes everyone who sells any firearm for a profit a firearms dealer who has to register as a federal firearms licensee, be granted a license, and pay $200 for it.

207. This is turn requires every purchaser to fill out an ATF Form 4473 and be

43

subject to a background check. Because of the broad scope of this rule, this would be a backdoor way to institute universal or near-universal background checks.

208. There is an earnest and profound debate going on around the country about whether and the what extent the federal government should conduct universal background checks, as evidenced by the fact that the proposed rule received nearly 388,000 comments.

209. In addition, Congress has attempted to pass similar measures on multiple occasions but has failed to do so.

210. States have also implemented their own laws to either provide greater protection for Second Amendment rights or to impose more gun control.

211. Defendants attempt to unilaterally end this debate through the Final Rule.

212. Defendants use the pretextual artifice of a minor statutory amendment to justify their sweeping redefinition of what it is to be engaged in the business of dealing in firearms.

213. To adopt a regulation so sweeping on such a politically sensitive issue, Defendants need to point to clear statutory authorization for their actions to be legal. They cannot, so the Final Rule should be set aside.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully ask this Court to:

a. Postpone the effective date of the Final Rule pending judicial review;

b. Declare that the Final Rule is unlawful and an *ultra vires* agency action and of no force and effect;

c. Declare that the Final Rule violates the Administrative Procedure Act as it was not promulgated "in accordance with law" and is of no force and effect;

44

d.     Declare that the Final Rule violates the Administrative Procedure Act as it is arbitrary and capricious and is of no force and effect;

e.     Declare that the Final Rule violates the Administrative Procedure Act insofar as it is contrary to constitutional right, power, privilege, or immunity;

f.     Declare that the Final Rule violates rights protected by the Second Amendment and is of no force and effect;

g.     Vacate the Final Rule as contrary to law and unreasonable, arbitrary, and capricious;

h.     Issue an injunction prohibiting Defendants from enforcing the Final Rule;

i.     Issue an injunction prohibiting Defendants and anyone acting in concert with them from taking any action inconsistent with the rescission of the Final Rule;

j.     Grant Plaintiffs their costs and reasonable attorney's fees under 28 U.S.C. § 2412, 42 U.S.C. § 1988, or other applicable law; and

k.     Grant Plaintiffs such other and further relief as this Court deems just and proper.


Dated:  May 1, 2024

Respectfully submitted,

*Kris W. Kobach* (signature)

KRIS W. KOBACH
Kansas Attorney General

/s/Abhishek S. Kambli
*Abhishek S. Kambli
*Deputy Attorney General*
*Jesse A. Burris
*Assistant Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Kansas*

BRENNA BIRD
Iowa Attorney General

/s/ Eric H. Wessan
*Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric.Wessan@ag.iowa.gov

*Motion for admission forthcoming

*Counsel for Plaintiff State of Iowa*

*Tim Griffin* (signature)

TIM GRIFFIN
Arkansas Attorney General

/s/ Nicholas J. Bronni
Nicholas J. Bronni (2016097)
 Solicitor General
Dylan L. Jacobs (2016167)
 Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-2007
Fax: (501) 683-2520

*Counsel for Plaintiff State of Arkansas*

AUSTIN KNUDSEN
 Montana Attorney General

/s/ Christian B. Corrigan
*CHRISTIAN B. CORRIGAN
 *Solicitor General*
*PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Montana*

STEVE MARSHALL
Alabama Attorney General

/s/ Edmund G. LaCour, Jr.
*Edmund G. LaCour, Jr.
Solicitor General
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

/s/ Aaron C. Peterson
*Aaron C. Peterson
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

/s/ Stephen Petrany
*Stephen Petrany
Solicitor General
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

/s/ Joshua N. Turner
*Joshua N. Turner
Chief of Constitutional Litigation and
Policy
*Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Idaho*

TODD ROKITA
Indiana Attorney General

/s/ James A. Barta
*James A. Barta
Solicitor General
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone: (317) 232-0709
James.Barta@atg.in.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ Victor B. Maddox
*Victor B. Maddox
*Aaron J. Silletto
*Zachary M. Zimmerer
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov
Zachary.Zimmerer@ky.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Kentucky*

ANDREW BAILEY
Missouri Attorney General

/s/ Bryce Beal
*Bryce Beal
Assistant Attorney General
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ Zachary A. Viglianco
*Zachary A. Viglianco
Deputy Solicitor General

Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

/s/Brandon F. Chase
*Brandon F. Chase
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Katie L. Carpenter*
*Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
*GARRY M. GASKINS, II
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:        (405) 521-3921
garry.gaskins@oag.ok.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ *Joseph D. Spate*
*Joseph D. Spate
Assistant Deputy Solicitor General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC 29201
(803) 734-3371
josephspate@scag.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State South Caro-
lina*

MARTY J. JACKLEY
South Dakota Attorney General

/s/ Charles D. McGuigan
*Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

/s/ Whitney D. Hermandorfer
*WHITNEY D. HERMANDORFER
Director of Strategic Litigation Unit
*BRIAN DANIEL MOUNCE
Counsel for Strategic Litigation &
Assistant Solicitor General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for the State of Tennessee*

JASON S. MIYARES
Attorney General of Virginia

/s/ Kevin M. Gallagher
*Kevin M. Gallagher
*Principal Deputy Solicitor General*
*Brendan T. Chestnut
*Deputy Solicitor General*
*M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Virginia*

PATRICK MORRISEY
West Virginia Attorney General

/s/ Michael R. Williams
*Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for State of West Virginia*

BRIDGET HILL
Wyoming Attorney General

*/s/ Ryan Schelhaas*
\*Ryan Schelhaas
*Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

\*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State Wyoming*

*/s/ Michael D. McCoy*
\*Michael D. McCoy
\*William E. Trachman
Mountain States
Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
Mmccoy@mslegal.org

\*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiffs Allen Black, Donald
Maxey, and Chisholm Trail Antique Gun
Association*

*/s/ Anna St. John*
Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

*/s/ M. Frank Bednarz*
M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org

\*Motion for admission forthcoming

*Counsel for Plaintiff Phillip Journey*

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

**STATE OF KANSAS,
ET AL.**                                                                              **PLAINTIFFS**


**V.**                                      **CASE NO. 2:24CV00088 JM**


**MERRICK GARLAND,
ET AL.**                                                                              **DEFENDANTS**

<u>**ORDER**</u>

Pending is Plaintiffs' motion for preliminary injunction, docket # 4.[1]  Defendants have filed a response and Plaintiffs have filed a reply.  On May 17, 2024, the Court held a hearing in this matter.  After reviewing the pleadings, including the amicus briefs which were filed, and hearing argument of counsel, the Court finds that the State of Arkansas has failed to demonstrate standing accordingly, the State of Arkansas is dismissed without prejudice.  Because no Plaintiff with standing resides in this district, venue is improper.  The Court hereby transfers jurisdiction to the United States District Court for the District of Kansas pursuant to 28 U.S.C. §1406.

Plaintiffs, twenty-one states, led by Kansas, three individuals and an association, all from Kansas, challenge the Final Rule promulgated on April 19, 2024 by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  The Final Rule published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) provides a "Definition of 'Engaged in the

---

[1] Similar cases are currently pending in the Northern District of Texas, *State of Texas et al., v. Bureau of Alcohol, Tobacco, Firearms and Explosives et al*., Case No. 2:24cv89-Z (N.D. Tex. filed May 1, 2024) and the Middle District of Florida*, State of Florida et al.., v Bureau of Alcohol, Tobacco, Firearms and Explosives et al*., Case No. 8:24cv01041 (M.D. Fla. filed May 1, 2024).

Business' as a Dealer in Firearms." Plaintiffs argue that the Final Rule violates the Administrative Procedure Act ("APA") and the U.S. Constitution. Plaintiffs seek a nationwide preliminary injunction enjoining the Defendants from implementing or acting pursuant to the Final Rule.

"The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Ferry-Morse Seed Co. v. Food Corn, Inc*., 729 F.2d 589, 593 (8th Cir. 1984). The Court considers four factors in evaluating Plaintiffs' request for a preliminary injunction: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of an injunction; (3) the balance of equities; and (4) the public interest. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co*., 997 F.2d 484, 485-86 (8th Cir. 1983) citing, *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 112 (8th Cir. 1981) (en banc).

Defendants argue that the State Defendants lack standing to seek injunctive relief because they have not alleged a concrete and imminent injury in fact. "[S]tanding is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta,* 495 F.3d 567, 569 (8th Cir. 2007). "In essence, the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "[S]tanding imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III. This is the threshold question in every federal case, determining the power of the court to entertain suit." *Id.*

To satisfy the case-or-controversy requirement of Article III of the United States Constitution, a plaintiff must establish standing as an "indispensable part of the plaintiff's case." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To meet this standing requirement, the plaintiff must (1) have suffered an injury in fact, (2) establish a causal relationship between the

053

contested conduct and the alleged injury, and (3) show that a favorable decision would redress the injury. *Lujan*, 504 U.S. at 560–61.  To allege an "injury in fact" that confers standing to seek injunctive relief, a plaintiff must face a threat of ongoing or future harm. *Park v. Forest Serv. of the U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000).  Further, an injury in fact "must be concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted). The purpose of this requirement "is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.* (internal quotation marks omitted). Allegations of a possible future injury are insufficient to confer standing. *Id.*

Plaintiffs argue that implementation of the Final Rule will result in a decrease in state tax revenue collected by the states.  Specifically, as to Arkansas, Plaintiffs anticipate that Final Rule will reduce the number of firearms sold and the number of vendors at gun shows, resulting in a decrease in gun show table rentals and tax revenue. Arkansas charges a 1% short-term-tax on the cost of any table rentals that are at gun shows in addition to a sales tax that applies to the sale of firearms at gun shows and online.

The Court finds that these injuries are vague and speculative and the State of Arkansas has not shown that the injuries are "concrete, particularized, and actual or imminent." *Clapper* at 409. The State of Arkansas alleges in the complaint it may (or will) sustain reduced revenue as a result of potentially fewer tables being rented at guns shows. Unlike the States of New Hampshire, Oklahoma, Virginia, and Wyoming who submitted declarations to establish potential harm, Arkansas submitted no declaration and failed to call at any witness at the preliminary injunction hearing to establish harm. It is Arkansas's burden to establish standing. It is speculative to assume that any potential, marginal, loss of a 1% table tax would not be made up from the collection of

sales tax from the sale of firearms being diverted to a licensed dealer. Since the sales tax on the sale of firearms is significantly higher than the 1% tax on gun show tables, the State of Arkansas may well net a tax collection increase should the rule go into effect. The notion that an eligible, law abiding, person desiring to buy a firearm would refrain from acquiring one if required follow the proposed rule, and that that decision might affect tax revenue is to speculative to establish standing.  Allegations of possible future injury without factual support is not sufficient to establish "certainly impending" injury.  *Clapper* at 409.  *See Com. of Pa., by Shapp v. Kleppe,* 533 F.2d 668, 672 (D.C. Cir. 1976) (finding that the allegation that tax revenues were reduced is "the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing.").  *See also Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives,* 78 F.4th 1011, 1017 n. 5 (8th Cir. 2023) (finding that the states' allegation that it would suffer a decrease in tax revenue along with other harm was vague, speculative and failed to establish standing) and *Iowa ex rel. Miller v. Block*, 771 F.2d 347 (8th Cir. 1985) (finding that the state could not establish a sufficient injury in fact to satisfy the constitutional requirements of standing where the state alleged it would suffer a decrease in tax revenues).   The United States Supreme Court recently reiterated this principle when it stated: "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated."  *United States v. Texas*, 599 U.S. 670, 680, n. 3 (2023). For these reasons, the State of Arkansas does not have standing to proceed with this action and is therefore dismissed without prejudice.

Having found that the State of Arkansas does not have standing to proceed in this action, venue is improper in this Court.  Pursuant to 28 U.S.C. §1406, the Court hereby transfers this case to the United States District Court for the District of Kansas where venue appears to be proper. The Clerk of the Court is requested to transfer the case immediately.  I decline to make any findings on the merits of the case and leave that to the sound judgment of the District Court of Kansas.

IT IS SO ORDERED this 23rd day of May, 2024.

James M. Moody Jr
United States District Judge

056

# UNITED STATES DISTRICT COURT
OFFICE OF THE CLERK
DISTRICT OF KANSAS



SKYLER B. O'HARA
CLERK OF COURT
E-MAIL: Skyler_OHara@ksd.uscourts.gov
(913) 735-2220

KIM LEININGER
CHIEF DEPUTY CLERK
E-MAIL: Kim_Leininger@ksd.uscourts.gov
(913) 735-2225

490 U.S.COURTHOUSE
444 SE QUINCY
TOPEKA, KS 66683

204 U.S.COURTHOUSE
401 N. MARKET
WICHITA, KS 67202

259 ROBERT J. DOLE U.S. COURTHOUSE
500 STATE AVENUE
KANSAS CITY, KS 66101

May 24, 2024

Nicholas J. Bronni (Email: nicholas.bronni@arkansasag.gov)
Eric H. Wessan (Email: eric.wessan@ag.iowa.gov)
Dylan L. Jacobs (Email: dylan.jacobs@arkansasag.gov)
Peter Martin Torstensen, Jr. (Email: peter.torstensen@mt.gov)
Edmund G. LaCour , Jr. (Email: edmund.lacour@AlabamaAG.gov)
Aaron C. Peterson (Email: aaron.peterson@alaska.gov)
Stephen J. Petrany (Email: spetrany@law.ga.gov)
Alan M. Hurst: (Email: alan.hurst@ag.idaho.gov)
Joshua N. Turner (Email: josh.turner@ag.idaho.gov)
James A. Barta (Email: james.barta@atg.in.gov)
Aaron J. Silletto (Email: aaron.Silletto@ky.gov)
Victor B. Maddox (Email: victor.maddox@ky.gov)
Zachary M. Zimmerer (Email: zachary.zimmerer@ky.gov)
Byrce Beal (Email: bcyce.beal@ago.mo.gov)
Zachary A. Viglianco (Email: zachary.viglianco@nebraska.gov)
Brandon F. Chase (Email: brandon.f.chase@doj.nh.gov)
Katie L. Carpenter (Email: katcarpenter@nd.gov)
Garry M. Gaskins, II (Email: garry.gaskins@oag.ok.gov)
Joseph D. Spate (Email: josephspate@scag.gov)
Charles D. McGuigan (Email: charles.mcguigan@state.sd.us)
Brian Daniel Mounce (Email: brian.mounce@ag.tn.gov)
Whitney D. Hermandorfer (Email: whitney.hermandorfer@ag.tn.gov)
Brendan T. Chestnut (Email: bchestnut@oag.state.va.us)
Kevin M. Gallagher (Email: kgallagher@oag.state.va.us)
Martin Jordan Minot (Email: mminot@oag.state.va.us)
Michael Ray Williams (Email: michael.r.williams@wvago.gov)
Ryan Schelhaas (Email: ryan.schelhaas@wyo.gov)
Anna St. John (Email: anna.stjohn@hlli.org)
Michael Frank Bednarz (Email: frank.bednarz@hlli.org)
Michael D. McCoy (Email: mmccoy@mslegal.org)
William Edward Trachman (Email: wtrachman@mslegal.org)
Jeremy S. B. Newman (Email: jeremy.s.newman@usdoj.gov)
Keri Lane Berman (Email: keri.l.berman@usdoj.gov)
Zachary Sherwood (Email: zachary.w.sherwood@usdoj.gov)
Jocelyn Jezierny (Email: jjezierny@cov.com)
John Graubert (Email: jgraubert@cov.com)
William R. Isasi (Email: wisasi@cov.com)

Re: State of Kansas, et al v. United States Attorney General et al
USDC Kansas Case Number: 6:24-cv-01086-TC-TJJ
USDC Eastern Arkansas Case Number: 2:24-cv-00088-JM

Dear Counsel:

Please be advised that the above named action has been transferred to the U.S. District Court for the District of Kansas at Wichita, Kansas. We have assigned Civil Action Number 6:24-cv-01086-TC-TJJ, assigned to the Honorable Toby Crouse, District Judge, and to the Honorable Teresa J. James, Magistrate Judge, for pretrial proceedings.

Our local rules and information regarding admission pro hac vice can be found at www.ksd.uscourts.gov or by contacting Attorney Registration at (913) 735-2229.

Please be advised that Department of Justice attorneys have different registration requirements and must contact Attorney Registration at ksd_attorney_registration@ksd.uscourts.gov or (913) 735-2229.


Sincerely,
Skyler B. O'Hara, Clerk
By: s/M. Barnes

058

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| MERRICK GARLAND IN HIS | § | Civil Action No. 6:24-cv-01086-TC-TJJ |
| OFFICIAL CAPACITY AS ATTORNEY | § | |
| GENERAL OF THE UNITED STATES, | § | |
| ET AL., | § | |
| | § | |
| *Defendants*. | | |

### PLAINTIFFS' MOTION TO SET HEARING

On May 23, 2024, the court in the Eastern District of Arkansas transferred the matter to this court. Prior to that, briefing on the preliminary injunction was complete and a hearing was held in the Eastern District of Arkansas (*See* Dkts. 4, 5, 50, 52, 65, 67, and 74). The Plaintiffs do not believe further briefing on the matter is necessary and Plaintiffs move to set a hearing. The parties can present additional in circuit authority during such hearing. The Final Rule went into effect on May 20, 2024. The Plaintiffs sought expedited briefing in the Eastern District of Arkansas to get a ruling prior to the Final Rule's effective date but due to the transfer of venue that did not happen. At this point, the Final Rule is in effect nationwide (including in the Plaintiff States) except that the Defendants are temporarily restrained from enforcing the Final Rule against Texas, the Gun Owners of America, Inc., the Gun Owners Foundation, the Tennessee Firearms Association, and the Virginia Defense League until June 2, 2024 (*See* Dkt. 44 of 2:24-cv-89-Z). Therefore, the Plaintiffs move for the Court to set a hearing on the first

available date on its calendar with a preference for May 29-30 or June 3.  The Defendants oppose this motion.

Respectfully submitted,

/s/ Abhishek S. Kambli
Abhishek S. Kambli, Kan. SC No. 29788
    *Deputy Attorney General*
Erin B. Gaide, Kan. SC No. 29691
    *Assistant Attorney General*
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov

*Counsel for Plaintiff State of Kansas*

060

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that on this the 24th day of May, 2024, this motion was electronically

filed with the Clerk of the Court by using the CM/ECF system.

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION**

| | |
|---|---|
| STATE OF KANSAS, ET AL., | § |
| | § |
| *Plaintiffs*, | § |
| | § |
| v. | § |
| | § |
| MERRICK GARLAND IN HIS | § |
| OFFICIAL CAPACITY AS ATTORNEY | §   Civil Action No. 6:24-cv-01086-TC-TJJ |
| GENERAL OF THE UNITED STATES, | § |
| ET AL., | § |
| | § |
| *Defendants*. | § |

## MOTION FOR TEMPORARY RESTRAINING ORDER AND RESPONSE TO MOTION TO AMEND SCHEDULING ORDER

On May 24, 2024, the Defendants submitted a motion that requested the court amend its scheduling order to allow supplemental briefing and set a hearing no earlier than June 10, 2024. (*See* Dkt. 80.)  It is puzzling why the Defendants believe 15 pages of supplemental briefing is necessary given that they relied heavily on out of circuit authority (including 10th Circuit authority) in their Response.  (*See* Dkt. 40.)  Regardless, the Final Rule is in effect except for the state of Texas and some organizational plaintiffs because a federal court found that the Final Rule is likely unlawful and would cause irreparable harm for reasons similar to those laid out in this case and temporarily restrained its enforcement.  (*See* Dkt. 44 of 2:24-cv-89-Z.)  Although this court will certainly reach its own determination, the Defendants should not be allowed to inflict irreparable harm on Plaintiffs by enforcing an unlawful Final Rule simply because they believe they need additional time for briefing.  However, if the court is inclined to allow additional briefing on the matter it should issue a temporary restraining order (TRO) for two weeks that prevents the Defendants from enforcing the Final Rule against the Plaintiffs for the

reasons cited in the Plaintiffs' briefing.  A two-week TRO would cause no harm to the Defendants and ensure that irreparable harm is not inflicted on the Plaintiffs while the preliminary injunction litigation is pending.

Respectfully submitted,

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli, Kan. SC No. 29788
    *Deputy Attorney General*
Topeka, Kansas 66612-1597
Phone: (785) 296-7109
Email: abhishek.kambli@ag.ks.gov
*Counsel for Plaintiff State of Kansas*

063

### CERTIFICATE OF SERVICE

This is to certify that on this the 26th day of May, 2024, this motion was electronically filed with the Clerk of the Court by using the CM/ECF system.

*/s/ Abhishek S. Kambli*
Abhishek S. Kambli

064

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | |
| MERRICK GARLAND, *ET. AL.* | § § § | Civil Action No. 6:24-cv-01086-TC-TJJ |
| *Defendants*. | § § § § | |

## MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Federal Rules of Civil Procedure 65(a) and (b), Plaintiffs move for a Temporary Restraining Order and a Preliminary Injunction enjoining Defendants from implementing or acting pursuant to the Final Rule promulgated by Defendants entitled "*Definition of 'Engaged in the Business' as a Dealer in Firearms*," 89 Fed. Reg. 28,968. A memorandum in support of this motion explains it more fully.

Respectfully submitted this 7th day of June, 2024.

KRIS W. KOBACH
Kansas Attorney General

*/s/Erin B. Gaide*
Abhishek S. Kambli, 29788
*Deputy Attorney General*
Erin B. Gaide, 29691
*Assistant Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov


*Counsel for Plaintiff State of Kansas*


BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
**Eric H. Wessan
*Solicitor General*
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric. Wessan@ag.iowa.gov


*Counsel for Plaintiff State of Iowa*

AUSTIN KNUDSEN
 Montana Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN, 25622
 *Solicitor General*
**PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov


*Counsel for Plaintiff State of Montana*

2

STEVE MARSHALL
Alabama Attorney General

/s/ Edmund G. LaCour, Jr.
**Edmund G. LaCour, Jr.
*Solicitor General*
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov


*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

/s/ Aaron C. Peterson
**Aaron C. Peterson
*Senior Assistant Attorney General*
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov


*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

/s/ Stephen Petrany
*Stephen Petrany
*Solicitor General*
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov


*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

/s/ Joshua N. Turner
**Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
**Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov


*Counsel for Plaintiff State of Idaho*

TODD ROKITA
Indiana Attorney General

/s/ James A. Barta
*James A. Barta
*Solicitor General*
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone:  (317) 232-0709
James.Barta@atg.in.gov


*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ Victor B. Maddox
**Victor B. Maddox
**Aaron J. Silletto
**Zachary M. Zimmerer
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov
Zachary.Zimmerer@ky.gov


*Counsel for Plaintiff Commonwealth of Kentucky*

ANDREW BAILEY
Missouri Attorney General

/s/ Bryce Beal
**Bryce Beal
*Assistant Attorney General*
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov


*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ Zachary A. Vigliano
*Zachary A. Vigliano
*Deputy Solicitor General*
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov


*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

/s/Brandon F. Chase
*Brandon F. Chase
*Assistant Attorney General*
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ Katie L. Carpenter
**Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Counsel for Plaintiff State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
**GARRY M. GASKINS, II
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:      (405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ Joseph D. Spate
**Joseph D. Spate
*Assistant Deputy Solicitor General*
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC  29201
(803) 734-3371
josephspate@scag.gov

*Counsel for Plaintiff State South Carolina*

069

MARTY J. JACKLEY
South Dakota Attorney General

/s/ Charles D. McGuigan
**Charles D. McGuigan
*Deputy Attorney General*
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Counsel for Plaintiff State of South Dakota*


JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

/s/ Whitney D. Hermandorfer
**WHITNEY D. HERMANDORFER
*Director of Strategic Litigation Unit*
**BRIAN DANIEL MOUNCE
*Counsel for Strategic Litigation &*
*Assistant Solicitor General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov

*Counsel for the State of Tennessee*


JASON S. MIYARES
Attorney General of Virginia

/s/ Kevin M. Gallagher
**Kevin M. Gallagher
*Principal Deputy Solicitor General*
**Brendan T. Chestnut
*Deputy Solicitor General*
**M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*


PATRICK MORRISEY
West Virginia Attorney General

/s/ Michael R. Williams
**Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

BRIDGET HILL
Wyoming Attorney General


/s/ Ryan Schelhaas
**Ryan Schelhaas
 *Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov


*Counsel for Plaintiff State Wyoming*

/s/ Michael D. McCoy
**Michael D. McCoy
**William E. Trachman
Mountain States
Legal Foundation
 2596 South Lewis Way
 Lakewood, Colorado 80227
 (303) 292-2021
Mmccoy@mslegal.org


*Counsel for Plaintiffs Allen Black, Donald Maxey,
and Chisholm Trail Antique Gun Association*


/s/ Anna St. John
**Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

/s/ M. Frank Bednarz
**M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org


*Counsel for Plaintiff Phillip Journey*

*pro hac vice
** *pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

This is to certify that on this the 7th day of June, 2024, this motion was electronically filed with the Clerk of the Court by using the CM/ECF system with electronic delivery to all parties.

Respectfully submitted,

_/s/ Erin B. Gaide_
Erin B. Gaide

072

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | |
|---|---|
| STATE OF KANSAS, *et al.* | |
| Plaintiffs, | |
| v. | |
| MERRICK GARLAND, *et al.*, | Civil Action No. 6:24-cv-01086-TC-TJJ |
| Defendants. | |

PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR A TEMPORARY RESTRINING ORDER AND PRELIMINARY
INJUNCTION[1]

---

[1] In compliance with the Court's order in ECF #100, the standing portion of this memorandum is limited to five pages and the merits portion, including the introduction and background, is limited to fifteen pages. This accounts for the portions of the Introduction relevant to each.

TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................. iv

**TABLE OF EXHIBITS** ...................................................................................................viii

INTRODUCTION ............................................................................................................1

BACKGROUND...............................................................................................................1

    A.     Federal Firearms Act of 1938 and Gun Control Act of 1968 ....................................1

    B.     The Firearms Owners' Protection Act ...................................................................2

    C.     The Bipartisan Safer Communities Act ................................................................3

    D.     The Final Rule..........................................................................................................4

LEGAL STANDARD .........................................................................................................5

ARGUMENT .....................................................................................................................5

    A.     Plaintiffs Have Standing ........................................................................................5

           1. The States have standing because they are losing tax revenue .......................5

           2. The States have standing because they face increased administrative costs.............................................................................................................................7

           3. Individual Plaintiffs have standing................................................................7

           4. Plaintiff Chisholm Trail has standing ............................................................9

    B.     Plaintiffs are Likely to Succeed on the Merits .....................................................10

           1.     The Final Rule is in excess of and contrary to federal law ..................10

                **a.**     Defendants lack authority to promulgate the Final Rule........ 10

                **b.**     The Final Rule violates the text of Federal Law ..................... 12

                **c.**     The  Final Rule exceeds Defendants' limited authority and violates the major questions doctrine ...................................... 14

           **2.**     The Final Rule is unconstitutionally vague ...........................................15

           **3.**     The Final Rule is arbitrary and capricious.............................................17

           **4.**     The Final Rule violates the Second Amendment ..................................18

C.     The Remining Factors Weigh in Plaintiffs' Favor ....................................................19

           **1.**     The Final Rule irreparably harms Plaintiffs.............................................19

           **2.**     The balance of the equities and public interest favor Plaintiffs...........19

D.     A TRO and Injunction Should Apply Nationwide. ....................................................20

CONCLUSION....................................................................................................................20

CERTIFICATE OF SERVICE ........................................................................................................ 27

iii

# TABLE OF AUTHORITIES

Cases

*Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12 (D.D.C. 2010) .......................................... 5

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) ..................................................... 20

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) .......................................................................... 15

*Bittner v. United States*, 598 U.S. 85 (2023) ........................................................................ 11

*City of Chi. v. Morales*, 527 U.S. 41 (1999) ......................................................................... 15

*Collins v. Yellen*, 141 S. Ct. 1761 (2021) ............................................................................. 5

*Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972 (D.C. Cir. 1985) .................................................. 5

*D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1 (D.D.C. 2020) ......................................................... 20

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019) ................................................................... 6

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) .......................................... 17

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251 (10th Cir. 2024) .................................... 19

*Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011) .................................................................... 18

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...................................................... 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S 167 (2000) ..................................... 9

*Guedes v. BAFTE*, 140 S. Ct. 789 (2020) ............................................................................ 12

*Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226 (10th Cir. 2017) .......... 19

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ................................................................................ 12

*Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023) .................................................... 18

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) .................................................. 18

iv

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ................................................................ 10

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998) ................................. 20

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022) ................................................................................ 20

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021) ................................................................................... 5

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ...................................................................... 18

*Sackett v. EPA*, 566 U.S. 120 (2012) ................................................................................................... 9

*StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023) .............................................. 15

*Susan B. Anthony v. Driehus*, 573 U.S. 149 (2014) .............................................................................. 9

Temp. Restraining Ord., *Texas v. ATF*, Case no. 2:24-cv-89-z (May 19, 2024) .............. 6, 12, 13, 14

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) ........................................................................... 7

*Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023) .................................................................................... 5

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669 (1973) ....................... 6

*West Virginia v. EPA*, 597 U.S. 697 (2022) ....................................................................................... 15

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) ...................................................................... 15

Statutes

18 U.S.C § 921(a)(22) ........................................................................................................................ 14

18 U.S.C. § 921 ............................................................................................................................. 3, 12

18 U.S.C. § 921(a)(11) ....................................................................................................................... 2

18 U.S.C. § 921(a)(11)(A) ............................................................................................................... 11

18 U.S.C. § 921(a)(13) ...................................................................................................................... 11

18 U.S.C. § 921(a)(21)(C) ...................................................................................................... 4, 13, 14, 16

18 U.S.C. § 922(a)(1) ....................................................................................................................... 14

077

18 U.S.C. § 922(t)(1)(A) .................................................................................. 8

18 U.S.C. § 923 ............................................................................................... 14

18 U.S.C. § 923(d)(1)(E) ................................................................................. 8

18 U.S.C. § 923(g)(1)(A) ................................................................................. 8

18 U.S.C. § 923(g)(1)(B)(i) .............................................................................. 8

18 U.S.C. § 923(g)(1)(B)(ii)(I) ........................................................................ 8

18 U.S.C. § 926(a) ........................................................................................... 11

18 U.S.C. 921(a)(11)(A) .................................................................................. 14

5 U.S.C. § 705 ................................................................................................. 5

5 U.S.C. § 706(2) ............................................................................................. 20

5 U.S.C. § 706(2)(C) ....................................................................................... 10

Tenn. Code Ann. § 39-17-1316........................................................................ 7

Other Authorities

Joan Burbick, *Cultural Anatomy of a Gun Show*, 17 Stan. L. & Pol'y Rev. 657 (2006) ....................... 18

John Berrigan, Deborah Azrael, and Matthew Miller, "*The Number and Type of Private Firearms in the United States*," Sage Journals, Table 2 ................................................. 13, 16

Regulations

18 C.F.R. § 478.102(a).................................................................................... 8

18 C.F.R. § 478.124(a)-(b)............................................................................. 8

27 C.F.R. § 478 ............................................................................................... 17

27 C.F.R. § 478.11........................................................................................... 16

27 C.F.R. § 478.13........................................................................................... 17

Kan. Admin. Regs. § 92-19-22a(4) ............................................................... 6

078

Acts of Congress

The Bipartisan Safer Communities Act of 2022, Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022) ............................................................................................................................ 3, 4, 15

The Federal Firearms Act of 1938, Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938)........................... 1

The Firearm Owners Protection Act of 1986, Pub. L. 99-308, 100 Stat. 449 (May 19, 1986) .... 3, 11

The Gun Control Act of 1968, Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968) .................................. 2

Congressional Record

S. Rep. No. 98–583 (1984) ............................................................................................................... 3

*The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess. (1982) ......................................................................................................... 2

079

TABLE OF EXHIBITS

| Exhibit Number | Exhibit Name | Page Numbers |
|---|---|---|
| Exhibit 1 | Chipley Declaration | 6, 16, 19 |
| Exhibit 2 | Kehril Declaration | 6, 10, 17, 18, 19 |
| Exhibit 3 | Temporary Restraining Order, *Texas v. ATF*, Case no. 2:24-cv-89-z at 5–8 (May 19, 2024) | 6, 9, 12, 13, 14 |
| Exhibit 4 | Journey Declaration | 7, 8 |
| Exhibit 5 | Black Declaration | 8 |
| Exhibit 6 | Maxey Declaration | 8 |
| Exhibit 7 | Fry Declaration | 9, 10 |
| Exhibit 8 | Edwards Declaration | 7 |
| Exhibit 9 | Fanning Declaration | 6 |
| Exhibit 10 | Mayer Declaration | 6 |
| Exhibit 11 | Francis Declaration | 6 |

## INTRODUCTION

The Second Amendment preserves treasured rights rooted deeply in our nation's history and tradition. Accordingly, Congress has always been careful when addressing regulation of firearms, including firearms commerce. It has been especially careful in how much authority it delegates to the executive branch. In adopting the Final Rule,[2] Defendants exceeded their statutory authority, blatantly violating both the statute they claim to interpret and the Constitution itself. Under the Final Rule, Defendants attempt to change the definitions set by Congress so they can regulate any citizen who makes a local sale of even one firearm to another individual. The Final Rule is unlawful, and its implementation is causing irreparable harm to all Plaintiffs. Plaintiffs respectfully ask the Court to grant a temporary restraining order and a preliminary injunction.

## BACKGROUND

**A.      Federal Firearms Act of 1938 and Gun Control Act of 1968**

For the first 150 years of our nation's history, there was no significant regulation of firearms commerce. The first licensing requirement for firearms dealers took place when Congress enacted the Federal Firearms Act of 1938 ("FFA"), Pub. L. 75-785, 52 Stat. 1250, 1251 (June 30, 1938), which required

> [a]ny . . . dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce" to apply for a license with "the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application.

The license "entitle[d] the licensee to transport, ship, and receive firearms . . . in interstate . . . commerce." 52 Stat. at 1251. As relevant here, the FFA defined a "dealer" as "any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail." 52 Stat. at 1250.

---

[2] *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 F.R. 28968 (Apr. 19, 2024).

In 1968, Congress passed the Gun Control Act ("GCA").[3] The GCA sought to prevent "crime and violence" without "intending to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 82 Stat. at 1213-14. The GCA defined definition of "dealer" largely tracked the FFA's definition: "any person engaged in the business of selling firearms or ammunition at wholesale or retail." 82 Stat. at 1216.[4]

**B.      The Firearms Owners' Protection Act**

ATF was accused of utilizing questionable techniques to generate arrests after the GCA. These cases led to congressional hearings in late 1979 and early 1980.[5] The report of the Senate Subcommittee on the Constitution concluded as follows: (1) The "enforcement tactics made possible by current federal firearms laws are constitutionally, legally and practically reprehensible." *Id.*;(2) The Subcommittee found that ATF had "primarily devoted its firearms enforcement efforts to the apprehension, upon technical malum prohibitum charges, of individuals who lack all criminal intent and knowledge." *Id.*; (3) The Subcommittee also found that ATF "[a]gents anxious to generate an impressive arrest and gun confiscation quota [had] repeatedly enticed gun collectors into making a small number of sales—often as few as four—from their personal collections," even though each of the sales "was completely legal under state and federal law." *Id.* ATF still "charged the collector with having 'engaged in the business' of dealing in guns without the required license," which saddled "numerous collectors … [with] a felony record carrying a potential sentence of five years in federal prison" even though many had "no criminal knowledge or intent." *Id.*

---

[3] Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968).
[4] *Codified at* 18 U.S.C. § 921(a)(11).
[5] *The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 20 (1982).

Congress passed the Firearm Owners Protection Act ("FOPA")[6] to correct those abuses. *See also* S. Rep. No. 98–583, at 6 (1984).   In so doing, Congress found: (1) "the rights of citizens . . . require additional legislation to correct existing firearms statutes and enforcement policies." 100 Stat. at 449[7]; and (2) "additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the [GCA]." *Id.* So, the FOPA clarified that "it is not the purpose of this title to place undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of personal protection, or any other lawful activity." *Id.* And the FOPA "is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.'" *Id.*

The FOPA narrowed the definition of "dealer" by defining "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 100 Stat. at 450. But the FOPA excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* It also narrowed the definition of "dealer" by defining "with the principal objective of livelihood and profit" as intending "the sale or disposition of firearms is predominantly [to] obtain livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.*

**C.**     **The Bipartisan Safer Communities Act**

In 2022, Congress passed a narrow amendment to the GCA in the Bipartisan Safer Communities Act ("BSCA").[8]   The BSCA amended "dealer: by replacing "with the principal objective of livelihood and profit" with "to predominantly earn a profit,"  § 12002, 136 Stat.

---

[6] Pub. L. 99-308, 100 Stat. 449 (May 19, 1986)
[7] *Codified at* 18 U.S.C. § 921 Note.
[8] Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022).

at 1324,  and defining "to predominantly earn a profit" as an "intent underlying the sale or disposition of firearms [that] is primarily one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection," *id.* at 1325.  The BSCA did not alter the requirement for a "regular course" of trade involving "repetitive" transactions of "firearms."

**D.**      **The Final Rule**

The Final Rule uses the statutory tweak in the BSCA as a pretext for creating an entirely different definition of what it means to be "engaged in the business" of a firearms dealer. The Final Rule states "even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 F.R. 28976, 29091. In addition to redefining already-defined statutory terms, the Final Rule creates a series of five presumptions—three of which are explicitly multipart—any one of which ATF can use to presume someone is dealing in firearms. *See* 89 F.R. 29091. Indeed, the Final Rule has exceptions to those presumptions that have their own exceptions. *See id.* This results in a nebulous web of presumptions and exceptions that makes it nearly impossible to identify who and what conduct is covered.

18 U.S.C. § 921(a)(21)(C) excludes someone from being "engaged in the business" if that person "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." But the Final Rule purports to (re)define this unqualified exception via its definition of the term "personal collection" as "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.*, noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction). The term shall not include any firearm purchased for the purpose of resale with the predominant intent to earn a profit. . . . In addition, *the term shall not include firearms*

4

*accumulated primarily for personal protection.*" 89 F.R. 29090 (emphasis added). It also states that if someone "restocks" their personal collection after selling a firearm they may not qualify for the exemption for selling from a personal collection. *Id.* at 29092.

The Final Rule anticipates several effects on those who sell firearms without a license. The first is that a significant number of them will become federal firearms licensees and abide by the new regulations. *Id.* at 29898. A second anticipated effect is that there will be many individuals that stop selling firearms altogether. *Id.* at 29,054. The Final Rule estimates that number at 2.5–10%. *Id.* The Final Rule took effect May 20, 2024. *Id.* at 28968.

## LEGAL STANDARD

The APA allows "the reviewing court" to issue "all necessary and appropriate process" to delay "an agency action or to preserve status or rights pending conclusion of review proceedings." 5 U.S.C. § 705.  All four of the standard factors for a preliminary injunction and temporary restraining order weigh in favor of such relief here.

## ARGUMENT

### A.    Plaintiffs Have Standing

"If at least one plaintiff has standing"—here, that would mean one valid theory of standing for even one State or private party—the suit should "move forward." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023); *see also id.* ("we need not consider the other theories of standing").

### 1. The States have standing because they are losing tax revenue

The States have already lost (and will continue to lose) tax revenue under the Final Rule. Monetary loss is a cognizable harm. *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023) ("pocketbook injur[ies]" confer standing); *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021) (noting that "specific lost tax revenues suffice to support standing" and differ from "allegations of generalized economic harm only"). Loss of revenue caused by a federal agency is an injury to the States that is traceable to Defendants. *See Dep't of Com. v. New York*, 139 S.

Ct. 2551, 2565 (2019). Just as New York had standing in that case, so too do the States here.[9]

Many of Plaintiff States tax tables at gun shows, sales of firearms, or admissions to gun shows. Kansas, for example, collects a 6.5% sales tax both for admissions and for sale of firearms during gun shows. Kan. Admin. Regs. § 92-19-22a(4); *see also* Complaint at 19–23 (ECF #1) (listing state tax laws); Ex. 9; Ex. 10; Ex 11. The loss of tax revenue at gun shows is not speculative; it has already occurred and will continue to occur every week until a temporary injunction is in place. Because of the Final Rule, the number of unlicensed sellers at gun shows has already dropped dramatically—by an estimated 30-40% (not the 10% predicted by Defendants).  *See* Ex. 1 ¶ 3; Ex. 2 ¶ 2. In the Plaintiff States, collectively, an average of ten gun shows are scheduled to occur each weekend.[10]  In addition, at least five gun shows have been cancelled entirely, as a direct consequence of the Final Rule. In May, June, and July, shows in Hamilton, Montana;[11] Athens and Sparta Tennessee, Ex. 1 ¶¶ 18, 21; and Murfreesboro, Tennessee, and Broken Arrow, Oklahoma, Ex. 2 ¶¶ 12, 15, were also canceled because of the Final Rule. When cancellation occurs, a state collects no tax revenue.  For example, the Athens show generated over $2,600 in state sales taxes in 2023. Ex. 1 ¶ 20. In 2024, zero taxes were collected. The cancelation in Murfreesboro has cost Tennessee over $1,500. Ex. 2 ¶ 13. There is no minimum amount of tax revenue that must be lost. "[A]n identifiable trifle is enough for standing . . . ." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 690 n.14 (1973). As a judge in the Northern District of Texas has already found, the States have clearly established an injury to their State fiscs that they will not face if the Final Rule is stayed and later vacated.  *See* Temp. Restraining Ord., *Texas v. ATF*, Case no. 2:24-cv-

---

[9] Go to a Gun Show! The BIG 2024 Gun Shows List, Gun Show Trader, (last accessed Jun. 4, 2024) https://gunshowtrader.com/gun-shows. Information found by clicking on the calendar of gun shows in each respective state.

[10] Eleven on June 8–9, nine on June 15–16, ten on June 22–23. *See* https://gunshowtrader.com/gun-shows/page/2/.

[11] News Release: *MT Gun Show Cancelled–BATFE Regulation*, Montana Shooting Sports Association (last accessed Jun. 5, 2024), https://www.mtssa.org/mt-gun-show-cancelled-batfe-regulation/ (shows canceled "because of the new regulation by the Biden administration and the [ATF] redefining what 'engaged in business' is for selling one or more firearms").

89-z at 5–8 (May 19, 2024) (attached as Ex. 3).

**2. The States have standing because they face increased administrative costs**

The States have also established standing because, as Defendants admit, the Final Rule will impose additional administrative costs. Plaintiffs Tennessee and New Hampshire tie their own background checks to the federal requirements. *See* Tenn. Code Ann. § 39-17-1316; Ex. 8 at 2–3. The Final Rule anticipates an increase in the number of federal firearms licensees across the country. 89 F.R. 28998. It also expects an increase in background checks and notes that it is state law enforcement agencies in Tennessee that conduct these background checks. *Id.* at 29088. This will result in an increase in administrative costs for Tennessee and New Hampshire as they process more firearms license applications and run background checks for new licensees that previously did not need to do so. *See* Ex. 8 at 2–3. Once these costs are incurred, they can't be clawed back, causing an injury. The States are also harmed if they are forced to change their laws to *avoid* irreparable injury. *Texas v. United States*, 787 F.3d 733, 748 (5th Cir. 2015), *aff'med by an equally divided Court* 579 U.S. 547 (2016).

**3. Individual Plaintiffs have standing**

Plaintiff Journey attends four to five gun shows a year and buys or sells firearms at most of them. Ex. 4 ¶ 4. Journey owns firearms for self-defense, and he sells firearms for various reasons. *Id.* ¶¶ 3, 4. As he noted, the Final Rule could require him to obtain a federal firearm license ("FFL") if he engages in "even a single firearm transaction or offer to engage in a transaction." *Id.* ¶ 25 (quoting 89 F.R. 29091). So, if the Final Rule is allowed to take effect, Journey "believe[s] that [he] will have to give up selling firearms or register as [a licensee]." *Id.* ¶ 10. This will have an immediate impact on him because he intends to attend gun shows (where he intends to buy and sell firearms) in July, October, and November, and the license application process is burdensome and takes several months to complete. *Id.* ¶¶ 4, 10.2. He is harmed regardless of whether he is forced to unnecessarily apply for a license or he skips the shows. There is a realistic danger that he will be subject to penalties, and his injury is certainly impending.

Black likewise attends multiple gun shows a year where he buys and sells firearms. Ex. 5

7

¶ 4. He has reviewed the Final Rule and believes that it applies to him and his purchases and sales—a supposition he is better suited to make at this time than Defendants. *Id.* ¶¶ 6, 8. If the Final Rule is allowed to take effect, he will either need to register as a licensee, which is a burdensome and time-consuming process, or stop buying and selling firearms altogether. *Id.* ¶¶ 7, 8. He is concerned that if he does not do so, an otherwise perfectly legal sale or offer to sell will put him at risk of "civil, administrative, and possibly criminal penalties." *Id.* ¶ 13. Maxey attends three gun shows a year and regularly purchases firearms. Ex. 6 ¶ 4. He is aware that the Final Rule will decrease the number of people who sell firearms at gun shows. *Id.* ¶¶ 8–10. This will impact his constitutional and statutory rights to acquire firearms.

Individual Plaintiffs do not want to become licensees. Becoming a licensee is a cumbersome process that takes months and costs $200.[12] By the time a license is approved (if it is), Individual Plaintiffs will have had to decide whether to attend upcoming gun shows (and risk enforcement) or decline to exercise their Second Amendment rights. Once someone has a license, there are extensive obligations and burdens. *See, e.g.*, 18 U.S.C. §§ 923(g)(1)(A); 923(g)(1)(B)(ii)(I); 923(d)(1)(E); 922(t)(1)(A); 18 C.F.R. § 478.102(a); *see also id.* § 478.124(a)-(b). And he is subject to warrantless record inspections if he becomes involved in a criminal investigation. *See* 18 U.S.C. § 923(g)(1)(B)(i).

All three Individual Plaintiffs reasonably believe the Final Rule applies to conduct they regularly (and legally) engage in. Among other things, all three sell and buy firearms for personal protection, which is excluded from the definition of "personal collection" in the Final Rule. All three individuals attend multiple gun shows a year, which may or may not constitute "occasional" sales under the Final Rule, because it does not define the term and because it suggests even one sale (or contemplated sale) is sufficient to qualify someone as "engaged in the business." *See* 89 F.R. 29091.

Individual Plaintiffs do not need to declare an intent to break the Final Rule in order to

---

[12] *Apply for a License*, ATF (last accessed Jun. 6, 2024), https://www.atf.gov/firearms/apply-license.

challenge it. Their simple desire to do something in the future that could result in prosecution is sufficient to establish a "cognizable injury" for the purposes of standing, especially when they have established a specific date in the future or plan to do the prohibited thing. *Susan B. Anthony v. Driehus*, 573 U.S. 149, 161 (2014). Individual Plaintiffs must simply establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Id.*; *see also Sackett v. EPA*, 566 U.S. 120, 127 (2012). Individual Plaintiffs have articulated in their declarations a desire and intent to do the very thing in the future that has been prohibited by the Final Rule (sell firearms multiple times a year without an FFL). This "cognizable threat" of potential prosecution based on the potential future conduct of Individual Plaintiffs is enough to refute the government's claim on this front. Individual Plaintiffs face a realistic, imminent threat of danger or else are chilled from exercising their Second Amendment rights. They have standing. *See* Ex. 3 at 5-8.

**4. Plaintiff Chisholm Trail has standing**

Plaintiff Chisholm Trail also has standing. Both Plaintiffs Maxey and Black are members of Chisolm Trail, *see* Ex. 7 at 2, and both have standing. Both Plaintiffs declared that they own, sell, or purchase firearms repeatedly throughout the year. The firearms that Black and Maxey sell and purchase can be used for personal protection, and thus fall within the ambit of the Final Rule. Black and Maxey's activities relate to the purpose of the organization, *see id.* at 2–3, and, therefore, it has standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S 167, 181 (2000).

Chisolm Trail's injuries are concrete and particularized. In his declaration, Jim Fry outlined how approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by the biannual gun shows they organize. Ex. 7 at 2. Since private party sales of firearms are what dominate these gun shows, the Final Rule will drive down attendance and revenue for the organization (because there will be fewer people willing to risk selling a firearm without becoming a licensee). In the weeks that the Final Rile has been in effect, there has been a drop of 30% in the number of unlicensed vendors at gun shows. Ex. 2 ¶ 10. Last fiscal year, Chisholm Trail paid sales tax to Kansas for table rental fees charged during their gun shows in the

9

amount of $4,005.72. Ex. 7 at 3. So, the loss of even a relatively small amount of the revenue generated by these gun shows would cause financial harm to both Chisholm Trail and Kansas in the form of tax revenue. So, Chisolm Trail also has standing.

**B.      Plaintiffs are Likely to Succeed on the Merits**

**1.      The Final Rule is in excess of and contrary to federal law**

Defendants have no authority to issue the Final Rule. But even if they did, they can't redefine Congressionally defined terms.

**a.      Defendants lack authority to promulgate the Final Rule**

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Congress expressly limited how much authority to grant Defendants in issuing regulations and allowed them to "prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." *See* 18 U.S.C. 926. Because Chapter 44 of Title 18 ("federal firearms law") gives ATF no statutory authority to redefine terms or to create rebuttable presumptions in the federal firearms law, those portions of the Final Rule must be set aside.[13] *See, e.g., Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

The ATF Director's statutory authority is circumscribed in 18 U.S.C. § 926(a), which explains that he "may prescribe only such rules and regulations as are necessary to carry out the [law's] provisions." *Id.* Congress's intentionally limited this authority to "only . . . necessary" rules and regulations. As discussed, *supra*, Congress specifically limited Defendants delegated authority.

There is another indication in the statutory text that Congress did not delegate

---

[13] The Final Rule redefines "dealer," "engaged in the business," "principal objective of livelihood and profit," and it adds definitions for "personal collection (or personal collection of firearms, or personal firearms collection)," "former licensee inventory," "predominantly earn a profit," "responsible person," and "terrorism." *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 F.R. 28968, 29089–90.

authority to the Director to redefine statutory definitions in the Final Rule. The statutory definition part of section 921(a) grants the Director rulemaking authority to define only the term "curios and relics." *See* 18 U.S.C. § 921(a)(13).[14] The Director is not authorized to promulgate any rules to define statutory terms. And there is absolutely no authority for the idea that Congress gave the Director authority to define "personal collection" to exclude those acquired for "personal protection," the most common type of firearm. No other part of § 921(a) authorizes the Director to promulgate any rules to define statutory terms. *See id.* (use of "particular language in one section of a statute" paired with "omi[ssion] from a neighbor[ing] provision]," "normally . . . convey[s] a difference in meaning (*expressio unius est exclusio alterius*)"). *See Bittner v. United States*, 598 U.S. 85, 94 (2023). So too here. The express grant of authority to the Director to define some terms strongly suggests Congress withheld that same authority for other terms.

Nor are the changed definitions in the Final Rule "necessary." *See* 18 U.S.C. § 926(a). Before the BSCA, the statute defined a "dealer" as a person "engaged in the business" of selling firearms, *see id.* § 921(a)(11)(A), and further defined "engaged in the business" as "a person who devotes time, attention and labor to dealing in firearms as a regular course of trade or business with *the principal objective of livelihood and profit* through the repetitive purchase and sale of firearms," *see* FOPA, 100 Stat. 449, 450 (emphasis added). It defined "with the principal objective of livelihood and profit" as an "intent . . . [that] is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* Further, it certainly wasn't "necessary" to carve out "personal protection" firearms.

In addition, ATF lacks authority to create presumptions as to whether someone is "engaged in the business." *See* 18 U.S.C. §§ 921–34. That the Final Rule's presumptions apply to a

---

[14] Even this limited grant of authority was later restricted in a spending prohibition. *See* Pub. L. 113-6, 127 Stat. 198, 248 (Mar. 26, 2013) ("[I]n the current fiscal year and any fiscal year thereafter, no funds appropriated under this Act shall be used to pay administrative expenses or the compensation of any officer or employee of the United States to . . . change the definition of 'Curios or relics' in § 478.11 of title 27 . . .") (*codified at* 18 U.S.C. § 921).

*criminal statute* only reinforces this. ATF claims the presumptions would not apply in criminal proceedings, but it still concedes that the presumptions "may be useful to a court." *See* 89 F.R. at 28976, 29011, 29014. Regardless, the Final Rule's meaning must be the same in civil and criminal contexts. *See Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004). Because the statute has criminal applications, ATF's construction of it—through presumptions to define covered conduct—is entitled to no deference, *Guedes v. BAFTE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in the denial of *certiorari*). ATF has exceeded its authority by redefining statutory provisions and creating rebuttable presumptions in the Final Rule that it has no authority to promulgate.

**b.      The Final Rule violates the text of Federal Law**

The Northern District of Texas has correctly held "the Final Rule clashes with the text of the BSCA in at least three ways." Ex. 3 at 9. This Court should do the same. These clashes with the terms of federal law are obvious and can't be reconciled with the its text.

*"Repetitive" sales of multiple "firearms."*   First, the Final Rule violates the statute's requirement that there be "repetitive" sales of multiple "firearms." The Final Rule claims that there is no "minimum number of firearms to actually be sold to be 'engaged in the business.'" 89 F.R. 29021.  "[A] single firearm transaction"—or even a mere offer to sell a firearm when combined with other evidence—"may be sufficient to require a license." *Id.* at 28976. The Final Rule flatly contradicts the statutory text. As explained in *Texas*, "Defendants' proffered interpretation is severely undercut by Section 921(a)(21)(C)'s use of [] 'firearms,' in the plural." Ex. 3 at 9. And there's more. "Section 921(a)(21)(C) require[s] the 'purchase *and* resale' of firearms—a conjunctive requirement that flatly contradicts Defendants' assertion that 'there is no minimum threshold number of firearms purchased *or* sold" to require a license. *Id.* at 9-10 (emphases original) (quoting 89 F.R. 29091).

*The "personal protection" exclusion.* Second, the Final Rule invents an exclusion of firearms "for personal protection" that is found nowhere in federal law. Federal law creates a safe harbor that excludes a person from being "engaged in the business" if he

"make[s] occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby," or if he "sell[s] all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C) (cleaned up). Congress did not delegate authority to Defendants to redefine "personal collection," *see* 89 F.R. 28971, but they did so anyway, *see* 89 F.R. 29090. The Final Rule redefines this unqualified "personal collection" exception by excluding "*any firearm* purchased for the purpose of resale with the predominant intent to earn a profit" and "firearms accumulated *primarily for personal protection*." 89 F.R. 29090 (emphases added). As the court in the Northern District of Texas correctly held, in so doing, the Final Rule "arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision." Ex. 3 at 11. Nothing in the statute's text warrants excluding firearms obtained for personal protection from the statutory term "personal collection." Indeed, *Heller* expressly recognized that personal protection is "central to the Second Amendment right" and a primary reason that individuals acquire firearms for personal use. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). Additionally, this would likely apply to almost all handguns (44% of firearms in private possession[15]) and shotguns (20%[16]). Finally, if one includes rifles as firearms usable for personal protection—which virtually every rifle is—then every functioning firearm in the country is excluded from Defendants' arbitrary definition of "personal collection." They cannot point to any authority for this absurd result.

*"Proof of profit."* The Final Rule claims that "actual profit is not a requirement of the statute—it is only the predominant intent to earn a profit though the repetitive purchase and resale of firearms that is required." 89 F.R. 29091. The Final Rule misconstrues the statute, which states: "The term 'to predominantly earn a profit' means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and

---

[15] 145,027,290 out of a total of 325,974,664. John Berrigan, Deborah Azrael, and Matthew Miller, "*The Number and Type of Private Firearms in the United States*," Sage Journals, Table 2, *available at* https://journals.sagepub.com/doi/full/10.1177/00027162231164855.)

[16] 65,384,747 out of a total of 325,974,664, *Berrigan, et al.*

disposition of firearms for *criminal purposes or terrorism*." 18 U.S.C § 921(a)(22) (emphasis added). As the court in *Texas* pointed out, "the negative corollary is obvious: while proof of profit is not required 'for criminal purposes or terrorism,' it is required for all other cases." Ex. 3 at 10.

**c.      The Final Rule exceeds Defendants' limited authority and violates the major questions doctrine**

Federal law regulates the interstate firearms industry by imposing licensing requirements on firearms importers, manufacturers, and as relevant here, dealers. *See* 18 U.S.C. § 923. Any person who wishes to "engage in the business of . . . dealing in firearms" must obtain a federal firearms license. *See id.* § 923(a) (cleaned up); *see also id.* § 922(a)(1). The statutory definitions show federal firearms laws' focus on commercial firearms operations. It defines "dealer" as "any person engaged in the business of selling firearms at wholesale or retail." *Id.* § 921(a)(11)(A). It then defines "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms *as a regular course of trade or business* to predominantly earn a profit through the *repetitive purchase and resale* of firearms." *Id.* § 921(a)(21)(C) (emphases added). Status as a "dealer" is thus tailored to capture commercial firearms operations. *See id.* To meet the statute's definition of "dealer," a person must devote significant time to the commercial selling and reselling of firearms at routine intervals—periodic or irregular sales don't suffice. Federal firearms law never intended to impose dealer requirements on those making small-scale and infrequent sales. Nor does it authorize ATF to use these sales as a backdoor to impose universal background checks.

Defendants latch onto the BSCA's minor amendment to smuggle universal background checks in the back door. But nothing in the BSCA's recent amendment hints that Congress retrained its focus on local sales. The BSCA amended the FOPA's definition of "engaged in the business" but it otherwise left section 921(a) untouched.[17] The BSCA

---

[17] *See* Pub. L. No. 117-159, § 3(b), div. A, tit. II, § 12002, 136 Stat. 1313, 1324–25 (June 25, 2022).

replaced FOPA's definition of "with the principal objective of livelihood and profit" with "to predominantly earn a profit" and defined "predominantly earn a profit" as an intent that is "predominantly one of obtaining pecuniary gain"—a near carbon copy of the FOPA's definition. 136 Stat. at 1324–25.

Universal background checks are a hotly contested political issue and a "major question." *See West Virginia v. EPA*, 597 U.S. 697, 721–22 (2022); *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023). Decisions on "major questions" must be made by "Congress itself, or [by] an agency acting pursuant to a clear delegation from that representative body." *West Virginia*, 597 U.S. at 735. A "colorable" or "plausible" textual basis won't do. *Id.* at 723; *see also Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001). But if Congress intended the BSCA's benign changes to authorize ATF to resolve these contentious issues, "common sense" suggests it would have done so plainly. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Congress wasn't unclear; it didn't delegate this authority *at all*.

**2.      The Final Rule is unconstitutionally vague**

A regulation is unconstitutionally vague if it does not give a person of reasonable intelligence fair notice that his conduct is unlawful or it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chi. v. Morales*, 527 U.S. 41, 52, 60 (1999). The Final Rule is confusing and susceptible to multiple interpretation; as such, it "encourages arbitrary and discriminatory enforcement." *Street Media Group, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023). The three greatest sources of vagueness created by the Final Rule are: (1) the invention of a new distinction between guns used for personal protection and guns not used for personal protection, (2) the creation of a new standard that the mere suggestion of a willingness to sell a *single* firearm *may or may not* be enough to bring someone within the scope of being engaged in the business, and (3) the mind-numbing complexity of the rule itself, with its exceptions to exceptions and its multiple presumptions.

**First, the phrase "primarily for personal protection" is inherently vague.** This phrase is a completely new legal standard invented by Defendants. It appears in the Final Rule's

definition of the term "personal collection," with the full sentence reading: "In addition, the term shall not include firearms accumulated primarily for personal protection." 27 C.F.R. § 478.11. However, as discussed *supra*, *virtually every firearm* can be used for personal protection: handguns, shotguns, and rifles. It is beyond cavil that every handgun is useful for personal protection. Berrigan, *et al.*, Table 2. Shotguns are also ideal for personal protection—particularly personal protection in one's home. *Id.* The only category about which reasonable debate might occur is the rifle category. So which guns were "accumulated primarily for personal protection?" It is impossible to say with certainty. No gun buyer fills out a form when purchasing a firearm that requires him to state his intend use of the firearm. And it would be difficult to do so even if such a form existed. Most gun buyers have *multiple* purposes in mind.[18]

**Second, it creates vagueness as to how many firearms must be sold.** The wording of the Final Rule exudes vagueness: "[T]here is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms. Even "a single firearm transaction or offer to engage in a transaction, when combined with other evidence . . . may require a license." 27 C.F.R. § 478.13. This stands in contrast to the wording of federal law prior to the issuance of the Final Rule. The wording of the law is fairly easy to understand: a person is "engaged in the business" through "the repetitive purchase and resale of firearms," but not through "occasional sales, exchanges, or purchases" of guns in a "personal collection." 18 U.S.C. § 921(a)(21)(C). So, put simply, the law indicates that lots of repetitive sales constitute being "engaged in the business," and a few "occasional" sales are not enough. The Final Rule changes all of that, with the *potential* sale of single firearm *maybe* being enough. According to one of the largest

---

[18] For example: .25 ACP caliber semi-automatic pistols are extremely small handguns were widely sold in the United States in the 1950s, 1960s, and 1970s. Now, none of the major firearm companies manufactures them, mainly because the small .380 caliber has become more popular. They have consequently increased in value. Suppose a person acquired a few .25 ACP pistols in the 1960s mainly for personal protection. Now they are collectors' items. Without an FFL, he decides to sell them at a profit, and he restocks his personal collection with newer handguns. Did he "accumulate" the .25 ACP pistols for personal protection? The Final Rule is too vague for any reasonably intelligent person to know and for any ATF agent to enforce fairly.

16

gun show organizers in the country, "If you talk to five different ATF agents about what the Final Rule covers, you will likely get five different answers." Ex. 2 ¶ 8.

**Third, the Byzantine complexity of the Final Rule itself creates vagueness**. The Final Rule contains multiple exceptions and multiple presumptions. And the multiple presumptions are accompanied by multiple opposing presumptions that serve as exceptions to the presumptions. *See generally* 27 C.F.R. § 478.13.[19] A person of ordinary intelligence cannot easily comprehend exactly what conduct is prohibited.

**3.      The Final Rule is arbitrary and capricious**

An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation, fails to address alternatives to its action, or when it ignores affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The Final Rule departs sharply from prior practice. Previously, Defendants adopted the statutory definition of terms such as "engaged in the business," rather than expanding those definitions beyond what Congress included. *See* 27 C.F.R. § 478. This radical change has "caused great fear and confusion" among gun show sellers, causing approximately 30% to stop selling altogether. Ex. 2 ¶¶ 9, 10. This departure is arbitrary. The arbitrary exclusion of firearms acquired for personal protection from "personal collection[s]" can't be attributed to a difference in view or experience. It's from thin air.

Because Congress already defined these terms, Defendants' new definition can't be ascribed to a difference in view or product of agency experience. And the other explanations for the Final Rule aren't reasonable either. The Final Rule nods toward "new technologies, mediums of exchange, and forums in which firearms are bought and sold." 89 F.R. 28973. But it doesn't limit

---

[19]For example, the Final Rule claims to uphold a statutory exemption by not presuming someone selling firearms from their personal collection is a dealer. At the same time, the Final Rule creates the following exceptions to the exception to that presumption: (1) a personal collection doesn't include firearms purchased for self-defense, (2) includes no firearm that was brought with any intent to obtain profit, and (3) includes no one who buys any other firearms after selling from their personal collection. *Id.* at 29068–69.

itself to those new forums. It mostly targets gun shows which have been around since at least 1895.[20] "Clarity" and "emerging technologies" only existed to serve as a pretext for what Defendants wanted to do, which was establish near-universal background checks through the rulemaking process after they failed to pass this requirement through Congress. Defendants can't use an implausible pretext to impose them. Consequently, it is arbitrary and capricious.

**4.     The Final Rule violates the Second Amendment**

The Final Rule also violates the Second Amendment.  In the landmark *Bruen* decision, the Supreme Court succinctly stated the test for a law or rule's constitutionality.  "We reiterate that the standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). So, the first half of the test is the text, the second half is the history.

Plaintiffs unquestionably satisfy the first half of the test, which is simply whether the "Second Amendment's plain text covers an individual's conduct."  There is no doubt that the Second Amendment phrase "to keep and bear arms" includes the right to purchase or sell arms. *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023); *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011). While the Second Amendment expressly protects the right to "keep and bear arms," the only way to exercise this right "is to get one, either through sale, rental, or gift," *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), or to build one oneself. Therefore, because the text of the Second Amendment plainly covers Plaintiffs' conduct, it is Defendants' burden to justify its regulation by presenting evidence that the Final Rule aligns with the historical tradition of regulations in place at the time that the Second Amendment was ratified. The Final Rule itself offers no historical analogue that similarly regulated the private, non-commercial sale of firearms

---

[20] Joan Burbick, *Cultural Anatomy of a Gun Show*, 17 Stan. L. & Pol'y Rev. 657, 660 (2006).

between individuals.  That is because no historical analogue exists. For that reason, the Final Rule fails the *Bruen* test and is unconstitutional.

**C.      The Remining Factors Weigh in Plaintiffs' Favor**
**1.       The Final Rule irreparably harms Plaintiffs**

Without preliminary injunctive relief, Plaintiffs will suffer irreparable harm. As discussed above, the States are harmed though loss of tax revenue and administrative costs. None of those damages are recoverable from the United States; "a party suing the government suffers irreparable harm where monetary relief might not be available because of the government's sovereign immunity." *Kansas ex rel. Kansas Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226, 1251 (10th Cir. 2017) (cleaned up). The Final Rule has already decreased attendees, vendors, and sales revenue at gun shows in Plaintiff States. Exs. 1 ¶¶ 13–17; 2 ¶¶ 9–11. Chisholm Trail will experience the same harm at its gun shows. As discussed above, the Final Rule will harm Individual Plaintiffs through their ability to sell firearms from their personal collection at gun shows. This harm began the moment the Final Rule took effect and is ongoing. This harm cannot be remedied after the fact. Preliminary relief is necessary.

**2.       The balance of the equities and public interest favor Plaintiffs**

There is no harm to Defendants in pausing their attempted usurpation of Congress's role by maintaining the *status quo* with standards that have been in place for decades. Defendants contend that they aren't—and don't have the power to—imposing universal background checks. 89 F.R. 28987. Firearms sold by those truly "engaged in the business" of firearms sales already require a background check. *Id.* And the Final Rule risks turning everyday citizens into criminals if they inadvertently sell guns according longstanding law but in violation of the Final Rule's changes. *Id.* at 28995. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1279 (10th Cir. 2024). Maintaining the *status quo* while Plaintiffs challenge this rule is important and will ensure that otherwise law-abiding citizens aren't caught in the drag net of this overly broad and intrusive federal regulation.

19

**D.**     **A TRO and Injunction Should Apply Nationwide.**

Plaintiffs request a nationwide injunction pending a decision on the merits. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir.1989)); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020). When agency actions are unlawful, nationwide preliminary relief is appropriate. *See e.g.*, *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 46–48 (D.D.C. 2020).  Indeed, the APA allows a reviewing court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). "[T]ailoring an injunction to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022).

A nationwide injunction is called for here. Because Plaintiffs include 20 States, an injunction limited to those States would create a patchwork of enforceable federal law while allowing the continued infringement of constitutional rights of citizens of States not party to this suit. Given the significant harms the Final Rule imposes, Plaintiffs ask that the Court issue a TRO and enjoin it pending a determination on the merits.

## CONCLUSION

For these reasons, Plaintiffs request the Court issue a TRO and a Preliminary Injunction.

KRIS W. KOBACH
Kansas Attorney General

*/s/Erin B. Gaide*
Abhishek S. Kambli, 29788
*Deputy Attorney General*
Erin B. Gaide, 29691
*Assistant Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov
erin.gaide@ag.ks.gov


*Counsel for Plaintiff State of Kansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
**Eric H. Wessan
*Solicitor General*
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric. Wessan@ag.iowa.gov


*Counsel for Plaintiff State of Iowa*

AUSTIN KNUDSEN
 Montana Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN, 25622
 *Solicitor General*
**PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov


*Counsel for Plaintiff State of Montana*

21

STEVE MARSHALL
Alabama Attorney General

/s/ Edmund G. LaCour, Jr.
**Edmund G. LaCour, Jr.

*Solicitor General*
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov


*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

/s/ Aaron C. Peterson
**Aaron C. Peterson
*Senior Assistant Attorney General*
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov


*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

/s/ Stephen Petrany
*Stephen Petrany
*Solicitor General*
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov


*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

/s/ Joshua N. Turner
**Joshua N. Turner
*Chief of Constitutional Litigation and Policy*
**Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov


*Counsel for Plaintiff State of Idaho*

22

TODD ROKITA
Indiana Attorney General

/s/ James A. Barta
*James A. Barta
*Solicitor General*
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone:  (317) 232-0709
James.Barta@atg.in.gov

*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ Victor B. Maddox
**Victor B. Maddox
**Aaron J. Silletto
**Zachary M. Zimmerer
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov
Zachary.Zimmerer@ky.gov

*Counsel for Plaintiff Commonwealth of Kentucky*

ANDREW BAILEY
Missouri Attorney General

/s/ Bryce Beal
**Bryce Beal
*Assistant Attorney General*
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ Zachary A. Viglianco
*Zachary A. Viglianco
*Deputy Solicitor General*
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

/s/Brandon F. Chase
*Brandon F. Chase
*Assistant Attorney General*
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov


*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Katie L. Carpenter*
**Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov


*Counsel for Plaintiff State of North Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
**GARRY M. GASKINS, II
 *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:      (405) 521-3921
garry.gaskins@oag.ok.gov


*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ *Joseph D. Spate*
**Joseph D. Spate
*Assistant Deputy Solicitor General*
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC  29201
(803) 734-3371
josephspate@scag.gov


*Counsel for Plaintiff State South Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

/s/ Charles D. McGuigan
**Charles D. McGuigan
*Deputy Attorney General*
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

/s/ Whitney D. Hermandorfer
**WHITNEY D. HERMANDORFER
*Director of Strategic Litigation Unit*
**BRIAN DANIEL MOUNCE
*Counsel for Strategic Litigation &*
*Assistant Solicitor General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov

*Counsel for the State of Tennessee*

JASON S. MIYARES
Attorney General of Virginia

/s/ Kevin M. Gallagher
**Kevin M. Gallagher
*Principal Deputy Solicitor General*
**Brendan T. Chestnut
*Deputy Solicitor General*
**M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

PATRICK MORRISEY
West Virginia Attorney General

/s/ Michael R. Williams
**Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

25

BRIDGET HILL
Wyoming Attorney General


/s/ Ryan Schelhaas
**Ryan Schelhaas
 *Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov


*Counsel for Plaintiff State Wyoming*

/s/ Michael D. McCoy
**Michael D. McCoy
**William E. Trachman
Mountain States
Legal Foundation
 2596 South Lewis Way
 Lakewood, Colorado 80227
 (303) 292-2021
Mmccoy@mslegal.org


*Counsel for Plaintiffs Allen Black, Donald Maxey,
and Chisholm Trail Antique Gun Association*

/s/ Anna St. John
**Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

/s/ M. Frank Bednarz
**M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org


*Counsel for Plaintiff Phillip Journey*

*pro hac vice
** *pro hac vice* forthcoming

26

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this the 7th day of June, 2024, this motion was electronically filed with the Clerk of the Court by using the CM/ECF system with electronic delivery to all parties.

Respectfully submitted,

*/s/ Erin B. Gaide*
Erin B. Gaide

**EXHIBIT 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § | |
| MERRICK GARLAND, *ET. AL.* | § § § | Civil Action No. _____ |
| *Defendants.* | § § § § | |

## DECLARATION OF ROBERT CHIPLEY

I, Robert Chipley, declare as follows

1. I am Robert Chipley. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I am a resident of Sevierville, Tennessee.

3. I am a professional show promoter. I am a partner in Great American Promotions, LLC. In that capacity, I promote gun shows predominantly. But I also promote car shows and craft shows.

4. As gun show promoters, my partner and I organize and manage up to 60 gun shows each year in Tennessee and South Carolina, combined.

5. The role of a gun show promoter is to organize and manage the gun show from start to finish. That includes finding a venue for the gun show, contacting vendors willing to rent tables at the show, purchasing insurance for the show, hiring security for the show,

108

advertising the show (using billboards, radio advertisements, internet postings, posters and other media), selling tickets to attendees, and collecting sales taxes for the state in which the show is located.

6. At Tennessee gun shows, I collect 9.75% sales taxes for the State on the sale of tickets to attendees and the sale of tables to vendors. In addition, the sellers of firearms collect 9.75% sales taxes for the State on the sale of each firearm.

7. At South Carolina gun shows, I collect 6-7% sales taxes (depending on the county) for the State on the sale of tickets to attendees and the sale of tables to vendors. On top of that, the State imposes an additional 4% tax on the sale of tickets. In addition, the sellers of firearms collect 6-7% sales taxes for the State on the sale of each firearm.

8. I am aware of the Final Rule promulgated by the Bureau of Alcohol, Tobacco, and Firearms and Explosives ("ATF") that is at issue in this case, and I have read it.

9. The Final Rule is extremely vague and difficult to understand clearly. It appears to give ATF wide discretion to interpret it in a manner that allows them to arrest people who have no idea that they are violating the Final Rule.

10. I am aware of the requirements of obtaining a federal firearms license (FFL), and they are extremely burdensome for someone who sells firearms as a hobby. The $200 cost of the license is high, the months of time it takes to obtain an FFL, and the record-keeping requirements deter most people from even considering attempting to obtain an FFL.

11. In my experience of organizing over 700 gun shows, I am aware of the impact the Final Rule has had, and will continue to have, on gun shows overall.

12. The great majority of individuals without an FFL who sell firearms at gun shows are scared to death of what ATF will do to them with the Final Rule. They are afraid that

2

109

ATF agents will set them up to unknowingly violate the Final Rule and then arrest them to be prosecuted. While most ATF agents are fair and reasonable, there are some ATF "cowboys" who go out of their way to trip up law-abiding gun owners.

13. I am aware that, according to ATF, the Final Rule was expected to decrease the number of unlicensed firearms sellers at gun shows by 10%. 89 Fed. Reg. 29054.

14. That ATF estimate is proving to be way off. The actual effect of the Final Rule has to decrease the number of unlicensed firearms sellers at gun shows by approximately 30-40%. Those individuals are stopping their selling of firearms at gun shows altogether.

15. A very large number of vendors without FFLs at gun shows are individuals who only have five or six guns that they wish to sell. Very few of them are interested in obtaining an FFL.

16. Based on my observations of the impact of the rule on gun show vendors, only 5% or 6% of the individuals who were unlicensed vendors at gun shows before the Final Rule are now attempting to obtain an FFL.

17. The 30-40% decrease in the number of unlicensed vendors at gun shows is causing a number of gun shows to be cancelled altogether.

18. Due to the Final Rule, I personally cancelled a gun show that I was promoting that was advertised to take place in Athens, Tennessee, on June 1-2, 2024. Unlicensed sellers usually compose 50% of the vendors at the annual Athens gun show. Those vendors without FFLs were extremely scared that they would unknowingly violate the Final Rule and that ATF would set them up to violate the Final Rule. They told me that they were not willing to risk attending the Athens gun show with the Final Rule in effect. As a

110

result of this dramatic drop in vendors due to the ATF Final Rule, I was forced to cancel the gun show.

19. The cancellation of that gun show cost the State of Tennessee a significant amount of sales tax revenue. In 2023 at the same show, I collected over $600 in sales taxes on the sale of tickets and rental of tables. That doesn't even include the additional lost revenue due to the loss of sales taxes on the sales of the firearms.

20. One can also estimate the lost sales taxes on the sales of firearms and accessories. In 2023, at least $2,000 in sales tax revenue on the sale of firearms and accessories was collected at the 2023 show. So combining the sales tax revenue from the sale of tables and tickets to figure, the total sales taxes collected was over $2,600. That same estimated amount of sales tax revenue on the sale of firearms was lost by the State due to the cancellation of the Athens in gun show 2024.

21. Another gun show in Sparta, Tennessee, that had been scheduled for the same June 1-2, 2024, weekend was cancelled by the show's promoter for the same reasons (due to the Final Rule. I spoke with that promoter about his cancellation of the Sparta gun show.

22. As I explained above, about 30-40% of unlicensed vendors are no longer showing up at the gun shows. As a result, gun show promoters are "shortening" the shows by renting fewer tables to vendors. This is leading to a decrease in attendance at gun shows as the presence of fewer vendors decreases the options available for gun buyers and reduces public interest in attending gun shows.

23. Two major reasons that people attend gun shows to purchase a firearm are: (1) the fact that there are sometimes multiple sellers of the same firearm in the same building, allowing the buyer to get a better price, and (2) the majority of guns sold are used guns,

4

111

many of which are no longer in production, difficult to find, and cannot be obtained at typical gun shops that deal predominantly in new firearms.

24. Because these attractions are not available at a typical gun shops, the sales that would have occurred at gun show that are shortened or cancelled are not simply being replaced by sales of the same or similar firearms at typical gun shops.

25. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Tennessee that the foregoing is true and correct.

Executed in _Sevierville, TN_ , this this _5_ day of June 2024.

5

112

**EXHIBIT 2**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STATE OF KANSAS,
*ET AL.*

     *Plaintiffs,*

v.

MERRICK GARLAND,
*ET. AL.*

     *Defendants.*

§
§
§
§
§
§
§
§
§
§
§
§
§
§

Civil Action No. 624-CV-1086-TC-TJJ

## DECLARATION OF REX KEHRLI

I, Rex Kehrli, declare as follows

1. I am Rex Kehrli. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I am a resident of Manchester, Iowa.

3. I am a professional show promoter. I am the President of R.K Shows. In that capacity, I promote gun shows.

4. R.K. Shows organizes and manages approximately 100 gun shows each year in Kansas, Missouri, Oklahoma, Kentucky, Tennessee, and Georgia, combined.

5. When promoting gun shows, R.K. Shows does a number of tasks, including finding a venue for the gun show, contacting vendors willing to rent tables at the show, purchasing insurance for the show, hiring security for the show, selling tickets to attendees, and collecting sales taxes for the state in which the show is located.

113

6. I am aware of the Final Rule promulgated by the Bureau of Alcohol, Tobacco, and Firearms and Explosives ("ATF") that is at issue in this case, and I have read it.

7. The Final Rule is extremely vague and hard to understand. I don't know what qualifies as a sale by a person "engaged in the business" of dealing in firearms. For example, it is vague as to what constitutes a "profit."

8. The ATF agents that I have spoken with about the Final Rule are also uncertain about what it means. If you talk to five different ATF agents about what the Final Rule covers, you will likely get five different answers.

9. In the few weeks that the Final Rule has been in effect, it has already had a very significant effect. It has caused great fear and confusion among gun owners and sellers of firearms at gun shows who do not possess a federal firearms license (FFL). The sellers of firearms at gun shows that I have spoken with are terrified of unknowingly violating the Final Rule.

10. Because unlicensed firearms sellers are terrified of unknowingly violating the Final Rule, many have stopped selling firearms at gun shows entirely. Since the Final Rule has been in effect, it has reduced the number of unlicensed firearms sellers at gun shows by approximately 30%.

11. The 30% decrease in the number of unlicensed vendors at gun shows is causing a number of gun shows to be cancelled altogether.

12. The Final Rule resulted in me personally cancelling a gun show that I was promoting that was advertised to take place in Murfreesboro, Tennessee, on July 6-7, 2024. Gun sellers without FFLs are extremely scared that they will unknowingly violate the Final Rule. As a result of this reduction in unlicensed vendors due to the ATF Final Rule, as well as due

114

to concerns with the facility, I was forced to cancel the gun show. The Murfreesboro gun show normally happens four times a year. I am planning on cancelling all future Murfreesboro gun shows as well.

13. The cancellation of the Murfreesboro gun show cost the State of Tennessee a significant amount of sales tax revenue. In 2023 at the Murfreesboro gun shows, I collected over $1,500 in sales taxes on the sale of tickets at each show. The State of Tennessee is losing over $1,500 in sales tax revenue at each cancelled show, or over $6,000 per year, from the Murfreesboro gun shows alone. That doesn't include the additional lost revenue due to the loss of sales taxes on the sales of the firearms.

14. The state doesn't just lose the sales taxes on the admissions tickets and on the sales of firearms. Each show also generates a significant amount of sales tax revenue through the rental of hotel rooms, at restaurants, at gas stations, and at every business that benefits from the influx of visitors attending the gun show.

15. It is my understanding that a gun show in Broken Arrow, Oklahoma, that had been scheduled for July 6-7, 2024, has also cancelled by the show's promoter for the same reasons due to the Final Rule. I am familiar with the show's promoter.

16. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Iowa that the foregoing is true and correct.


Executed in _____, this this _____ day of June 2024.

3

115

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| STATE OF TEXAS *et al.*, | |
| Plaintiffs, | |
| v. | 2:24-CV-89-Z |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion for a Temporary Restraining Order ("Motion") (ECF No. 16), filed on May 9, 2024. Defendants responded (ECF No. 22) on May 14, 2024. Having reviewed the materials, the Court **GRANTS IN PART** the Motion. Accordingly, Defendants are hereby **TEMPORARILY RESTRAINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" (hereinafter "Final Rule") — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against Plaintiffs Texas, Jeffery Tormey ("Tormey"), the Gun Owners of America, Inc. ("GOA"), the Gun Owners Foundation ("GOF"), the Tennessee Firearms Association ("TFA"), and the Virginia Citizens Defense League ("VCDL"), **through June 2, 2024**.

### BACKGROUND

The United States Attorney General has authority to enforce the Gun Control Act of 1968 ("GCA") and promulgate regulations necessary to enforce its provisions. 18 U.S.C. § 926(a). Congress and the Attorney General, in turn, delegated GCA administrative and enforcement responsibilities to the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). 28 U.S.C. §§ 599A(b)(1), (c)(1); 28 C.F.R. §§ 0.130(a)(1)–(2).

The GCA imposes strict requirements on firearms dealers and severe consequences for violating them. It makes it unlawful for any person — save a licensed dealer — to "engage in the business" of dealing in firearms until he has filed an application with ATF and received a license. 18 U.S.C. § 923(a). It requires dealers to conduct background checks on prospective firearms recipients and to maintain records for tracing purposes. *Id.* §§ 922(t), 922(b)(5), 923(g)(1)(A). And it provides that persons who willfully engage in the business of dealing firearms without a license face imprisonment for up to five years, a fine of up to $250,000, or both. *Id.* §§ 922(a)(1)(A), 924(a)(1)(D), 3571(b)(3). Any firearms involved in such violations may be subject to administrative or civil forfeiture. *Id.* § 924(d)(1).

The Firearms Owners' Protection Act of 1986 ("FOPA") modified the GCA, adding a statutory definition of "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." Public Law 99-308, § 101, 100 Stat. 449, 450 (1986). Then in 2022, President Biden signed into law the Bipartisan Safer Communities Act ("BSCA"). The BSCA broadened the definition of "engaged in the business" by eliminating the requirement that a person's "principal objective" of purchasing and reselling firearms must include both "livelihood and profit," replacing it with a requirement to "predominantly earn a profit." 18 U.S.C. § 921(a)(21)(C). However, the BSCA did not alter FOPA's exclusions for "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.*

On April 19, 2024, ATF promulgated a Final Rule to "provide clarity to persons who remain unsure of whether they are *engaged in the business* as a dealer in firearms with

2

the *predominant intent* of obtaining pecuniary gain." 89 Fed. Reg. at 28968 (emphasis added). To that end, it clarifies "that firearms dealing may occur wherever, or through whatever medium, qualifying . . . activities are conducted." *Id.* This includes "a gun show or event, flea market, auction house, or gun range or club; at one's home; by mail order; over the internet; through . . . other electronic means (*e.g.*, an online broker, online auction, text messaging service, social media raffle, or website) . . . ." *Id.* at 28973–74. And it clarifies that "a single firearm transaction or *offer* to engage in a transaction" may require a license. *Id.* at 29091 (emphasis added).

Four States, a handful of organizations, and an individual citizen argue that the Final Rule violates the Administrative Procedure Act ("APA") and the U.S. Constitution. In their view, the Final Rule is (1) arbitrary and capricious; (2) in excess of ATF's lawful authority; (3) an abuse of ATF's discretion; (4) in contravention of the BSCA; and (5) violative of the Second and Fourth Amendments. *See generally* ECF No. 16. And Plaintiffs aver that they will suffer irreparable harm when the Final Rule takes effect — as scheduled — on May 20, 2024. *Id.* at 2. Defendants respond that (1) Plaintiffs do not have standing, and (2) even if they did, their claims fail on the merits. ECF No. 31 at 25, 36.

LEGAL STANDARD

To obtain a preliminary injunction or temporary restraining order, Plaintiffs must show (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prod. & Chemicals, Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023); *see also Janvey*

*v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (explaining that courts apply identical standards for preliminary injunctions and temporary restraining orders).

The first two factors are most critical, and the latter two merge when the government is an opposing party. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* In sum, "[t]he decision to grant or deny [relief] lies within the sound discretion of the trial court . . . ." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

ANALYSIS

I.      **Plaintiffs Louisiana, Mississippi, and Utah fail to demonstrate standing.**

The Court must address the threshold question of standing before addressing the merits. *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 7 F. Supp. 3d 1, 7 (D.D.C. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). Here, Plaintiffs' Complaint — insofar as it implicates Louisiana, Mississippi, and Utah — only claims that each "is a sovereign State of the United States." ECF No. 1 at 3. But the Complaint falls short by not explaining, or even alleging, any injury to each State's sovereign or semi-sovereign interests. *See Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.,* 70 F.4th 872, 881 (5th Cir. 2023) (explaining that "the declaration does not 'connect the dots' . . . to the State's ostensible sovereign injury"). Neither Plaintiffs' Motion (ECF No. 16) nor their reply brief (ECF No. 37) proffers *any* arguments to support those States' standing. Likewise, Plaintiffs' "States' Comment" exhibit — despite arguing at length that the Final Rule is unlawful — says nothing about standing.[1] ECF No. 16-2.

---

[1] Moreover, at the TRO hearing, Plaintiffs' counsel did not present any arguments about standing for Louisiana, Mississippi, or Utah. *See* Tr. at 16: 7–8 ("I'm here today . . . just talking about Texas's standing.").

This Court understands the difficulties inherent in multi-State litigation — and particularly where, as here, there is an expedited briefing schedule. However, these States' showings fall short, even at this early stage of litigation. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (explaining that "the proof required to establish standing increases as the suit proceeds[.]"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). As such, Louisiana, Mississippi, and Utah will not be afforded relief at this stage of litigation.

## II.    All other Plaintiffs show standing.

However, Plaintiffs Texas, Tormey, and affiliated organizations have sufficiently demonstrated standing for the purposes of the requested temporary restraining order. The Court takes each in turn.

First, Texas adequately pleads a cognizable "pocketbook injury" — "a prototypical form of injury in fact." *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 461 (2017). Specifically, Texas illustrates how the Final Rule will prohibit otherwise eligible persons from obtaining a Federal Firearms License ("FFL"), thereby reducing total gun sales at gun shows. ECF No. 37 at 7–8. And because Texas "has a sales tax that applies to the sale of firearms at gun shows," it will sustain financial loss.[2]

Moreover, "[i]n determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016)). And even purely economic costs — like those alleged here — "may count as irreparable harm where they cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr.*, 66 F.4th at 597.

---

[2] Between the Final Rule's effective date and July of 2024, Texas has 58 gun shows calendared. ECF No. 37 at 7. Texas collects 6.25 percent State tax on taxable items sold — including guns sold at gun shows. *Id.*

Second, Tormey pleads that he has "bought, sold, and traded firearms" for "many years" as part of his "large personal collection," and "even previously purchased a table at certain gun shows, in order to facilitate enhancing [his] collection." ECF No. 16-3 at 3. In response, Defendants point to *Susan B. Anthony List v. Driehaus* for the proposition that the "threat of future enforcement" against a plaintiff bringing a pre-enforcement challenge must be "substantial." 573 U.S. 149, 159 (2014). But that case "treated the threat of future enforcement as case-and fact-specific, understanding that evaluating threats . . . cannot be neatly reduced to a rigid formula." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 928 (5th Cir. 2023). Accordingly, "even a 'public[] announce[ment]' to enforce a statute and one prior proceeding are sufficient for standing." *Id.* (quoting *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019)).

Here, Defendants have announced their intent to enforce the Final Rule and the GCA. ECF No. 37 at 9. And Plaintiffs have identified a prior enforcement proceeding "targeting conduct falling squarely within the [Final] Rule's ambit." *Id.*; *e.g.*, ECF No. 16-4 at 8–9 (Declaration of Erich M. Pratt). Tormey is thus well situated to allege that the Final Rule may be enforced against him. And Defendants do not deny — nor could they deny — that such an enforcement would result in irreparable injury if it occurred.

Lastly, the organizations GOA, GOF, TFA, and VCDL show standing. Under the doctrine of associational standing, an association may bring suit on behalf of its members when (1) those members would otherwise have standing to sue; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. Appx. 189, 195 (5th Cir. 2012).

Here, three organizations (GOA, TFA, and VCDL) count Tormey — who has standing — as a member. ECF No.16-3 at 2. Moreover, TFA and VCDL have provided declarations evidencing that they have specific members "who will be impacted [by the Final Rule] because they have . . . bought and resold firearms, and wish to do so in the future without being improperly labeled as a 'dealer' in firearms." ECF No. 16-5 at 3 (Declaration of C. Richard Archie); ECF No. 16-6 at 3–4 (Declaration of Philip Van Cleave). The same holds true for GOF. *See* ECF No. 16-4 at 4 (Declaration of Erich M. Pratt). And the GOA describes a former FFL whose retirement savings are now frozen in unsellable inventory. ECF Nos. 37 at 11; 16-4 at 8.

Defendants respond that the organizations must identify their members by *name* to have associational standing. *See* ECF No. 31 at 33 ("[The organizational Plaintiffs] cannot establish standing based on an unnamed member."). And they cite *Summers v. Earth Island Institute*, 555 U.S. 488 (2009) for support. But *Summers* did not consider impermissible reliance on anonymous or pseudonymous declarations to establish standing.[3] *Id.* at 495. Rather, it considered the plaintiffs' failure "to allege that *any* particular . . . sale or other project claimed to be unlawfully subject to the regulations [would] impede a specific and concrete plan" of the plaintiffs. *Id.* (emphasis in original). Nor has the Supreme Court adopted a "naming requirement" — such as the one proposed by Defendants — in the wake of *Summers*. *See, e.g.*, *Students for Fair Admissions, Inc. v. Harvard*, 600 U.S. 181, 200–01 (2023) (holding that an organization had standing "when it filed suit" where it "identified" individual harmed members but did not provide their names).

Nor does the Fifth Circuit offer any support for Defendants' "identify-by-name" requirement. *See Hancock Cnty. Bd. of Sup'rs*, 487 F. Appx. at 195 (upholding the use of

---

[3] The Tenth Circuit recognized that "[a]nonymity was not even an issue before the Supreme Court in *Summers*." *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024). "Although one might read language in that opinion to require that only persons identified by their legal names can have standing, that was clearly not the intent of the Court." *Id.* "The opinion provided no hint, much less an emphatic statement, that it was abrogating decades of precedent." *Id.*

anonymous declarations); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020) (accepting anonymous declarations); *Blanchard v. Bergeron*, 489 U.S. 87 (1989). Nor do our sister districts in this Circuit. *See Chamber of Com. of U.S.A. v. Consumer Fin. Prot. Bureau*, No. 6:22-CV-00381, 2023 WL 5835951, at *6 (E.D. Tex. Sept. 8, 2023) ("[D]efendants argue that no plaintiff has shown that an 'identified member' suffers harm because some plaintiffs have used pseudonyms . . . . That argument fails."); *id.* (finding that anonymous declarations "credibly show that plaintiffs have identified members . . . currently suffering cognizable harm"). Nor — for that matter — do courts *outside* this Circuit. *See Speech First, Inc. v. Shrum*, 92 F.4th 947, 949 (10th Cir. 2024) ("Longstanding and well-established doctrine in the federal courts establishes that anonymous persons may have standing to bring claims.").

For the foregoing reasons, Plaintiffs Texas, Tormey, and the organizations have satisfied their burden at this stage. No arguments advanced by Defendants convince the Court otherwise.

### III.   Plaintiffs are substantially likely to prevail on the merits.

#### A.  The Final Rule likely violates the APA.

Judicial review under the APA is limited to the administrative record. 5 U.S.C. § 706. "[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their decisions." *Clean Water Action v. U.S. Env't Prot. Agency*, 936 F.3d 308, 313 n.10 (5th Cir. 2019); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). As such, courts are compelled to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority . . . ." 5 U.S.C. § 706(2)(A), (C).

As this is a question of statutory interpretation, the Court begins with the text. *United States v. Lauderdale Cnty., Miss.*, 914 F.3d 960, 961 (5th Cir. 2019). And here, the Final Rule clashes with the text of the BSCA in at least three ways. First, it asserts that there is no "minimum number of firearms to actually be sold to be 'engaged in the business'" for the purposes of the licensing requirement. 89 Fed. Reg. at 29021. "[A] single firearm transaction" — or even a mere *offer* to engage in a transaction — may suffice. *Id.* at 28976.

> [W]hile selling large numbers of firearms or engaging or offering to engage in frequent transactions may be highly indicative of business activity, neither the courts nor the Department have recognized a set minimum number of firearms purchased or resold that triggers the licensing requirement. Similarly, there is no minimum number of transactions that determines whether a person is "engaged in the business" of dealing in firearms. *Even a single firearm transaction*, or offer to engage in a transaction, when combined with other evidence, *may be sufficient to require a license*.

89 Fed. Reg. at 28976 (emphasis added).

But the BSCA says otherwise:

> The term "engaged in the business" means . . .
>
> ***
>
> as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through *the repetitive purchase and resale of firearms*, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C) (emphasis added).

Defendants' proffered interpretation is severely undercut by Section 921(a)(21)(C)'s use of (1) "firearms," in the plural; (2) the phrase "regular course," clearly contemplating a series of events; (3) "repetitive," meaning more than once; and (4) the Section's exemption of "sales, exchanges, or purchases" in the plural. 18 U.S.C. § 921(a)(21)(C). So too does Section

921(a)(21)(C) require the "purchase *and* resale" of firearms — a conjunctive requirement that flatly contradicts Defendants' assertion that "there is no minimum threshold number of firearms purchased *or* sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (emphasis added).

Second, the Final Rule suggests that "actual profit is not a requirement of the statute — it is only the predominant *intent* to earn a profit through the repetitive purchase and resale of firearms that is required." *Id.* at 29045. In other words, "a person may repeatedly advertise and display firearms for sale, and therefore demonstrate a predominant intent to earn a profit from repeatedly reselling the firearms purchased, but never actually find a buyer." *Id.* But Section (a)(22) of the BSCA provides:

> The term "to predominantly earn a profit" means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for *criminal purposes or terrorism*.

18 U.S.C § 921(a)(22) (emphasis added).

The negative corollary is obvious: while proof of profit is *not* required "for criminal purposes or terrorism," it *is* required for all other cases. *See Baptist Mem'l Hosp. - Golden Triangle, Inc. v. Azar*, 956 F.3d 689, 694 (5th Cir. 2020) ("[T]he canon of *Expressio Unius Est Exclusio Alterius* . . . provides that 'expressing one item of [an] associated group or series excludes another left unmentioned.'"). Moreover, the mere fact that the word "intent" appears in the Section does necessitate — or even suggest — that intent is *all* that is required. On the contrary, the Section's usage of "intent" serves merely to distinguish the *type* of intent contemplated: namely, "one of obtaining pecuniary gain." 18 U.S.C § 921(a)(22). Action is needed, too.

Third, the Final Rule arbitrarily eviscerates Section 921(a)(21)(C)'s safe harbor provision.[4]

That provision reads:

> The term "engaged in the business" . . . shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms[.]

18 U.S.C. § 921(a)(21)(C). Nothing in the foregoing text suggests that the term "personal collection" does not include firearms accumulated primarily for personal protection — yet that is exactly what the Final Rule asserts. *See* 89 Fed. Reg. at 29090 ("[T]he term [personal collection] shall not include firearms accumulated . . . for personal protection[.]"). Nor can Defendants' position be supported by its *own* interpretative policy of implementing terms' "common meaning." *See id.* at 28974 ("This definition is consistent with the common meaning of 'purchase,' . . . . This definition is consistent with the common meaning of 'sale[.]'"). Here, Plaintiffs' reading of the Section 921(a)(21)(C) terminology "personal collection" is more consonant with "common meaning." *See Collection*, Webster's Third New International Dictionary (1993) ("[A] number of objects or persons or a quantity of a substance that has been collected or has collected often according to some unifying principle . . . ."); *see also Collection*, Webster's Second New International Dictionary (1940) ("That which is collected; as: a gathering or assemblage of objects or of persons; an accumulation of specimens of a certain class . . . .").

Yet Defendants maintain their interpretation despite knowing that "two-thirds of Americans report owning firearms primarily for 'defense' or 'protection'" — thereby necessitating the absurdity that the statute's safe harbor provision provides *no safe harbor at all* for the majority

---

[4] Defendants themselves recognize the accuracy of the phrase "safe harbor provision" and utilize it several times throughout the Final Rule. *See, e.g.*, 89 Fed. Reg. at 29025 ("The proposed rule explicitly recognized the GCA's 'safe harbor' provision that a person is not engaged in the business if the person makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby.").

of gun owners. *Id.* at. 29036. Such an interpretation is untenable given the provision's logical statutory role. *See* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) ("[T]he whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical *and logical relation of its many parts*," as "[t]he entirety of the document thus provides the context for each of its parts.") (emphasis added); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (holding that courts must look to "the language and design of the statute as a whole"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a[] harmonious whole.").

Lastly, the Final Rule creates sets of presumptions indicating (1) "when a person has the intent to 'predominantly earn a profit'" and (2) "that someone is 'engaged in the business.'" 89 Fed. Reg. at 28968–69. But these presumptions are highly problematic for at least two reasons. First, they flip the statute on its head by requiring that firearm owners prove innocence rather than the government prove guilt. *See id.* at 29024 ("[T]he presumptions are rebuttable, so in the event a civil or administrative proceeding is brought, and a presumption is raised, *it can be rebutted with reliable evidence to the contrary*.") (emphasis added). Second, several presumptions conflict with the statutory text. For example, two provide that a person is presumptively "engaged in the business" if he "demonstrates a willingness and ability to purchase and resell" firearms or "purchases . . . *or* . . . resells" firearms. *Id.* at 29091 (emphasis added).  But as discussed *supra*, a mere willingness is not enough — there must also be prohibited acts. *See* 18 U.S.C. § 921(a)(21)(C) ("through the *repetitive purchase and resale of firearms*") (emphasis added). Nor is purchasing *or* reselling sufficient — the statute provides a conjunctive. *See id.* ("purchas[ing] *and* res[elling]") (emphasis added).

Plaintiffs understandably fear that these presumptions will trigger civil or criminal penalties for conduct deemed lawful just yesterday. Nevertheless, ATF avers that its "knowledge of existing case law" and "subject-matter expertise" will prevent misuse or abuse of the presumptions. 89 Fed. Reg. at 28975. In other words, "just trust us." But "[p]resumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*." *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 251 (5th Cir. 2024).

For the foregoing reasons, Plaintiffs are substantially likely to succeed on the merits of their APA claims. As such, further analysis of their other claims — including their constitutional ones — is unnecessary at this time.

### IV.   Plaintiffs face irreparable injury and are favored by the equities and public interest.

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 348 (5th Cir. 2022); *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 582 (N.D. Tex. 2022). Irreparable harm must also be concrete, non-speculative, and more than *de minimis*. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013). Lastly, "[t]he government's and the public's interests merge when the government is a party." *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023).

That Plaintiffs would suffer irreparable injury absent an injunction is hard to dispute. Plaintiff Texas faces the irreparable injury of revenue loss. *Wages & White Lion Invs.*, 16 F.4th 1130, 1142 (5th Cir. 2021). Other Plaintiffs face both civil and criminal enforcement actions for engaging in conduct that the BSCA permits but the Final Rule impermissibly forbids. They cannot dispose of firearms from their personal collections for fear of being presumed "engaged in the business." ECF No. 16 at 43.  And compliance costs — as well as those accrued by persons seeking

licensure to avoid liability — "are unrecoverable because of the government–defendant's sovereign immunity from monetary damages[.]" *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *9 (N.D. Tex. Mar. 29, 2024); *see also Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022) ("[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs[.])"

Moreover, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021). And as this Court's analysis makes clear, Defendants' Final Rule is almost certainly violative of — at the least — the APA. As such, "both the balance of equities and the public interest weigh in favor of allowing orderly judicial review of the Rule before anyone shuts down their businesses or sends them to jail." *VanDerStok v. Garland*, 2023 U.S. App. LEXIS 26499, at *6 (5th Cir. Oct. 2, 2023).

CONCLUSION

Defendants are **TEMPORARILY RESTRAINED** from enforcing the regulations — "Definition of 'Engaged in the Business' as a Dealer in Firearms" — published at 89 Fed. Reg. 28968 (April 19, 2024) (to be codified at 27 C.F.R. pt. 478) against Plaintiffs Texas, Jeffery Tormey, the Gun Owners of America, Inc., the Gun Owners Foundation, the Tennessee Firearms Association, and the Virginia Citizens Defense League, **through June 2, 2024**. Plaintiffs Louisiana, Mississippi, and Utah are excluded from the relief granted herein.

**SO ORDERED**.

May 19, 2024

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

129



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § § | Civil Action No. 2:24-cv-88 |
| MERRICK GARLAND, *ET. AL.* | § § § | |
| *Defendants.* | § § § § § § § § § § § § § | |

## <u>DECLARATION OF PHILLIP JOURNEY</u>

I, Phillip Journey, declare as follows:

1. I am Phillip Journey. I am over the age of 18 and a U.S. citizen. I make this declaration in support of Plaintiffs' Motion for Stay / Preliminary Injunction. I have personal knowledge of the facts contained in this declaration unless otherwise stated. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I currently serve as a state court judge in Kansas in Division 1, 18th Judicial District. I am also a shooting sports coach in rifle and pistol for 4-H and a master high-power rifle instructor for the division of civilian marksmanship. I am a law-abiding person, eligible to possess firearms under state and federal law.

3.  I am a firearms hobbyist and enthusiast who maintains a large personal collection of
    firearms that includes handguns and firearms widely considered self-defense weapons. I
    have been a gun owner for over four decades and am an avid supporter of the right to
    keep and bear arms. I served on the board of the Kansas State Rifle Association for 24
    years. While serving in the Kansas Senate from 2003 to 2008, I authored 30 bills
    including the right to carry concealed weapons and range protection. I have taught more
    than 5,000 Kansas youth as a hunter education instructor.

4.  I attend at least 4-5 gun shows every year. At most of those gun shows I buy firearms
    and I sell firearms from my personal collection. I have bought and sold firearms both
    from licensed dealers and other private collectors and hobbyists like myself. I presently
    have a large personal collection of firearms that I have accumulated over many years and
    which I actively seek to enhance my collection on different themes by adding firearms
    that I find particularly interesting in terms of history, design and craftmanship. In the
    course of maintaining my collection, I sell firearms for various reasons, such as to trade
    up to a nicer model or better example of a historically significant model, free up funds or
    space for firearms that I would prefer to collect, or to get rid of firearms that I simply no
    longer wish to keep. It is my intention to continue buying and selling firearms, including
    self-defense weapons, at gun shows for my personal collection, and, to that end, I plan to
    attend a gun show within the next July, October and November 2024.

5.  I am not a federal firearms licensee. Although I have occasionally bought and sold
    firearms through private sales, I have never been "engaged in the business" of dealing in
    firearms, as my sales of firearms have been made in connection with my firearm
    collection and hobby. While some of the firearms I've collected have increased in value,

2

131

I do not make any significant net profit from my hobby, nor is that my predominant purpose in collecting. I appreciate the craftsmanship, design and history of individual firearms, and accumulate them as relics of special interest, for noncommercial recreation, for personal enjoyment—and for self-defense.

6. I own firearms for their Constitutional purpose: as a "right of the people to keep and bear Arms," for traditional lawful self-defense. I keep some of my firearms primarily for personal protection, and I sometimes replace these firearms by selling and buying new models to effectively replace them.

7. Part of the tradition of gun ownership is the history of my state. Kansas enacted its Constitution in 1859. Kansas was admitted as a state in 1861 with the enactment of the Kansas/Nebraska Act. Pursuant to that law, the residents of Kansas voted it a free state. The Kansas framers ratified that the "people have a right to bear arms for their defense and security." This right had special importance prior to and during the Civil War, when guerilla pro-slavery "bushwackers" raided Kansas settlements and municipalities unprotected by federal troops. Later, my own home of Wichita became the destination of cowboys driving cattle up from Texas along the Chisholm Trail. Armed citizens were imperative to protect against highwaymen and other outlaws. Some of my collection includes firearms from that era including muzzleloading percussion and flintlock firearms, curios and relics from before 1898, my great-grandfather's handgun from when he practiced law and served in the Missouri house of representatives. It also contains firearms brought to the US by my grandfather in WWI and father in WWII, as well as firearms used in international and national competitions in the last 100 years, including Margaret Murdock's Anschutz Model 250 used in several international competition

3

events (including the Montreal Olympics), and the Finnish army's biathlon rifle as well as several firearms used in the commonwealth games. I own historic firearms designed for and/or used in the Boar War, WWI, WWII, Korea, Desert Storm, Desert Shield, etc. Major themes which comprise the bulk of my collection include competitive firearms for state, national and international competition. Like my ancestors, I keep and bear arms for my defense and security.

8. In 2010, Kansas amended its constitution so that the right to bear arms, Section 4 of the Kansas Bill of Rights, reads: "A person has the right to keep and bear arms for the defense of self, family, home and state, for lawful hunting and recreational use, and for any other lawful purpose." This Constitutional Amendment received support from 88.2% of the electorate. I also keep and bear arms for the defense of myself, my family, my home, and my state.

9. I am aware of the Final Rule that is at issue in this case and have reviewed it.

10. If the Final Rule goes into effect I believe that I will have to either give up selling firearms or register as a federal firearms licensee. It will immediately have this effect because of the burdens and multi-month application process associated with obtaining a license combined with my intention to attend gun shows in the coming months with the expectation of buying and/or selling firearms for and/or from my personal collection. I believe my firearms transactions have always been lawful under federal law. I wish to continue altering, improving, and, if ever necessary, having the option to liquidate my firearms collection, without becoming a federal firearms licensee, but the Final Rule makes portions of such lawful activity seem suspect and potentially actionable.

11. For example, various of the Final Rule's definitions are written so broadly that they cover conduct that Congress left lawful under the statute, or are written so narrowly that they eviscerate explicit statutory protections for personal collections such as mine. The Final Rule arbitrarily defines "collection" so narrowly that I am not even certain if my firearms collection still qualifies. It excludes firearms from someone's personal collection if they are weapons for self-defense. 89 Fed. Reg. 29039. The Final Rule also prohibits purchasing additional firearms for individuals "liquidating" all or part of their personal collection. *Id.* at 29092. Moreover, parts of the Final Rule are so convoluted, vague, and ambiguous that I (even as a lawyer myself) cannot determine what is prohibited versus what is allowed. I fear that the vague threats and ambiguous definitions in the Final Rule will be wielded as a weapon against me and persons like me, in order to threaten, coerce, and intimidate me into obtaining a license that federal law does not require.

12. I am aware of the requirements of a federal firearms licensee and they are burdensome for someone such as myself who buys, sells, and collects firearms as a hobby.

13. In my experience of attending hundreds of gun shows, I am aware of the impact the Final Rule will have on gun shows overall.

14. Based on the information available, the Final Rule in this case is expected to decrease the sale of unlicensed firearms dealers by 10%. 89 Fed. Reg. 29054. My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.

15. The Final Rule will likely decrease the number of vendors that sell firearms at gun shows as those who are not federal firearms licensees (like me) will be less likely to attend, buy, or sell firearms. On the weekend of May 4, 2024, at a gun show in Wichita, Kansas, over

100 collectors and dealers sought my opinion on the effect of the rule. It could be described as a panic.

16. Gun collectors like myself know that ATF has a history of enticing hobbyists into transactions the agency dubiously regards to be criminal. This problem was the entire reason Congress passed the Firearm Owners Protection Act, which has relevant language that was only slightly revised by Bipartisan Safer Communities of 2022. Every potential buyer or seller of firearms will fear being labeled as a "dealer" that is "engaged in the business" of dealing firearms, which could result in civil actions brought against them, or even criminal charges and dangerous raids by federal officials. *See, e.g.*, Benjamin Hardy et al., *Illegal Guns Sales Led to Fatal ATF Raid on Airport Director Malinowski's Home, Affidavit Says*, ARK. TIMES (Mar. 21, 2024), https://arktimes.com/arkansas-blog/2024/03/21/judge-unseals-documents-in-malinowski-case (reporting on an Arkansas airport executive accused of "engaging in the business," who died March 21, 2024 after being shot in the head during a dawn raid of his house by ATF agents).

17. In light of this uncertainty, imagine that I was offering to sell a modern revolver from my collection because I've acquired a superior handgun for my own use. If I were approached by a fellow hobbyist who instead wanted to buy a hunting rifle, would it be lawful for me to sell him a rifle from my collection? If I do not immediately reject the idea, but tell him I have to think about what I might be willing to part with, have I offered to procure him a gun under the rules? If I happen to own an unwanted rifle, do I become a dealer if I suggest a fair market price? Does it matter whether I am selling the rifle for more than I bought it for years ago? Should I keep purchase records to show a loss? The proposed rule suggests that even tracking this information might make me

"presumptively" a for-profit dealer.  If the rifle still bears the price sticker from when I bought it, would that be sufficient for running afoul the rule?  Would I have to prove how I intended to spend the money from the sale—that it was being used to enhance another part of my collection?  How could I do that, given that money is fungible?  Even if I kept a separate account for this purpose, that itself could also be "presumptive" evidence I am a dealer.  Suppose my wife bought the rifle because she though it would go up in value and could be resold for a profit, am I breaking the rules if, unknown to me, my sale does cause a household profit on that rifle?  And if I happen to know—and could somehow prove—that I would be selling the rifle for a loss and I have no pecuniary purpose, how could I know what the buyer's intent it?  Is he planning to re-sell the rifle for profit because he knows someone else is specifically looking for the model?  How could the buyer know what *my* intent is?

18. Returning to selling the modern revolver, would that even be permitted under the rules?  While the rules draw a narrow exception for selling from a collection, self-defense weapons do not clearly fit within it.  Would it matter how I used the revolver before selling it—or how the buyer intended to use it?  Would I have to prove that money from selling the revolver only went toward a new "self-defense" weapon?  How?  If I sell the firearm by delivering it to a Federal Firearms Licensee so that the buyers background check is run, is that a defense?  It is not included in statute or the rule.

19. Now say the collector buys my modern revolver and asks me if I have any historically-significant firearms I might sell.  Have I run afoul the rules if I respond "yes"?  Could this itself that be considered an offer "to be a source of additional firearms for resale" as ATF has defined it?  How could I rebut the presumption that the rules suggest I am

engaged in business?  Would I have to document in advance which firearms I'm willing to sell in order to reach the narrow exception for "liquidation" allowed by the rules? How could I even document such a thing?  Do I lose any hope of safe harbor by switching from a potential "self-defense" firearm into liquidating part of my collection? And if I use money from a "self-defense" sale to buy a collectable firearm—or vice versa—have I run afoul the rules?  Even if the purchase happens months later?

20. The potential consequences *after* a sale are also vague and potentially dire.  For example, if I buy later the same model after selling a particular firearm, have I "restocked" it? Even if I sold the earlier firearm years earlier and forgot I'd ever even owned it?  In fact, if I buy *any* firearm after liquidating part of my collection am I "restocking"?  That sounds absurd, because it would imply that one could never privately buy another gun after a partial liquidation, but the rules do not clearly allow it.  I have no reasonable notice of what *is* allowed under the rules, and extremely narrow exemplary exceptions suggest that ATF thinks virtually no private sale should be permitted under the rules.

21. However you cut it, the transaction becomes risky from both my perspective and the buyer's perspective, and the penalty for miscalculating the risk prosecution with the result prison.  Private non-commercial transactions cannot easily occur under such rules—if at all.

22. And the rules apply to more than sales.  They could apply to simply loaning a rifle to someone, if the use could be deemed commercial.  Suppose a friend of mine borrows a rifle for deer season, then sells the venison (deer meat) from his quarry to a friend or neighbor.  Have I broken the rules because I am not a dealer and have unwittingly loaned a firearm for a colorable commercial purpose?

8

137

23. I feel certain this will likely lead to a decrease in attendance at gun shows as fewer vendors will decrease the options available, including my personal options for selling my firearms, and reduce public interest in gun shows, reducing the avenues that lawful hobbyists like me have to expand their collection or sell unwanted parts of it. The universe of those purchasing opportunities will shrink also as the number of potential sellers is diminished.

24. I do not want to give up selling firearms at gun shows from my personal collection, but this Final Rule makes me believe that I will potentially be subject to civil, administrative, and possibly criminal penalties if I do, even if using a federally licensed dealer.

25. This belief is reinforced by the Final Rule providing that "even a single firearm transaction or offer to engage in a transaction" may require a federal firearms license. 89 Fed. Reg at 29091.

26. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Kansas that the foregoing is true and correct.

Phillip B. Journey

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS,<br>*ET AL.*<br><br>    *Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND,<br>*ET. AL.*<br><br>    *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. _____ |

## DECLARATION OF ALLEN S. BLACK

I, Allen S. Black, declare as follows:

1.  I am Allen S. Black.  I am over the age of 18, and I have personal knowledge of the facts contained in this Declaration.  I could competently testify as to the contents of this Declaration if called upon to do so.

2.  I am a law-abiding person, eligible to possess firearms under state and federal law.

3.  I am a firearms hobbyist and enthusiast who maintains a personal collection of firearms that includes handguns.  I have also volunteered my time as a shooting instructor on at least 10 occasions.

4. I attend approximately 4-5 gun shows every year.  At those gun shows I buy firearms and I sell from my personal collection.  I am not a federal firearms licensee.

5. I presently have a large personal collection of firearms, including self-defense weapons, which I have accumulated over many years and which I actively seek to expand by attending gun shows in the future.

6. I am aware of and have reviewed the Final Rule which redefines what qualifies as "Engaged in the Business" as a Dealer in Firearms ("Final Rule") that is at issue in this case.

7. I am aware of the requirements of a federal firearms licensee, and they are burdensome for someone who sells firearms as a hobby.

8. If the Final Rule goes into effect, I will have to either give up selling firearms or register as a federal firearms licensee.

9. In my experience of attending approximately 4-5 gun shows each year, I am aware of the impact the Final Rule will have on gun shows overall.

10. Based on the information available, it is my understanding that the Final Rule is expected to decrease the sale of unlicensed firearms dealers by 10%.  89 Fed. Reg. 29054.  My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.

11. The Final Rule will likely decrease the number of vendors that sell firearms at gun shows as those who are not federal firearms licensees (like myself) will be less likely to sell firearms.

12. The Final Rule will also likely lead to a decrease in attendance at gun shows as fewer vendors will decrease the options available and reduce public interest in gun shows.

2

140

13. I do not want to give up selling firearms at gun shows from my personal collection but this Final Rule makes me concerned that I will be subject to civil, administrative, and possibly criminal penalties if I do.

14. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Kansas that the foregoing is true and correct.

Executed in _Wichita Kansas_ , this _4th_ day of May 2024.

BY: _____
                Allen S. Black

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | |
| MERRICK GARLAND, *ET. AL.* | § § § § | Civil Action No. _____ |
| *Defendants.* | § § § § § § § § § § § § | |

## <u>DECLARATION OF JAMES FRY – PRESIDENT OF THE</u>

## <u>CHISHOLM TRAIL ANTIQUE GUN ASSOCIATION</u>

I, James Fry, President of the Chisholm Trail Antique Gun Association, declare as follows:

1. I am James Fry. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I currently serve as the President of the Chisholm Trail Antique Gun Association ("Chisholm Trail").

3. Chisholm Trail is a Kansas not-for-profit corporation founded in 1957 in Wichita, Kansas.

142

4. Chisholm Trail was organized for the purposes of serving the interests of collectors and shooters of antique and antique-replica firearms and to help preserve the craftsmanship and the history of the arms of our forefathers for the enlightenment and enjoyment of future generations

5. Chisholm Trail sponsors and manages the biannual Wichita Gun Show each year and relies on the proceeds generated from these events to fund its annual club activities. Approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by these two gun shows.

6. Chisholm Trail is not a federal firearms licensee, nor are most of its members, including Allen S. Black and Donal G. Maxey, who attend gun shows each year where they buy and/or sell firearms for and from their personal collections.

7. I am aware of and have reviewed the Final Rule which redefines what qualifies as "Engaged in the Business" as a Dealer in Firearms ("Final Rule") that is at issue in this case.

8. The Final Rule will harm Chisholm Trail because it will reduce the revenue this not-for-profit corporation generates from its biannual gun shows. The Final Rule will do this in two ways: 1) by decreasing the number of attendees that sell firearms at these shows as those who are not federal firearms licensees will not be able to sell their firearms; and 2) a decrease in overall attendance at these gun shows, as fewer firearms for sale will decrease the options available and reduce public interest in these events.

9. In addition, the Final Rule will harm Chisholm Trail's members, many of whom are not federal firearms licensees, because it would require them to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms from their

personal collections at gun shows.

10. Chisholm Trail requires all those who sell one or more firearms at their gun shows to collect and pay sales tax to the state of Kansas for any proceeds acquired from the sale of those firearms.

11. Chisholm Trail also collects and pays sales tax to the State of Kansas for table rental fees charged during our gun shows. During the most recent fiscal year, Chisholm Trail paid $4,005.72 in sales tax to the State of Kansas.

12. Therefore, any loss of revenue for Chisholm Trail due to the Final Rule would naturally lead to a loss of state tax revenue for Kansas.

13. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Kansas that the foregoing is true and correct.

Executed in _____, this _6_ day of May 2024.

BY: _____

James Fry, President
Chisholm Trail Antique Gun Association

3

144

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS,<br>*ET AL.*<br><br>    *Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND,<br>*ET. AL.*<br><br>    *Defendants*. | § § § § § § § § § § § § § § § § § § § § § | Civil Action No. _____ |

## DECLARATION OF DONALD G. MAXEY

I, Donald G. Maxey, declare as follows

1.  I am Donald G. Maxey.  I am over the age of 18, and I have personal knowledge of the facts contained in this Declaration.  I could competently testify as to the contents of this Declaration if called upon to do so.

2.  I am a law-abiding person, eligible to possess firearms under state and federal law.

3.  I am a firearms hobbyist and enthusiast who maintains a personal collection of firearms that includes handguns.  I have also volunteered my time as a shooting instructor on at least 10 occasions.

145

4. I attend approximately three gun shows every year.  At those gun shows I buy firearms to add to my personal collection.  I also provide guidance to other gun show attendees on which firearms they should purchase.  I am not a federal firearms licensee.

5. I presently have a modest collection of antique firearms, some reproductions of antique firearms, several modern sporting rifles and shotguns, and several revolvers which I depend on for self-defense.  I have assembled this collection over several years, and actively seek to expand it by attending gun shows in the future.

6. I am aware of and have reviewed the Final Rule which redefines what qualifies as "Engaged in the Business" as a Dealer in Firearms ("Final Rule") that is at issue in this case.

7. I am aware of the requirements of a federal firearms licensee, and they are burdensome for someone who sells firearms as a hobby.

8. In my experience of attending approximately three gun shows every year, I am aware of the impact the Final Rule will have on gun shows overall.

9. Based on the information available, it is my understanding that the Final Rule is expected to decrease the sale of unlicensed firearms dealers by 10%.  89 Fed. Reg. 29054.  My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.

10. The Final Rule will likely decrease the number of vendors that sell firearms at gun shows as those who are not federal firearms licensees will be less likely to sell firearms.

11. The Final Rule will also likely lead to a decrease in attendance at gun shows as fewer vendors will decrease the options available and reduce public interest in gun shows.

12. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of

Kansas that the foregoing is true and correct.

Executed in _Valley Center, KS_ , this _4_ th day of May 2024.

BY: _Donald G. Maxey_

Donald G. Maxey

3

147

**EXHIBIT E**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *et al.* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:24-CV-88-JM |
| | ) | |
| MERRICK B. GARLAND, in his official | ) | |
| capacity, as Attorney General of the United | ) | |
| States, *et al.* | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

---

### SWORN DECLARATION OF EDDIE EDWARDS

---

Pursuant to 28 U.S.C. § 1746, I, Eddie Edwards, duly affirm under penalty of perjury as follows:

1.      I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this Declaration. The facts contained in this Sworn Declaration are true and accurate and are of my personal knowledge.

2.      My name is Eddie Edwards, and I serve as the Assistant Commissioner of the New Hampshire Department of Safety.  I have served in this capacity since March 3, 2021. My responsibilities include overseeing the Department's personnel management, the Division of State

148

Police, the Fire Marshal's Office, the Bureau of Hearings, Homeland Security and Emergency Management, and highway safety initiatives.

3.      After reading ATF's proposed rule change, titled, Definition of "Engaged in the Business as a Dealer in Firearms," 88 Fed Reg. 61993 (Sept. 8, 2023), I state the following regarding the New Hampshire Department of Safety:

4.      The following paragraph is a correct description of New Hampshire's role in processing background checks for firearms purchases:

> New Hampshire law permits the New Hampshire Department of Safety ("NHDOS") to become a point of contact for the federal government for the purposes of the National Instant Criminal Background Check System (NICS). N.H. Rev. Stat. Ann. § 159-D:1.  Since approximately 1999, NHDOS has served as a partial point of contact in that a federal firearms licensee contacts the state for purchases of handgun, the frame or receiver of any firearm, firearm mufflers, and firearm silencers, and contacts the FBI for long guns, rifles and shotgun purchases.  The Permits and Licensing Unit of the Division of State Police fulfills the point of contact ("POC") role.  It must access the NICS as part of the background check process and search the New Hampshire Criminal History Record database established under RSA 106-B:14.  In addition, it must conduct a review of a list of individuals produced by the New Hampshire Judiciary who currently have a domestic violence protection orders issued against him or her.  This review is conducted because state law prohibits firearm sales to individuals who are under an *ex parte* domestic violence protective order; federal law contains a different standard.  *Compare* N.H. Rev. Stat. Ann. § 173-B:4, II *with* 18 U.S.C. § 922(g)(8).  Thus, maintaining the NHDOS's current practice as a POC not only benefits public safety in New Hampshire, but ensures the continued enforcement of RSA 173-B:4, II.  The Final Rule expects an increase in background checks. This increase will likely result in an increase in administrative costs and resources for Plaintiff New Hampshire.

5.      Attached as Exhibit A is a true and accurate copy of a memorandum dated January 6, 2021, describing the procedure for denial or delay to purchase pursuant to R.S.A. § 159-D:1.

6.      By expanding the transactions under the Final Rule, the Department, and more specifically the Permits and Licensing Unit of the Division of State Police, will expend additional

149

resources and personnel to determine how to implement this expansion. Further, the increase in the number of background checks will increase the cost of administration in that the number additional resources and personnel will be needed to conduct the additional checks.

      7.      I declare under penalty of perjury that the foregoing is true and correct.


                        /s/ *Eddie Edwards*_____
                        Eddie Edwards
                        Assistant Commissioner, New Hampshire
                        Department of Safety

                        Dated: May 3, 2024

# Exhibit A

Memorandum

To:     Executive Councilor David Wheeler
From:   Commissioner Robert L. Quinn
Date:   1/6/21
Re:     Procedure for Appeal of Denial or Delay to Purchase Pursuant to RSA159-D

Councilor,

Per your request, I am providing you with an overview of the current laws applicable to appeals for the denial or delay to purchase, pursuant to RSA 159-D.

The State of New Hampshire is a designated partial Point of Contact ("POC") for the purposes of conducting criminal background checks on individuals seeking to purchase handguns in the state. See **RSA 159-D.**[1] In the event that the background check results in a denial of a transaction, a person wishing to challenge or contest this result must adhere to the applicable federal laws and regulations governing this process. See **18 U.S.C.A. § 922; 18 U.S.C.A. § 925A; 28 C.F.R. § 25.10.**

Pursuant to **28 C.F.R. § 25.10:**

1.  The Federal Firearms Licensee ("FFL") that receives notice of a denial may, upon request by the person seeking to purchase the firearm, provide the person with the address of the "denying agency," and the unique transaction number (NICS Transaction Number ("NTN") or State Assigned Transaction Number ("STN")) associated with the NICS background check. **28 C.F.R. § 25.10 (a).** The "denying agency" is either the FBI or the state or local law enforcement agency serving as a POC. *Id.* In New Hampshire, this means that for denied handgun transactions, the "denying agency" would be the Department of Safety ("DOS"), for all other firearm purchases the "denying agency" would be the FBI.

    An individual may then request the reason for the denial from the denying agency. According to federal regulations, the request for the reason of the denial must be made in writing to the denying agency. *Id.* However, POCs may waive this requirement. *Id.*

    The denying agency then has five business days to respond to the individual with the reason for the denial. **28 C.F.R. § 25.10 (b).** The response from the denying agency should indicate whether additional information or documents are required to support an appeal, such as fingerprints in appeals involving questions of identity (i.e., a claim that the record in question does not pertain to the individual who was denied). *Id.*

---

[1] The federal government continues to conduct the background checks for long guns.

1

2. If the individual wishes to challenge the accuracy of the record upon which the denial is based, or if the individual wishes to assert that his or her rights to possess a firearm have been restored, he or she may make application first to the denying agency, i.e. either the FBI or to the DOS, depending on what type of firearm is involved in the transaction. **28 C.F.R. § 25.10 (c)**

"If the denying agency is unable to resolve the appeal, the denying agency will so notify the individual and shall provide the name and address of the agency that originated the document containing the information upon which the denial was based." *Id.*

"The individual may then apply for correction of the record directly to the agency from which it originated." *Id.*

If the record is corrected as a result of the appeal to the originating agency, the individual may notify the denying agency, which will, in turn, verify the record correction with the originating agency (assuming the originating agency has not already notified the denying agency of the correction) and take all necessary steps to correct the record in the NICS. *Id.*

As an alternative to the above procedure where a POC was the denying agency, the individual may elect to direct his or her challenge to the accuracy of the record, in writing, to the FBI, which has the authority to "investigate the matter by contacting the POC that denied the transaction or the data source." **28 C.F.R. § 25.20 (d)**. The FBI will consider both information obtained from both the individual and the POC. *Id.* If the record is corrected as a result of the challenge, the FBI notifies the individual, corrects the erroneous information in the NICS, and gives notice of the error to any Federal department or agency or any state that was the source of such erroneous records. *Id.*

If the originating record that resulted in the denial is a New Hampshire criminal history record, Saf-C 5703.12 also sets forth the procedure for correcting that record.

A person making a challenge shall identify that portion of his or her record which he or she believes to be inaccurate or incorrect, and shall also give a correct version of his or her record with an explanation of the reason that he or she believes his/her version to be correct. **Saf-C 5703.12(c)**

Within 30 days of receipt of challenge, the criminal records unit shall review the records and contact the law enforcement agency or court which submitted the record to compare the information to determine whether the challenge is valid. If the challenge is valid, which means there is a discrepancy between the information submitted and the information maintained by the law enforcement agency or court, the record shall be corrected and the person and appropriate criminal justice agency shall be notified. If the challenge is invalid, the person making the challenge will be so informed. **Saf-C 5703.12 (d)**

3. Upon receipt of notice of the correction of a contested record from the originating agency, the FBI or the agency that contributed the record shall correct the data in the

2

NICS and the denying agency shall provide a written confirmation of the correction of the erroneous data to the individual for presentation to the FFL. **28 C.F.R. § 25.10 (e).**

If the appeal of a contested record is successful and thirty (30) days or less have transpired since the initial check, and there are no other disqualifying records upon which the denial was based, the NICS will communicate a "Proceed" response to the FFL. *Id.*

If the appeal is successful and more than thirty (30) days have transpired since the initial check, the FFL must recheck the NICS before allowing the sale to continue.  *Id.*

In cases where multiple disqualifying records are the basis for the denial, the individual must pursue a correction for **each** record.  *Id.*

4.  An individual may also contest the accuracy or validity of a disqualifying record by bringing an action against the state or political subdivision responsible for providing the contested information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the contested information be corrected or that the firearm transfer be approved.  **28 C.F.R. § 25.10 (f)**; see also **18 U.S.C.A. 925A.**

5.  An individual may provide written consent to the FBI to maintain information about himself or herself in a Voluntary Appeal File to be established by the FBI and checked by the NICS for the purpose of preventing the future erroneous denial or extended delay by the NICS of a firearm transfer.  **28 C.F.R. § 25.20 (g).**

Such file shall be used only by the NICS for this purpose.  *Id.*

The FBI shall remove all information in the Voluntary Appeal File pertaining to an individual upon receipt of a written request by that individual. However, the FBI may retain such information contained in the Voluntary Appeal File as long as needed to pursue cases of identified misuse of the system. *Id.*

If the FBI finds a disqualifying record on the individual after his or her entry into the Voluntary Appeal File, the FBI may remove the individual's information from the file. *Id.*

---

## Relevant Statutes, Rules and Case Law

### State Law

3

154

**RSA 159-D:1 Sale of Firearms; Criminal History Record and Protective Order Check.** – The department of safety may become the point of contact for the federal government for the purposes of the National Instant Criminal Background Check System (NICS).

**RSA 159-D:2 Confidentiality.** –

I. If the department of safety conducts criminal background checks under RSA 159-D:1, any records containing information pertaining to a potential buyer or transferee who is not found to be prohibited from receipt or transfer of a firearm by reason of state or federal law, which are created by the department of safety to conduct the criminal background check, shall be confidential and may not be disclosed by the department or any officers or employees to any person or to another agency. The department shall destroy any such records after it communicates the corresponding approval number to the licensee and, in any event, such records shall be destroyed within one day after the day of the receipt of the licensee's request.

II. The department shall retain records containing any information pertaining to a potential buyer or transferee who is prohibited from receipt or transfer of a firearm for 3 years.

III. Notwithstanding the provisions of this section, the department may maintain only a log of dates of requests for criminal background checks and unique approval numbers corresponding to such dates for an indefinite period.

IV. Nothing in this section shall be construed to allow the department to maintain records containing the names of licensees who receive unique approval numbers or to maintain records of firearm transactions, including the names or other identification of licensees and potential buyers or transferees, including persons not otherwise prohibited by law from the receipt or possession of firearms.

**RSA 159-D:3 Penalties for Attempts to Purchase Firearms Illegally.** – A person who completes and signs an application for purchase of a firearm and who knows that such purchase is illegal because he or she is subject to a protective order shall be guilty of a class A misdemeanor for a first offense and a class B felony for a second or subsequent offense.

**Saf-C 5703.12  Procedure for Correcting a CHRI.**

(a) Persons or their attorneys desiring access to their CHRI for the purpose of challenge or correction shall appear at the central repository.

(b) A copy shall be provided to a person if after review he or she indicates he or she needs the copy to pursue the challenge.

(c) Any person making a challenge shall identify that portion of his/her CHRI which he or she believes to be inaccurate or incorrect, and shall also give a correct version of his or her record with an explanation of the reason that he or she believes his/her version to be correct.

(d) The director shall take the following actions within 30 days of receipt of challenge:

(1) Review the records and contact the law enforcement agency or court which submitted the record to compare the information to determine whether the challenge is valid;

(2) If the challenge is valid, which means there is a discrepancy between the information submitted and the information maintained by the law enforcement agency or court, the record shall be corrected and the person and appropriate CJAs shall be notified; and

(3) If the challenge is invalid, the person shall be so informed.

(e) When a record has been corrected, the division shall notify all non-criminal justice agencies, to whom the data has been disseminated in the last year, of the correction.

4

(f) The person shall be entitled to review the information that records the facts, dates, and results of each formal stage of the criminal justice process through which he passes, to ensure that all such steps are completely and accurately recorded.

## Federal Law

**18 U.S.C.A. § 925A**
**§ 925A. Remedy for erroneous denial of firearm**
Any person denied a firearm pursuant to subsection (s) or (t) of section 922--
**(1)** due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or
**(2)** who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922, may bring an action against the State or political subdivision responsible for providing the erroneous information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the erroneous information be corrected or that the transfer be approved, as the case may be. In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.

**28 C.F.R. § 25.10**
**§ 25.10 Correction of erroneous system information.**

(a) An individual may request the reason for the denial from the agency that conducted the check of the NICS (the "denying agency," which will be either the FBI or the state or local law enforcement agency serving as a POC). The FFL will provide to the denied individual the name and address of the denying agency and the unique transaction number (NTN or STN) associated with the NICS background check.
The request for the reason for the denial must be made in writing to the denying agency. (POCs at their discretion may waive the requirement for a written request.)
(b) The denying agency will respond to the individual with the reasons for the denial within five business days of its receipt of the individual's request. The response should indicate whether additional information or documents are required to support an appeal, such as fingerprints in appeals involving questions of identity (i.e., a claim that the record in question does not pertain to the individual who was denied).
(c) If the individual wishes to challenge the accuracy of the record upon which the denial is based, or if the individual wishes to assert that his or her rights to possess a firearm have been restored, he or she may make application first to the denying agency, i.e., either the FBI or the POC. If the denying agency is unable to resolve the appeal, the denying agency will so notify the individual and shall provide the name and address of the agency that originated the document containing the information upon which the denial was based. The individual may then apply for correction of the record directly to the agency from which it originated. If the record is corrected as a result of the appeal to the originating agency, the individual may so notify the denying

5

agency, which will, in turn, verify the record correction with the originating agency (assuming the originating agency has not already notified the denying agency of the correction) and take all necessary steps to correct the record in the NICS.

(d) As an alternative to the above procedure where a POC was the denying agency, the individual may elect to direct his or her challenge to the accuracy of the record, in writing, to the FBI, NICS Operations Center, Criminal Justice Information Services Division, 1000 Custer Hollow Road, Module C–3, Clarksburg, West Virginia 26306–0147. Upon receipt of the information, the FBI will investigate the matter by contacting the POC that denied the transaction or the data source. The FBI will request the POC or the data source to verify that the record in question pertains to the individual who was denied, or to verify or correct the challenged record. The FBI will consider the information it receives from the individual and the response it receives from the POC or the data source.

If the record is corrected as a result of the challenge, the FBI shall so notify the individual, correct the erroneous information in the NICS, and give notice of the error to any Federal department or agency or any state that was the source of such erroneous records.

(e) Upon receipt of notice of the correction of a contested record from the originating agency, the FBI or the agency that contributed the record shall correct the data in the NICS and the denying agency shall provide a written confirmation of the correction of the erroneous data to the individual for presentation to the FFL. If the appeal of a contested record is successful and thirty (30) days or less have transpired since the initial check, and there are no other disqualifying records upon which the denial was based, the NICS will communicate a "Proceed" response to the FFL. If the appeal is successful and more than thirty (30) days have transpired since the initial check, the FFL must recheck the NICS before allowing the sale to continue. In cases where multiple disqualifying records are the basis for the denial, the individual must pursue a correction for each record.

(f) An individual may also contest the accuracy or validity of a disqualifying record by bringing an action against the state or political subdivision responsible for providing the contested information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the contested information be corrected or that the firearm transfer be approved.

(g) An individual may provide written consent to the FBI to maintain information about himself or herself in a Voluntary Appeal File to be established by the FBI and checked by the NICS for the purpose of preventing the future erroneous denial or extended delay by the NICS of a firearm transfer. Such file shall be used only by the NICS for this purpose. The FBI shall remove all information in the Voluntary Appeal File pertaining to an individual upon receipt of a written request by that individual. However, the FBI may retain such information contained in the Voluntary Appeal File as long as needed to pursue cases of identified misuse of the system. If the FBI finds a disqualifying record on the individual after his or her entry into the Voluntary Appeal File, the FBI may remove the individual's information from the file.

## 18 U.S.C.A. § 922

(s)(1) Beginning on the date that is 90 days after the date of enactment of this subsection and ending on the day before the date that is 60 months after such date of enactment, it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or

transfer a handgun (other than the return of a handgun to the person from whom it was received) to an individual who is not licensed under section 923, unless--

(A) after the most recent proposal of such transfer by the transferee--

(i) the transferor has--

(I) received from the transferee a statement of the transferee containing the information described in paragraph (3);

(II) verified the identity of the transferee by examining the identification document presented;

(III) within 1 day after the transferee furnishes the statement, provided notice of the contents of the statement to the chief law enforcement officer of the place of residence of the transferee; and

(IV) within 1 day after the transferee furnishes the statement, transmitted a copy of the statement to the chief law enforcement officer of the place of residence of the transferee; and

(ii)(I) 5 business days (meaning days on which State offices are open) have elapsed from the date the transferor furnished notice of the contents of the statement to the chief law enforcement officer, during which period the transferor has not received information from the chief law enforcement officer that receipt or possession of the handgun by the transferee would be in violation of Federal, State, or local law; or

(II) the transferor has received notice from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law;

(B) the transferee has presented to the transferor a written statement, issued by the chief law enforcement officer of the place of residence of the transferee during the 10-day period ending on the date of the most recent proposal of such transfer by the transferee, stating that the transferee requires access to a handgun because of a threat to the life of the transferee or of any member of the household of the transferee;

(C)(i) the transferee has presented to the transferor a permit that--

(I) allows the transferee to possess or acquire a handgun; and

(II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of the law;

(D) the law of the State requires that, before any licensed importer, licensed manufacturer, or licensed dealer completes the transfer of a handgun to an individual who is not licensed under section 923, an authorized government official verify that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of law;

(E) the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

(F) on application of the transferor, the Attorney General has certified that compliance with subparagraph (A)(i)(III) is impracticable because--

(i) the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

(ii) the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

(iii) there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

7

**(2)** A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General.

**(3)** The statement referred to in paragraph (1)(A)(i)(I) shall contain only--

**(A)** the name, address, and date of birth appearing on a valid identification document (as defined in section 1028(d)(1)) of the transferee containing a photograph of the transferee and a description of the identification used;

**(B)** a statement that the transferee--

**(i)** is not under indictment for, and has not been convicted in any court of, a crime punishable by imprisonment for a term exceeding 1 year, and has not been convicted in any court of a misdemeanor crime of domestic violence;

**(ii)** is not a fugitive from justice;

**(iii)** is not an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act);

**(iv)** has not been adjudicated as a mental defective or been committed to a mental institution;

**(v)** is not an alien who--

**(I)** is illegally or unlawfully in the United States; or

**(II)** subject to subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(vi)** has not been discharged from the Armed Forces under dishonorable conditions; and

**(vii)** is not a person who, having been a citizen of the United States, has renounced such citizenship;

**(C)** the date the statement is made; and

**(D)** notice that the transferee intends to obtain a handgun from the transferor.

**(4)** Any transferor of a handgun who, after such transfer, receives a report from a chief law enforcement officer containing information that receipt or possession of the handgun by the transferee violates Federal, State, or local law shall, within 1 business day after receipt of such request, communicate any information related to the transfer that the transferor has about the transfer and the transferee to--

**(A)** the chief law enforcement officer of the place of business of the transferor; and

**(B)** the chief law enforcement officer of the place of residence of the transferee.

**(5)** Any transferor who receives information, not otherwise available to the public, in a report under this subsection shall not disclose such information except to the transferee, to law enforcement authorities, or pursuant to the direction of a court of law.

**(6)(A)** Any transferor who sells, delivers, or otherwise transfers a handgun to a transferee shall retain the copy of the statement of the transferee with respect to the handgun transaction, and shall retain evidence that the transferor has complied with subclauses (III) and (IV) of paragraph (1)(A)(i) with respect to the statement.

**(B)** Unless the chief law enforcement officer to whom a statement is transmitted under paragraph (1)(A)(i)(IV) determines that a transaction would violate Federal, State, or local law--

**(i)** the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record containing

8

159

information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III);

**(ii)** the information contained in the statement shall not be conveyed to any person except a person who has a need to know in order to carry out this subsection; and

**(iii)** the information contained in the statement shall not be used for any purpose other than to carry out this subsection.

**(C)** If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer shall provide such reasons to the individual in writing within 20 business days after receipt of the request.

**(7)** A chief law enforcement officer or other person responsible for providing criminal history background information pursuant to this subsection shall not be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a handgun to a person whose receipt or possession of the handgun is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a handgun.

**(8)** For purposes of this subsection, the term "chief law enforcement officer" means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

**(9)** The Attorney General shall take necessary actions to ensure that the provisions of this subsection are published and disseminated to licensed dealers, law enforcement officials, and the public.

18 U.S.C.A. § 922 (West)

**(t)(1)** Beginning on the date that is 30 days after the Attorney General notifies licensees under section 103(d) of the Brady Handgun Violence Prevention Act that the national instant criminal background check system is established, a licensed importer, licensed manufacturer, or licensed dealer shall not transfer a firearm to any other person who is not licensed under this chapter, unless--

**(A)** before the completion of the transfer, the licensee contacts the national instant criminal background check system established under section 103 of that Act;

**(B)(i)** the system provides the licensee with a unique identification number; or

**(ii)** 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section; and

**(C)** the transferor has verified the identity of the transferee by examining a valid identification document (as defined in section 1028(d) of this title) of the transferee containing a photograph of the transferee.

**(2)** If receipt of a firearm would not violate subsection (g) or (n) or State law, the system shall--

**(A)** assign a unique identification number to the transfer;

**(B)** provide the licensee with the number; and

**(C)** destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

**(3)** Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if--

9

**(A)(i)** such other person has presented to the licensee a permit that--
**(I)** allows such other person to possess or acquire a firearm; and
**(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and
**(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law;
**(B)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or
**(C)** on application of the transferor, the Attorney General has certified that compliance with paragraph (1)(A) is impracticable because--
**(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;
**(ii)** the business premises of the licensee at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer (as defined in subsection (s)(8)); and
**(iii)** there is an absence of telecommunications facilities in the geographical area in which the business premises are located.
**(4)** If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the receipt of a firearm by such other person would violate subsection (g) or (n) or State law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the unique identification number provided by the system with respect to the transfer.
**(5)** If the licensee knowingly transfers a firearm to such other person and knowingly fails to comply with paragraph (1) of this subsection with respect to the transfer and, at the time such other person most recently proposed the transfer, the national instant criminal background check system was operating and information was available to the system demonstrating that receipt of a firearm by such other person would violate subsection (g) or (n) of this section or State law, the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under section 923, and may impose on the licensee a civil fine of not more than $5,000.
**(6)** Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages--
**(A)** for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or
**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.


18 U.S.C.A. § 922 (West)


**(g)** It shall be unlawful for any person--
**(1)** who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
**(2)** who is a fugitive from justice;

10

**(3)** who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

**(4)** who has been adjudicated as a mental defective or who has been committed to a mental institution;

**(5)** who, being an alien--

**(A)** is illegally or unlawfully in the United States; or

**(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(6)** who has been discharged from the Armed Forces under dishonorable conditions;

**(7)** who, having been a citizen of the United States, has renounced his citizenship;

**(8)** who is subject to a court order that--

**(A)** was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

**(B)** restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

**(C)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

**(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C.A. § 922 (West)

**(n)** It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

11

**EXHIBIT F**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § | |
| *Plaintiffs*, | § § § | |
| v. | § § § | Civil Action No. _____ |
| MERRICK GARLAND, *ET. AL.* | § § § | |
| *Defendants*. | § § § § § § § § § § § § | |

## <u>DECLARATION OF DAVID FRANCIS</u>

I, David Francis, declare as follows:

1. I am a Manager for the Business Tax Services Division at the Oklahoma Tax Commission. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I have been employed with the Oklahoma Tax Commission for twenty-seven (27) years.

3. As a result of my current duties, I am familiar with the state's tax code and how it relates to gun sales.

4.  Under Oklahoma Code 68 O.S. § 1354, the state taxes the sale of firearms, including those occurring at gun shows. *See* 68 O.S. § 1364.2.

5.  Under Oklahoma Code 68 O.S. § 1402 and 68 O.S. § 1364.2, the state taxes the online sale of firearms that occur where the buyer is a resident of Oklahoma and the firearm is stored and/or used in the State of Oklahoma.

6.  If there is a decrease in gun sales there will naturally be a decrease in state tax revenue.

7.  Based on the information available, the Final Rule in this case is expected to decrease the sale of firearms by unlicensed firearms dealers. 89 Fed. Reg. 29054.

8.  If that were the case, it is likely that Oklahoma would see a corresponding decrease in sales tax revenue.

9.  Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Oklahoma that the foregoing is true and correct.

Dated this 6ᵗ day of ⁀⁀⁀⁀⁀, 2024.

_____
David Francis, Oklahoma Tax Commission

Subscribed and sworn to before me this 6ᵗʰ day of May, 2024, in the County of Oklahoma, State of Oklahoma.

(seal)



_____
Notary Public

2

164

**EXHIBIT G**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § § | |
| MERRICK GARLAND, *ET. AL.* | § § § | Civil Action No. 2:24-cv-88 |
| *Defendants.* | § § § § § § § § § § § | |

## DECLARATION OF JOSEPH E. MAYER

I, Joseph E. Mayer, declare as follows

1. I am a Lead Policy Analyst at the Virginia Department of Taxation. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I have served as a Lead Policy Analyst at the Virginia Department of Taxation for 17 years.

3. Prior to this, I served as a Senior Policy Analyst at the Virginia Department of Taxation for 5 years.

4. As a result of my current duties, I am familiar with Virginia's tax code and how it relates to the sale of firearms online and at gun shows.

5. Under Va. Code §§ 58.1-603 and 58.1-604, Virginia taxes the sale of firearms at gun shows by persons or businesses that regularly engage in the business of selling firearms.

6. Under Va. Code §§ 58.1-603 and 58.1-604, Virginia taxes the online sale of firearms that occur where the buyer is a resident of Virginia.

7. If there is a decrease in firearm sales at gun shows or online there will naturally be a decrease in state tax revenue.

8. Based on the information available the Final Rule in this case is expected to decrease the sale of unlicensed firearms dealers by 10%. 89 Fed. Reg. 29054.

9. If that were the case, it is likely that Virginia would see a decrease in sales tax revenue.

10. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the Commonwealth of Virginia that the foregoing is true and correct.


Executed in the City of Richmond, Virginia this 6th day of May 2024.

*Joseph E. May*

2

166

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS,<br>*ET AL.* | § § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | |
| MERRICK GARLAND,<br>*ET. AL.* | § § § | Civil Action No. _____ |
| *Defendants.* | § § § § § § § § § § § § | |

---

### DECLARATION OF BRET FANNING

---

I, Bret Fanning, declare as follows:

1. I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this Declaration.

2. My name is Bret Fanning. I serve as the Excise Tax Administrator for the Wyoming Department of Revenue. I can competently testify as to the contents of this Declaration if called upon to do so.

3. In my capacity, I am responsible for the administration of Wyoming's excise tax system. This includes overseeing vendor licensing as well as the reporting and collection of excise

1

tax from transactions involving tangible personal property. As a result of my current duties, I am familiar with the Wyoming's tax code and how it relates to both gun shows and online sale of firearms in the State of Wyoming.

4. Wyoming imposes an excise tax upon the sales price of "tangible personal property" within the State under Wyo. Stat. Ann. §§ 39-15-103 and 39-16-103. In most instances, such taxes are collected by licensed retail vendors directly from their customers. Those vendors then report and remit the collected tax to the Department of Revenue.

5. Most retail sales of firearms in Wyoming are subject to the imposition of an excise tax since those items fall within the statutory definition of "tangible personal property" under Wyo. Stat. Ann. §§ 39-15-101(a)(ix) and 39-16-101(a)(vi). Firearm sales may occur in "brick-and-mortar" shops, as internet purchases, or at gun show events. In each sales situation, the seller is generally required to collect and remit tax from customers.

6. There is an underlying State mandated 4% excise tax rate that applies to the sale of firearms at "brick-and-mortar" shops, at gun shows, and via the internet. In addition, each Wyoming county and local jurisdiction may further increase the tax rate above the 4% State mandated excise tax rate.

7. For firearms sales conducted through the internet, the State imposes the obligation to collect excise tax on non-Wyoming based sellers, if those sellers meet minimal statutory sales thresholds under Wyo. Stat. Ann. § 39-15-501.

8. If there is a decrease in firearm sales in Wyoming it will naturally result in a decrease in State excise tax revenue.

2

I declare under penalty of perjury under the laws of the United States of American and the

State of Wyoming that the foregoing is true and correct.

Executed on May 1st, 2024.

_____
BRET FANNING
Excise   Tax   Administrator,   Wyoming
Department of Revenue

3

169

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS,<br>*ET AL.*<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND,<br>*ET. AL.*<br><br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. _____ |

**DECLARATION OF ALLEN S. BLACK**

I, Allen S. Black, declare as follows:

1. I am Allen S. Black.  I am over the age of 18, and I have personal knowledge of the facts contained in this Declaration.  I could competently testify as to the contents of this Declaration if called upon to do so.

2. I am a law-abiding person, eligible to possess firearms under state and federal law.

3. I am a firearms hobbyist and enthusiast who maintains a personal collection of firearms that includes handguns.  I have also volunteered my time as a shooting instructor on at least 10 occasions.

170

4.  I attend approximately 4-5 gun shows every year.  At those gun shows I buy firearms and I sell from my personal collection.  I am not a federal firearms licensee.

5.  I presently have a large personal collection of firearms, including self-defense weapons, which I have accumulated over many years and which I actively seek to expand by attending gun shows in the future.

6.  I am aware of and have reviewed the Final Rule which redefines what qualifies as "Engaged in the Business" as a Dealer in Firearms ("Final Rule") that is at issue in this case.

7.  I am aware of the requirements of a federal firearms licensee, and they are burdensome for someone who sells firearms as a hobby.

8.  If the Final Rule goes into effect, I will have to either give up selling firearms or register as a federal firearms licensee.

9.  In my experience of attending approximately 4-5 gun shows each year, I am aware of the impact the Final Rule will have on gun shows overall.

10. Based on the information available, it is my understanding that the Final Rule is expected to decrease the sale of unlicensed firearms dealers by 10%.  89 Fed. Reg. 29054.  My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.

11. The Final Rule will likely decrease the number of vendors that sell firearms at gun shows as those who are not federal firearms licensees (like myself) will be less likely to sell firearms.

12. The Final Rule will also likely lead to a decrease in attendance at gun shows as fewer vendors will decrease the options available and reduce public interest in gun shows.

2

171

13. I do not want to give up selling firearms at gun shows from my personal collection but this Final Rule makes me concerned that I will be subject to civil, administrative, and possibly criminal penalties if I do.

14. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Kansas that the foregoing is true and correct.

Executed in _Wichita Kansas_ , this _4th_ day of May 2024.

BY: _Allen S. Black_
Allen S. Black

3

172

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

| | |
|---|---|
| STATE OF KANSAS, *ET AL.* | § |
| | § |
| | § |
| *Plaintiffs,* | § |
| | § |
| v. | § |
| | § |
| MERRICK GARLAND, *ET. AL.* | § Civil Action No. _____ |
| | § |
| | § |
| *Defendants.* | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |
| | § |

## <u>DECLARATION OF DONALD G. MAXEY</u>

I, Donald G. Maxey, declare as follows

1. I am Donald G. Maxey.  I am over the age of 18, and I have personal knowledge of the facts contained in this Declaration.  I could competently testify as to the contents of this Declaration if called upon to do so.

2. I am a law-abiding person, eligible to possess firearms under state and federal law.

3. I am a firearms hobbyist and enthusiast who maintains a personal collection of firearms that includes handguns.  I have also volunteered my time as a shooting instructor on at least 10 occasions.

4. I attend approximately three gun shows every year. At those gun shows I buy firearms to add to my personal collection. I also provide guidance to other gun show attendees on which firearms they should purchase. I am not a federal firearms licensee.

5. I presently have a modest collection of antique firearms, some reproductions of antique firearms, several modern sporting rifles and shotguns, and several revolvers which I depend on for self-defense. I have assembled this collection over several years, and actively seek to expand it by attending gun shows in the future.

6. I am aware of and have reviewed the Final Rule which redefines what qualifies as "Engaged in the Business" as a Dealer in Firearms ("Final Rule") that is at issue in this case.

7. I am aware of the requirements of a federal firearms licensee, and they are burdensome for someone who sells firearms as a hobby.

8. In my experience of attending approximately three gun shows every year, I am aware of the impact the Final Rule will have on gun shows overall.

9. Based on the information available, it is my understanding that the Final Rule is expected to decrease the sale of unlicensed firearms dealers by 10%. 89 Fed. Reg. 29054. My experience leads me to believe that this 10% estimate is conservative, and sales could decrease by an even greater percentage.

10. The Final Rule will likely decrease the number of vendors that sell firearms at gun shows as those who are not federal firearms licensees will be less likely to sell firearms.

11. The Final Rule will also likely lead to a decrease in attendance at gun shows as fewer vendors will decrease the options available and reduce public interest in gun shows.

12. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Kansas that the foregoing is true and correct.

Executed in _Valley Center, KS_, this _4 th_ day of May 2024.

BY: _Donald & Maxey_
Donald G. Maxey

3

175

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS,<br>*ET AL.*<br><br>    *Plaintiffs,*<br><br>v.<br><br>MERRICK GARLAND,<br>*ET. AL.*<br><br>    *Defendants.* | § § § § § § § § § § § § § § § § § § § | Civil Action No. _____ |

## <u>DECLARATION OF JAMES FRY – PRESIDENT OF THE</u>

## <u>CHISHOLM TRAIL ANTIQUE GUN ASSOCIATION</u>

I, James Fry, President of the Chisholm Trail Antique Gun Association, declare as follows:

1. I am James Fry.  I am over the age of 18, and I have personal knowledge of the facts contained in this declaration.  I could competently testify as to the contents of this Declaration if called upon to do so.

2. I currently serve as the President of the Chisholm Trail Antique Gun Association ("Chisholm Trail").

3. Chisholm Trail is a Kansas not-for-profit corporation founded in 1957 in Wichita, Kansas.

4. Chisholm Trail was organized for the purposes of serving the interests of collectors and shooters of antique and antique-replica firearms and to help preserve the craftsmanship and the history of the arms of our forefathers for the enlightenment and enjoyment of future generations

5. Chisholm Trail sponsors and manages the biannual Wichita Gun Show each year and relies on the proceeds generated from these events to fund its annual club activities. Approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by these two gun shows.

6. Chisholm Trail is not a federal firearms licensee, nor are most of its members, including Allen S. Black and Donal G. Maxey, who attend gun shows each year where they buy and/or sell firearms for and from their personal collections.

7. I am aware of and have reviewed the Final Rule which redefines what qualifies as "Engaged in the Business" as a Dealer in Firearms ("Final Rule") that is at issue in this case.

8. The Final Rule will harm Chisholm Trail because it will reduce the revenue this not-for-profit corporation generates from its biannual gun shows.  The Final Rule will do this in two ways: 1) by decreasing the number of attendees that sell firearms at these shows as those who are not federal firearms licensees will not be able to sell their firearms; and 2) a decrease in overall attendance at these gun shows, as fewer firearms for sale will decrease the options available and reduce public interest in these events.

9. In addition, the Final Rule will harm Chisholm Trail's members, many of whom are not federal firearms licensees, because it would require them to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms from their

177

personal collections at gun shows.

10. Chisholm Trail requires all those who sell one or more firearms at their gun shows to collect and pay sales tax to the state of Kansas for any proceeds acquired from the sale of those firearms.

11. Chisholm Trail also collects and pays sales tax to the State of Kansas for table rental fees charged during our gun shows.  During the most recent fiscal year, Chisholm Trail paid $4,005.72 in sales tax to the State of Kansas.

12. Therefore, any loss of revenue for Chisholm Trail due to the Final Rule would naturally lead to a loss of state tax revenue for Kansas.

13. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Kansas that the foregoing is true and correct.

Executed in _____, this _6_ day of May 2024.

BY: _James Fry_____
James Fry, President
Chisholm Trail Antique Gun Association

**EXHIBIT 8**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS
# DELTA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *et al.* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:24-CV-88-JM |
| | ) | |
| MERRICK B. GARLAND, in his official | ) | |
| capacity, as Attorney General of the United | ) | |
| States, *et al.* | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## SWORN DECLARATION OF EDDIE EDWARDS

Pursuant to 28 U.S.C. § 1746, I, Eddie Edwards, duly affirm under penalty of perjury as follows:

  1. I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this Declaration. The facts contained in this Sworn Declaration are true and accurate and are of my personal knowledge.

  2. My name is Eddie Edwards, and I serve as the Assistant Commissioner of the New Hampshire Department of Safety. I have served in this capacity since March 3, 2021. My responsibilities include overseeing the Department's personnel management, the Division of State

179

Police, the Fire Marshal's Office, the Bureau of Hearings, Homeland Security and Emergency Management, and highway safety initiatives.

3.    After reading ATF's proposed rule change, titled, Definition of "Engaged in the Business as a Dealer in Firearms," 88 Fed Reg. 61993 (Sept. 8, 2023), I state the following regarding the New Hampshire Department of Safety:

4.    The following paragraph is a correct description of New Hampshire's role in processing background checks for firearms purchases:

> New Hampshire law permits the New Hampshire Department of Safety ("NHDOS") to become a point of contact for the federal government for the purposes of the National Instant Criminal Background Check System (NICS). N.H. Rev. Stat. Ann. § 159-D:1. Since approximately 1999, NHDOS has served as a partial point of contact in that a federal firearms licensee contacts the state for purchases of handgun, the frame or receiver of any firearm, firearm mufflers, and firearm silencers, and contacts the FBI for long guns, rifles and shotgun purchases. The Permits and Licensing Unit of the Division of State Police fulfills the point of contact ("POC") role. It must access the NICS as part of the background check process and search the New Hampshire Criminal History Record database established under RSA 106-B:14. In addition, it must conduct a review of a list of individuals produced by the New Hampshire Judiciary who currently have a domestic violence protection orders issued against him or her. This review is conducted because state law prohibits firearm sales to individuals who are under an *ex parte* domestic violence protective order; federal law contains a different standard. *Compare* N.H. Rev. Stat. Ann. § 173-B:4, II *with* 18 U.S.C. § 922(g)(8). Thus, maintaining the NHDOS's current practice as a POC not only benefits public safety in New Hampshire, but ensures the continued enforcement of RSA 173-B:4, II. The Final Rule expects an increase in background checks. This increase will likely result in an increase in administrative costs and resources for Plaintiff New Hampshire.

5.    Attached as Exhibit A is a true and accurate copy of a memorandum dated January 6, 2021, describing the procedure for denial or delay to purchase pursuant to R.S.A. § 159-D:1.

6.    By expanding the transactions under the Final Rule, the Department, and more specifically the Permits and Licensing Unit of the Division of State Police, will expend additional

resources and personnel to determine how to implement this expansion. Further, the increase in the number of background checks will increase the cost of administration in that the number additional resources and personnel will be needed to conduct the additional checks.

7.     I declare under penalty of perjury that the foregoing is true and correct.


/s/ Eddie Edwards_____
Eddie Edwards
Assistant Commissioner, New Hampshire
Department of Safety

Dated: May 3, 2024

Exhibit A

Memorandum

To:     Executive Councilor David Wheeler
From:   Commissioner Robert L. Quinn
Date:   1/6/21
Re:     Procedure for Appeal of Denial or Delay to Purchase Pursuant to RSA159-D

---

Councilor,

Per your request, I am providing you with an overview of the current laws applicable to appeals for the denial or delay to purchase, pursuant to RSA 159-D.

The State of New Hampshire is a designated partial Point of Contact ("POC") for the purposes of conducting criminal background checks on individuals seeking to purchase handguns in the state. See **RSA 159-D**.[1] In the event that the background check results in a denial of a transaction, a person wishing to challenge or contest this result must adhere to the applicable federal laws and regulations governing this process. See **18 U.S.C.A. § 922; 18 U.S.C.A. § 925A; 28 C.F.R. § 25.10.**

Pursuant to **28 C.F.R. § 25.10**:

1.  The Federal Firearms Licensee ("FFL") that receives notice of a denial may, upon request by the person seeking to purchase the firearm, provide the person with the address of the "denying agency," and the unique transaction number (NICS Transaction Number ("NTN") or State Assigned Transaction Number ("STN")) associated with the NICS background check. **28 C.F.R. § 25.10 (a).** The "denying agency" is either the FBI or the state or local law enforcement agency serving as a POC. *Id.* In New Hampshire, this means that for denied handgun transactions, the "denying agency" would be the Department of Safety ("DOS"), for all other firearm purchases the "denying agency" would be the FBI.

    An individual may then request the reason for the denial from the denying agency. According to federal regulations, the request for the reason of the denial must be made in writing to the denying agency. *Id.* However, POCs may waive this requirement. *Id.*

    The denying agency then has five business days to respond to the individual with the reason for the denial. **28 C.F.R. § 25.10 (b).** The response from the denying agency should indicate whether additional information or documents are required to support an appeal, such as fingerprints in appeals involving questions of identity (i.e., a claim that the record in question does not pertain to the individual who was denied). *Id.*

---

[1] The federal government continues to conduct the background checks for long guns.

1

2. If the individual wishes to challenge the accuracy of the record upon which the denial is based, or if the individual wishes to assert that his or her rights to possess a firearm have been restored, he or she may make application first to the denying agency, i.e. either the FBI or to the DOS, depending on what type of firearm is involved in the transaction. **28 C.F.R. § 25.10 (c)**

"If the denying agency is unable to resolve the appeal, the denying agency will so notify the individual and shall provide the name and address of the agency that originated the document containing the information upon which the denial was based." *Id.*

"The individual may then apply for correction of the record directly to the agency from which it originated." *Id.*

If the record is corrected as a result of the appeal to the originating agency, the individual may notify the denying agency, which will, in turn, verify the record correction with the originating agency (assuming the originating agency has not already notified the denying agency of the correction) and take all necessary steps to correct the record in the NICS. *Id.*

As an alternative to the above procedure where a POC was the denying agency, the individual may elect to direct his or her challenge to the accuracy of the record, in writing, to the FBI, which has the authority to "investigate the matter by contacting the POC that denied the transaction or the data source." **28 C.F.R. § 25.20 (d)**. The FBI will consider both information obtained from both the individual and the POC. *Id.* If the record is corrected as a result of the challenge, the FBI notifies the individual, corrects the erroneous information in the NICS, and gives notice of the error to any Federal department or agency or any state that was the source of such erroneous records. *Id.*

If the originating record that resulted in the denial is a New Hampshire criminal history record, Saf-C 5703.12 also sets forth the procedure for correcting that record.

A person making a challenge shall identify that portion of his or her record which he or she believes to be inaccurate or incorrect, and shall also give a correct version of his or her record with an explanation of the reason that he or she believes his/her version to be correct. **Saf-C 5703.12(c)**

Within 30 days of receipt of challenge, the criminal records unit shall review the records and contact the law enforcement agency or court which submitted the record to compare the information to determine whether the challenge is valid. If the challenge is valid, which means there is a discrepancy between the information submitted and the information maintained by the law enforcement agency or court, the record shall be corrected and the person and appropriate criminal justice agency shall be notified. If the challenge is invalid, the person making the challenge will be so informed. **Saf-C 5703.12 (d)**

3. Upon receipt of notice of the correction of a contested record from the originating agency, the FBI or the agency that contributed the record shall correct the data in the

NICS and the denying agency shall provide a written confirmation of the correction of the erroneous data to the individual for presentation to the FFL. **28 C.F.R. § 25.10 (e).**

If the appeal of a contested record is successful and thirty (30) days or less have transpired since the initial check, and there are no other disqualifying records upon which the denial was based, the NICS will communicate a "Proceed" response to the FFL. *Id.*

If the appeal is successful and more than thirty (30) days have transpired since the initial check, the FFL must recheck the NICS before allowing the sale to continue. *Id.*

In cases where multiple disqualifying records are the basis for the denial, the individual must pursue a correction for **each** record. *Id.*

4. An individual may also contest the accuracy or validity of a disqualifying record by bringing an action against the state or political subdivision responsible for providing the contested information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the contested information be corrected or that the firearm transfer be approved. **28 C.F.R. § 25.10 (f);** see also **18 U.S.C.A. 925A.**

5. An individual may provide written consent to the FBI to maintain information about himself or herself in a Voluntary Appeal File to be established by the FBI and checked by the NICS for the purpose of preventing the future erroneous denial or extended delay by the NICS of a firearm transfer. **28 C.F.R. § 25.20 (g).**

Such file shall be used only by the NICS for this purpose. *Id.*

The FBI shall remove all information in the Voluntary Appeal File pertaining to an individual upon receipt of a written request by that individual. However, the FBI may retain such information contained in the Voluntary Appeal File as long as needed to pursue cases of identified misuse of the system. *Id.*

If the FBI finds a disqualifying record on the individual after his or her entry into the Voluntary Appeal File, the FBI may remove the individual's information from the file. *Id.*

---

**Relevant Statutes, Rules and Case Law**

**State Law**

3

**RSA 159-D:1 Sale of Firearms; Criminal History Record and Protective Order Check.** –
The department of safety may become the point of contact for the federal government for the
purposes of the National Instant Criminal Background Check System (NICS).

**RSA 159-D:2 Confidentiality.** –
I. If the department of safety conducts criminal background checks under RSA 159-D:1, any
records containing information pertaining to a potential buyer or transferee who is not found to
be prohibited from receipt or transfer of a firearm by reason of state or federal law, which are
created by the department of safety to conduct the criminal background check, shall be
confidential and may not be disclosed by the department or any officers or employees to any
person or to another agency. The department shall destroy any such records after it
communicates the corresponding approval number to the licensee and, in any event, such records
shall be destroyed within one day after the day of the receipt of the licensee's request.
II. The department shall retain records containing any information pertaining to a potential buyer
or transferee who is prohibited from receipt or transfer of a firearm for 3 years.
III. Notwithstanding the provisions of this section, the department may maintain only a log of
dates of requests for criminal background checks and unique approval numbers corresponding to
such dates for an indefinite period.
IV. Nothing in this section shall be construed to allow the department to maintain records
containing the names of licensees who receive unique approval numbers or to maintain records
of firearm transactions, including the names or other identification of licensees and potential
buyers or transferees, including persons not otherwise prohibited by law from the receipt or
possession of firearms.

**RSA 159-D:3 Penalties for Attempts to Purchase Firearms Illegally.** – A person who
completes and signs an application for purchase of a firearm and who knows that such purchase
is illegal because he or she is subject to a protective order shall be guilty of a class A
misdemeanor for a first offense and a class B felony for a second or subsequent offense.

**Saf-C 5703.12  Procedure for Correcting a CHRI.**
        (a) Persons or their attorneys desiring access to their CHRI for the purpose of challenge
or correction shall appear at the central repository.
        (b) A copy shall be provided to a person if after review he or she indicates he or she
needs the copy to pursue the challenge.
        (c) Any person making a challenge shall identify that portion of his/her CHRI which he
or she believes to be inaccurate or incorrect, and shall also give a correct version of his or her
record with an explanation of the reason that he or she believes his/her version to be correct.
        (d)  The director shall take the following actions within 30 days of receipt of challenge:
(1) Review the records and contact the law enforcement agency or court which submitted the
record to compare the information to determine whether the challenge is valid;
(2) If the challenge is valid, which means there is a discrepancy between the information
submitted and the information maintained by the law enforcement agency or court, the record
shall be corrected and the person and appropriate CJAs shall be notified; and
(3) If the challenge is invalid, the person shall be so informed.
        (e)  When a record has been corrected, the division shall notify all non-criminal justice
agencies, to whom the data has been disseminated in the last year, of the correction.

4

(f)  The person shall be entitled to review the information that records the facts, dates, and results of each formal stage of the criminal justice process through which he passes, to ensure that all such steps are completely and accurately recorded.

## Federal Law

**18 U.S.C.A. § 925A**
**§ 925A. Remedy for erroneous denial of firearm**
Any person denied a firearm pursuant to subsection (s) or (t) of section 922--
**(1)** due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or
**(2)** who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922, may bring an action against the State or political subdivision responsible for providing the erroneous information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the erroneous information be corrected or that the transfer be approved, as the case may be. In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.

**28 C.F.R. § 25.10**
**§ 25.10 Correction of erroneous system information.**

(a) An individual may request the reason for the denial from the agency that conducted the check of the NICS (the "denying agency," which will be either the FBI or the state or local law enforcement agency serving as a POC). The FFL will provide to the denied individual the name and address of the denying agency and the unique transaction number (NTN or STN) associated with the NICS background check.
The request for the reason for the denial must be made in writing to the denying agency. (POCs at their discretion may waive the requirement for a written request.)
(b) The denying agency will respond to the individual with the reasons for the denial within five business days of its receipt of the individual's request. The response should indicate whether additional information or documents are required to support an appeal, such as fingerprints in appeals involving questions of identity (i.e., a claim that the record in question does not pertain to the individual who was denied).
(c) If the individual wishes to challenge the accuracy of the record upon which the denial is based, or if the individual wishes to assert that his or her rights to possess a firearm have been restored, he or she may make application first to the denying agency, i.e., either the FBI or the POC. If the denying agency is unable to resolve the appeal, the denying agency will so notify the individual and shall provide the name and address of the agency that originated the document containing the information upon which the denial was based. The individual may then apply for correction of the record directly to the agency from which it originated. If the record is corrected as a result of the appeal to the originating agency, the individual may so notify the denying

5

agency, which will, in turn, verify the record correction with the originating agency (assuming the originating agency has not already notified the denying agency of the correction) and take all necessary steps to correct the record in the NICS.

(d) As an alternative to the above procedure where a POC was the denying agency, the individual may elect to direct his or her challenge to the accuracy of the record, in writing, to the FBI, NICS Operations Center, Criminal Justice Information Services Division, 1000 Custer Hollow Road, Module C–3, Clarksburg, West Virginia 26306–0147. Upon receipt of the information, the FBI will investigate the matter by contacting the POC that denied the transaction or the data source. The FBI will request the POC or the data source to verify that the record in question pertains to the individual who was denied, or to verify or correct the challenged record. The FBI will consider the information it receives from the individual and the response it receives from the POC or the data source.

If the record is corrected as a result of the challenge, the FBI shall so notify the individual, correct the erroneous information in the NICS, and give notice of the error to any Federal department or agency or any state that was the source of such erroneous records.

(e) Upon receipt of notice of the correction of a contested record from the originating agency, the FBI or the agency that contributed the record shall correct the data in the NICS and the denying agency shall provide a written confirmation of the correction of the erroneous data to the individual for presentation to the FFL. If the appeal of a contested record is successful and thirty (30) days or less have transpired since the initial check, and there are no other disqualifying records upon which the denial was based, the NICS will communicate a "Proceed" response to the FFL. If the appeal is successful and more than thirty (30) days have transpired since the initial check, the FFL must recheck the NICS before allowing the sale to continue. In cases where multiple disqualifying records are the basis for the denial, the individual must pursue a correction for each record.

(f) An individual may also contest the accuracy or validity of a disqualifying record by bringing an action against the state or political subdivision responsible for providing the contested information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the contested information be corrected or that the firearm transfer be approved.

(g) An individual may provide written consent to the FBI to maintain information about himself or herself in a Voluntary Appeal File to be established by the FBI and checked by the NICS for the purpose of preventing the future erroneous denial or extended delay by the NICS of a firearm transfer. Such file shall be used only by the NICS for this purpose. The FBI shall remove all information in the Voluntary Appeal File pertaining to an individual upon receipt of a written request by that individual. However, the FBI may retain such information contained in the Voluntary Appeal File as long as needed to pursue cases of identified misuse of the system. If the FBI finds a disqualifying record on the individual after his or her entry into the Voluntary Appeal File, the FBI may remove the individual's information from the file.


18 U.S.C.A. § 922

(s)(1) Beginning on the date that is 90 days after the date of enactment of this subsection and ending on the day before the date that is 60 months after such date of enactment, it shall be unlawful for any licensed importer, licensed manufacturer, or licensed dealer to sell, deliver, or

transfer a handgun (other than the return of a handgun to the person from whom it was received) to an individual who is not licensed under section 923, unless--

(A) after the most recent proposal of such transfer by the transferee--

(i) the transferor has--

(I) received from the transferee a statement of the transferee containing the information described in paragraph (3);

(II) verified the identity of the transferee by examining the identification document presented;

(III) within 1 day after the transferee furnishes the statement, provided notice of the contents of the statement to the chief law enforcement officer of the place of residence of the transferee; and

(IV) within 1 day after the transferee furnishes the statement, transmitted a copy of the statement to the chief law enforcement officer of the place of residence of the transferee; and

(ii)(I) 5 business days (meaning days on which State offices are open) have elapsed from the date the transferor furnished notice of the contents of the statement to the chief law enforcement officer, during which period the transferor has not received information from the chief law enforcement officer that receipt or possession of the handgun by the transferee would be in violation of Federal, State, or local law; or

(II) the transferor has received notice from the chief law enforcement officer that the officer has no information indicating that receipt or possession of the handgun by the transferee would violate Federal, State, or local law;

(B) the transferee has presented to the transferor a written statement, issued by the chief law enforcement officer of the place of residence of the transferee during the 10-day period ending on the date of the most recent proposal of such transfer by the transferee, stating that the transferee requires access to a handgun because of a threat to the life of the transferee or of any member of the household of the transferee;

(C)(i) the transferee has presented to the transferor a permit that--

(I) allows the transferee to possess or acquire a handgun; and

(II) was issued not more than 5 years earlier by the State in which the transfer is to take place; and

(ii) the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of the law;

(D) the law of the State requires that, before any licensed importer, licensed manufacturer, or licensed dealer completes the transfer of a handgun to an individual who is not licensed under section 923, an authorized government official verify that the information available to such official does not indicate that possession of a handgun by the transferee would be in violation of law;

(E) the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or

(F) on application of the transferor, the Attorney General has certified that compliance with subparagraph (A)(i)(III) is impracticable because--

(i) the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;

(ii) the business premises of the transferor at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer; and

(iii) there is an absence of telecommunications facilities in the geographical area in which the business premises are located.

7

**(2)** A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(III) shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and in a national system designated by the Attorney General.

**(3)** The statement referred to in paragraph (1)(A)(i)(I) shall contain only--

**(A)** the name, address, and date of birth appearing on a valid identification document (as defined in section 1028(d)(1)) of the transferee containing a photograph of the transferee and a description of the identification used;

**(B)** a statement that the transferee--

**(i)** is not under indictment for, and has not been convicted in any court of, a crime punishable by imprisonment for a term exceeding 1 year, and has not been convicted in any court of a misdemeanor crime of domestic violence;

**(ii)** is not a fugitive from justice;

**(iii)** is not an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act);

**(iv)** has not been adjudicated as a mental defective or been committed to a mental institution;

**(v)** is not an alien who--

**(I)** is illegally or unlawfully in the United States; or

**(II)** subject to subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(vi)** has not been discharged from the Armed Forces under dishonorable conditions; and

**(vii)** is not a person who, having been a citizen of the United States, has renounced such citizenship;

**(C)** the date the statement is made; and

**(D)** notice that the transferee intends to obtain a handgun from the transferor.

**(4)** Any transferor of a handgun who, after such transfer, receives a report from a chief law enforcement officer containing information that receipt or possession of the handgun by the transferee violates Federal, State, or local law shall, within 1 business day after receipt of such request, communicate any information related to the transfer that the transferor has about the transfer and the transferee to--

**(A)** the chief law enforcement officer of the place of business of the transferor; and

**(B)** the chief law enforcement officer of the place of residence of the transferee.

**(5)** Any transferor who receives information, not otherwise available to the public, in a report under this subsection shall not disclose such information except to the transferee, to law enforcement authorities, or pursuant to the direction of a court of law.

**(6)(A)** Any transferor who sells, delivers, or otherwise transfers a handgun to a transferee shall retain the copy of the statement of the transferee with respect to the handgun transaction, and shall retain evidence that the transferor has complied with subclauses (III) and (IV) of paragraph (1)(A)(i) with respect to the statement.

**(B)** Unless the chief law enforcement officer to whom a statement is transmitted under paragraph (1)(A)(i)(IV) determines that a transaction would violate Federal, State, or local law--

**(i)** the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record containing

8

190

information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III);

**(ii)** the information contained in the statement shall not be conveyed to any person except a person who has a need to know in order to carry out this subsection; and

**(iii)** the information contained in the statement shall not be used for any purpose other than to carry out this subsection.

**(C)** If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination, the officer shall provide such reasons to the individual in writing within 20 business days after receipt of the request.

**(7)** A chief law enforcement officer or other person responsible for providing criminal history background information pursuant to this subsection shall not be liable in an action at law for damages--

**(A)** for failure to prevent the sale or transfer of a handgun to a person whose receipt or possession of the handgun is unlawful under this section; or

**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a handgun.

**(8)** For purposes of this subsection, the term "chief law enforcement officer" means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual.

**(9)** The Attorney General shall take necessary actions to ensure that the provisions of this subsection are published and disseminated to licensed dealers, law enforcement officials, and the public.

18 U.S.C.A. § 922 (West)

**(t)(1)** Beginning on the date that is 30 days after the Attorney General notifies licensees under section 103(d) of the Brady Handgun Violence Prevention Act that the national instant criminal background check system is established, a licensed importer, licensed manufacturer, or licensed dealer shall not transfer a firearm to any other person who is not licensed under this chapter, unless--

**(A)** before the completion of the transfer, the licensee contacts the national instant criminal background check system established under section 103 of that Act;

**(B)(i)** the system provides the licensee with a unique identification number; or

**(ii)** 3 business days (meaning a day on which State offices are open) have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section; and

**(C)** the transferor has verified the identity of the transferee by examining a valid identification document (as defined in section 1028(d) of this title) of the transferee containing a photograph of the transferee.

**(2)** If receipt of a firearm would not violate subsection (g) or (n) or State law, the system shall--

**(A)** assign a unique identification number to the transfer;

**(B)** provide the licensee with the number; and

**(C)** destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

**(3)** Paragraph (1) shall not apply to a firearm transfer between a licensee and another person if--

9

**(A)(i)** such other person has presented to the licensee a permit that--
**(I)** allows such other person to possess or acquire a firearm; and
**(II)** was issued not more than 5 years earlier by the State in which the transfer is to take place; and
**(ii)** the law of the State provides that such a permit is to be issued only after an authorized government official has verified that the information available to such official does not indicate that possession of a firearm by such other person would be in violation of law;
**(B)** the Attorney General has approved the transfer under section 5812 of the Internal Revenue Code of 1986; or
**(C)** on application of the transferor, the Attorney General has certified that compliance with paragraph (1)(A) is impracticable because--
**(i)** the ratio of the number of law enforcement officers of the State in which the transfer is to occur to the number of square miles of land area of the State does not exceed 0.0025;
**(ii)** the business premises of the licensee at which the transfer is to occur are extremely remote in relation to the chief law enforcement officer (as defined in subsection (s)(8)); and
**(iii)** there is an absence of telecommunications facilities in the geographical area in which the business premises are located.
**(4)** If the national instant criminal background check system notifies the licensee that the information available to the system does not demonstrate that the receipt of a firearm by such other person would violate subsection (g) or (n) or State law, and the licensee transfers a firearm to such other person, the licensee shall include in the record of the transfer the unique identification number provided by the system with respect to the transfer.
**(5)** If the licensee knowingly transfers a firearm to such other person and knowingly fails to comply with paragraph (1) of this subsection with respect to the transfer and, at the time such other person most recently proposed the transfer, the national instant criminal background check system was operating and information was available to the system demonstrating that receipt of a firearm by such other person would violate subsection (g) or (n) of this section or State law, the Attorney General may, after notice and opportunity for a hearing, suspend for not more than 6 months or revoke any license issued to the licensee under section 923, and may impose on the licensee a civil fine of not more than $5,000.
**(6)** Neither a local government nor an employee of the Federal Government or of any State or local government, responsible for providing information to the national instant criminal background check system shall be liable in an action at law for damages--
**(A)** for failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section; or
**(B)** for preventing such a sale or transfer to a person who may lawfully receive or possess a firearm.


18 U.S.C.A. § 922 (West)


**(g)** It shall be unlawful for any person--
**(1)** who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
**(2)** who is a fugitive from justice;

10

**(3)** who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));

**(4)** who has been adjudicated as a mental defective or who has been committed to a mental institution;

**(5)** who, being an alien--

**(A)** is illegally or unlawfully in the United States; or

**(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)));

**(6)** who has been discharged from the Armed Forces under dishonorable conditions;

**(7)** who, having been a citizen of the United States, has renounced his citizenship;

**(8)** who is subject to a court order that--

**(A)** was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

**(B)** restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

**(C)(i)** includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

**(ii)** by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or

**(9)** who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C.A. § 922 (West)

**(n)** It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

11

**EXHIBIT 9**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

| | |
|---|---|
| STATE OF KANSAS,<br>*ET AL.*<br><br>　　*Plaintiffs,*<br><br>v.<br><br>MERRICK GARLAND,<br>*ET. AL.*<br><br>　　*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

Civil Action No. _____

---

### DECLARATION OF BRET FANNING

---

I, Bret Fanning, declare as follows:

1. I am over 18 years of age, have personal knowledge of the matters set forth herein, and am competent to make this Declaration.

2. My name is Bret Fanning.  I serve as the Excise Tax Administrator for the Wyoming Department of Revenue. I can competently testify as to the contents of this Declaration if called upon to do so.

3. In my capacity, I am responsible for the administration of Wyoming's excise tax system. This includes overseeing vendor licensing as well as the reporting and collection of excise

1

tax from transactions involving tangible personal property. As a result of my current duties, I am familiar with the Wyoming's tax code and how it relates to both gun shows and online sale of firearms in the State of Wyoming.

4. Wyoming imposes an excise tax upon the sales price of "tangible personal property" within the State under Wyo. Stat. Ann. §§ 39-15-103 and 39-16-103. In most instances, such taxes are collected by licensed retail vendors directly from their customers. Those vendors then report and remit the collected tax to the Department of Revenue.

5. Most retail sales of firearms in Wyoming are subject to the imposition of an excise tax since those items fall within the statutory definition of "tangible personal property" under Wyo. Stat. Ann. §§ 39-15-101(a)(ix) and 39-16-101(a)(vi). Firearm sales may occur in "brick-and-mortar" shops, as internet purchases, or at gun show events. In each sales situation, the seller is generally required to collect and remit tax from customers.

6. There is an underlying State mandated 4% excise tax rate that applies to the sale of firearms at "brick-and-mortar" shops, at gun shows, and via the internet. In addition, each Wyoming county and local jurisdiction may further increase the tax rate above the 4% State mandated excise tax rate.

7. For firearms sales conducted through the internet, the State imposes the obligation to collect excise tax on non-Wyoming based sellers, if those sellers meet minimal statutory sales thresholds under Wyo. Stat. Ann. § 39-15-501.

8. If there is a decrease in firearm sales in Wyoming it will naturally result in a decrease in State excise tax revenue.

2

I declare under penalty of perjury under the laws of the United States of American and the State of Wyoming that the foregoing is true and correct.

Executed on May 1st, 2024.

BRET FANNING
Excise    Tax    Administrator,    Wyoming
Department of Revenue

3

196

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION**

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § | |
| *Plaintiffs,* | § § § | |
| v. | § § § | Civil Action No. 2:24-cv-88 |
| MERRICK GARLAND, *ET. AL.* | § § § | |
| *Defendants.* | § § § § § § § § § § § § | |

## DECLARATION OF JOSEPH E. MAYER

I, Joseph E. Mayer, declare as follows

1. I am a Lead Policy Analyst at the Virginia Department of Taxation. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I have served as a Lead Policy Analyst at the Virginia Department of Taxation for 17 years.

3. Prior to this, I served as a Senior Policy Analyst at the Virginia Department of Taxation for 5 years.

4. As a result of my current duties, I am familiar with Virginia's tax code and how it relates to the sale of firearms online and at gun shows.

5. Under Va. Code §§ 58.1-603 and 58.1-604, Virginia taxes the sale of firearms at gun shows by persons or businesses that regularly engage in the business of selling firearms.

6. Under Va. Code §§ 58.1-603 and 58.1-604, Virginia taxes the online sale of firearms that occur where the buyer is a resident of Virginia.

7. If there is a decrease in firearm sales at gun shows or online there will naturally be a decrease in state tax revenue.

8. Based on the information available the Final Rule in this case is expected to decrease the sale of unlicensed firearms dealers by 10%.  89 Fed. Reg. 29054.

9. If that were the case, it is likely that Virginia would see a decrease in sales tax revenue.

10. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the Commonwealth of Virginia that the foregoing is true and correct.


Executed in the City of Richmond, Virginia this 6th day of May 2024.

*Joseph E. May*

2

198

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, *ET AL.* | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | |
| MERRICK GARLAND, *ET. AL.* | § § § | Civil Action No. _____ |
| *Defendants.* | § § § § § § § § § § § | |

## DECLARATION OF DAVID FRANCIS

I, David Francis, declare as follows:

1. I am a Manager for the Business Tax Services Division at the Oklahoma Tax Commission. I am over the age of 18, and I have personal knowledge of the facts contained in this declaration. I could competently testify as to the contents of this Declaration if called upon to do so.

2. I have been employed with the Oklahoma Tax Commission for twenty-seven (27) years.

3. As a result of my current duties, I am familiar with the state's tax code and how it relates to gun sales.

4. Under Oklahoma Code 68 O.S. § 1354, the state taxes the sale of firearms, including those occurring at gun shows. *See* 68 O.S. § 1364.2.

5. Under Oklahoma Code 68 O.S. § 1402 and 68 O.S. § 1364.2, the state taxes the online sale of firearms that occur where the buyer is a resident of Oklahoma and the firearm is stored and/or used in the State of Oklahoma.

6. If there is a decrease in gun sales there will naturally be a decrease in state tax revenue.

7. Based on the information available, the Final Rule in this case is expected to decrease the sale of firearms by unlicensed firearms dealers. 89 Fed. Reg. 29054.

8. If that were the case, it is likely that Oklahoma would see a corresponding decrease in sales tax revenue.

9. Further the declarant sayeth naught.

I declare under penalty of perjury under the laws of the United States of America and the State of Oklahoma that the foregoing is true and correct.

Dated this 6ᵗʰ day of _____, 2024.

_____
David Francis, Oklahoma Tax Commission

Subscribed and sworn to before me this 6ᵗʰ day of May _____, 2024, in the County of Oklahoma, State of Oklahoma.

(seal)

_____
Notary Public

DEZTINI LE JONAE HIGHTOWER
NOTARY PUBLIC
Commission #
21005590
My Commission
Expires 04-22-2025
STATE OF OKLAHOMA

2

200

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | | |
|---|---|---|
| STATE OF KANSAS, ET AL., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| MERRICK GARLAND IN HIS | § | Civil Action No. 6:24-cv-01086-TC-TJJ |
| OFFICIAL CAPACITY AS ATTORNEY | § | |
| GENERAL OF THE UNITED STATES, | § | |
| ET AL., | § | |
| | § | |
| *Defendants.* | | |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................................1

LEGAL STANDARD .........................................................................................................4

ARGUMENT ......................................................................................................................4

    I.    Plaintiffs Lack Standing and Fail to Establish Irreparable Harm..................................4

        A.    The State Plaintiffs Demonstrate Neither Standing Nor Irreparable Harm.................4

        B.    The Individual Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge and Fail to Show Irreparable Harm .................................................................7

        C.    Chisholm Trail Also Lacks Standing and Fails to Show Irreparable Harm..................9

    II.    Plaintiffs Are Not Substantially Likely to Succeed on the Merits ...............................9

        A.    Defendants Have Authority to Promulgate the Rule.........................................9

        B.    The Rule Is Consistent with the Text of the GCA.........................................12

        C.    The Rule Does Not Implicate the Major Questions Doctrine ....................................15

        D.    The Rule Is Not Unconstitutionally Vague ....................................................15

        E.    The Rule Is Not Arbitrary And Capricious ....................................................16

        F.    The Rule Comports with the Second Amendment.........................................17

    III.    The Balance of Equities and Public Interest Weigh Against Preliminary Relief .................18

    IV.    Any Relief Should Be Limited........................................................................19

CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Abramski v. United States*,
573 U.S. 169 (2014) ................................................................................................................. 2

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987) ............................................................................................................... 20

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ................................................................................................ 20

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) .......................................................................................... 17

*Bradford v. DOL*,
101 F.4th 707 (10th Cir. 2024) .......................................................................................... 15

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................................... 20

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...................................................................................................... 6, 7, 9

*Cole v. USDA*,
33 F.3d 1263 (11th Cir. 1994) ............................................................................................ 11

*Colo. Outfitters Ass'n v. Hickenlooper*,
823 F.3d 537 (10th Cir. 2016) .......................................................................................... 8, 9

*Colorado v. EPA*,
989 F.3d 874 (10th Cir. 2021) .................................................................................. 4, 5, 7, 9

*Cox v. Louisiana*,
379 U.S. 559 (1965) ............................................................................................................... 16

*Dias v. City & Cnty. of Denver*,
567 F.3d 1169 (10th Cir. 2009) .......................................................................................... 16

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................................................................... 17

*Farm Bureau Prop. & Cas. Ins. Co. v. Biggs*,
No. 2:20-cv-2558, 2021 WL 1348317 (D. Kan. Feb. 25, 2021) ...................................... 6

*FDA v. All. for Hippocratic Med.*,
No. 23-235, slip. op. (U.S. June 13, 2024) ....................................................................... 8

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)............................................................................................14

*Florida v. Mellon*,
    273 U.S. 12 (1927)..............................................................................................5

*FTC v. Mandel Bros., Inc.*,
    359 U.S. 385 (1959)............................................................................................14

*Garrison v. Baker Hughes Oilfield Operations, Inc.*,
    287 F.3d 955 (10th Cir. 2002)............................................................................20

*Gill v. Whitford*,
    585 U.S. 48 (2018)..............................................................................................19

*Holland Livestock Ranch v. United States*,
    655 F.2d 1002 (9th Cir. 1981)............................................................................11

*Jewell v. United States*,
    749 F.3d 1295 (10th Cir. 2014)..........................................................................11

*Labrador v. Poe ex. rel Poe*,
    144 S. Ct. 921 (2024)..........................................................................................20

*Licon v. Ledezma*,
    638 F.3d 1303 (10th Cir. 2011)..........................................................................17

*Maryland v. King*,
    567 U.S. 1301 (2012)..........................................................................................19

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024)...............................................................................18

*N.M. Health Connections v. HHS*,
    946 F.3d 1138 (10th Cir. 2019)..........................................................................17

*New Mexico v. Dep't of Interior*,
    854 F.3d 1207 (10th Cir. 2017)..........................................................................20

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)..........................................................................................17, 18

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................................4

*Nova Health Sys. v. Gandy*,
    416 F.3d 1149 (10th Cir. 2005)............................................................................6

*NRA v. Brady*,
  914 F.2d 475 (4th Cir. 1990) ................................................................................................ 10

*Pugin v. Garland*,
  599 U.S. 600 (2023) ............................................................................................................... 14

*Rangel-Lopez v. Cox*,
  344 F. Supp. 3d 1285 (D. Kan. 2018) .................................................................................... 4

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 (1945) ............................................................................................................... 11

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................................................................. 9

*Sheldon v. BOP*,
  No. 23-cv-00273, 2024 U.S. Dist. LEXIS 21698 (D. Colo. Feb. 7, 2024) ......................... 19

*Sierra Club, Inc. v. Bostick*,
  539 F. App'x 885 (10th Cir. 2013) ........................................................................................ 18

*Sperry v. McKune*,
  445 F.3d 1268 (10th Cir. 2006) ............................................................................................. 16

*StreetMediaGroup, LLC v. Stockinger*,
  79 F.4th 1243 (10th Cir. 2023) ............................................................................................. 16

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ....................................................................................................... 4, 7, 8

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................................... 19

*U.S. Steel Corp. v. Astrue*,
  495 F.3d 1272 (11th Cir. 2007) ............................................................................................. 11

*United States v. Biswell*,
  406 U.S. 311 (1972) ............................................................................................................... 19

*United States v. Hosford*,
  82 F. Supp. 3d 660 (D. Md. 2015) ........................................................................................ 19

*United States v. King*,
  735 F.3d 1098 (9th Cir. 2013) ............................................................................................... 13

*United States v. Morales-Lopez*,
  92 F.4th 936 (10th Cir. 2024) ............................................................................................... 15

*United States v. Nat'l Dairy Prods. Corp.,*
372 U.S. 29 (1963) ...................................................................................16

*United States v. Platte,*
401 F.3d 1176 (10th Cir. 2005) ..............................................................16

*United States v. Texas,*
599 U.S. 670 (2023) .................................................................................5

*USX Corp. v. Barnhart,*
395 F.3d 161 (3d Cir. 2004) ...................................................................11

*Util. Air Regul. v. EPA,*
573 U.S. 302 (2014) ...............................................................................15

*Vincent v. Garland,*
80 F.4th 1197 (10th Cir. 2023) ........................................................ 17, 18

*Welch v. City of Pratt,*
214 F.3d 1219 (10th Cir. 2000) ..............................................................12

*Wyoming v. U.S. Dep't of Interior,*
674 F.3d 1220 (10th Cir. 2012) ................................................... 5, 6, 7, 9

**Statutes**

5 U.S.C. § 705 .................................................................................................20

18 U.S.C. § 921 ................................................................................................1

18 U.S.C. § 921(a)(13) ............................................................................. 10, 13

18 U.S.C. § 921(a)(21)(C) .......................................................................... 2, 13

18 U.S.C. § 921(a)(22) ............................................................................. 12, 14

18 U.S.C. § 922(a)(1)(A) ..................................................................................1

18 U.S.C. § 922(b)(5) .......................................................................................1

18 U.S.C. § 922(c) ............................................................................................1

18 U.S.C. § 922(t)(1) ........................................................................................1

18 U.S.C. § 923(g)(1)(A) ..................................................................................1

18 U.S.C. § 926(a) ...................................................................................... 9, 10

Pub. L. No. 99-308, 100 Stat. 449 (1986) ........................................................2

Pub. L. No. 117-159, 136 Stat. 1313 (2022) ............................................................... 1, 2

**The Constitution**

U.S. Const. amend. II ....................................................................................................17

**Legislative Materials**

*Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) ......................................20

**Regulations**

27 C.F.R. § 478.11 ....................................................................................3, 13, 16, 17

27 C.F.R. § 478.13(b) ................................................................................................ 3, 16

27 C.F.R. § 478.13(c) ............................................................................................. 3, 4, 12

27 C.F.R. § 478.13(d) ................................................................................................ 4, 15

27 C.F.R. § 478.13(e) ......................................................................................................4

27 C.F.R. § 478.13(f) ......................................................................................................4

27 C.F.R. § 478.121 .........................................................................................................1

88 Fed. Reg. 61,993 (Sept. 8, 2023) ............................................................................10

Final Rule, *Definition of "Engaged in the Business" as a Dealer in Firearms*,
    89 Fed. Reg. 28,968 (Apr. 19, 2024) ................................................................*passim*

**Other Authorities**

Chisholm Trail Antique Gun Association,
    https://www.ctaga.com/gun-show ............................................................................9

Comment of Attorney General of New York, et al., Definition of "Engaged in the Business" as a
    Dealer in Firearms, Docket No. ATF 2022R-17 (Dec. 7, 2023),
    https://ag.ny.gov/sites/default/files/letters/multistate-comment-on-nprm-eitb-atf-rule.pdf ......20

In the Gun Control Act (GCA), Congress required those engaged in the business of dealing in firearms to obtain a federal license and comply with a series of verification, background-check, and recordkeeping obligations when transferring firearms. Recognizing the harm to public safety caused by unlicensed dealing in firearms, Congress recently amended the GCA *via* the Bipartisan Safer Communities Act (BSCA) to expand the definition of engaged in the business of dealing. In the Rule under review,[1] the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) exercised its statutory authority to promulgate regulations necessary to carry out the GCA by clarifying what it means to be "engaged in the business" of dealing in firearms and setting forth examples of conduct that presumptively does, or does not, rise to the level of engaging in the business of dealing. Far from changing the GCA's definition of engaging in the business, as Plaintiffs wrongfully suggest, the Rule clarifies applications of the GCA in ways that are consistent with statutory text. Plaintiffs fail to make the required clear and unequivocal showing that they are entitled to preliminary injunctive relief. Plaintiffs lack standing and have not shown irreparable harm, they are not likely to succeed on the merits, and the balance of the equities weighs strongly against enjoining this public safety regulation.

## BACKGROUND

The Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, as amended by the Bipartisan Safer Communities Act of 2022, Pub. L. No. 117-159, 136 Stat. 1313, requires those "engage[d] in the business of . . . dealing in firearms" to obtain a federal license. 18 U.S.C. § 922(a)(1)(A). When transferring firearms, federal firearms licensees (FFLs) generally must meet the transferee in person, verify the transferee's identity, and submit the transferee's information to the FBI's National Instant Background Check System (NICS), which will deny the transaction if the background check reveals that the transferee is prohibited from possessing or receiving the firearm. *Id.* §§ 922(b)(5), (c), (t)(1). FFLs also maintain records of acquisitions and dispositions of firearms, which enable tracing of firearms recovered from crime scenes through a process in which ATF queries records maintained by FFLs to trace the firearm to its first retail purchaser. 18 U.S.C. §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R.

---

[1] Final Rule, *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

§§ 478.121-478.134.  These requirements serve the "twin goals" of "keep[ing] guns out of the hands of criminals and others who should not have them, and . . . assist[ing] law enforcement authorities in investigating serious crimes."  *Abramski v. United States*, 573 U.S. 169, 180 (2014).  Conversely, unlicensed dealing can allow criminals to obtain firearms and hinder tracing.

Congress first defined "engaged in the business" of dealing in firearms in 1986 as part of the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986).  In the BSCA, Congress expanded the GCA's definition to eliminate a requirement that a person have "the principal objective of livelihood and profit," replacing it with a required intent "to predominantly earn a profit."  136 Stat. at 1324-25, § 12002.  One of the events that prompted Congress to enact the BSCA was a mass shooting in Texas in which the shooter was denied a firearm by an FFL due to mental illness but then obtained the firearm he used in the shooting from an unlicensed dealer who did not conduct a background check.  *See* 89 Fed. Reg. at 28,971-72 & nn.26-29.

ATF promulgated the Rule to implement the BSCA and clarify the circumstances under which a person is engaged in the business of dealing in firearms.  Although Plaintiffs accuse ATF of "redefin[ing]" engaging in the business of dealing, Pls. Mem. in Support of Mot. for TRO & Preliminary Injunction 10, ECF No. 104 ("Mem."), the Rule actually sets forth a definition of engaging in the business of dealing that is substantively identical to the statutory definition:

| GCA, 18 U.S.C. § 921(a)(21)(C) | Rule, 89 Fed. Reg. at 29,091 |
|---|---|
| The term "engaged in the business" means— . . . as applied to a dealer in firearms, as defined in section 921(a)(11)(A), a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms; | **§478.13 Definition of "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker."** <br>(a) *Definition.* A person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms.  The term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms. |

The Rule also defines certain terms in the GCA and clarifies the application of the statutory standard in ways that are consistent with the statutory text.  For example, the Rule provides that

2

209

purchases and sales include exchanges for anything of value, not just cash, 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11, definitions of "purchase," "sale," and "something of value"), consistent with dictionary definitions and case law, *id.* at 28,974-75 & nn.49-56.  The Rule provides that dealing activity is treated the same regardless of whether it occurs at a store, a gun show, online, or at any other location, *id.* at 29,090 (27 C.F.R. § 478.11, definition of "Dealer"), consistent with statutory text, case law, and ATF's longstanding interpretation, *id.* at 28,973-74 & nn.35-45.

The Rule defines "personal collection," which triggers an exclusion from the statute for certain activity that would otherwise qualify as engaging in the business of dealing, as including "[p]ersonal firearms that a person accumulates for study, comparison, exhibition . . . or for a hobby," but not including "any firearm purchased for the purpose of resale with the predominant intent to earn a profit" or "firearms accumulated primarily for personal protection."  *Id.* at 29,090 (27 C.F.R. § 478.11). ATF explained that this definition is consistent with dictionary definitions and case law interpreting the term "collection" in the GCA.  *Id.* at 28,980 & n.88; *id.* at 29,038 & nn.215-217.

The Rule provides that a "fact-specific inquiry" governs whether someone is engaged in the business, such that "there is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms."  *Id.* at 29,091 (27 C.F.R. § 478.13(b)).  Plaintiffs focus on language stating that "even a single firearm transaction or offer to engage in a transaction, when combined with other evidence (*e.g.,* where a person represents to others a willingness and ability to purchase more firearms for resale), may require a license."  *Id.*  Plaintiffs argue that this language suggests that ATF treats isolated firearms transactions as firearms dealing, but that provision clarifies that "a single isolated firearm transaction" is insufficient.  *Id.*  ATF explained that this provision was supported by case law upholding convictions for unlicensed dealing where the defendants held themselves out as firearms dealers and engaged in significant legwork to set up firearms businesses but were apprehended before few, if any, firearms sales were completed.  *See id.* at 28,976 & n.67.

The Rule sets forth circumstances that give rise to rebuttable presumptions, applicable in civil and administrative proceedings (but not criminal proceedings), that a person is engaged in the business of dealing in firearms or has the predominant intent to earn a profit.  *Id.* at 29,091 (27 C.F.R.

3

§ 478.13(c), (d)(2)).  ATF explained that case law and ATF's enforcement experience indicated that the activities set forth in the presumptions were generally indicative of engaging in the business or having the predominant intent to earn a profit.  *See id.* at 28,977-79 & nn.72, 74-84; *id.* at 28,981-82 & nn.97-103.  The Rule also sets forth types of conduct that do not support a presumption that a person is engaged in the business of dealing in firearms and can be used to rebut the Rule's presumptions.  *Id.* at 29,092 (27 C.F.R. § 478.13(e), (f)).

<h3 style="text-align:center">LEGAL STANDARD</h3>

A movant seeking a preliminary injunction "must make a clear and unequivocal showing it is entitled to such relief."  *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (citation omitted).  "To obtain a preliminary injunction, the movant must show (1) it is substantially likely to succeed on the merits, (2) it will suffer irreparable injury if the injunction is denied, (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction, and (4) the injunction would not be adverse to the public interest."  *Id.* (citation omitted).  The same requirements apply to requests for "a stay of agency action under section 705 of the APA," *id.*, and temporary restraining orders, *Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018).  The balance of harms and public interest factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

<h3 style="text-align:center">ARGUMENT</h3>

## I.  Plaintiffs Lack Standing and Fail to Establish Irreparable Harm

Plaintiffs' demand for a preliminary injunction should be denied at the threshold because they fail to demonstrate that they have standing and will also suffer irreparable harm absent such relief.

### A.  The State Plaintiffs Demonstrate Neither Standing Nor Irreparable Harm

Twenty states, led by Kansas, assert that they have standing to challenge the Rule because (1) they "have already lost (and will continue to lose) tax revenue under [the Rule]," and (2) the Rule "will impose additional administrative costs" related to federally mandated background checks.  Mem. 5, 7.  But neither of these asserted injuries is "concrete" and "imminent" enough to confer Article III standing, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), nor do they constitute irreparable

harm, *Colorado*, 989 F.3d at 884 ("[A] speculative or theoretical injury will not suffice.").

The States' first asserted injury hinges on there being (1) a decrease in the number of unlicensed firearms sellers at gun shows because of the Rule; (2) a corresponding decrease in table rentals, attendance, and firearms sales at such shows; and (3) ultimately, a reduction in sales tax revenues derived from gun shows.  Mem. 5-6; *see* Compl. ¶¶ 61-92, ECF No. 1.  But such incidental downstream effects of a federal policy on state tax revenues do not qualify as judicially cognizable injuries for purposes of standing.  Indeed, the Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "*direct* injury" from federal action, and the Court rejected a theory of standing based on a federal policy's "remote and indirect" effects on a state's property tax base.  *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927).  The Court reiterated this same principle just last year when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," a State's "claim for standing" when asserting such indirect effects "can become more attenuated."  *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).  "[T]he unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest . . . that impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing."  *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (citation omitted).

In any event, the States' reduced-revenue theory fails on its own terms.  The States tie that injury in part to an expected, but uncertain, decrease in firearms sales (and sales taxes assessed) at gun shows.  *See, e.g.*, Fanning Decl. ¶ 8, ECF No. 104-9 ("*If* there is a decrease in firearm sales in Wyoming it will naturally result in a decrease in State excise tax revenue.") (emphasis added).  But this bare assumption rests on a flawed premise: Even if the Rule marginally reduces the number of *individuals* who sell firearms, *see* 89 Fed. Reg. at 29,072, that does not imply that the aggregate number of *firearms* sold in each state will decrease in equal measure, or even at all.  To the contrary, it is entirely possible, if not expected, that those wanting to purchase firearms will just go elsewhere, including to FFLs, to do so.  And that would mean that roughly the same number of firearms will be sold in the Plaintiff States under the Rule, just from a slightly smaller pool of sellers, such that no decrease in sales tax

revenues ever materializes.  The Rule, in fact, contemplates this very outcome.  *See id.* at 29,066 ("[T]he overall number of firearm transactions are unlikely to be affected [by the Rule].").

The States also tie their reduced-revenue injury to a decrease in taxes assessed on tables at gun shows and gun show admissions.  Mem. 6.  And two gun show promoters submitted declarations claiming that they recently cancelled gun shows in Tennessee because of the Rule.  *See* Chipley Decl. ¶ 18, ECF No. 104-1; Kehrli Decl. ¶ 12, ECF No. 104-2.  Any resulting revenue loss, however, is not fairly traceable to the Rule but rather to "independent" business decisions made by "some third party not before the court."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005) (citation omitted).  That several other gun shows are still scheduled to take place in the Plaintiff States in the coming weeks undermines any suggestion that cancellations are an inevitable consequence of or reasonable response to the Rule.  *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (explaining that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves").  Relatedly, Plaintiffs offer no evidence indicating that, absent a complete cancellation, the decision by certain unlicensed vendors to not participate in a given gun show will necessarily result in lower sales tax revenues.  Such vendors could be readily replaced by FFLs or other vendors unaffected by the Rule, and nothing mandates that those new vendors would sell fewer firearms or that gun show attendance would inevitably decline.  And more generally, even assuming that *some* gun-show-related tax revenues might decline, there is no reason to doubt that the money that would have otherwise been spent at those shows will simply be spent on other taxable goods and services.  Any overall loss of state tax revenues thus remains entirely speculative, further underscoring why courts have generally rejected standing based on the incidental revenue effects of a federal policy.  *See Wyoming*, 674 F.3d at 1234.

The evidence the States offer is notable for what it fails to show.[2]  It fails to show that any State has suffered a "specific loss" of gun-show-related tax revenues that is directly attributable to the

---

[2] The Plaintiffs' declarants' assertions that gun shows in Sparta, TN and Broken Arrow, OK were also cancelled because of the Rule is quintessential hearsay that the Court need not credit.  *See Farm Bureau Prop. & Cas. Ins. Co. v. Biggs*, No. 2:20-cv-2558, 2021 WL 1348317, at *4 (D. Kan. Feb. 25, 2021).  And even assuming the cancelled Hamilton, MT gun show, Mem. 6, caused some loss of revenue— Plaintiffs fail to allege in their Complaint whether or how Montana even taxes such shows, *see* Compl.

Rule (as opposed to a promoter's decision to cancel a show). *Wyoming*, 674 F.3d at 1235. And the States' "assertions of future lost tax revenues are merely speculative." *Id.* For example, the claim that "the great majority" of unlicensed firearms sellers "are scared to death" of the Rule, Chipley Decl. ¶ 12, is the epitome of "rhetorical exaggeration." *Wyoming*, 674 F.3d at 1236 (citation omitted). The States assert that the Rule has reduced "the number of unlicensed sellers at gun shows . . . by an estimated 30-40%," Chipley Decl. ¶ 14; *see* Mem. 6, but they provide no basis for extrapolating that figure to other gun shows in other states organized by promoters other than their two declarants. This reduced-revenue theory is too "conjectural" and "hypothetical" to satisfy Article III, *Susan B. Anthony List*, 573 U.S. at 158, or to constitute irreparable harm, *see Colorado*, 989 F.3d at 884.

Tennessee's and New Hampshire's second asserted injury—that the Rule will impose "additional administrative costs" related to federally mandated background checks these States conduct themselves—likewise fails to confer standing for several reasons. First, the expected increase in the number of private firearms sellers obtaining licenses is caused by the *statutory* broadening of the definition of being "engaged in the business," meaning that any corresponding increase in background checks is traceable to the BSCA—which Plaintiffs do not challenge—rather than the Rule. Second, any attendant increase in administrative costs would result from a state's voluntary decision to conduct background checks itself, which federal law does not require. *See Colorado*, 989 F.3d at 888 (explaining that an injury stemming from a state's "legislative decision" was "self-inflicted" and thus "not legally cognizable" for standing purposes). And third, the States offer nothing beyond "conclusory statements" in a two-page declaration to evidence any additional administrative costs. *Wyoming*, 674 F.3d at 1233-34 (finding no standing). Such assertions of "*possible* future injury" fail to establish standing, *Clapper*, 568 U.S. at 409 (citation omitted), or irreparable harm, *see Colorado*, 989 F.3d at 884.

### B. The Individual Plaintiffs Lack Standing to Bring a Pre-Enforcement Challenge and Fail to Show Irreparable Harm

Plaintiffs Journey, Black, and Maxey base their standing to sue on their subjective fear that

---

¶¶ 60-92—that loss, like the two Tennessee shows, is attributable to the decision to cancel the show entirely and not the Rule.

there is a "realistic danger" they will be "subject to penalties" under the Rule for firearms-related conduct that they "regularly (and legally) engage in." Mem. 7-8.  To bring such a pre-enforcement challenge, however, the individual plaintiffs must establish that they "intend[] to engage in conduct that violate[s] the Rule and "face[] a credible threat of prosecution as a result." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 546 (10th Cir. 2016); *see Susan B. Anthony List*, 573 U.S. at 158-59; *FDA v. All. for Hippocratic Med.*, No. 23-235, slip op. at 8 (U.S. June 13, 2024) ("the injury must have already occurred or be likely to occur soon").  And they fall well short of satisfying this standard.

The individual Plaintiffs would be subject to the Rule only if their firearms-related conduct amounts to being "engaged in the business" of dealing firearms.  Per their declarations, Journey and Black are "firearms hobbyist[s] and enthusiast[s]" who each maintain a large "personal collection of firearms"; attend between three and five gun shows per year; and buy and sell firearms at those shows to "enhance" or "expand" their collections.  Journey Decl. ¶¶ 3-4, ECF No. 104-4; Black Decl. ¶¶ 3-5, ECF No. 104-5.[3]  But to the extent Journey sells firearms to acquire ones he finds "particularly interesting in terms of history, design and craftmanship," Journey Decl. ¶ 4, the Rule excludes such occasional sales for the enhancement of a "personal collection." 89 Fed. Reg. at 29,092; *see id.* at 29,090 (defining "personal collection" to include firearms "accumulate[d] for study, comparison, [and] exhibition").  And Journey's and Black's occasional sales of self-defense firearms likewise do not constitute being "engaged in the business" because neither plaintiff further indicates that he "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business" and makes such sales with the predominant intent to "earn a profit."  *Id.* at 29,091; *see* Journey Decl. ¶ 5 (disclaiming profit as the "predominant purpose in collecting").  Both plaintiffs thus fail to establish that their conduct is even "arguably proscribed" by the Rule, making any "fear of future enforcement . . . wholly speculative." *Susan B. Anthony List*, 573 U.S. at 160, 163.

The individual plaintiffs suggest they have standing simply because they "believe[]" the Rule

---

[3] Maxey does not assert that he sells firearms.  *See* Maxey Decl. ¶ 4, ECF No. 104-6 ("At those gun shows I buy firearms to add to my personal collection.").  Any risk of future enforcement against him of a Rule that defines "engag[ing] in the business" of *firearms dealing* is thus nonexistent.

"applies to [them]" and will consequently "stop buying and selling firearms altogether." Mem. 8. But they cannot "manufacture standing merely by inflicting harm on themselves" based solely on their "subjective fear" of the Rule. *Clapper*, 568 U.S. at 416, 418. Separately, even if Journey and Black stop selling firearms because of the Rule, that "harm" is only temporary; if the Rule were later held invalid, the two would be able to complete any foregone sales, just "at a later date" following the "ordinary course of litigation"—which is the opposite of irreparable. *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

### C.    Chisholm Trail Also Lacks Standing and Fails to Show Irreparable Harm

Chisholm Trail likewise lacks standing. Chisholm Trail cannot base its standing on Black and Maxey, Mem. 9, because they lack standing. *See Colo. Outfitters Ass'n*, 823 F.3d at 550. And Chisholm Trail's assertions that the Rule will harm it directly by reducing revenue the organization earns from its gun shows are too speculative to confer standing. *See Wyoming*, 674 F.3d at 1235. Chisholm Trail offers no evidence indicating (1) how many vendors at its gun shows are unlicensed and what proportion of the revenue those vendors generate; (2) whether any vendors have signaled that they will not participate in Chisholm Trail's shows because of the Rule; (3) whether vendors who elect not to participate can be replaced (by FFLs or vendors unaffected by the Rule); and (4) whether, at the end of this chain of contingencies, Chisholm Trail will actually lose revenue. Any such revenue loss also does not amount to irreparable harm. Chisholm Trail's next gun show is scheduled for October 2024.[4] Accordingly, since it is not clear that any harm is "likely to occur before [the Court] rules on the merits, there is no need for preliminary relief" here. *Colorado*, 989 F.3d at 884 (citation omitted).

## II.    Plaintiffs Are Not Substantially Likely to Succeed on the Merits

### A.    Defendants Have Authority to Promulgate the Rule

Plaintiffs contend that ATF has "no statutory authority to redefine terms or create rebuttable presumptions" because "Congress[] intentionally limited [ATF's] authority to 'only . . . necessary' rules and regulations." Mem. 10. Yet in vesting in the Attorney General, and by delegation ATF, authority to prescribe "such rules and regulations as are necessary to carry out the provisions" of the GCA, 18

---

[4] *See* Chisholm Trail Antique Gun Association, https://www.ctaga.com/gun-show (last visited June 13, 2024).

U.S.C. § 926(a), the GCA "almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *NRA v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). In *Brady*, the court approved as "necessary" ATF regulations defining terms in the GCA. *See id.* at 480-81 (upholding ATF regulations defining "business premises" and "gun show or event"). Thus, ATF has authority to engage in necessary rulemaking, including by defining statutory terms.

Plaintiffs also assert without explanation that the "changed definitions" in the Rule are not necessary, including "carv[ing] out 'personal protection' firearms." Mem. 11. But ATF explained at length that the Rule was necessary to provide "clarity" regarding when a federal firearms license was required and to "deter[]" unlawful unlicensed dealing, 88 Fed. Reg. 61,993, 61,996 (Sept. 8, 2023), given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," 89 Fed. Reg. at 29,086. And ATF further determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,987. These are unquestionably valid regulatory objectives that justified providing further clarity regarding the operation of statutory terms. *Brady*, 914 F.2d at 479; *see also infra*, p. 17. ATF also explained in detail why including weapons accumulated primarily for personal protection in the definition of personal collection would contradict statutory text and allow a limited statutory exception to swallow the statutory rule. *See* 89 Fed. Reg. at 29,039-39. To be sure, an agency may not "redefine" a statutory term inconsistently with unambiguous statutory text, *see* Mem. 11, but that does not mean an agency cannot exercise its authority in a manner *consistent* with the text.

Plaintiffs also argue that ATF "is not authorized to promulgate rules to define any statutory terms" because "section 921(a) grants the Director rulemaking authority to define only the term 'curios and relics.'" Mem. 11. Plaintiffs argue that the "express grant of authority" to define the single term in § 921(a) "strongly suggests Congress withheld that same authority for other terms." *Id.* But Plaintiffs' premise is mistaken. Section 921(a)(13) states that ATF *must* use its rulemaking authority to define "curios or relics." 18 U.S.C. § 921(a)(13) ("curios or relics, as the Attorney General *shall* by regulation define . . . .") (emphasis added). "It is a basic canon of statutory construction that use of

10

the word shall indicates a mandatory intent." *Jewell v. United States,* 749 F.3d 1295, 1298 (10th Cir. 2014) (citation omitted). Therefore, the *expressio unius* canon suggests, at most, that ATF is not *required* to define other terms, not that it is *prohibited* from exercising its authority under § 926 to do so.

Plaintiffs also contend, again without explanation, that ATF lacks authority to create "presumptions as to whether someone is 'engaged in the business.'" Mem. 11. The Supreme Court has long recognized the validity of regulatory presumptions, and decades of precedent across the country have followed. *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 804-05 (1945)) (for "a statutory presumption or one established by regulation, the validity . . . depends upon the rationality between what is proved and what is inferred."). ATF, like any other federal agency, has general authority to promulgate regulations to effectuate its administration of the statutes it is charged with administering. Such regulations can include presumptions when such presumptions establish a rational nexus between the facts found and the facts to be presumed. *U.S. Steel Corp. v. Astrue,* 495 F.3d 1272, 1284 (11th Cir. 2007) ("Preliminarily, administrative agencies may establish presumptions, as long as there is a rational nexus between the proven facts and the presumed facts." (citation omitted)).[5] The creation of presumptions is an *inherent* power of an agency authorized to issue regulations or conduct adjudications and to administer a statute, regardless of whether the particular statute explicitly addresses presumptions. Moreover, "in challenging the validity of [a] regulatory presumption . . . [the Plaintiff] bears the heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed." *Cole,* 33 F.3d at 1267.

Plaintiffs confuse the issues by pointing out that the GCA is a criminal statute. Mem. 12. They appear to be arguing that because the statute has criminal elements, and because an agency interpretation of a criminal statute is not entitled to deference, the GCA cannot abide presumptions,

---

[5] *See also, e.g., USX Corp. v. Barnhart,* 395 F.3d 161, 171 (3d Cir. 2004) ("Presumptions may, of course, be established both by legislative bodies and by administrative agencies, but their validity depends as a general rule upon a rational nexus between the proven facts and the presumed facts." (citation omitted)); *Cole v. USDA,* 33 F.3d 1263, 1267 (11th Cir. 1994) ("The law is well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts."); *Holland Livestock Ranch v. United States,* 655 F.2d 1002, 1005 (9th Cir. 1981) ("Administrative agencies are entitled to create evidentiary presumptions.").

even those applicable only to civil and administrative proceedings. *Id.* This argument makes no sense. As noted above, promulgating presumptions is an inherent aspect of an agency's power to administer a statute. The presumptions simply provide rules about burdens of production in civil and administrative proceedings. 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)) (clearly stating that the presumptions do not apply to criminal proceedings). Those presumptions do not alter the meaning of the statute or the burden of proof applicable in the proceedings where they apply, and each is based on existing precedent, ATF's enforcement experience, statutory interpretation, and common sense.[6] Indeed, Plaintiffs do not even challenge the rational nexus underlying any of the Rule's specific presumptions, and therefore have failed to carry their burden to invalidate them. Nor is there anything infirm in the Rule's unremarkable observation that the presumptions might nevertheless be "useful" to a criminal court. *See id.* at 28,976 n.66 (explaining that courts may use permissive inferences in jury instructions); *see also*, *e.g.*, *Welch v. City of Pratt*, 214 F.3d 1219, 1224-25 (10th Cir. 2000) (permissive presumptions are not constitutionally suspect in criminal jury instructions).

## B.    The Rule Is Consistent with the Text of the GCA

Plaintiffs make three arguments, derived from a recent TRO order in Texas,[7] that the Rule misconstrues the GCA, but those arguments are incorrect. First, Plaintiffs argue that the Rule improperly permits enforcement on the basis of a single (or even no) firearm sale. Mem. 12. Contrary to Plaintiffs' contention, the Rule does not state that a single transaction or offer to transact, without other evidence, can satisfy the definition. *See* 89 Fed. Reg. at 29,091. But more importantly, the statutory definition requires that a person intend to profit by engaging in the repetitive purchase and resale of firearms. Section 921(a)(22) makes clear that "to predominantly earn a profit" in

---

[6] *See*, *e.g.*, Rule, 89 Fed. Reg. 28,977-78; *id.* at nn.73-77, 79; *id.* at 29,030 (supporting the Rule's presumption that a person repeatedly purchasing or reselling unlawful firearms or through unlawful methods, 27 C.F.R. § 478.13(c)(2), is engaged in the business of dealing); *id.* at 28,981-82, n.100; *id.* at 29,049 (supporting the Rule's presumption that a person securing financial services for the purpose of accepting repetitive payments for firearms transactions, 27 C.F.R. § 478.13(d)(2)(iv), is intending to predominantly earn a profit from the sale of firearms).
[7] The Texas court echoed its merits analysis in an opinion granting a preliminary injunction. Mem. Op. & Order, *Texas v. ATF*, 2:24-cv-89, ECF No. 70 (N.D. Tex. June 11, 2024). For the reasons explained here, Defendants disagree with both the TRO and preliminary injunction opinions.

§ 921(a)(21)(C) concerns the "intent underlying" firearms dealing and not actual sales or profit. Thus § 921(a)(21)(C) is properly understood as encompassing individuals who "devote[] time, attention, and labor" to dealing in firearms with the predominant intent to "earn a profit *through* the repetitive purchase and resale of firearms." (emphasis added). Thus, courts have long recognized that engaging in the business of dealing does not require multiple successful sales. *See* 89 Fed. Reg. at 28,976; *id.* at nn.67-68 (collecting cases); *see, e.g.*, *United States v. King,* 735 F.3d 1098, 1107 n.8 (9th Cir. 2013).

Second, Plaintiffs contend that ATF lacks authority to define "personal collection" and the Rule's definition undermines the GCA's safe harbor by excluding firearms accumulated primarily for personal protection. Mem. 13. As explained *supra*, pp. 9-11, ATF's authority to enact necessary regulations includes the authority to define statutory terms. The Rule's definition is well supported by a common-sense understanding of the statute and the generally accepted definition of a "collection." The Rule defines personal collection as the "[p]ersonal firearms that a person accumulates for study, comparison, exhibition . . . or for a hobby." 89 Fed. Reg. 29,090 (27 C.F.R. § 478.11). ATF explains that the "definition is from standard dictionary definitions" of the term "collection," which means "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby." *Id.* at 29,038; *id.* at n.216 (citing two dictionary definitions of "collection"). Moreover, the definition "is consistent with how the GCA views a 'collection,'" as the statute "defines the term 'collector' as 'any person who acquires, holds, or disposes of firearms as curios or relics,'" and ATF regulations (at the direction of Congress) have long further defined "curios or relics" as "'[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended . . . as offensive or defensive weapons.'" *Id.* (quoting 18 U.S.C. § 921(a)(13); 27 C.F.R. § 478.11). Finally, the Rule cites case law similarly reading "collection" narrowly. *Id.* at n.217.

Instead of addressing the validity of the definition, Plaintiffs contend that excluding "firearms accumulated primarily for personal protection" from the definition of personal collection violates a Second Amendment right to acquire firearms for personal defense and will exclude "every functioning firearm in the country." Mem. 13. This argument both misunderstands the Rule and flips the statutory definition on its head. It is the intent for which a firearm was obtained, and not the functionality of

13

the firearm, that determines whether it is part of a personal collection. Plaintiffs' disagreement is with the terms used in the statute not the Rule. As for the safe harbor, it is a limited *exception* to the general prohibition on unlicensed dealing in firearms. "[I]ncluding all firearms usable for self-defense in the definition of 'personal collection' is inconsistent with the statutory scheme" and would "allow the limited definitional exclusion for enhancing and liquidating a personal collection to swallow the rule . . . because one could nearly always claim that a firearm was purchased or sold to improve or liquidate the firearms one keeps for self-defense." 89 Fed. Reg. 29,038-39; *see also, e.g., Pugin v. Garland*, 599 U.S. 600, 607 (2023) (courts "should not lightly conclude that Congress enacted a self-defeating statute." (citation omitted)).

Nor is there any genuine Second Amendment concern with this exclusion. The definition itself has no bearing on any person's ability to purchase or sell firearms for personal protection; it simply means "persons who buy or sell such firearms cannot avail themselves of the statutory exception for personal collections" for those firearms. 89 Fed. Reg. 29,039; *see id.* at 29,090 ("nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use.").

Third, Plaintiffs argue that the Rule conflicts with the GCA because the statute requires that a dealer obtain actual profit from dealing in firearms. Mem. 13-14. Specifically, they contend that 18 U.S.C. § 921(a)(22) creates a negative corollary that actual profit is required in all circumstances with the exception of dealing in firearms "for criminal purposes or terrorism" where proof of actual profit is explicitly not required. But Plaintiffs' proposed reading contradicts the clear language in § 921(a)(22) that "to predominantly earn a profit" refers to "the intent underlying the sale or disposition of firearms," violating the principle that courts should "fit, if possible, all parts [of a statute] into a harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)). In contrast to Plaintiffs' internally contradictory construction, the Rule's construction of this provision harmonizes its language as signifying that a

predominant intent to profit is generally required, but such intent is not required when the purpose of firearms transactions is crime or terrorism. *See* 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)).[8]

### C.       The Rule Does Not Implicate the Major Questions Doctrine

Plaintiffs argue that the Rule violates the major questions doctrine because it "impose[s] universal background checks." Mem. 14-15. This premise is mistaken. The Rule explicitly states that it does not impose universal background checks, *see* 89 Fed. Reg. at 28,987, as Plaintiffs elsewhere acknowledge, Mem. 19. The Rule sets forth the same standard for engaging in the business as the GCA. *See supra*, p. 2. Dealing activity that falls short of that standard does not require licensing or background checks. *See* 89 Fed. Reg. at 29,091-92. As the Tenth Circuit has explained, the major questions doctrine "typically applie[s] . . . where an 'agency claim[s] to discover' regulatory authority for the first time 'in a long-extant statute.'" *Bradford v. DOL*, 101 F.4th 707, 727 (10th Cir. 2024) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Here, ATF has regulated firearms dealing for decades, many of the Rule's provisions derive from case law generated by past enforcement actions, and this Rule implements a recent law expanding the licensing requirement.

### D.       The Rule Is Not Unconstitutionally Vague

Plaintiffs cannot show that the Rule is unconstitutionally vague. Far from being vague, the Rule clarifies how the statutory standard for engaging in the business of dealing applies in various circumstances. Plaintiffs bring a facial vagueness challenge, but a litigant "cannot" challenge an enactment as void for vagueness "on its face . . . except in those *rare* instances where" it "is so totally vague as to proscribe no comprehensible course of conduct at all." *United States v. Morales-Lopez*, 92 F.4th 936, 941-42 (10th Cir. 2024) (cleaned up). Plaintiffs do not even attempt to meet this standard. Instead, they describe three purported "sources of vagueness" in the Rule, Mem. 15, but even the

---

[8] Plaintiffs' reading of "to predominantly earn a profit" conflicts not only with clear statutory text, but also with the BSCA's purposes. In the BSCA, Congress replaced the phrase "with the principal objective of livelihood and profit" with "to predominantly earn a profit," to *broaden* the definition of engaged in the business by replacing one intent requirement with a broader intent requirement that did not include an intent to earn a "livelihood." *See* 89 Fed. Reg. at 28,972 & nn.30-31 (discussing BSCA's legislative history). Yet Plaintiffs implausibly interpret the BSCA as *narrowing* the definition by introducing a new requirement of actual profit.

15

presence of "some arguably vague elements" does not make a rule "vague on its face in violation of the" Due Process Clause. *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009).

In any event, Plaintiffs are incorrect about the purported sources of vagueness. Plaintiffs argue that the exclusion of "firearms accumulated primarily for personal protection" from the definition of "personal collection," 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11), is vague, Mem. 15-16, but this provision sets forth a clear standard: If a person's primary purpose for accumulating a firearm is personal protection, it is not part of a personal collection. By contrast, if the primary purpose for accumulating the firearm is "study, comparison, exhibition . . . or for a hobby," 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11), then it is part of a personal collection. Plaintiffs also argue that the Rule is vague because it provides that "[T]here is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms." Mem. 16 (quoting 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(b)). But that provision reflects the GCA, which does not define engaging in the business by number of transactions. *See* 89 Fed. Reg. at 28,976, 29,086. The statute may have been simpler to apply if Congress had adopted a mechanical numerical test, "[b]ut the 'Constitution does not . . . impose impossible standards of specificity, and courts should remain ever mindful that general statements of the law are not inherently incapable of giving fair and clear warning.'" *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1253 (10th Cir. 2023) (*Sperry v. McKune*, 445 F.3d 1268, 1271 (10th Cir. 2006)).[9] Finally, simply saying that the Rule has "Byzantine complexity," Mem. 17, cannot satisfy Plaintiffs' heavy burden of showing unconstitutional vagueness.[10]

### E.    The Rule Is Not Arbitrary And Capricious

Review under the arbitrary and capricious standard is "very deferential," and "[c]ourts cannot second guess an agency's rulemaking decision when it provided reasons for its chosen course of

---

[9] Courts regularly uphold general standards against vagueness challenges. *See, e.g., Cox v. Louisiana*, 379 U.S. 559, 568 (1965) ("near" a courthouse); *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 31-33 (1963) ("unreasonably low prices"); *United States v. Platte*, 401 F.3d 1176, 1189-90 (10th Cir. 2005) ("national defense").

[10] The only example Plaintiffs provide of such complexity is the definition of personal collection. Mem. 17 n.19. As explained above, that definition is not unconstitutionally vague.

action." *N.M. Health Connections v. HHS*, 946 F.3d 1138, 1162, 1167 (10th Cir. 2019) (cleaned up). Plaintiffs' argument that ATF did not adequately explain why it enacted the Rule, Mem. 17-18, ignores the extensive explanation in the Rule itself.  ATF explained that it had observed "significant . . . noncompliance" with the GCA, 89 Fed. Reg. at 29,086, and the Rule would "provide clarity" regarding application of the GCA, *id.* at 28,968, and "increase compliance" with the GCA, *id.* at 28,994, which would significantly enhance public safety by leading to background checks that could be used to deny firearms to dangerous people and improving crime gun tracing, *id.* at 28,993-95.[11]  A rule is not arbitrary and capricious when the agency explains why the rule promotes the valid objective of "public safety." *Licon v. Ledezma*, 638 F.3d 1303, 1310-11 (10th Cir. 2011).

Plaintiffs' other arguments also fail.  The Rule's definition of "personal collection" did not come from "thin air," Mem. 17, as Plaintiffs assert.  ATF explained that the definition was supported by dictionary definitions, case law, statutory text, and ordinary meaning.  89 Fed. Reg. at 28,980 & n.88; *id.* at 29,037-39 & nn.215-217.  Plaintiffs are also incorrect to say that the Rule "mostly targets gun shows."  Mem. 18.  The Rule clarifies that dealing activity is treated the same whether it occurs at a gun show or anywhere else.  *See* 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11, definition of "dealer"); *see also id.* at 28,973-74 (explaining that this clarification is consistent with longstanding ATF practice).

### F.    The Rule Comports with the Second Amendment

The Second Amendment protects a right to "keep and bear arms," U.S. Const. amend. II, but it does not prohibit "laws imposing conditions and qualifications on the commercial sale of arms," which are "presumptively lawful," *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008). The Tenth Circuit has held that it is "bound by" *Heller*'s articulation of limitations of the Second Amendment.  *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015).  Accordingly, the Tenth Circuit has blessed other "presumptively lawful" laws identified in *Heller*: laws forbidding carrying weapons in government buildings, *Bonidy*, 790 F.3d at 1125, and felon-in-possession laws, *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023).  The Supreme Court clarified *Heller*'s holding in *New*

---

[11] *See also id.* at 28,990-29,067 (responses to comments criticizing the Rule); *id.* at 29,071-86 (cost-benefit analysis of Rule); *id.* at 29,086-87 (explaining why ATF rejected certain alternatives).

*York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), but *Bruen* "did nothing to disturb th[e] part of *Heller*" finding that regulations of commercial firearms sales are presumptively lawful. *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024). To the contrary, *Bruen* "approved the constitutionality" of "'shall-issue' licensing regimes" requiring a "criminal background check[]" before obtaining a "permit[]" to carry firearms. *Vincent*, 80 F.4th at 1201-02 (citing *Bruen*, 597 U.S. at 38 n.9). If it is permissible to require a license to *bear* arms, a right listed in the Second Amendment, there is no reason that it would violate the Second Amendment to require a license to *deal* firearms, an activity not mentioned in the amendment's text. *See McRorey*, 99 F.4th at 536-37 (Supreme Court has "continued to distinguish the treatment of prohibitions on 'keep[ing] and bear[ing]'" from "other ancillary firearm regulations such as background checks preceding sale"); *see also* 89 Fed. Reg. at 29,002 (citing cases holding that regulations on firearms sales do not violate the Second Amendment).

Moreover, the GCA's common-sense licensing requirements implemented by the Rule are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As ATF explained in the Rule's preamble, "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." 89 Fed. Reg. at 29,002. Examples cited in the Rule include laws requiring licenses and inspections to sell gunpowder, restrictions on exports of arms, and restrictions on selling firearms to those believed to be dangerous. *Id.* at 29,002-03. Plaintiffs argue that historical laws did not regulate commercial firearms sales in precisely the same way as the Rule does, Mem. 17-18, but a "historical twin" or "dead ringer" is not required; a "historical analogue" is sufficient. *Bruen*, 597 U.S. at 30.

## III.   The Balance of Equities and Public Interest Weigh Against Preliminary Relief

The balance of equities tips decidedly against preliminarily enjoining the regulation. Plaintiffs bear the burden of establishing each of the preliminary injunction factors, and they have not demonstrated that their "right to relief [is] clear and unequivocal" in this case. *Sierra Club, Inc. v. Bostick,* 539 F. App'x 885, 888-89 (10th Cir. 2013) (citation omitted). Plaintiffs have not established any harm to themselves in allowing the Rule to take effect or any public benefit from enjoining the Rule.

Plaintiffs cannot circumvent these failures by claiming risks to their constitutional rights since they cannot establish a likelihood of success on those grounds. *See, e.g., Sheldon v. BOP*, No. 23-cv-00273, 2024 U.S. Dist. LEXIS 21698, at *14 (D. Colo. Feb. 7, 2024). Nor, as Plaintiffs claim, Mem. 19, does the Rule actually change the statutory scheme or attach liability to any conduct that is lawful under the statute. *See supra*, pp. 12-15. There is no status quo to preserve because the BSCA expanded the universe of regulated people. Consequently, Plaintiffs have placed nothing on their side of the balance.

Conversely, ATF has exercised its authority to issue regulations to effectuate laws enacted by Congress to reduce violent crime. Congress specifically amended the definition of "engaged in the business" to encompass more conduct and to reduce the volume of unlicensed dealing in firearms. Under such circumstances, if the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Moreover, regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders." *United States v. Biswell*, 406 U.S. 311, 315 (1972); *see also United States v. Hosford*, 82 F. Supp. 3d 660, 667 (D. Md. 2015) ("[R]egulating firearms dealers . . . furthers the Government's substantial interest in protecting the community."). Therefore, granting preliminary relief would significantly harm the government's interest in law enforcement and public safety, and the balance tips decidedly against granting an injunction.

## IV.   Any Relief Should Be Limited

In the event the Court awards any relief, such relief should be no broader than necessary to remedy any demonstrated harms of any Plaintiffs found to have shown standing and irreparable harm. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted).

In particular, the Court should not order universal relief that prevents Defendants from implementing the Rule nationwide. Plaintiffs cite D.C. Circuit case law approving of universal

remedies, but in the Tenth Circuit, "[i]t is well settled an injunction must be narrowly tailored to remedy the harm shown." *Garrison v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002). A "universal injunction" would "def[y] . . . foundational principles" that "a federal court may not issue an equitable remedy 'more burdensome to the defendant than necessary to [redress]' the plaintiff's injuries." *Labrador v. Poe ex. rel Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., joined by Thomas, J., and Alito, J., concurring in the grant of the stay) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Moreover, nationwide injunctions "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top," and "sometimes give States victories they do not want," *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring), concerns especially salient here given that multiple challenges to the Rule are pending in other courts,[12] and many states support the Rule.[13] Plaintiffs' invocation of Section 705 of the APA does not support a universal remedy because that statute instructs courts to grant relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, and the House Report for the APA indicates that relief under § 705 should "normally, if not always, be limited to the parties complainant." *Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946).

If the Court concludes that Plaintiffs are likely to succeed in showing that only certain provisions or aspects of the Rule are unlawful, the Court should limit relief to those provisions or aspects, to effectuate the Rule's "[s]everability" section. 89 Fed. Reg. at 29,070; *see New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1233 (10th Cir. 2017) ("A severability clause creates a presumption" that an enactment is intended to be severable). Thus, any "objectionable provision[s]" should be temporarily enjoined while the others remain in place. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987).

## CONCLUSION

The Court should deny Plaintiffs' Motion for TRO and Preliminary Injunction.

---

[12] *Texas v. ATF*, Case No. 2:24-cv-89 (N.D. Tex.); *Florida v. ATF*, Case No. 8:24-cv-1041 (M.D. Fla.).
[13] Comment of Attorney General of New York, et al., Definition of "Engaged in the Business" as a Dealer in Firearms, Docket No. ATF 2022R-17 (Dec. 7, 2023), https://ag.ny.gov/sites/default/files/letters/multistate-comment-on-nprm-eitb-atf-rule.pdf (comment of 20 states and the District of Columbia supporting the Rule).

Dated: June 14, 2024

Respectfully submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
KERI L. BERMAN
ZACHARY W. SHERWOOD
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*

228

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this the 14th day of June, 2024, this document was electronically filed with the Clerk of the Court by using the CM/ECF system.

<u>*/s/ Jeremy S.B. Newman*</u>
Jeremy S.B. Newman

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
WICHITA DIVISION

| | |
|---|---|
| **STATE OF KANSAS,** *et al.* | |
| Plaintiffs, | |
| v. | |
| **MERRICK GARLAND**, *et al.*, | Civil Action No. 6:24-cv-01086-TC-TJJ |
| Defendants. | |

<u>PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR A TEMPORARY RESTRAINING ORDER / PRELIMINARY
INJUNCTION</u>

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii

INTRODUCTION.................................................................................................................1

ARGUMENT .........................................................................................................................1

    I.     Defendants' Arguments on Standing Lack Merit ..........................................1

    II.    Plaintiffs Are Likely to Prevail on the Merits.................................................3

         A.    Defendants Lack Authority to Redefine the Relevant Statutory Terms.................................................................................................................3

         B.    The Final Rule Conflicts with the Terms of Federal Statute.........................4

         C.    The Final Rule Violates the Second Amendment................................4

CONCLUSION ......................................................................................................................5

CERTIFICATE OF SERVICE............................................................................................13

## TABLE OF AUTHORITIES

### Cases

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023)..................................................................... 1

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................................................. 5

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251 (10th Cir. 2024) .................................... 1

*Garland v. Cargill*, 602 U.S __ (June 14, 2024) ................................................................. 1

*Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475 (4th Cir. 1990) ...................................................... 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ........................................ 5

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021)................................................................ 2

*Rio Grande Found. v. Oliver*, 57 F.4th 1147 (10th Cir. 2023)................................................... 3

*Tennessee v. Dep't of Educ.*, No. 22-5807, 2024 WL 2984295 (6th Cir. June 14, 2024 ......................... 2

*Texas v. United States*, 809 F.3d 135 (5th Cir. 2015), *aff'd by eq. div. ct. sub nom. United States v. Texas*, 136
     S. Ct. 2271 (2016)........................................................................................ 2

*United States v. Jackson*, 390 U.S. 570 (1968) ................................................................. 3

*United States v. King*, 735 F.3d 1098 (9th Cir. 2013) .......................................................... 4

*United States v. Rahimi*, 602 U.S. __ (2024) .................................................................... 5

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992)....................................................................... 2

### Statutes

18 U.S.C. § 921 .................................................................................................. 4

18 U.S.C. § 922.................................................................................................. 4

18 U.S.C. § 923.................................................................................................. 4

### Other Authorities

*Comment Letter of Senators John Cornyn and Thom Tillis regarding Notice of Proposed Rulemaking: Definition of*

"*Engaged in the Business*.................................................................................................. 1

## Acts of Congress

Act of May 22, 1794, 1 Stat. 369, ch. 33 § 1 ...................................................................... 5

## INTRODUCTION

At the outset, two overarching points bear mentioning. First, on June 11, 2024, the Northern District of Texas issued a preliminary injunction barring enforcement of the Final Rule in the four plaintiff states and against the private plaintiffs. *Texas v. ATF*, 2:24-cv-89, ECF No. 70 (attached as Ex. 1). Defendants in the instant case offer no specific responses to that decision, other than to mention in a footnote that they "disagree" (at 12 n.7). Second, Defendants implausibly claim (at 2) that the Final Rule reflects the intention of Congress when it passed the BSCA. To the extent this Court considers legislative intent (and it need not here, as the plain language is clear[1]), Defendants' claim is false. Senators John Cornyn and Thom Tillis provided votes necessary to pass the BSCA. They wrote a comment letter opposing what would become the Final Rule.[2] They stated, "As chief negotiators and drafters of the BSCA, we can say with certainty that the BSCA would not have passed with Section 12002 had we contemplated this proposed rule or anything remotely similar to it." They described it as "a material breach of our agreement and understanding when we negotiated in good faith a bipartisan bill."[3] They "abandon[] the text" of the law they claim to interpret. *Cargill*, *supra*, slip op. at 17. The Court should prevent this.

## ARGUMENT

### I.     Defendants' Arguments on Standing Lack Merit

Defendants do not challenge the rule that "[i]f at least one plaintiff has standing" the suit should "move forward." *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023). For good reason: the *Nebraska* Court stopped its analysis after holding one State had standing on just one theory. *Id.*; *see also Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1262 (10th Cir. 2024) ("At least one plaintiff had standing to seek a preliminary injunction regarding each Policy.").

Defendants argue (at 5) that the States' loss of tax revenue is insufficient to confer standing. That is incorrect. Loss of tax revenue is a cognizable harm. *New York v. Yellen*, 15 F.4th

---

[1] *See Garland v. Cargill*, 602 U.S __, slip op. at 1 (June 14, 2024) (Alito, J., concurring).
[2] *Comment Letter of Senators John Cornyn and Thom Tillis regarding Notice of Proposed Rulemaking: Definition of "Engaged in the Business," located at* https://tinyurl.com/3ndz2uza.
[3] *Id.*

569, 576 (2d Cir. 2021) (noting that "specific lost tax revenues . . . suffice to support standing" and differ from "allegations of generalized economic harm only"). Defendants incorrectly liken this case to ones where only a *speculative* loss of *unspecified* taxes is alleged. As the court in *Texas* held regarding the same Final Rule, "in line with cases like *Wyoming v. Oklahoma*, [Plaintiff States] allege 'a direct injury in the form of a loss of *specific* tax revenues.' 502 U.S. 437, 438 (1992)." Ex. 1 at 7 (emphases in original). The Final Rule will "reduc[e] total attendance and sales at gun shows. This is not speculative." *Id.* at 6. Defendants also fail to address the fact that the 30% drop in sellers at gun shows since the Final Rule has been in effect has *already* caused a drop in taxes collected in Plaintiff States. *See* Chipley Dec. 14-22. Grasping at straws, Defendants suppose (at 5) that perhaps those lost gun sales might be replaced with purchases of the same guns at the stores of gun dealers. But they ignore the declarations explaining why most gun show purchases cannot be replaced by purchases at ordinary stores—the competitive show environment with multiple sellers in the same venue is missing, and many out-of-production guns at shows are unlikely to be available. Chipley Dec. 23-24. Finally, Defendants rely (at 5) on their own speculation—that it is "entirely possible" total sales remain constant—which is not evidence. Plaintiffs have submitted multiple declarations offering ample empirical evidence to the contrary.

Defendants also argue (at 7) that the second form of injury suffered by Tennessee and New Hampshire—increased costs because state law mandates that they conduct the background checks themselves—is not cognizable because it is "self-inflicted." But if a federal agency action pushes a state to repeal its own laws to avoid injury, the state suffers an injury sufficient for standing. It "affects the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their laws . . . ." *Texas v. United States*, 809 F.3d 135, 153 (5th Cir. 2015), *aff'd by eq. div. ct. sub nom. United States v. Texas*, 136 S. Ct. 2271 (2016).[4] Moreover, "that [the State] sued in response to a significant change in the [] polic[y] shows that its injury is not self-inflicted." *Id.* at 158.

Defendants claim the Private Plaintiffs suffer no injury. They say that Plaintiff Journey, a

---

[4] *See also Tennessee v. Dep't of Educ.*, No. 22-5807, 2024 WL 2984295, at *7 n.11 (6th Cir. June 14, 2024).

2

state court judge, is incorrect in his reading of the Final Rule and that his repeated sales of firearms at multiple gun shows would not be considered "engaged in the business" under the Final Rule. Assertions of counsel means little here. Opposing counsel will not be enforcing the Final Rule or constraining the ATF agents who do so; and ATF has repeatedly shown itself to be overly zealous in finding violations of its regulations, particularly under President Biden's "zero tolerance" regime.[5] Private Plaintiffs have presented evidence that they reasonably fear that ATF will enforce the new restrictions of the Final Rule against them. Defendants have presented no countervailing evidence. When challenging the constitutionality of a regulation as overbroad or vague, a plaintiff must show a "an objectively justified fear of real consequences . . . following from . . . enforcement," *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023), that has an "unnecessary" chilling effect on a constitutional right, *United States v. Jackson*, 390 U.S. 570, 582 (1968). Plaintiffs have undoubtedly done so. Defendants made the same arguments against the standing of an individual gun seller in *Texas*, and the Court rightly rejected them. Ex. 1 at 8-9.

## II.   Plaintiffs Are Likely to Prevail on the Merits

### A.   <u>Defendants Lack Authority to Redefine the Relevant Statutory Terms</u>

Defendants rely exclusively on *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475 (4th Cir. 1990) to support their claim of authority to modify definitions set by Congress. To the extent *Brady* has any relevance, it supports the Plaintiffs' position. Plaintiffs' motion notes that Defendants were expressly granted authority to implement regulations for substantive sections of 18 U.S.C. §§ 922-923. The *Brady* Court noted, "The argument that [ATF] retains statutory discretion to promulgate regulations is bolstered by the *specific grants of rulemaking authority* in a number of areas implicated by this litigation." *Id.* at 479 (emphasis added). The statutory provisions that contained these explicit grants were under 18 U.S.C. § 923, which deals with the *mechanics* of federal firearms licensing. However, the Final Rule has nothing to do with the mechanics of licensing. Rather, it attempts to redefine a substantive term that Congress already defined in § 921. Additionally, the

---

[5] Houston Keene, *Internal ATF Docs Show "Zero Tolerance" Guidelines for Shutting Down Gun Stores*, FOX News, Feb. 10, 2023, *available at* https://tinyurl.com/3cvs7ff9.

statute in § 921(a)(13) expressly gives ATF authority to define the terms "curios or relics," and provisions of §§ 922 and 923 grant specific authority to define terms and issue regulations concerning the mechanics of licensing. These explicit grants to define certain terms demonstrate that Defendants do not have authority to define terms in any other sections, or else those grants of authority would be superfluous—mere surplusage.

### B.   The Final Rule Conflicts with the Terms of Federal Statute

*"Repetitive" sales.* First, in defense of their deviation from the plain meaning of 18 U.S.C. § 921(a)(21)(C), which requires the "repetitive purchase and resale" of firearms, Defendants offer a hollow response. They claim that one firearm is enough under the statute itself. To support this claim, they offer an unexplained "*see*" citation to *United States v. King*, 735 F.3d 1098, 1107 n.8 (9th Cir. 2013). But *King* offers no support. There, the alien defendant purchased 24 firearms with the intention to resell them; and he was in the process of selling them to various buyers when CBP agents uncovered the plot. *Id*. at 1102-03. *King* may stand for the unremarkable proposition that a criminal transaction need not be completed to be prosecuted, but it doesn't support Defendants' claim that one firearm is enough under 18 U.S.C. § 921(a)(21)(C).

*"Personal Protection."* Second, Defendants' changing of the definition of "personal collection" to exclude firearms purchased primarily for personal protection is contrary to law. Defendants respond (at 14) to the fact that their redefinition excludes the overwhelming majority of firearms in the United States by acknowledging that that was precisely their intention. They made this change because they believe the exception is too big and "swallow[s] the rule." But only Congress can change the definition that Congress created, not an agency.

*"Proof of Profit."* Third, Defendants fail to justify for their exclusion of the "proof of profit" requirement. They merely say (at 14) that courts should construe statutes as a harmonious whole. But it would render this clause mere surplusage if proof of profit is never required anyway.

### C.   The Final Rule Violates the Second Amendment

Responding to Plaintiffs' Second Amendment claim, the Defendants do not correctly apply

4

the test laid out by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). They suggest—without any support—that perhaps acquiring a firearm through purchase is not included in the protection of the right to keep and bear arms. Resp. 18.

They also fail the second half of the *Bruen* test: "justify[ing] [their] regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation." *Bruen*, 597 U.S. at 17. "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit . . . ." *United States v. Rahimi*, 602 U.S. __ (2024), slip op. at 7. And even then, the new law must not regulate "beyond what was done at the founding." *Id.* Here, Defendants simply restate the Final Rule's reference to two historical laws that bear no resemblance whatsoever to the Final Rule. The first is a 1794 law making it unlawful "to export from the United States any cannon, muskets, pistols, . . . musket balls, lead, bombs, grenades, [or] gunpowder . . . ."[6] But this concerned the export of arms at a time when the U.S. faced the threat of war with Great Britain. It had nothing to do with regulating or limiting the sale of firearms between U.S. citizens. Indeed, the next section says, "nothing in this act shall be construed to prohibit the removal or transportation of any of the articles aforesaid from one port to another port within the United States . . . ." *Id.* at § 3. They next point to colonial or state laws requiring the inspection of gunpowder magazines. These had nothing to do with the sale of guns between U.S. citizens and everything to do with the prevention of fires in American cities. "Nothing about these fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns." *District of Columbia v. Heller*, 554 U.S. 570, 632 (2008). So, they fail to identify any law in the period when the Second Amendment was ratified that comes close to requiring individual Americans to obtain a license prior to selling firearms to one another.

## CONCLUSION

For these reasons, the Court should grant a TRO and/or a Preliminary Injunction.

---

[6] Act of May 22, 1794, 1 Stat. 369, ch. 33 § 1.

Dated:  June 21, 2024                    Respectfully submitted,


                                         KRIS W. KOBACH
                                         Kansas Attorney General

                                         */s/Erin B. Gaide*
                                         Kris W. Kobach, 17280
                                         Attorney General
                                         Abhishek S. Kambli, 29788
                                         *Deputy Attorney General*
                                         Erin B. Gaide, 29691
                                         *Assistant Attorney General*
                                         Office of the Kansas Attorney General
                                         120 SW 10th Avenue, 2nd Floor
                                         Topeka, Kansas 66612
                                         Telephone: (785) 296-2215
                                         Fax: (785) 296-3131
                                         abhishek.kambli@ag.ks.gov
                                         erin.gaide@ag.ks.gov


                                         *Counsel for Plaintiff State of Kansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
\*Eric H. Wessan
*Solicitor General*
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric. Wessan@ag.iowa.gov


*Counsel for Plaintiff State of Iowa*


AUSTIN KNUDSEN
 Montana Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN, 25622
 *Solicitor General*
\*\*PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov


*Counsel for Plaintiff State of Montana*


STEVE MARSHALL
Alabama Attorney General

*/s/ Edmund G. LaCour, Jr.*
\*Edmund G. LaCour, Jr.
*Solicitor General*
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov


*Counsel for Plaintiff State of Alabama*


TREG R. TAYLOR
Alaska Attorney General

*/s/ Aaron C. Peterson*
\*Aaron C. Peterson
*Senior Assistant Attorney General*
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov


*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

/s/ Stephen Petrany
*Stephen Petrany
Solicitor General
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

Counsel for Plaintiff State of Georgia


RAÚL R. LABRADOR
Idaho Attorney General

/s/ Joshua N. Turner
**Joshua N. Turner
Chief of Constitutional Litigation and Policy
**Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov

Counsel for Plaintiff State of Idaho


TODD ROKITA
Indiana Attorney General

/s/ James A. Barta
*James A. Barta
Solicitor General
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone:  (317) 232-0709
James.Barta@atg.in.gov

Counsel for Plaintiff State of Indiana


RUSSELL COLEMAN
Kentucky Attorney General

/s/ Victor B. Maddox
**Victor B. Maddox
**Aaron J. Silletto
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov

Counsel for Plaintiff Commonwealth of Kentucky

8

ANDREW BAILEY
Missouri Attorney General

*/s/ Bryce Beal*
**Bryce Beal
*Assistant Attorney General*
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov


*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Zachary A. Vigliano*
*Zachary A. Vigliano
*Deputy Solicitor General*
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.vigliano@nebraska.gov


*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

*/s/Brandon F. Chase*
*Brandon F. Chase
*Assistant Attorney General*
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov


*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

*/s/ Katie L. Carpenter*
**Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov


*Counsel for Plaintiff State of North
Dakota*

9

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
**GARRY M. GASKINS, II
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:     (405) 521-3921
garry.gaskins@oag.ok.gov


*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

*/s/ Joseph D. Spate*
**Joseph D. Spate
*Assistant Deputy Solicitor General*
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC  29201
(803) 734-3371
josephspate@scag.gov


*Counsel for Plaintiff State South Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
*Charles D. McGuigan
*Deputy Attorney General*
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us


*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
**WHITNEY D. HERMANDORFER
*Director of Strategic Litigation Unit*
*BRIAN DANIEL MOUNCE
*Counsel for Strategic Litigation &*
*Assistant Solicitor General*
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov


*Counsel for the State of Tennessee*

10

243

JASON S. MIYARES
Attorney General of Virginia

/s/ *Kevin M. Gallagher*
*Kevin M. Gallagher
*Principal Deputy Solicitor General*
*Brendan T. Chestnut
*Deputy Solicitor General*
*M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us

*Counsel for Plaintiff Commonwealth of Virginia*

PATRICK MORRISEY
West Virginia Attorney General

/s/ *Michael R. Williams*
*Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

BRIDGET HILL
Wyoming Attorney General

/s/ Ryan Schelhaas
*Ryan Schelhaas
*Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for Plaintiff State Wyoming*

/s/ *Michael D. McCoy*
*Michael D. McCoy
**William E. Trachman
Mountain States
Legal Foundation
 2596 South Lewis Way
 Lakewood, Colorado 80227
 (303) 292-2021
Mmccoy@mslegal.org

*Counsel for Plaintiffs Allen Black, Donald Maxey,
and Chisholm Trail Antique Gun Association*

11

244

/s/ *Anna St. John*
*Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

/s/ *M. Frank Bednarz*
**M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org


*Counsel for Plaintiff Phillip Journey*

\**pro hac vice*
\*\* *pro hac vice* forthcoming

CERTIFICATE OF SERVICE

This is to certify that on this the 21st day of June, 2024, this motion was electronically filed with the Clerk of the Court by using the CM/ECF system with electronic delivery to all parties.

Respectfully submitted,

*/s/ Erin B. Gaide*
Erin B. Gaide