IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF KANSAS, et al.,

      Plaintiffs-Appellants,

      v.

MERRICK B. GARLAND, in his official
capacity as the United States Attorney
General, et al.,

      Defendants-Appellees.

No. 24-3101

## OPPOSITION TO PLAINTIFFS' MOTION
## FOR INJUNCTION PENDING APPEAL

Plaintiffs challenge a rule issued by the Bureau of Alcohol,
Tobacco, Firearms and Explosives (ATF) that went into effect on May
20, 2024. The district court denied a preliminary injunction, explaining
that plaintiffs had shown only "questionable injuries-in-fact" and that
"even [their] best arguments" do not "suggest any of the Plaintiffs are
'substantially likely to succeed on the merits'" at this stage.
Supplemental Addendum 12 (SA). That conclusion was correct, and
plaintiffs identify no basis for an injunction pending appeal over two
months after the rule went into effect. The motion should be denied.

## BACKGROUND

1.  To restrict the access of criminals and other dangerous individuals to firearms, federal law has long imposed requirements on dealers of firearms, most notably through the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.* (GCA).  *See Huddleston v. United States*, 415 U.S. 814, 825 (1974).  Federal firearms licensees (FFLs) must comply with various obligations when transferring firearms to non-licensees, including submitting information about the transferee to the Federal Bureau of Investigation's National Instant Criminal Background Check System, which then conducts a background check on the transferee and denies transactions where the transferee is prohibited from receiving or possessing the firearm.  18 U.S.C. § 922(t)(1).  FFLs also maintain records of firearms transfers, enabling tracing of firearms recovered from crime scenes.  *Id.* §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-478.134.

Since the GCA's enactment, Congress has required anyone "engage[d] in the business" of dealing firearms to become an FFL.  18 U.S.C. § 922(a)(1)(A).  As most recently amended by the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022)

(BSCA), "engaged in the business" means "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," while excluding anyone "who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."  18 U.S.C. § 921(a)(21)(C). As relevant here, the as-amended version of the GCA defines "to predominantly earn a profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  *Id.* § 921(a)(22).

2.  Even before the BSCA amendments, ATF observed significant noncompliance with the licensing requirements of the GCA.  *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968, 29,086 (Apr. 19, 2024).  After the BSCA amendments, ATF conducted the rulemaking at issue here to "implement" the BSCA's "statutory change" to the definition of engaged in the business and to "provide clarity to persons who remain unsure of whether" they are

engaged in the business of dealing in firearms.  *Id.* at 28,968.

The Rule does not create any new licensing requirements or require anyone to become an FFL of its own force.  Instead, relying on "conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business'" and ATF's enforcement experience, 89 Fed. Reg. at 28,977, the Rule identifies circumstances in which individuals are likely "engaged in the business" or likely have the requisite intent "to predominantly earn a profit," *id.* at 29,091; *see id.* at 28,977 nn.72-73, 28,978 nn.74-77 & 79-80, 28,979 nn.81-83, 28,981-82, 28,981 nn.97-99, 28,982 nn.100-104 (collecting case law and examples of federal prosecutions), as well as circumstances in which individuals likely do not meet the statutory definition, *id.* at 29,092.

For example, a person is likely engaged in the business if he repetitively purchases stolen firearms for the purpose of resale or resells or offers for resale stolen firearms.  89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c)(2)(ii)(A)).  Similarly, a person likely has the requisite intent to earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale.

*Id.* (27 C.F.R. § 478.13(d)(2)(ii)).  By contrast, a person likely does not need a license if they resell or transfer firearms "[o]ccasionally to a licensee or to a family member for lawful purposes."  *Id.* at 29,092 (27 C.F.R. § 478.13(e)(3), (f)).

The Rule provides that the identified circumstances give rise to rebuttable presumptions in civil or administrative (but not criminal) proceedings.  89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(c), (d)(2)).  Within civil and administrative proceedings, the rebuttable presumptions "apply only to shift the burden of production, not the burden of persuasion."  *Id.* at 29,007.  Thus, "the rebuttable presumptions are merely evidentiary tools to assist the trier of fact in determining whether the Government has met its burden of production in a given proceeding."  *Id.* at 29,007-08.  Therefore, "[i]f evidence sufficient to support a presumption is produced in a civil or administrative proceeding, the responding person has the opportunity to produce reliable rebuttal evidence to refute that presumption."  *Id.* at 29,026.  And the Rule explains that the activities set forth in the presumptions, and the examples of rebuttal evidence set out in the Rule, "are not exhaustive of the conduct or evidence that may be

considered." *Id.* at 29,092 (27 C.F.R. § 478.13(g)).

To concretely illustrate the point, if the government produces reliable evidence in an administrative proceeding that a person repetitively purchases stolen firearms for the purpose of resale, that evidence would give rise to a presumption in that proceeding that the person is required to be licensed. The person would then bear the burden to produce reliable evidence showing that their conduct nevertheless does not require a license.

One specific aspect of the Rule is particularly relevant here. As noted, the statutory definition of "engaged in the business" excludes "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" or sales of "all or part of [a] personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). Drawing on dictionary definitions and case law, the Rule defines the term "personal collection" to include "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.,* collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting,

historical re-enactment, or noncommercial firearms safety instruction)."
89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11).  The Rule further explains
that firearms purchased "for the purpose of resale with the
predominant intent to earn a profit" or "accumulated primarily for
personal protection" are excluded from the definition of "personal
collection," though the Rule provides that nothing in it "shall be
construed as precluding a person from lawfully acquiring firearms for
self-protection or other lawful personal use."  *Id.* (27 C.F.R. § 478.11).

3.  A group of 25 plaintiffs—21 States, three individuals, and one
association—filed suit in the Eastern District of Arkansas and sought a
preliminary injunction.  The district court there concluded that
Arkansas lacked standing because its alleged harm from the Rule—
supposed loss of tax revenue—was "too speculative to establish
standing."  A54-55.  Because Arkansas was the only plaintiff with venue
in Arkansas, the court transferred the case to the District of Kansas
without ruling on other issues.  A56.

The Kansas court denied the preliminary injunction motion as to
the remaining 24 plaintiffs.  SA1-15.  The court held that plaintiffs had
not adequately demonstrated standing.  As to the three individual

plaintiffs, Phillip Journey and Allen Black asserted only that they "attend gun shows to sell firearms," remained "uncertain whether they will become licensed," and thus faced no imminent enforcement. SA8. Donald Maxey did not claim to sell firearms, instead asserting only that the Rule "will limit the number of guns in circulation and 'reduce public interest in gun shows,'" a purported injury "even more speculative than that of his peers." SA8. As for the organizational plaintiff, Chisholm Trail Antique Gun Association, it could not establish standing based on a member, as Black lacked standing. SA8. And Chisholm Trail lacked standing in its own right: although it sponsors a biannual gun show, "its theory of injury depends on a layered prediction" about how third parties would react to the Rule, asserting the same purported reduced interest in gun shows that Maxey identified. SA8.

The district court observed that the remaining State plaintiffs faced an "even more difficult" task in establishing standing. SA8. Two States pled no facts at all to support standing, while others rested on a "speculative sales-tax theory" under which they believe that "the Final Rule makes individuals less likely to sell guns, which makes gun show promoters less likely to host shows, which makes putative buyers less

likely to purchase guns, which ultimately reduces a state's sales tax receipts," or alternatively that "taxes imposed on gun show tickets and tables rented at gun shows" will decline.  SA8.  But those theories "depend on a speculative chain with many uncertain links" that could not establish standing.  SA9.

Preliminary relief was particularly inappropriate given the combination of plaintiffs' "questionable injuries-in-fact" and their failure to show that "even [their] best arguments . . . suggest any of the Plaintiffs are 'substantially likely to succeed on the merits'" at this stage.  SA12.  In addition, the Rule has already gone into effect and an injunction would thus "upend the current legal landscape."  SA12.  The court also noted that plaintiffs' request for a nationwide injunction was especially unwarranted because such an injunction would "frustrate nonparty states' interests and fail to show due regard for the other branches of the federal government."  SA14.

## STANDARD OF REVIEW

In considering a motion for injunction pending appeal, this Court "makes the same inquiry as it would when reviewing a district court's grant or denial of a preliminary injunction," considering "whether the

district court abused its discretion and whether the movant has demonstrated a clear and unequivocal right to relief." *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001) (per curiam); *see New Mexico Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017). Plaintiffs must establish that they are "likely to succeed on the merits," are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## DISCUSSION

The district court carefully scrutinized plaintiffs' arguments and concluded that they had failed to "clear[] the high bar imposed between a plaintiff and preliminary injunctive relief" given "serious issues" with plaintiffs' "standing and merits arguments" and the "procedural stage" of the case. SA14. Plaintiffs offer no reason for this Court to displace that judgment in this extraordinary posture.

### A.    Plaintiffs Have Failed to Establish Standing

1. No plaintiff has made the requisite "clear showing" that they are "likely to establish each element of standing." *Murthy v. Missouri*,

144 S. Ct. 1972, 1986 (2024) (quotation omitted).  Only two plaintiffs—

Journey and Black—suggest that the Rule may someday apply to them.

To establish standing, they must show that they face a credible threat

that the Rule will be applied to them in some future civil or

administrative proceeding; mere "subjective fear," *Clapper v. Amnesty*

*Int'l USA*, 568 U.S. 398, 418 (2013), or "wholly speculative" possibilities

of future application, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149,

160 (2014), do not suffice.

Neither plaintiff has stated an intent to engage in conduct that

would require obtaining a license to sell firearms.  Journey and Black

say they are "firearms hobbyist[s] and enthusiast[s]" who each maintain

a large "personal collection of firearms"; attend four or five gun shows

per year; and buy and sell firearms at those shows to "enhance" or

"expand" their collections.  A131, A139, A170-71.  But such conduct

does not require obtaining a license: the occasional sales Journey and

Black describe do not constitute being "engaged in the business"

because neither plaintiff indicates that he "devotes time, attention, and

labor to dealing in firearms as a regular course of trade or business"

and makes such sales with the predominant intent to "earn a profit."

89 Fed. Reg. at 29,091; *see* A132 (disclaiming profit as the "predominant purpose in collecting").  Neither plaintiffs' motion nor their declarations specify how they believe the Rule or its presumptions actually apply to their conduct or why they expect any future civil or administrative enforcement proceeding.  They instead assert in passing that their conduct "can be deemed 'predominantly for a profit,'" without addressing the other components of the statutory definition that would need to be met before a license would be required.  Mot. 6-7.

Moreover, Journey's declaration asserts that he sells firearms to acquire others he finds "particularly interesting in terms of history, design and craftsmanship," A131, and the Rule recognizes that the statute excludes such occasional sales for the enhancement of a "personal collection."  89 Fed. Reg. at 29,090, 29,092.  Both plaintiffs thus fail to establish that their conduct is even arguably covered by the Rule, rendering any fear of future application "speculative."  SA8; *Susan B. Anthony List*, 573 U.S. at 160, 163.  Similarly, Journey and Black's assertions of subjective uncertainty or claims that they would either cease engaging in their conduct or obtain a license do not suffice.  Mot. 8; A133, A172.  Such "subjective fear[s]" and "self-inflicted

injuries" based on "hypothetical future harm that is not certainly impending" cannot ground standing. *Clapper*, 568 U.S. at 416, 418.[1]

2. None of the remaining 22 plaintiffs assert that they will ever or could ever be subject to a civil or administrative proceeding where the Rule might apply. They instead assert various speculative economic theories of injury. At the outset, these theories depend entirely on the actions of third parties, which makes standing "substantially more difficult to establish." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024); *accord Murthy*, 144 S. Ct. at 1986. Plaintiffs cannot "rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper*, 568 U.S. at 414 n.5. Moreover, their showing of causation "must not be too speculative or too attenuated," an inquiry examining both whether the reactions of third parties are "sufficiently predictable" and whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."

---

[1] Plaintiffs' motion does not address Maxey's standing, but his theory of injury—based on a purported decline in interest in gun shows—"is even more speculative than" Journey and Black's. SA8.

13

*Alliance for Hippocratic Med.*, 602 U.S. at 383. And changes in behavior attributable to the BSCA's broadening of the statutory definition are not traceable to the Rule; the injury must flow from some way in which the Rule purportedly differs from the requirements of the statute.

The district court correctly applied those premises here. Chisholm Trail asserts that the Rule will reduce the revenue the organization derives from its biannual gun shows "by decreasing the number of attendees that sell firearms at these shows as those who are not [FFLs] will not be able to sell their firearms," leading to "a decrease in overall attendance at these gun shows, as fewer firearms for sale will decrease the options available and reduce public interest in these events." A143. Those sorts of guesses about how prospective gun show attendees will choose to spend their time and money—and whether and to what extent those decisions are influenced by the Rule as opposed to other factors— are precisely the sort of "layered prediction" that cannot suffice for standing. SA8. Chisholm Trail's theory is particularly questionable because it starts from the erroneous premise that the Rule forbids sales by unlicensed individuals at gun shows. Nothing precludes such sales,

so long as the sales activity does not rise to the level of being "engaged in the business" of dealing firearms.  And even assuming that some third parties might not attend a gun show based on inaccurate subjective concerns about the Rule (like Journey and Black), those "third parties' subjective fear" cannot confer standing.  *Clapper*, 568 U.S. at 417 n.7.

3.  The States face all these difficulties and more.  Two States—West Virginia and Montana—pled no harms at all, and plaintiffs' motion does not address their standing.  SA8.  The remaining States offer only speculative and attenuated theories of possible harm to state tax revenue.  Their motion does not attempt to articulate those theories with precision or even articulate to which States they apply, suggesting broadly that "[m]any Plaintiff States tax tables at gun shows, sales of firearms, or income made from selling firearms."  Mot. 10.[2]  The theory appears to have two strands.  Some States suggest that the Rule will

---

[2] Plaintiffs' complaint reveals substantial differences among States: some tax all firearms sales; some tax only sales or other activities at gun shows; others tax many sales but exempt "occasional sales."  A19-23.  Such variation only underscores the speculation involved in ascertaining the effects the Rule would have on any State's revenue.

make individuals less likely to sell guns, leading to fewer overall firearms sales, thus reducing the sales tax collected on private sales of firearms.  SA8; A19-23.  Others simply add a further step to Chisholm Trail's theory, suggesting that they stand to lose tax revenue from decreased attendance at gun shows, where some States impose taxes on firearms sales, tables rented, or tickets sold.  SA8; A19-23.

These alleged injuries are too speculative and attenuated to confer standing.  The Supreme Court long ago explained that a state may sue the federal government only if it has suffered a "direct injury" from federal action, rejecting a theory of standing based on a federal policy's "remote and indirect" effects on a state's property tax base, *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927), and recently reiterated that because "federal policies frequently generate indirect effects on state revenues or state spending," a "State's claim for standing" when asserting such indirect effects "can become more attenuated," *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).

The States' view has no limit: because virtually everything the federal government does (or does not do) may have some downstream effect on state tax revenue, states would have standing to sue over

virtually every federal policy.  Nor would such theories be cabined to states: hotels or restaurants near a gun show would have the same downstream claim to standing.  *See Alliance for Hippocratic Med.*, 602 U.S. at 391-92 (rejecting similar theories).  This Court has thus recognized that "impairment of state tax revenues should not, in general, be recognized as sufficient injury-in-fact to support state standing" given "the unavoidable economic repercussions of virtually all federal policies."  *Wyoming v. U.S. Dep't of Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012); *see Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022).

Plaintiffs' theories of injury are also highly speculative.  To begin, even if the Rule marginally reduces the number of firearms sellers, that does not mean that the number of taxable firearms sales will decline: prospective buyers are just as likely to simply go to another source— including an FFL—to obtain a firearm, which would result in the same number of taxable sales.  *See* 89 Fed. Reg. at 29,066 ("[T]he overall number of firearm transactions [is] unlikely to be significantly affected [by the Rule].").

Plaintiffs' limited efforts to demonstrate lost revenue from gun shows similarly highlight the speculative nature of their claims and

their reliance on independent decisions by third parties.  Aside from

Chisholm Trail, plaintiffs point only (Mot. 14) to a declaration from a

gun show promoter who asserts that he cancelled a gun show, but that

cancellation is attributed in part to "concerns with the facility."  A115.

Moreover, vendors who decide not to attend a gun show could be

replaced by FFLs or other vendors unaffected by the Rule, and nothing

mandates that those new vendors would sell fewer firearms or that gun

show attendance would inevitably decline.  And even assuming that

*some* gun-show-related tax revenues might decline, there is every

reason to think that people who decide not to attend a gun show will

instead spend their discretionary income on other taxable goods and

services.  Any overall loss of tax revenues thus remains speculative,

further underscoring why courts have generally rejected standing based

on the incidental revenue effects of a federal policy.  *Wyoming*, 674 F.3d

at 1234.

Finally, Tennessee and New Hampshire claim injury based on

increased administrative costs.  Specifically, while FFLs generally

contact the federal government to process background checks, states

may voluntarily serve as the "Point of Contact" for those checks, 28

C.F.R. § 25.2; *see id.* § 25.6(a) (process for initiating background checks), as these States have.  They assert that because more individuals will become FFLs required to conduct background checks for each sale, they will have to expend more resources processing background checks.  A23-26.  But any such injury is a "self-inflicted" one stemming from the States' "legislative decision" to conduct background checks the federal government would otherwise perform at no cost to those States. *Colorado v. U.S. EPA*, 989 F.3d 874, 888 (10th Cir. 2021); SA9 n.3.

## B.    Plaintiffs Have Not Shown Likelihood of Success on the Merits

Given plaintiffs' failure to adequately demonstrate standing, "it is not necessary to go further."  SA9.  But plaintiffs' merits arguments do not warrant preliminary relief.

1.  Plaintiffs first contend that ATF lacked authority to promulgate the Rule.  Mot. 13.  18 U.S.C. § 926(a) provides for the promulgation of "only such rules and regulations as are necessary to carry out the provisions" of the GCA.  That express grant of rulemaking authority "almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'"  *NRA v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) (upholding ATF regulation defining GCA

terms); SA11.  The Rule explains that it was necessary to implement the BSCA amendments, provide "clarity" regarding when a federal firearms license was required, and "deter[]" unlawful unlicensed dealing, 88 Fed. Reg. 61,993, 61,996 (Sept. 8, 2023), given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," 89 Fed. Reg. at 29,086.  Greater compliance with the statute, in turn, "improve[s] public safety" by keeping firearms out of the hands of dangerous individuals and aiding tracing of firearms involved in crime.  *Id.* at 28,986.

Plaintiffs also observe that "Section 921(a)[(13)] specifically grants ATF rulemaking authority to define the term 'curios and relics,'" inferring that ATF must therefore lack authority to provide other definitions.  Mot. 13.  But that provision states that ATF "shall"—in other words, must—define "curios or relics."  18 U.S.C. § 921(a)(13).  That ATF is required to define one term does not eliminate the authority ATF otherwise has to issue rules.

2.  Plaintiffs observe that the GCA excludes from the licensing requirement "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for

a hobby, or who sells all or part of his personal collection of firearms."
18 U.S.C. § 921(a)(21)(C); Mot. 14.  The Rule explains that not everyone
who owns firearms has a "personal collection" of firearms, just as not
everyone who owns cars has a "personal collection" of automobiles.
Instead, the Rule explains that a "[p]ersonal collection" refers to
"[p]ersonal firearms that a person accumulates for study, comparison,
exhibition … or for a hobby."  89 Fed. Reg. at 29,090 (27 C.F.R.
§ 478.11).  That follows from dictionary definitions of "collection," *id.* at
29,038 & n.216, and corresponds to other parts of the GCA.  A
"collector" is a "person who acquires, holds, or disposes of firearms as
curios or relics," 18 U.S.C. § 921(a)(13), and "[c]urios or relics" are
"[f]irearms which are of special interest to collectors by reason of some
quality other than is associated with firearms intended . . . as offensive
or defensive weapons," 27 C.F.R. § 478.11.  Courts have understood
"personal collection" similarly.  *See United States v. Tyson*, 653 F.3d
192, 202 (3d Cir. 2011); *United States v. Idarecis*, 164 F.3d 620 (table),
1998 WL 716568, at *3-4 (2d Cir. Oct. 9, 1998).  The Rule thus
recognizes that firearms acquired chiefly for self-defense rather than as
collector's items are not part of a "personal collection" under the statute.

And despite plaintiffs' rhetoric, recognizing the limits of the "personal collection" exception does not prevent unlicensed sales of self-defense firearms; such sales are permissible so long as the seller's conduct does not rise to the level of being "engaged in the business."

Plaintiffs argue that the Rule incorrectly views the licensing requirement as attaching based on the sale of, or an attempt to sell, a single firearm. Mot. 15. That misunderstands both the statute and the Rule's explanation of it. A person is engaged in the business if they "devote[] time, attention, and labor" to dealing in firearms "to predominantly earn a profit through the repetitive purchase and resale of firearms," 18 U.S.C. § 921(a)(21)(C), and "to predominantly earn a profit means that the *intent underlying* the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," *id.* § 921(a)(22) (emphasis added). The relevant question is thus whether a person has devoted effort as a regular course of trade or business to firearms transactions with the predominant purpose of profiting from repeated sales, not how many firearms they have sold. This Court and others have accordingly recognized that while a single sale or offer to sell standing alone does not mean that a person is "engaged in the

business," other evidence may demonstrate that the sale or offer is part of a course of conduct that constitutes engagement in the business. *See United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975); *United States v. King*, 735 F.3d 1098, 1107 & n.8 (9th Cir. 2013); *United States v. Nadirashvili*, 655 F.3d 114, 120 (2d Cir. 2011).

3.   Other arguments rest on fundamental misunderstandings of the Rule.  Plaintiffs suggest that parties face criminal penalties because of the Rule and must otherwise "conform their conduct" to the presumptions in the Rule.  Mot. 17.  Parties are required to conform to the *statute*.  The Rule simply identifies situations—drawn from case law plaintiffs do not address and ATF's enforcement experience—when individuals are likely to be engaged in the business or to have the requisite intent under the statute.  No one will or could be criminally prosecuted—or face civil or administrative enforcement—for "violating" the presumptions, because those presumptions do not set forth any requirements governing behavior and do not apply in criminal proceedings.

Plaintiffs' suggestion that the Rule is arbitrary and capricious because it recognizes that whether a person is engaged in the business

is a fact-specific determination (Mot. 16) is difficult to fathom.

Plaintiffs do not dispute that the determination is ultimately fact-specific, and they largely do not dispute that the circumstances ATF has identified are highly probative of whether a person is engaged in the business or has the requisite intent. Nor do they apparently disagree that a factfinder in a civil or administrative proceeding should consider countervailing evidence, as the Rule contemplates.

Plaintiffs' vagueness argument (Mot. 17-18) contains only one concrete claim: that the term "primarily for personal protection" is vague because the Rule does not provide further definition of such a weapon. Mot. 18. But the Rule, like the statute it implements, is clear: if the primary purpose for accumulating the firearm is "study, comparison, exhibition … or for a hobby," 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11), then it is part of a personal collection, *see supra* pp. 20-22, but a firearm acquired primarily for personal protection is not part of such a collection. Any lingering uncertainty does not amount to a constitutional vagueness issue. *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1180 (10th Cir. 2009).

Plaintiffs' briefly sketched Second Amendment arguments are mistaken. The Second Amendment protects a right to "keep and bear Arms," U.S. Const. amend. II, but it does not prohibit "laws imposing conditions and qualifications on the commercial sale of arms," which are "presumptively lawful," *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 627 n.26 (2008). The Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), "did nothing to disturb th[e] part of *Heller*" finding that regulations of commercial firearms sales are presumptively lawful. *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024). To the contrary, *Bruen* approved of "'shall-issue' licensing regimes," in which the right to carry weapons is conditioned on passing a "background check" and obtaining a license. *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring). If it is permissible to require a license to *bear* arms, a right listed in the Second Amendment, there is no reason that it would violate the Second Amendment to require a license to *deal* firearms, an activity not mentioned in the amendment's text. *See McRorey*, 99 F.4th at 835-37; *see also* 89 Fed. Reg. at 29,002 (citing cases).

In any event, the statutory licensing requirements implemented by the Rule are "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). As ATF explained, "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." 89 Fed. Reg. at 29,002; *see id.* at 29,002-03 (collecting examples).

## C.    The Other Factors Weigh Against an Injunction

The other injunctive factors likewise do not support an injunction pending appeal. Plaintiffs' claims of irreparable harm largely overlap with their claims to standing, with the States asserting lost tax revenue or administrative costs and some individual plaintiffs erroneously asserting "potential civil and criminal enforcement actions for selling even a single firearm." Mot. 19-20. Plaintiffs' claims of potential lost constitutional rights (Mot. 19) are similarly meritless, as discussed above. And plaintiffs do not attempt to demonstrate irreparable harm as to some plaintiffs, such as Chisholm Trail.

Plaintiffs have thus failed to show that an injunction pending appeal would address irreparable harm. And even if they had,

regulating "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime," *United States v. Biswell*, 406 U.S. 311, 315 (1972), and the Rule here helps to promote compliance with the licensing requirements of the GCA (as amended by the BSCA). Granting preliminary relief would undercut these efforts, and the balance tips decidedly against granting an injunction pending appeal.

Finally, if the Court were inclined to grant relief, any injunction should be limited to the parties the Court concludes have established standing. As noted, some plaintiffs have not tried to establish standing, and the others articulate different theories. And while plaintiffs' motion does not request a nationwide injunction, the district court correctly recognized that such relief would be inappropriate here. SA13-14; *see, e.g.*, *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 922-24 (2024) (Gorsuch, J., concurring in grant of stay); *id.* at 931-32 (Kavanaugh, J., concurring in grant of stay).

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MICHAEL S. RAAB

*/s/ Brad Hinshelwood*
BRAD HINSHELWOOD
KEVIN KENNEDY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  (202) 514-7823

August 8, 2024

## CERTIFICATE OF COMPLIANCE

I certify that this response complies with Federal Rule of Appellate Procedure 27(d)(2)(a) as it contains 5,199 words, excluding those portions exempted by Rule 32(f). I certify that the response complies with Federal Rule of Appellate Procedure 27(d)(1)(E) as it is prepared in 14-point Century Schoolbook, a proportionally spaced typeface. I further certify that:

(1) All required privacy redactions have been made;

(2) Any required paper copies to be submitted to the court are exact copies of the version submitted electronically; and

(3) This submission was scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Brad Hinshelwood*
BRAD HINSHELWOOD